KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900
Richard M. Cieri (RC 6062)
Matthew A. Cantor (MC 7727)
Edward O. Sassower (ES 5823)
Stephen E. Hessler (*Admitted Pro Hac Vice*)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

**DEBTORS' RESPONSE TO FIRST LIEN TRUSTEE'S OBJECTION TO**
**DEBTORS' MOTION FOR ORDER AUTHORIZING**
**REPAYMENT OF PRINCIPAL OF FIRST LIEN DEBT**

The Debtors have filed a motion seeking to repay up to the entire amount of outstanding

principal of their First Lien Debt ($646.11 million), with all parties in interest reserving all rights

to assert any valid claims or defenses in connection with the First Lien Noteholders' Makewhole

Premium Demand, and to do so at an appropriate later stage of these Reorganization Cases (*e.g*.,

in the context of the plan confirmation or claims reconciliation processes).[1]  In response, the First

Lien Trustee has objected to the Debtors' Repayment Motion on the ground that the Debtors

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Debtor's
      Motion For Order Authorizing Repayment of Principal of First Lien Debt, entered on April 19, 2006 [Docket
      No. 1280] (the "Repayment Motion").

cannot repay the First Lien Debt unless and until the Court adjudicates the First Lien Noteholders' Makewhole Premium Demand.[2]

The Debtors' Repayment Motion explained in detail the harm they are presently suffering and will continue to suffer if they are not permitted to repay First Lien Debt principal:  further losses of approximately $1.96 million per month due to the interest rate disparities between the First Lien Debt and the Debtors' various capital sources and obligations, as well as further losses of approximately $350,000 per month to support the First Lien Trustee's professional fees. Repayment Motion ¶¶ 2, 17-20, 30.  The First Lien Trustee's Objection, on the other hand, makes no serious attempt to explain how the First Lien Noteholders would suffer any prejudice by this Court's granting the Debtors' Repayment Motion.[3]

Similarly, the Debtors' Repayment Motion set forth at length their reasons for seeking to postpone resolution of the First Lien Noteholders' Makewhole Premium Demand; most significantly, extended litigation on this issue at the present time would be a disruptive distraction to the critical early stages of the Debtors' Reorganization Cases.  Indeed, as explained further below, the First Lien Trustee's conduct actually proves the Debtors' point about the inevitability of vexatious and burdensome proceedings if the First Lien Trustee is allowed to pursue its Makewhole Premium Demand right now—the First Lien Trustee has recently filed, served, or delivered, in addition to its thirty-three page Objection:

---

[2]    Objection of Law Debenture Trust Company of New York, Solely in Its Capacity as First Lien Trustee, to the Debtors' Motion For Order Authorizing Repayment of Principal of First Lien Debt, entered on May 5, 2006 [Docket No. 1485] (the "Objection").

[3]    The First Lien Trustee's entire argument on this point is to state, without any explanation or substantiation, that "with the passage of time and in particular, with the confirmation of a plan of reorganization, the First Lien Trustee's ability to appeal a determination as to the Make Whole Premium may be impaired."  Objection ¶ 66.

- an adversary proceeding seeking to require the Debtors to litigate the Makewhole Premium Demand immediately;

- extraordinarily broad discovery requests, seeking production of 22 categories of documents and 10 depositions of the Debtors' and Committee's counsel and financial advisers;

- an estimate that resolving its claims will take at least two years and cost the Debtors upwards of $10 million in legal fees; and

- a letter purporting to rescind the chapter 11 filing-induced acceleration of the First Lien Debt, possibly in violation of the automatic stay.

Consistent with the Debtors' position that the First Lien Noteholders' Makewhole Premium Demand should be decided at a later date, the Debtors decline to respond here to the lengthy merits-based arguments in the First Lien Trustee's Objection.[4] That said, the many misstatements contained in the Objection cannot be allowed to stand unanswered. To that end, this Response is limited to clarifying the material issues before this Court.

