**CHADBOURNE & PARKE LLP**
30 Rockefeller Plaza
New York, New York  10112
tel:  (212) 408-5100
fax: (212) 408-5369
N. Theodore Zink, Jr. (TZ 8980)
Andrew Rosenblatt (AR 9904)
Christy Rivera (CR 8895)
*Attorneys for Beal Bank Nevada*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Calpine Corporation, *et al*., | : | Case No. 05-60200 (BRL) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------x

### OBJECTION OF BEAL BANK NEVADA TO DEBTORS' MOTION FOR ORDER (I) AUTHORIZING DEBTORS TO OBTAIN REPLACEMENT POSTPETITION FINANCING AND (B) REPAY PREPETITION DEBT; (II) ALLOWING DEBTORS' LIMITED OBJECTION TO CLAIMS; AND (III) DETERMINING VALUE OF SECURED CLAIMS

Beal Bank Nevada ("Beal"), formerly known as Beal Savings Bank (by name change) and one of the secured lenders under the First Lien Notes (as defined herein), by its counsel, Chadbourne & Parke LLP, hereby submits this objection (the "Objection") to the motion (the "DIP Motion")[1] of the above-captioned debtors (together, the "Debtors") seeking entry of an order (I) authorizing the Debtors to obtain replacement postpetition financing for the purposes of allowing the Debtors (A) to refinance their existing postpetition financing and (B) to repay certain prepetition debt; (II) allowing the Debtors' limited objection to certain claims; and

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

(III) determining the value of certain secured claims pursuant to Bankruptcy Rule 3012. In opposition to the DIP Motion, Beal respectfully represents as follows:

**PRELIMINARY STATEMENT**

By the DIP Motion, the Debtors seek to repay the First Lien Notes, purportedly in full satisfaction of the claims evidenced by such notes, but without default interest and without compensation for the Debtors' acknowledged breach of the First Lien Note's no-call provision.

Surprisingly, the Debtors fail to address post-default interest in the DIP Motion, much less advance any argument in support of the disallowance of such interest. The Debtors' proposal as to claim amounts under the First Lien Notes, which excludes default interest from such amounts, is inconsistent with the terms of the operative credit documents and is unsupportable as a matter of law. The Debtors have failed to provide any legal basis why this Court should disregard the Credit Agreement's default interest provisions, and they certainly have made no showing that payment of default interest would be inequitable. To the contrary, the 2% default interest rate spread is consistent with other similar commercial loans and has been deemed reasonable in countless other cases.

The Debtors' proposed breach of the Credit Agreement's "no-call" or "lock-out" provision without compensation is unsupportable under prevailing law and should not be permitted without adequate compensation to noteholders. As more fully discussed herein, section 2.10 of the Credit Agreement, when read as a whole, contemplates no situation where prepayment of the First Lien Notes is permitted (prior to April 1, 2008) without payment of a make-whole premium.

## BACKGROUND

1. Beal is one of the secured lenders in connection with the $600,000,000 First Priority Secured Institutional Term Loans Due 2009 (the "Term Notes"), which were issued by Calpine Generating Company, LLC ("CalGen") pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004 among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger and sole bookrunner, and the various lenders named therein (the "Credit Agreement"). Beal is also the holder of First Priority Secured Floating Rate Notes Due 2009 (the "Floating Rate Notes" and, together with the Term Notes, the "First Lien Notes"), issued by CalGen pursuant to that certain first priority indenture (the "First Priority Indenture"), dated as of March 23, 2004.[2]

2. The First Lien Notes are secured by, among other things, all of the capital stock of CalGen, all of the capital stock of CalGen Expansion Company, all assets and properties of CalGen and each of the guarantors under the Credit Agreement.

3. Beal is owed not less than $260 million under the First Lien Notes.

## OBJECTION

4. By the DIP Motion, the Debtors seek to refinance the existing DIP Facility and to use the proceeds thereof to, *inter alia*, prepay, purportedly in full, all amounts owed under the First Lien Notes. In conjunction therewith, the Debtors object to the CalGen Claims,

---

[2] The First Priority Indenture and the Credit Agreement contain similar provisions with respect to default interest and the Make-Whole Premium (as defined below). For the sake of brevity, Beal analyzes its rights and entitlements to default interest and the Make-Whole Premium only with respect to the Credit Agreement. The same legal analysis set forth herein with respect to Beal's rights under the Credit Agreement applies equally to Beal's rights with respect to default interest and the Make-Whole Premium under the First Priority Indenture.

