WACHTELL, LIPTON, ROSEN & KATZ
Richard G. Mason (RM-0698)
Joshua A. Feltman (JF-9486)
Emil A. Kleinhaus (EK-6731)
51 West 52nd Street
New York, New York  10019-6150
Telephone:  (212) 403-1000
Facsimile:   (212) 403-2000

Attorneys for The Bank of Nova Scotia,
as Administrative Agent

Hearing Date:  February 27, 2007 at 10 a.m.
Objection Deadline:  February 16, 2007 at 12 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
In re:                                                                           :     Chapter 11
                                                                                      :
CALPINE CORPORATION, et al.                                  :     Case No. 05-60200 (BRL)
                                                                                      :
                            Debtors.                                          :     (Jointly Administered)
-------------------------------------------------------------- x

**LIMITED OBJECTION OF THE BANK OF NOVA SCOTIA TO DEBTORS'
MOTION FOR ORDER (I) AUTHORIZING DEBTORS TO OBTAIN
REPLACEMENT POSTPETITION FINANCING TO (A) REFINANCE
EXISTING POSTPETITION FINANCING AND (B) REPAY PREPETITION
DEBT; (II) ALLOWING DEBTORS' LIMITED OBJECTION TO CLAIMS;
AND (III) DETERMINING VALUE OF SECURED CLAIMS**

The Bank of Nova Scotia, as Administrative Agent ("BNS") under the Amended and Restated Credit Agreement dated as of March 23, 2004 (the "Credit Agreement") among BNS, Calpine Generating Company, LLC ("CalGen"), certain guarantors, and certain lenders (together with BNS, the "Lenders"), objects to the motion (the "Motion") dated January 26, 2007 of CalGen and its affiliated debtors-in-possession (the "Debtors") for entry of an order which, inter alia, would disallow the Lenders' claim for default interest that has accrued under the Credit Agreement.

## INTRODUCTION

During the pendency of these cases, approximately $128 million has been drawn under letters of credit issued by the Lenders for CalGen's account. CalGen has not reimbursed these amounts to the Lenders, notwithstanding its obligation to reimburse any drawn amount within five days.

Under the terms of the Credit Agreement, if CalGen fails to reimburse the Lenders within five days for amounts drawn under a letter of credit, it is required to pay interest on those amounts at the Credit Agreement's "Default Rate"—i.e., a rate fixed at 2% above the rate applicable to Base Rate Loans (as described below). CalGen, however, has not been paying the Default Rate on overdue amounts; instead, it has been paying only the non-default rate applicable to Base Rate Loans.

In the Motion, the Debtors seek an order disallowing the default interest that has accrued on the amounts owing under the Credit Agreement. They offer no legal basis for such relief, because there is none. As oversecured creditors, the Lenders are entitled not only to post-petition interest but to a presumption that the interest rates set forth in the Credit Agreement will be respected. Although that presumption may sometimes be overcome based on equitable considerations, any resort to equity would be futile here: CalGen is concededly solvent, and the Credit Agreement's 2% default increment is both reasonable and consistent with market practice. In addition, the Lenders' entitlement to default interest is predicated on the most straightforward of breaches, a payment default. CalGen, therefore, must pay the Lenders the default interest that has accrued on the approximately $128 million that has been drawn since the Petition Date. CalGen must also pay BNS the default interest that has accrued on both overdue interest and late-paid fees.

If the Court does not require CalGen to meet its obligation to pay all the interest owing under the Credit Agreement, it should require any unpaid amounts to be remitted to the Lenders by agents of CalGen's second and third-lien lenders. The Debtors have asked this Court for an order permitting them to repay outstanding principal amounts to CalGen's secured lenders. However, in the Collateral Trust and Intercreditor Agreement dated as of March 23, 2004 (the "Intercreditor Agreement"), CalGen's second and third-lien lenders agreed that proceeds of shared collateral would be held for and remitted to the first-lien lenders until every obligation to the first-lien lenders—including the obligation to pay allowed or disallowed post-petition default interest—is satisfied. The Lenders, therefore, are entitled to receive contract default interest from junior lienholders if not from the Debtors.

## BACKGROUND

A. **The Credit Agreement**

In the Credit Agreement, attached hereto as Exhibit A, the Lenders agreed to make revolving loans to CalGen and issue letters of credit for CalGen's account. As of the date on which these chapter 11 petitions were filed (the "Petition Date"), there were no revolving loans outstanding under the Credit Agreement, and the aggregate stated amount of outstanding letters of credit was $199,134,655.