## I.    The First Lien Trustee's Objection Is Demonstrably Misleading.

To be clear, a central element of the Debtors' Repayment Motion is that all parties in interest reserve all rights to advance any valid claims or defenses related to the First Lien Noteholders' Makewhole Premium Demand. Notwithstanding the objective fairness of such a proposal, the First Lien Trustee's Objection apparently is seeking some sort of litigation advantage by distorting the record to date.

***First***, the First Lien Trustee alleges the ongoing harm to the Debtors of paying the First Lien Debt interest rates cannot be too severe, given that the Debtors "waited <u>four months</u> before

---

[4]    The First Lien Trustee finds it "striking" that the Debtors have not yet briefed the legality of the First Lien Noteholders' Makewhole Premium Demand. Objection ¶ 67. To the contrary, although the Debtors have consistently and repeatedly maintained they "disagree their proposed repayment triggers any such makewhole obligation," Repayment Motion ¶¶ 1, 13-16, 25, they will vigorously argue their position at the appropriate time.

filing and seeking determination" of their Repayment Motion.   Objection ¶ 5 (emphasis in original).  This is a brazen claim, to say the least.  As the First Lien Trustee is well aware, the four-month "delay" in asking this Court for approval to repay First Lien Debt principal was due entirely to the actions of the First Lien Trustee.  The Debtors originally stated in their ***first-day*** Interim DIP Motion their intent to "seek authority to apply the [] Asset Sale Proceeds to repay $400.0 million in principal of the Calpine First Lien Debt . . . ."   Repayment Motion ¶ 13 (quoting Interim DIP Motion ¶ 155(e)).  The First Lien Trustee responded by filing an objection on January 19, 2006, which resulted in a settlement in the Final Cash Collateral Order whereby the parties would negotiate until March 1st, and ***only after this date*** could either side file a motion with this Court.  Id. ¶¶ 14-15.  Furthermore, ***at the First Lien Trustee's request***, this negotiation period subsequently was extended to April 1st.   During this period there were multiple fulsome communications between and among the Debtors and their various constituencies—all in an attempt to resolve the First Lien Noteholders' Makewhole Premium Demand.  Bottom line:  the First Lien Trustee cannot cause a four-month delay in the Debtors seeking authorization to repay First Lien Debt principal and then cite that very same four-month delay as evidence the Debtors' losses are not really as bad or the situation not quite as urgent as the Debtors claim.

***Second***, and further to that point, the First Lien Trustee's assertions that the Debtors did not engage in good-faith negotiations before filing their Repayment Motion is preposterous. Objection at 14 n.3.  As an initial matter, the Debtors and the First Lien Trustee met and conferred, in person and telephonically, multiple times.  But the allegation is even more egregious considering the Debtors filed their Repayment Motion on April 19th because ***the First Lien Trustee informed the Debtors it refused even to respond to the Debtors' latest written***

4

*settlement offer*.  To accuse the Debtors of failing to engage in good-faith negotiations is simply beyond the pale.

*Third*, the Debtors' Repayment Motion averred that "contesting the Makewhole Premium Demand right now inevitably will initiate a protracted and expensive battle among the Debtors and their various creditor constituencies."    Id. ¶ 26.    The First Lien Trustee's Objection disagreed, arguing "no discovery should be necessary" to resolve their Makewhole Premium Demand.  Id. ¶ 63; see also ¶ 5 (again stating this issue can be decided "without the need for pre-trial discovery").  But this is difficult to reconcile with the fact that *the First Lien Trustee has already sought extensive and wide-ranging discovery on this issue*.  More specifically, the First Lien Trustee recently served on the Debtors and the Committee over 60 pages of discovery demands, including *22 categories of document requests* and *10 deposition notices* for the Debtors' and Committee's counsel and financial advisers.[5]