3

including claims evidence by the First Lien Notes, to the extent they seek anything beyond the amount of outstanding principal, plus interest at the non-default contract rate through the date of repayment. Beal does not object to the Debtors' plan to refinance the DIP Facility. Beal does, however, object to the DIP Motion to the extent that CalGen seeks authority to repay the holders of the First Lien Notes without paying default interest and a Make-Whole Premium (as defined below), both which are required to be paid under the Credit Agreement.

### A. Beal is Entitled to Receive Default Interest on the Principal Amount of First Lien Notes Held by It

5. By the DIP Motion, the Debtors seek to repay the First Lien Noteholders, purportedly in full, without paying default interest as required under section 2.07 of the Credit Agreement. Incredibly, the Debtors fail to include any discussion regarding default interest, much less provide any legal or equitable basis upon which this Court should disregard the clear and unambiguous provisions of the Credit Agreement, which provide for such interest.

6. Section 2.07 of the Credit Agreement requires the payment of default interest to Beal upon CalGen's default:

> Notwithstanding anything to the contrary herein, upon the occurrence and during the continuation of any Event of Default, the outstanding principal amount of all First Priority Term Loans and, to the extent permitted by applicable Legal Requirements, any accrued but unpaid interest payments thereon and any accrued but unpaid fees and other amounts hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under applicable Bankruptcy Laws) payable upon demand at a rate that is (a) 2% per annum in excess of the interest rate then otherwise payable under this Agreement with respect to the applicable First Priority Term Loans or (b) in the case of any such fees and other

amounts, at a rate that is 2% per annum in excess of the interest rate then otherwise payable under this Agreement for Base Rate Loans ....[3]

7. As the Debtors have conceded, the commencement of the chapter 11 cases triggered an event of default under section 7.01 of the Credit Agreement.[4] See DIP Motion at p. 33 ("Put simply, the Debtors' commencement of their Chapter 11 Cases constituted an Event of Default...").

8. There is no question that, under the express terms of the Credit Agreement, default rate interest is accruing and owed to the First Lien Noteholders on outstanding principal, as evidenced by the First Lien Notes.

9. Claims for post-petition interest are determined under section 506(b) of the Bankruptcy Code. Section 506(b) provides:

> To the extent an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claims arose.

11 U.S.C. § 506(b).

10. After the Supreme Court's ruling in United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989), most courts recognize that section 506(b) establishes a presumption in

---

[3] It should be noted that under the First Priority Indenture, interest on overdue principal and interest on the Floating Rate Notes is equal to 1% per annum in excess of the otherwise applicable rate. See Section 4.01 of the First Priority Indenture.

[4] Pursuant to Section 7.01(j) of the Credit Agreement, an Event of Default will be deemed to have occurred when "[CalGen], any of its Subsidiaries that is a Significant Subsidiary or any group of Subsidiaries that, taken together would constitute a Significant Subsidiary, suffer a Bankruptcy Event."

favor of enforcing the contract rate[5] of postpetition interest. See, e.g., In re Kalian, 178 B.R. 308, 314 (Bank. D.R.I. 1995) ("post-Ron Pair decisions generally recognize 'a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations.'") (citations omitted); In re Vest Associates, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998) ("The developing consensus is a presumption in favor of the contract rate subject to equitable considerations.").

11.     It is well established that interest at the default rate will generally be allowed under section 506(b) unless the debtor can demonstrate that the default rate is inequitable. In re Southland Corp., 160 F.3d 1054 (5th Cir. 1998); In re Terry Ltd. P'ship, 27 F.3d 241 (7th Cir.), cert. denied, 513 U.S. 948 (1994) ("presumption in favor of the contract [default] rate subject to rebuttal based upon equitable considerations"); In re Courtland Estates Corp., 144 B.R. 5, 9 (Bankr. D. Mass. 1992) (contractual default rate allowed); In re Schaumburg Hotel Owner Ltd. P'ship, 97 B.R. 943, 951 (Bankr. N.D. Ill. 1989) (contractual default rate allowed); In re Roggio, 49 B.R. 450, 453 (Bankr. D. Conn. 1985) (contractual default rate allowed).