Since the Petition Date, letters of credit have been drawn in an aggregate principal amount equal to $128,305,953.63 (the "Reimbursement Obligations"). These amounts have not been repaid. In addition, letters of credit remain outstanding in the aggregate face amount of $24,677,123 (the "Outstanding LCs").

Pursuant to security arrangements among CalGen, certain of its affiliates, and CalGen's secured lenders, the Reimbursement Obligations are secured by collateral (the

"Collateral") consisting of (i) the equity interests in CalGen and various subsidiaries, and (ii) substantially all of the assets of CalGen and its subsidiaries, including cash and receivables. The Collateral also secures payment of certain fees and expenses, including attorneys' fees incurred in enforcing the Credit Agreement.

### B. Default Interest

Section 2.2.4 of the Credit Agreement requires that amounts drawn under letters of credit be repaid within five days, and also identifies the interest rates to be paid on those amounts:

> No later than 11:00 a.m. (New York City time) on the fifth Business Day after the Drawing Date [i.e., the date of a payment by BNS honoring a drawing under a letter of credit] the Borrower shall make or cause to be made to [BNS] a Reimbursement Payment in an amount equal to the sum of (a) the full amount of such [payment by BNS] and (b) interest thereon for each day or portion thereof until such Reimbursement Payment is made at a rate equal to (i) from the Drawing Date through the fifth Business Day following the Drawing Date, the interest rate that would be applicable to a one-month LIBOR Rate Loan made on the Drawing Date and (ii) thereafter, the Default Rate[.]

Under Section 2.2.4, therefore, amounts drawn under a letter of credit bear interest at a LIBOR-adjusted rate for five days. Once overdue, such amounts bear interest at the "Default Rate," which is defined in Section 2.1.7 of the Credit Agreement.

Section 2.1.7 of the Credit Agreement, entitled "Default Interest," provides as follows:

> Notwithstanding anything to the contrary herein, upon the occurrence and during the continuation of any Event of Default, the outstanding principal amount of all Revolving Loans and, to the extent permitted by applicable Legal Requirements, any accrued but unpaid interest payments thereon and any accrued but unpaid fees and other amounts hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under

> applicable Bankruptcy Laws) payable upon demand at a rate that is (a) 2% per annum in excess of the interest rate then otherwise payable under this Agreement with respect to the applicable Revolving Loans or (b) in the case of any such fees and other amounts, at a rate that is 2% per annum in excess of the interest rate then otherwise payable under this Agreement for Base Rate Loans (the "Default Rate")[.]

The Credit Agreement thus fixes the Default Rate—the rate of interest owed under Section 2.2.4 on overdue Reimbursement Obligations—at 2% above the rate applicable to Base Rate Loans (which is fixed at the higher of (a) BNS's prime lending rate and (b) the sum of the Federal Funds Effective Rate and .5% per annum, in either case plus an additional margin of 2.50%).

Because, under Section 2.2.4 of the Credit Agreement, amounts drawn under letters of credit accrue interest at the Default Rate if they are not repaid within five days, the Debtors' voluntary petitions have no bearing on the Lenders' contractual entitlement to receive interest at the Default Rate. Had the Debtors not filed Chapter 11 petitions but otherwise acted exactly as they have in terms of failing to meet their Reimbursement Obligations, they would owe the same amount of interest on drawn amounts that they now owe in bankruptcy.

### C. The Cash Collateral Order

On February 26, 2006, the Court entered the Cash Collateral Order (as defined in the Motion). That order required the Debtors, <u>inter alia</u>, to pay the Lenders all accrued but unpaid interest and fees at the non-default contract rate as and when required by the Credit Agreement. As of the Petition Date, the Debtors owed approximately $1.6 million in fees to BNS and the Lenders.

The Cash Collateral Order expressly preserves the Lenders' right to seek payment of default interest that has accrued since the Petition Date, whether from the Debtors or from the holders of subordinated liens. Paragraph 17(a) of the order states that "nothing contained herein

shall be deemed to constitute a waiver of any right of a Project Lender"—i.e., a lender to CalGen or another designated subsidiary of Calpine Corporation—"to seek payment of interest accruing from and after the Petition Date at the rate provided under the applicable Project Loan Documents (<u>including without limitation at the default or other applicable rate</u>) at any subsequent point in the Chapter 11 Cases or of the Debtors or any party in interest to object thereto." Cash Collateral Order ¶ 17(a) (emphasis added).