Moreover, the First Lien Trustee's assertion in its Objection that the Makewhole Premium Demand can be litigated cheaply and quickly is flatly contradicted by the First Lien Trustee's prior communications to the Debtors.  More specifically, the First Lien Trustee previously told the Debtors that ultimately receiving a final ruling from the Second Circuit (or even the U.S. Supreme Court) on the Makewhole Premium Demand could take *up to two years*.  According to the First Lien Trustee, litigating the issue would mean challenging several legal and factual issues, and thus *extensive deposition and document discovery* would be needed and would be time consuming for the Debtors' management and counsel.  The First Lien Trustee even informed the Debtors they could expect to incur well *over $10 million in legal fees* to

---

[5]    The First Lien Trustee withdrew its discovery requests after the Debtors indicated their intention to object formally to the tactic.

5

resolve the dispute.    In sum, the First Lien Trustee's initial litigation analysis departs

substantially from the Objection's revised estimate.

Again, the Debtors seek to defer resolution of the First Lien Noteholders' Makewhole

Premium Demand until later in the case precisely because:   (a) engaging in potentially

unnecessary—and thus premature—litigation only months into these Reorganization Cases is

detrimental to the Debtors' restructuring efforts; and (b) "Chapter 11 is a powerful tool to resolve

financial problems and offers unique opportunities to negotiate outstanding disputes."   In re

Chadwick Bay Hotel Assocs. Ltd. P'ship, 180 B.R. 47, 49 (Bankr. W.D.N.Y. 1995) (citations

omitted).[6]   The First Lien Trustee's Objection aptly reinforces the Debtors' position on both

fronts.[7]

---

[6]    The First Lien Trustee erroneously claims the Debtors' Repayment Motion actually constitutes a request for injunctive relief.   The Debtors are seeking to defer litigation of the Makewhole Premium Demand until the appropriate stage of these Reorganization Cases, not to enjoin the parties in interest from ever being able to resolve the issue.   Indeed, Bankruptcy Courts routinely postpone contested issues involving chapter 11 debtors until such time as they may be waged without derailing the restructuring process.   But even if the Debtors were seeking a stay, the First Lien Trustee's assertion that "the Debtors make no showing of irreparable harm," Objection ¶ 61, is both inaccurate and inapposite, "[s]ince injunctions in bankruptcy cases are authorized by statute, [thus] the usual equitable grounds, such as irreparable damage, need not be shown."   In re Neuman, 71 B.R. 567, 571 (S.D.N.Y. 1987).

[7]    Unsurprisingly, in light of the above, the Debtors reiterate their reservation of all rights to object to the fees sought by the First Lien Trustee and its counsel and advisers, especially those incurred in connection with filing the Objection and adversary proceeding in response to the Debtors' Repayment Motion.   The Final Cash Collateral Order provides that "[t]he Debtors shall pay all **reasonable** fees . . . of counsel for and the financial adviser to the First Lien Trustee . . . ."   Id. ¶ 15(c) (emphasis added).   Even before the First Lien Trustee filed its Objection, the Debtors stated their "position is any fees or charges asserted in connection with the First Lien Trustee's opposition to the repayment of the First Lien Debt are, by definition, unreasonable," and thus the Debtors "consider[] any such objection to be an unnecessary, unreasonable, and vexatious multiplication of the proceedings in [these] Reorganization Cases."   5/4/06 Letter from M. Cantor to S. Levine.

Furthermore, in a meeting on March 16th the Debtors requested a copy of the First Lien Trustee's engagement letter with its financial advisers, Jefferies & Co.   Almost **two full months** later, the First Lien Trustee provided the Debtors with a copy of this agreement—with the terms of Jefferies' success fee redacted.   This information is directly relevant to the issue of the Makewhole Premium Demand, as the Debtors have reason to believe this success fees is based on the outcome of this dispute.   Accordingly, the Debtors respectfully request that this Court order the First Lien Trustee to deliver to the Debtors an unredacted copy of the First Lien Trustee's engagement letter with Jefferies.