12.     As Collier on Bankruptcy, the leading treatise on bankruptcy law, advises, "[i]n general, just as there is no express mechanism in section 506(b) for adjusting basic interest rates, courts should be reluctant to infer a mechanism for disallowing default rates of interest under federal law. Rather, the allowability of the rate should turn instead on applicable nonbankruptcy law." 4 Collier on Bankruptcy, ¶ 506.04[2][b] (15th ed. rev. 2006).

13.     In this case, the First Lien Noteholders are substantially oversecured (a fact that the Debtors do not contest), and are therefore entitled to the benefits of section 506(b).

---

[5]  In this context, "contract rate" means the rate provided for in a loan document, whether at the default or non-default rate, as opposed to a statutory rate, federal rate or other rate of interest not provided for by contract.

6

Accordingly, because the Credit Agreement provides for default interest as a contractual right, the Court need only determine whether the default rate is so high as to disrupt the equities of this case.

14. Here, the Debtors have made no showing that the default rate is inequitable or not permissible under state or other nonbankruptcy law.[6] Nor is it likely that the Debtors can make such a showing. The default rate under the Credit Agreement is only 2% higher than the non-default contract rate (the default rate under the Indenture is only 1% above the non-default rate).

15. The 2% increase constituting default interest is consistent with commercial loans of a similar character and is neither punitive nor inequitable. In addition, the spread between the non-default rate and the default rate is well within the bounds of increases that have been found to be reasonable by other courts and is nowhere near the rates courts have determined to be unenforceable penalties. Compare, for example, In re Vanderveer Estate Holdings, Inc., 283 B.R. 122, 131 (Bankr. E.D.N.Y. 2002) (5% spread between default and non-default rate is reasonable); In re Skyler Ridge, 80 B.R. 500, 510-11 (Bankr. C.D. Cal. 1987) (4% spread between default and non-default rate is reasonable and enforceable); In re Vest Assocs., 217 B.R. at 703 (5% spread between default and non-default rate reasonable), with In re Kalian, 178 B.R. at 317 (36% default rate unenforceable penalty); In re Hollstrom D.C., 133 B.R. 535, 539-41 (Bankr. D. Colo.) (36% default rate unenforceable penalty against other creditors); In re White, 88 B.R. 498, 510 (Bankr. D. Mass. 1988) (holding 48% default rate was unenforceable as

---

[6] This Court has previously noted that contractual provisions providing for default interest are enforceable under New York law. See In re Chateaugay Corp., 150 B.R. 529, 542 (Bankr. S.D.N.Y. 1993) (citations omitted).

penalty).

16.     Given the presumed validity of the default interest rate provision, the modest rate of default interest, and the not insubstantial risk that the First Lien Noteholders have incurred both prior to and during this bankruptcy, the default interest should be deemed a valid obligation which must, pursuant to section 506(b) of the Bankruptcy Code, be paid in order for the Debtors to fully satisfy the First Lien Noteholders' claims.

17.     It is worth noting that this Court has previously identified a circumstance when a chapter 11 debtor may avoid paying default interest to an oversecured creditor. That circumstance is when a debtor cures its default and deaccelerates its debt under section 1124 of the Bankruptcy Code by reinstating the loan maturity date. See In re Chateaugay Corp., 150 B.R. 529 (Bankr. S.D.N.Y. 1993); In re Forest Hills Assocs., 40 B.R. 410 (Bankr. S.D.N.Y. 1984). Here, however, the Debtors are not seeking to reinstate the First Lien Notes under section 1124 through a plan of reorganization. To the contrary, the Debtors have argued that the First Lien Notes are fully due and payable and seek to repay the First Lien Notes immediately upon refinancing of the DIP Facility. Because the First Lien Notes will not be reinstated, the Debtors cannot cure their default and must pay the Lenders default interest if they seek to repay the First Lien Notes at this time.