Paragraph 25 of the order states that "nothing in this Order shall constitute a waiver of any right of any Project Lender under any intercreditor or like agreement with respect to payments and/or other adequate protection granted to any other Project Lender in this Order." Cash Collateral Order ¶ 25.

Pursuant to the Cash Collateral Order, CalGen paid the fees owing to BNS and the Lenders as of the Petition Date, but it did not pay contract default interest on those overdue fees. CalGen has also paid interest on its overdue Reimbursement Obligations at the non-default rate applicable to Base Rate Loans. However, it has not paid the contractually-mandated Default Rate on those overdue amounts.

As of February 6, the amount of unpaid contract interest that has accrued on Reimbursement Obligations outstanding for more than five days is equal to $2,306,662.78. The amount of interest that has accrued on that overdue interest is equal to $47,631.62 to date. The amount of interest that accrued on late-paid fees is equal to $8,035.60.

**D. The Intercreditor Agreement**[1]

CalGen, its parent and subsidiary guarantors, Wilmington Trust FSB, Morgan Stanley Senior Funding, Inc. ("Morgan Stanley"), BNS, and Wilmington Trust Company (as

collateral agent) are parties to the Intercreditor Agreement, attached hereto as Exhibit B. Wilmington Trust FSB was originally trustee for holders of the First Priority Notes ($235 million), the Second Priority Notes ($640 million), the Third Priority Floating Rate Notes ($680 million), and the Third Priority Fixed Rate Notes ($150 million). Morgan Stanley is administrative agent for holders of the First Priority Term Loans ($600 million) and the Second Priority Term Loans ($100 million).

The Intercreditor Agreement sets forth the terms on which proceeds of the various secured lenders' shared Collateral are to be distributed among the various lenders. Section 2.5(f) of the agreement provides:

> Except for payments received free from the Senior Priority Liens as provided in Section 2.5(g), subject to the rights of any holders of Permitted Prior Liens, including any Priming Lien Secured Parties, (i) all proceeds of Collateral received by any Junior Priority Debt Representative, the Collateral Agent or any holder of Junior Priority Liens at any time prior to the Discharge of Senior Priority Lien Obligations, will be held by such Junior Priority Debt Representative, the Collateral Agent or such holder, as the case may be, for the account of the holders of Senior Priority Liens and remitted to the applicable Senior Priority Debt Representative in accordance with the terms of the Senior Priority Debt Documents.

Section 2.5(g), in turn, states that payments out of proceeds of Collateral are subject to Section 2.5(f) if they are received prior to the repayment of all Obligations to senior lienholders and subsequent to either (i) the commencement of a bankruptcy case or (ii) written notice from senior lienholders that their debts are due and owing or in default. "Collateral" includes all collateral identified in the Security Agreement dated March 23, 2004, as well as any future collateral granted as security to the lenders identified in the Intercreditor Agreement. "Obligations" are defined to include "all debt, financial liabilities and obligations . . . of

---

[1] Capitalized terms in this section have the same meaning as in the Intercreditor Agreement.

whatsoever nature and howsoever evidenced (including principal, interest, fees, reimbursement obligations, cash cover obligations, penalties, indemnities and legal and other expenses, whether due after acceleration or otherwise) . . . in each case, direct or indirect, primary or secondary, fixed or contingent, now or hereafter arising out of or relating to any such agreement, document or instrument."

Section 3.4, the "Application of Proceeds" section of the Intercreditor Agreement, makes plain that proceeds of Collateral should be used to pay post-petition default interest, whether or not allowed by this Court as a claim against the Debtors. It requires that, before Obligations to junior lienholders are satisfied, proceeds from any realization of Collateral must be paid to the first-lien holders in an amount sufficient to meet all outstanding Obligations to them,

> (including all interest accrued thereon after the commencement of any Insolvency Proceeding at the rate, <u>including any applicable post-default rate</u>, specified in the [loan documents], <u>even if such interest is not enforceable, allowable or allowed as a claim in such proceeding</u>, and including the discharge or cash collateralization (at 102.5% of the aggregate undrawn amount) of all outstanding letters of credit constituting First Priority Lien Debt)[.] (emphases added)

The Intercreditor Agreement is thus explicitly applicable to contract default interest, regardless of whether such interest is allowed as a claim against the Debtors.