**II.**     **This Court Has Ample Authority To Grant The Debtors' Motion.**

Rather curiously, the First Lien Trustee places great stock on the point that the Debtors

"***merely*** cite to this Court's equitable powers under section 105(a) and 363(b) of the Bankruptcy

Code" in seeking the Court's authorization for their proposed repayment.   Objection ¶ 35

(emphasis added); <u>see</u> <u>also</u> ¶ 32 (noting the Debtors "rely ***only*** upon this Court's general

equitable powers under 105(a) and 363(b) of the Bankruptcy Code.") (emphasis added).   But the

plain text of the Bankruptcy Code reflects Congress's express directive that under section 105(a)

the Bankruptcy Court is empowered to "issue ***any order***, process or judgment that is necessary or

appropriate to carry out the provisions of this title" and under section 363(b) a debtor in

possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate."  (emphasis added).

And notwithstanding the First Lien Trustee's restrictive interpretation of this Court's

authority under these provisions, the Second Circuit has endorsed quite the opposite view.  <u>See</u>,

<u>e.g.</u>, <u>In re Baldwin-United Corp. Litig.</u>, 765 F.2d 343, 348 (2d Cir. 1985) (emphasizing the

Bankruptcy Court has "***broad***[]" authority under section 105(a) to "use its ***equitable powers*** to

***assure the orderly conduct*** of the reorganization proceedings." (emphasis added); <u>In re Lionel</u>

<u>Corp.</u>, 722 F.2d 1063, 1069 (2d Cir. 1983) (reiterating the "various policy considerations"

underlying section 363(b) include "the notion that a bankruptcy judge must not be shackled with

unnecessarily rigid rules when exercising the ***undoubtedly broad*** administrative power granted

him under the Code") (emphasis added).  Put simply, sections 105(a) and 363(b) vest this Court

with ample authority to grant the Debtors' Repayment Motion.

Finally, contrary to the First Lien Trustee's assertion that chapter 11 debtors are never

permitted to pay down secured debt outside of a reorganization plan and without the consent of

secured creditors, doing so is far from unprecedented.  "In order for the debtor to use, sell, or

lease cash collateral, the debtor needs to have *either* the consent of all creditors with an interest in the cash collateral *or* court authorization after notice and a hearing." In re Wabash Valley Power Assoc., Inc., 167 B.R. 885, 889 (S.D. Ind. 1994) (citing 11 U.S.C. § 363(c)(2)) (emphasis in original) (holding "pursuant to §§ 105 and 363, the Bankruptcy Court correctly granted [the debtor's] motion" having "determined that the relief requested would benefit [the debtor] by lowering its debt service obligations."). In addition, the First Lien Trustee is further mistaken that the Bankruptcy Court's equitable powers are insufficient to alter a secured creditor's contractual rights. See id. at 888-89 (noting that "bankruptcy courts have the authority in § 105 to preclude a creditor from exercising a contract right"; indeed, "[i]t is perfectly acceptable for a bankruptcy court to take such an action, so long as it furthers the purposes of a substantive provision of the Bankruptcy Code," and "[t]he underlying policy of § 363 is the protection of a debtor.").

## Conclusion

For the foregoing reasons, the Debtors again respectfully request this Court authorize the Debtors to repay immediately up to $646.11 million of principal of their First Lien Debt and permit all parties in interest to reserve all rights to litigate the disputed Makewhole Premium Demand—if necessary—at a more suitable stage of these Reorganization Cases.

Respectfully submitted,

Dated:    May 9, 2006
          New York, New York

 /s/ Matthew A. Cantor
Richard M. Cieri (RC 6062)
Matthew A. Cantor (MC-7727)
Edward O. Sassower (ES 5823)
Stephen E. Hessler (*Admitted Pro Hac Vice)*
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Counsel for the Debtors