> **B.     CalGen's Proposed Repayment of the CalGen Secured Debt is A *Voluntary* Payment and Therefore Falls Squarely Within the No-Call Provision Under the Credit Agreement**

18.     Section 2.10(b)(i) of the Credit Agreement provides that the First Lien Term Loans "may not be voluntarily prepaid at any time on or prior to April 1, 2007." With respect to any prepayments made after April 1, 2007, section 2.10(b)(ii) further provides that "[t]he

8

Borrower may, at its option … prepay at any time all, of from time to time any part of, the First Priority Term Loans, if such prepayment is after April 1, 2007 but on or before April 1, 2008, in an amount equal to 102.5% of the principal amount so prepaid, *plus* all other amounts owed hereunder in connection with such prepayment …" (the "Make-Whole Premium").[7]

19. Despite these contractual provisions prohibiting prepayment of the First Lien Notes prior to April 1, 2007 -- and expressly providing for compensation once prepayment is permitted -- CalGen seeks authority to repay the First Lien Notes prior to April 1, 2007 without compensation for the damages occasioned by its undeniable breach of the no-call provision.

20. In support of their argument, the Debtors first assert that the no-call or lock-out provision does not apply because it applies only in the event of an "optional redemption" or "voluntary prepayment" of the debt. See DIP Motion at pp. 32-34. The Debtors are correct that the no-call provision in the Credit Agreement applies only to a "voluntary" prepayment. The Debtors' argument is invalid, however, because it is based on the faulty premise that the proposed prepayment in this instance is involuntary.

21. The Debtors allege that the proposed prepayment is involuntary because their bankruptcy filing resulted in an event of default under the Credit Agreement which triggered the acceleration of the First Lien Notes. This is true. The maturity date of the First Lien Notes automatically accelerated upon the Debtors' bankruptcy filing. See section 7.02 of the Credit Agreement. It is well established, however, that the acceleration of debt occasioned by a bankruptcy filing does ***not*** require a debtor to immediately make payment on such debt and,

---

[7] Section 3.07 of the First Priority Indenture is substantively identical to section 2.10 of the Credit Agreement.

therefore, the subsequent prepayment of that debt is voluntary. See In re Skyler Ridge, 80 B.R. 500, 507 (Bankr. Ca. 1987) ("The automatic acceleration of a debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium."); see also In re Imperial Coronado Partners, Ltd., 96 B.R. 997, 1000 (B.A.P. 9th Cir. 1989) (debtor had the option to reinstate the loan both under state law and bankruptcy law as part of a plan of reorganization; therefore court found that decision to sell property and pay off the loan during bankruptcy, notwithstanding acceleration of the loan upon bankruptcy, was voluntary); In re A.J. Lane and Co., Inc., 113 B.R. 821, 827 (Bankr. D. Mass. 1990) (nothing compelled debtor to sell collateral serving as source of prepayment).

22.     These courts have merely acknowledged the obvious: because the debtor could have elected to reinstate the debt at issue pursuant to section 1124(2) of the Bankruptcy Code or continued to pay it pursuant to a cram-down under section 1129(b)(2)(A) of the Bankruptcy Code, the debtors' proposed prepayment was voluntary.[8] See In re Skyler Ridge, 80 B.R. 500, 507; In re Imperial Coronado Partners, Ltd., 96 B.R. 997, 1000; In re A.J. Lane and Co., Inc., 113 B.R. 821, 827.

23.     The few courts that have concluded that prepayments made during a bankruptcy proceeding were involuntary and therefore did not trigger a make-whole obligation,

---

[8]  Section 1124(2) provides, in relevant part, as follows:
    "[A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -
    (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default
    (B) reinstates the maturity of such claim or interest as such maturity existed before such default;"
11 U.S.C. § 1124(2)(B).

are distinguishable from the present case. Almost all such cases were grounded on a finding that the secured creditor had implicitly waived its right to a make-whole premium by having taken an affirmative action to compel immediate payment in full, such as filing a motion for relief from stay to foreclose. See, e.g., LHD Realty, 726 F.2d at 331-32 (finding that secured creditor "waived its right to a prepayment premium" when it sought relief from the automatic stay to proceed with foreclosure); In re Public Service Company of New Hampshire, 114 B.R. 813, 819-20 (Bankr. D.N.H. 1990) (senior secured noteholders consistently negotiated and demanded that their bonds be taken out in cash and indicated they would object to any plan that tried to reinstate their bonds); In re Planvest Equity Partners IV, 94 B.R. 644, 645 (Bankr. D. Ariz. 1988) (motion for relief from stay).