## ARGUMENT

### A. The Lenders Are Entitled to Default Interest.

Under section 506(b) of the Bankruptcy Code, oversecured creditors such as the Lenders are entitled to interest on their claims during the pendency of a chapter 11 case. See 11 U.S.C. § 506(b). In determining the appropriate rate of interest under section 506(b),

there is a presumption in favor of the default rate set forth in the parties' contract. E.g., Matter of Terry Ltd. P'ship, 27 F.3d 241, 243 (7th Cir. 1994); In re Vanderveer Estates Holdings, Inc., 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002); In re Liberty Warehouse Assocs. Ltd. P'ship, 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998); In re Vest Assocs., 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998); see also 4 Collier on Bankruptcy ¶ 506.04[2][b][ii] (15th ed. 2005) ("[J]ust as there is no express mechanism in section 506(b) for adjusting basic interest rates, courts should be reluctant to infer a mechanism for disallowing default rates of interest under federal law."). That presumption is rebuttable based on equitable considerations, including (i) whether the debtor is insolvent, and (ii) whether the contract default rate is so "inordinately high" that it should be treated as a "penalty rate." E.g., In re Vanderveer, 283 B.R. at 134; In re Liberty Warehouse, 220 B.R. at 551-52. Here, there is no basis—equitable or otherwise—to disregard the parties' bargain with respect to default interest.

First, CalGen is eminently solvent; the Debtors concede as much by stating their desire to maximize Calpine's access to CalGen's cash and value. (Motion at 24). In Ruskin v. Griffiths, 269 F.2d 827 (2d Cir. 1959), the Second Circuit held that a solvent debtor was obligated to pay default interest to secured creditors after a bankruptcy default. In doing so, the Court distinguished Vanston Bondholders Protective Committee v. Green, 329 U.S. 156 (1947)—in which the Supreme Court disallowed a claim for compound interest—on the basis that "[i]n Vanston the debtor was insolvent, and in our case it appears the debtor is solvent," Ruskin, 269 F.2d at 830. Because enforcement of the parties' agreement would not harm junior creditors, the Court concluded that it would be ''the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its [Chapter XI petition]." Id. at 832.

"Ruskin remains the law of the Second Circuit and applies" to cases decided under the Bankruptcy Code. In re 139-141 Owners Corp., 313 B.R. 364, 369 (S.D.N.Y. 2004). For solvent debtors, therefore, courts in this jurisdiction have followed the command of the Second Circuit and enforced the right of oversecured creditors to collect default interest. E.g., In re 139-141 Owners Corp., 306 B.R. 763, 773 (Bankr. S.D.N.Y. 2004), aff'd in relevant part, 313 B.R. 364; In re Vanderveer, 283 B.R. at 134; In re Liberty Warehouse, 220 B.R. at 551-52. The rationale for these decisions is straightforward: In insolvent cases, "there is a question whether one creditor should get interest while another doesn't even recover principal"; in solvent cases, on the other hand, any disallowed contract interest goes to equityholders. In the Matter of Chicago, M.S.P. & P.R. Co., 791 F.2d 524, 529 (7th Cir. 1986) (Posner, J.). Because CalGen is concededly solvent, there is no equitable basis to deny contract default interest to the Lenders.

Nor can the Debtors seriously claim that the Credit Agreement's default rate is unreasonably high. The 2% default increment is at the low end of those that have been enforced by courts. See, e.g., Matter of Southland Corp., 160 F.3d 1054, 1060 (5th Cir. 1998) (enforcing "relatively small" 2% increment); Terry, 27 F.3d at 244 (enforcing 3% default increment); In re Vanderveer, 283 B.R. at 134 (enforcing 5% default increment as "well within the range of default rates" allowed under section 506(b)); In re Liberty Warehouse, 220 B.R. at 552 (enforcing 8.8% default increment). Indeed, it is the exact same increment included in the Replacement DIP Facility proposed by the Debtors. (Motion at 14).