24. Unlike the lender in LHD Realty, neither Beal, nor to the best of Beal's knowledge, any of the other First Lien Noteholders, has ever demanded, requested or taken any affirmative step (*i.e.*, sought relief from the stay to foreclose on collateral) to compel CalGen to prepay principal on the First Lien Notes.

25. Here, the Debtors' decision to prepay the First Lien Notes is clearly strategic and by the Debtors' own volition. The stated reason for the Debtors' repayment plan is to "replace higher interest-rate debt with lower interest-rate debt." See DIP Motion at p. 2. Thus, CalGen's proposed prepayment can hardly be deemed to be involuntary.

26. Based on the foregoing, it is clear that any prepayment during this bankruptcy case is noncompulsory under the Credit Agreement and should be subject to, and prohibited by, the no-call provision set forth in section 2.10 of the Credit Agreement.

27. The Debtors also argue that, regardless of acceleration, no-call provisions that

11

preclude optional or voluntary repayment of debt are generally held unenforceable against chapter 11 debtors. The vast majority of the cases cited by the Debtors, however, do not support this position. In LHD Realty Corp., 726 F.2d 327 (7th Cir. 1984), the mortgagee did not seek enforcement of the no-call provision, but rather sought relief from the stay to proceed with foreclosure. Id. at 329. Similarly, in Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Cal. 1987), the lender did not insist on enforcement of the no-call provision and, therefore, the issue was not squarely before the court. Id. at 502. As such, the Skyler Ridge court's suggestion that no-call provisions are unenforceable in bankruptcy is merely *dicta*. None of the other cases relied on by the Debtors state specifically that the Bankruptcy Code precludes enforcement of no-call provisions and, in any event, it is not clear whether creditors in those cases actually sought to enforce such provisions.

28. The only case that may be read to hold that no-call provisions are unenforceable against a chapter 11 debtor is Shenandoah Nursing Home, 193 B.R. 769 (W.D. Va. 1996).[9] As explained in the following section, however, while the court in Shenandoah refused to enforce the injunction effect of the no-call provision, the case does ***not*** stand for the proposition that a debtor may prepay a lender in violation of a no-call provision without compensating the lender for such prepayment.

### C. Beal is Entitled to Payment of the Make-Whole Premium Upon Prepayment of the First Lien Notes During the Lock-Out Period

29. If this Court is inclined to disregard the no-call provision and permit

---

[9] In Shenandoah, however, the creditor conceded at the confirmation hearing that the court had authority to allow the debtor to prepay the loan. Accordingly, like Skyler Ridge, the issue of enforcement of the no-call was not squarely before the court. Id. at 774, n.5.

prepayment prior to April 1, 2007, CalGen should be required to compensate Beal by paying the Make-Whole Premium. As described below, the Credit Agreement contemplates no situation where prepayment prior to April 1, 2008 is permitted without CalGen being required to pay a make-whole premium to the First Lien Noteholders.

30. In opposing payment of the Make-Whole Premium, the Debtors' chief argument is that none of the indentures or other loan documents requires the payment of a make-whole or prepayment premium if a prepayment occurs during the lock-out period. Significantly, the Debtors do not suggest that the First Lien Noteholders are not harmed by the forbidden prepayment.