Finally, it bears emphasizing that the Lenders' entitlement to default interest on the Reimbursement Obligations is in no way contingent on the Debtors' bankruptcy filings. Although CalGen's filing would be sufficient under the Credit Agreement to trigger the Lenders' entitlement to default interest, that Event of Default is beside the point. CalGen is responsible

for multiple payment defaults under Section 2.2.4 of the Credit Agreement, and owes interest at the Default Rate as a result of those defaults.

Because the Debtors have not and cannot overcome the presumption in favor of enforcing the parties' contractual bargain with respect to default interest, the Lenders' claim to default interest on outstanding drawn amounts should be allowed.

**B.    The Lenders Are Entitled to Interest on Overdue Default Interest and Interest on Late-Paid Fees.**

Aside from default interest on outstanding drawn amounts, the Lenders are also entitled to the interest that has accrued under the Credit Agreement on overdue default interest and late-paid fees.

"[W]here there is a contractual provision, valid under state law, providing for interest on unpaid instal[l]ments of interest, the bankruptcy court will enforce the contractual provision with respect to both instal[l]ments due before and instal[l]ments due after the petition was filed." In re Chateaugay Corp., 150 B.R. 529, 537 (Bankr. S.D.N.Y. 1993) (quoting both In re Manville Forest Products Corp., 43 B.R. 293, 300 (Bankr. S.D.N.Y. 1984) and Ruskin, 269 F.2d at 830-32).  Section 2.1.7 of the Credit Agreement requires payment of interest at the Default Rate on all accrued but unpaid amounts, including accrued but unpaid interest.  That requirement, moreover, is valid under applicable state law.  See McKinney's General Obligations Law § 5-527 (1997) ("A loan or other agreement providing for compound interest shall be enforceable notwithstanding the date that such loan or other agreement providing for such compound interest shall have been executed.").

Here, CalGen has not paid the full Default Rate since the Petition Date.  Under the terms of the Credit Agreement, which are valid under state law, CalGen must pay interest on

-11-

the component of the Default Rate that has not been timely paid.[2]  CalGen is also obligated under Section 2.1.7 of the Credit Agreement to pay interest at the Default Rate on late-paid fees.

### C. The Intercreditor Agreement Requires Holders of Subordinated Liens to Pay the Lenders any Default Interest Not Paid by the Debtors.

Should the Court permit the Debtors to repay the Reimbursement Obligations without paying contract default interest, it should require the agents for CalGen's second and third-lien holders (including any paying agents) to remit to the Lenders an amount equal to the unpaid interest owing under the Credit Agreement.

Under section 510(a) of the Bankruptcy Code, "[a] subordination agreement is enforceable in a case under [title 11] to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). And the "enforcement of a contractual subordination agreement between parties that filed proofs of claim" falls within the core jurisdiction of the Bankruptcy Court. In re Best Products Co., 68 F.3d 26, 31 (2d Cir. 1995).

Section 2.5(f) of the Intercreditor Agreement requires any proceeds of Collateral received by junior lienholders or their agents after the commencement of a bankruptcy case but prior to repayment of all obligations to the Lenders to be held for and remitted to BNS. Since the Lenders' security interests extend to substantially all of CalGen's assets—including receivables

---

[2] In Chateaugay, after determining that the contract's compound interest provision was not valid under then-extant New York law, this Court left "for another day" the question of whether, in light of the debtor's insolvency, compound interest might be prohibited by federal bankruptcy law.  Since Chateaugay, courts in this Circuit have concluded either that oversecured creditors are necessarily entitled to interest on interest, see In re P.G. Realty Co., 220 B.R. 773, 783-84 (Bankr. E.D.N.Y. 1998), or that the same principles that govern the allowance of simple post-petition interest also govern the allowance of interest on interest, see In re Marfin Ready Mix Corp., 220 B.R. 148, 162-64 (Bankr. E.D.N.Y. 1998).  Regardless of which approach is taken by this Court, since CalGen is solvent, the question deferred in Chateaugay can once again be left for another day.

and cash—any interest payments made to junior lienholders or their agents during the pendency of these cases, as well as the proceeds of the Replacement DIP Facility contemplated to be paid as a result of the Motion, are subject to the Intercreditor Agreement.³ Under the plain terms of that agreement, the second and third lienholders or their respective agents must remit to BNS whatever amounts are necessary to satisfy all obligations to the Lenders.