31. This argument is disingenuous because it suggests that an outright and absolute prohibition on prepayment can logically coexist with a provision addressing the monetary consequence of the forbidden action. This argument also ignores the clear intent of section 2.10 of the Credit Agreement, which is to compensate the First Lien Noteholders in the event of any prepayment. Indeed, the make-whole provision and the no-call provision are intended to be read in tandem, as evidenced by the fact that they are part of the same section of the Credit Agreement. ***Read as a whole, section 2.10 contemplates no situation where prepayment of the First Lien Notes prior to April 1, 2008 is permitted without payment of the Make-Whole Premium***. Indeed, prepayments prior to April 1, 2007 (*i.e.*, the lock-out period) are absolutely prohibited and prepayments after April 1, 2007 (but before April 1, 2008) require payment of the Make-Whole Premium.

32. It would be manifestly unfair to deprive Beal of the benefit of its bargain by disregarding the protections set forth in the no-call provision and then failing to compensate Beal

13

NY4 - 200207.06

for the Debtors' breach of that provision. The terms of section 2.10 were negotiated in good faith and at arms' length and cannot be read in isolation. Had the Debtors insisted on the unrestricted right to prepay, other terms of the First Lien Notes (*i.e.*, the interest rate) would have been less favorable for CalGen.

33. The case In re 360 Inns, Ltd., 76 B.R. 573 (Bankr. N.D. Tex. 1987), which the Debtors cite favorably (see DIP Motion at p. 34), is on all fours with the facts here and supports the proposition that a lender should be compensated for a prepayment made during a no-call period, even when the underlying loan documents do not expressly provide for such compensation.

34. In 360 Inns, the court authorized the debtor to prepay voluntarily a promissory note despite a ten-year prohibition on prepayment. As is the case here, the note provided for prepayment premiums after the expiration of the no-call period.[10] Although no prepayment premium was provided for under the note in the case of voluntary prepayment during the lock-out period, the court nevertheless awarded prepayment compensation to the creditor upon the debtor's voluntary repayment during that period. Id. at 576.

35. The Debtors ignore 360 Inns, and instead rely solely on Shenandoah and In re Adelphia Communications Corp., 342 B.R. 142 (Bankr. S.D.N.Y. 2006) for the proposition that courts will not award a prepayment premium where the premium is not specifically provided for in the documentation. Shenandoah and Adelphia, however, are easily distinguishable and provide little guidance for the Court in these circumstances. The Shenandoah court itself stated

---

[10] The note also provided for a prepayment premium during the lockout period for any involuntary repayment. 360 Inns, 76 B.R. at 575.

14

that it "could not reach the same result [rewarded in 360 Inns] because the note at issue in 360 Inns is substantially different from the present note." Shenandoah, 193 B.R. at 777. Significantly, the note in the Shenandoah case "contain[ed] no formula, nor any specific figure, for calculating damages stemming from prepayment" whenever such prepayment was made. Id.

36. Here, as in 360 Inns, the Credit Agreement provides a Make-Whole Premium (in the same section as the no-call clause) "such that the debtor, and the bankruptcy court for that matter, [are] able reasonably to calculate a damages figure for the voluntary repayment made [within the lockout period] by borrowing from another analogous provision in the note…" Shenandoah, 193 B.R. at 777 (referring to the note in 360 Inns).

37. As for In re Adelphia Communications Corp., 342 B.R. 142, the case has no application here as it offers no guidance on proper compensation for a lender in the absence of an express contractual provision. The Adelphia court was not required to consider the parties' intent in determining how to compensate one party for an action not contemplated by the terms of the credit agreement. In that case, the lenders were seeking to ignore the remedies that were expressly bargained for by the parties and relevant to the default at issue. See id. at 145-46, 152.

38. In short, the situation at hand is squarely addressed in 360 Inns and the reasoning of that case, and not Shenandoah or Adelphia, should apply here.

15

WHEREFORE, for the reasons set forth herein, Beal respectfully requests that the Bankruptcy Court: (i) deny the relief requested in the DIP Motion; and (ii) grant such other relief as is just and proper.

Dated: New York, New York
February 16, 2007

**CHADBOURNE & PARKE LLP**

By: /s/ N. Theodore Zink, Jr.
N. Theodore Zink, Jr. (TZ 8980)
A Member of the Firm
30 Rockefeller Plaza
New York, New York 10112
Phone: (212) 408-5100
Fax: (212) 541-5369

Attorneys for Beal Bank Nevada