To the extent there is any legal requirement that a subordination agreement contain explicit language regarding post-petition interest, that requirement is easily met here. The Intercreditor Agreement requires payment of all obligations to the Lenders—"including all interest accrued thereon after the commencement of any [bankruptcy proceeding] at the rate, including any applicable post-default rate, specified in the [loan documents], even if such interest is not enforceable, allowable or allowed as a claim in such proceeding[.]" Intercreditor Agreement § 3.4. This language is identical in every material respect to the language identified by this Court as a model of explicitness. See In re Ionosphere Clubs, Inc., 134 B.R. 528, 535 n.14 (Bankr. S.D.N.Y. 1991) (example of explicit provision contained language entitling the senior creditor to "interest after the commencement of any [bankruptcy] proceeding at the rate specified in the applicable Senior Debt, whether or not such interest is an allowable claim in any such proceeding").⁴

---

³ Under section 9-102(a)(64) of the U.C.C., the "proceeds" of collateral include "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." McKinney's Uniform Commercial Code § 9-102 (2001). The cash generated by CalGen's business plainly falls within this definition. So do the proceeds of the Replacement DIP Facility: The pledge of substantially all of CalGen's assets to acquire new financing is manifestly a "disposition" of those assets, and the resulting cash the "proceeds" of that disposition.

⁴ It is far from clear whether any "rule of explicitness" can be squared with section 510(a) of the Bankruptcy Code. See generally Ionosphere, 134 B.R. at 533-34 (questioning the continued

-13-

The Lenders, therefore, are entitled to receive contract default interest from junior lienholders if not from the Debtors. In light of the express terms of the Intercreditor Agreement, this Court should not grant the relief sought by the Debtors without requiring the agents for the junior lienholders to satisfy remaining contractual obligations of the Debtors to the Lenders.

D. **The Debtors Must Make Adequate Provision for Outstanding LCs and Pay the Lenders' Fees and Expenses.**

While the Motion contemplates the repayment of the Reimbursement Obligations and the refinancing of CalGen's existing secured debt, it is silent with respect to the treatment of the Outstanding LCs. BNS objects to the Motion to the extent that the Debtors seek to leave the Outstanding LCs extant and subordinate or otherwise to diminish the pre-petition and adequate protection liens securing the obligations relating thereto. The Debtors must either terminate and return the Outstanding LCs or make satisfactory, alternative arrangements to protect the Lenders' rights (e.g., a back-to-back letter of credit under the Replacement DIP Facility or a grant of adequate cash collateral). If the Debtors do not terminate the Outstanding LCs, applicable fees under the Credit Agreement, including legal fees, will continue to accrue, irrespective of collateral arrangements, until the Outstanding LCs expire or are otherwise terminated and returned to BNS.[5]

---

vitality of the rule). Here, however, given the explicit terms of the Intercreditor Agreement, there is no need to revisit this issue.

[5] BNS understands that the Debtors do not dispute that arrangements must be made with respect to the Outstanding LCs. However, if no satisfactory resolution is reached, BNS reserves its rights under Section 3.4 of the Intercreditor Agreement, which requires the "discharge or cash collateralization (at 102.5% of the aggregate undrawn amount) of all outstanding letters of credit constituting First Priority Lien Debt" prior to the distribution of funds to junior creditors.

Regardless of how the Debtors treat the Outstanding LCs, the Debtors should be required to pay all fees and expenses (including legal fees) that are incurred under the Credit Agreement before the Debtors' obligations to the Lenders are paid in full.

## **CONCLUSION**

For the reasons set forth above, this Court should deny the Motion to the extent the Debtors seek to disallow any contract default interest that has accrued under the Credit Agreement. In the event that the Court does not require the Debtors to pay default interest to the Lenders, it should require the agents for CalGen's junior lienholders to remit such interest to BNS pursuant to the Intercreditor Agreement.

In addition, the Debtors should be required to pay all fees and expenses (including legal fees) that are incurred under the Credit Agreement before the Debtors' obligations to the Lenders are repaid in full, and to make adequate provision for the Outstanding LCs.

Dated: New York, New York  
February 16, 2007

WACHTELL, LIPTON, ROSEN & KATZ

By: /s/ Richard G. Mason
   Richard G. Mason (RM-0698)
   Joshua A. Feltman (JF-9486)
   Emil A. Kleinhaus (EK-6731)
   51 West 52nd Street
   New York, New York 10019-6150
   Telephone: (212) 403-1000
   Facsimile: (212) 403-2000