**Hearing Date: June 13, 2007, at 10:00 a.m. (EDT)**

CAMPEAU GOODSELL SMITH, L.C.
WILLIAM J. HEALY, #146158
440 N. 1st Street, Suite 100
San Jose, California  95112-4024
Telephone:  (408) 295-9555
Facsimile:   (408) 295-6606

ATTORNEYS FOR CREDITOR
Robert Membreno, Trustee of SAI Trust ("SAI")

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) CHAPTER 11 |
| | ) |
| CALPINE CORPORATION, et al, | ) Case No. 05-60200 (BRL) |
| | ) Jointly Administered |
| | ) |
| Debtor. | ) |

## MOTION FOR RELIEF FROM STAY

COMES NOW, ROBERT MEMBRENO, TRUSTEE OF SAI TRUST ("SAI"), and moves this Court for relief of stay so SAI may proceed with a pre-petition state action entitled ROBERT MEMBRENO, TRUSTEE of THE SAI TRUST vs. FREEPORT MCMORAN RESOURCE PARTNERS, a Limited Partnership; SANTA ROSA GEOTHERMAL COMPANY, L.P., SONOMA GEOTHERMAL PARTNERS, L.P.; CALPINE SONOMA, INC.; CALPINE GEYSERS COMPANY, L.P.; CALPINE CORPORATION,, and DOES ONE through, FIFTY, inclusive, Santa Clara Superior Court Case No. 1-05-CV-041957 ("State Action") as follows:

**I. SUMMARY OF ARGUMENT:**

SAI moves this Court for relief from stay pursuant to 11 U.S.C. 362 (d)(1), (2), (3) and for abstention pursuant to 28 U.S.C. 1334 (c)(2) so SAI may proceed with a pre-petition state action entitled ROBERT MEMBRENO, TRUSTEE of THE SAI TRUST vs. FREEPORT MCMORAN RESOURCE PARTNERS, a Limited Partnership; SANTA ROSA GEOTHERMAL COMPANY,

L.P., SONOMA GEOTHERMAL PARTNERS, L.P.; CALPINE SONOMA, INC.; CALPINE GEYSERS COMPANY, L.P.; CALPINE CORPORATION,, and DOES ONE through, FIFTY, inclusive, Santa Clara Superior Court Case No. 1-05-CV-041957 ("State Action"), which will formally liquidate SAI's claims, will require Debtors, as provided for in the underlying agreements, to provide documentation of the income and expenses which constitute the NPI payable to SAI, to establish compliance with the express terms of the underlying agreements regarding proper calculation of the NPI, to provide a proper accounting of expenses, to provide a proper certification from its chief financial officer confirming Debtors' compliance with the underlying agreement and calculation of the NPI payable to SAI, and will allow the parties to proceed with the State Action in Northern California where all substantive party and non-party witness reside or do business, all substantive and voluminous documents are located, its voluminous documents would have to be inspected, the subject plant in Northern California is located and operates, and SAI's and Debtors' counsel are located.

**II. FACTUAL BACKGROUND:**

On or about May 17, 1987, SAI Geothermal, Inc. (hereinafter "SAI Geothermal") and FREEPORT MCMORAN RESOURCE PARTNERS, L. P. ("FREEPORT") entered into an agreement entitled "Agreement For Purchase And Sale Of Assets (hereinafter "Agreement For Purchase"). (Exhibit A[1])

Article I, paragraph 1.2 (e) of the Agreement For Purchase provides, in pertinent part, that after commercial operation of a geothermal power plant to be constructed by FREEPORT known as West Ford Flat located in Sonoma County, California, that FREEPORT would pay to SAI Geothermal a Net Profit Interest (hereinafter "NPI") representing the right to receive a monthly payment in an amount equal to 6% of the Net Income for the month.

SAI Geothermal assigned its rights to receive 4.55 percent of the NPI to Plaintiff SAI TRUST ("SAI") and by letter dated August 4, 1989, so advised FREEPORT.

Paragraph 1.2 (e) of the Agreement For Purchase provides, in pertinent part: "After the Date

---

[1]All exhibits are attached to the Declaration of William J. Healy.

**MOTION FOR RELIEF FROM STAY**
2

of First Commercial Operation, Buyer shall pay Seller, the amount of the Net Profits Interest, commencing as provided in Section 1.5, which shall be calculated and paid monthly in arrears not later than the 20th day of the following month." Section 9.10, in pertinent part, defines Net Income as "... the gross revenues received by Buyer from the Project minus the sum the sum of the following: (i) if Option 1 has been selected, the cost of steam for the Project, which shall be calculated using the base price and price adjustments set forth in Section 19 of the Steam Sales Agreement (regardless of whether the Steam Sales Agreement has terminated), (ii) all Project direct operating expenses (excluding depreciation), (iii) general and administrative expenses associated with the Project, which shall be calculated as 15% of Project direct operating expenses (excluding depreciation and real estate taxes), (iv) the cost of any Project related capital additions made subsequent to the Date of First Commercial Operation, and (v) if the Project or a portion thereof is financed through Project Financing, principal, interest, reserves and any fees payable in respect of the Project Financing. For purposes of calculating the gross revenues of the Project, actual revenues received by the Buyer shall be used, unless Buyer has caused the PPA to be amended to provide for lower prices than provided for on the date of this Agreement, to obtain or retain any advantage of Buyer, in which event the gross revenues shall be deemed to be the revenues Buyer would have received under the PPA in effect on the date of this Agreement for delivery of the energy actually delivered. For purposes of calculating the direct operating expenses and the general and administrative expenses, the Accounting Procedure provided in Exhibit F shall govern."

Effective July 2, 1990, FREEPORT assigned its interest in, to, and under the Agreement For Purchase and a Standard Offer 4 Power Purchase Agreement it received from Pacific Gas & Electric Company ("Assigned Agreements") to Calpine.

On or about December 31, 1994 Calpine entered into a Settlement Agreement (hereinafter "Settlement Agreement") addressing past and future NPI related issues, including Overnight Interest, Escrow Balance, Debt Amortization, Audit Fees, and NPI Reports and specifically preserving the Agreement For Purchase and rights and remedies therein. (Exhibit B)

Section 1.6 of The Agreement For Purchase provides, in pertinent part that:

"Buyer shall maintain complete and accurate accounting records of the account

1    which are used to calculate the Net Profits Interest. Within 60 days after the end
2    of each fiscal year of Buyer, commencing with the fiscal year of Buyer in which
3    the Date of First Commercial Operation occurs, it shall furnish Seller with a
4    statement certified by Buyer's chief financial officer showing in reasonable
5    detail the calculation of the Net Profits interest for the fiscal year ended....Seller
6    and its authorized representatives shall have the right, upon reasonable notice to
7    Buyer and between 9 A.M. and 5 P.M. weekdays to audit Buyer's records to
8    determine whether the calculation of the Net Profits Interest during the fiscal year
9    then ended was in accordance with this Agreement. Buyer shall cooperate
10   reasonably with Seller as it conducts its audit."
11 SAI has not received a statement certified by Debtors' chief financial officer as required by the
12 Agreement For Purchase since at least the fiscal year ending 2000. As a direct result SAI has not
13 been able to audit Debtors' records to determine whether the calculation of the NPI for the fiscal
14 years following 2000 were in accordance with the Agreement For Purchase.
15     SAI noticed increases in costs, inclusions of costs, and allocations of costs since receipt of its
16 last statement certified by Debtors' chief financial officer. SAI has attempted to communicate with
17 Debtors and evaluate whether the uncertified NPI figures were reasonable and whether these
18 increases on costs, inclusions of costs, and allocations of costs are in accordance with the Agreement
19 For Purchase and Settlement Agreement.
20     Debtors have not maintain complete and accurate accounting records of the accounts used to
21 calculate NPI, have not maintained accounting records sufficient to show in reasonable detail the
22 calculation of NPI in accordance with the Agreement For Purchase, have not maintained accounting
23 records sufficient to show in reasonable detail the calculation of direct operating expenses and the
24 general and administrative expenses in accordance with the Agreement For Purchase, and have not
25 properly accounted for the general and administrative expenses in accordance with the Agreement
26 For Purchase. Debtors have not provided SAI with sufficient access to its records to determine
27 whether the calculation of NPI, although uncertified by the chief financial officer, was in accordance
28 with the Agreement For Purchase and have not reasonably cooperated with SAI so SAI could

conduct its audit of the uncertified records.

SAI brought to Debtors' attention that it noticed increases in costs, inclusions of costs, and allocations of costs since receipt of its last statement certified by Debtors' chief financial officer. SAI attempted to communicate with Debtors and determine whether these increases on costs, inclusions of costs, and allocations of costs are in accordance with the Agreement For Purchase and Settlement Agreement. As of the date of this complaint Debtors have not properly provided SAI with statements certified by their chief financial officer, have not provided SAI with sufficient access to its records to determine whether the calculation of NPI (although uncertified by the chief financial officer) was in accordance with the Agreement For Purchase, have not reasonably cooperated with SAI so SAI could conduct an audit of the uncertified records, have not maintain complete and accurate accounting records of the accounts used to calculate NPI, have not maintained accounting records sufficient to show in reasonable detail the calculation of NPI in accordance with the Agreement For Purchase, have not maintained accounting records sufficient to show in reasonable detail the calculation of direct operating expenses and the general and administrative expenses in accordance with the Agreement For Purchase, have not properly accounted for the general and administrative expenses in accordance with the Agreement For Purchase, have not identified and accounted for many costs associated with the operation of the power plant governed by the Agreement For Purchase, have improperly included and allocated costs to SAI and have failed and refused to identify and account for many costs associated with the operation of the power plants governed by the Agreement For Purchase.

On May 26, 2005, SAI filed the State Action against Debtors and others, generally predecessors, successors, assignors, assignees and/or partners of Debtors. The party and non-party witnesses, the voluminous documentation, the subject steam plant operation, and the counsel for SAI and Debtors are all located in Northern California. The State Action asserts various causes of action, including: Accounting; Breach of Contract; Specific Performance; and Declaratory Relief. (Exhibit C)

In a continuing effort to resolve the ongoing disputes regarding Debtors' non-compliance with the Agreement For Purchase and Settlement Agreement, SAI and its counsel meet with

1  Debtors, representative employees of Debtors, and Debtors' counsel. Such discussions did not
2  resolve the ongoing disputes. However, Debtors acknowledged, inter alia, they were unaware of the
3  underlying agreements, have not complied with the underlying agreements in several respects, have
4  not maintained the books and records reasonable detail to properly calculate direct operating
5  expenses and the general and administrative expenses in accordance with the underlying agreements,
6  and have not properly accounted for the general and administrative expenses in accordance with the
7  underlying agreements, but rather, caused SAI to bear the expenses from adjacent plants inconsistent
8  with the underlying agreements due to their own accounting preferences.

9  Debtors and others filed answers to the State Action. SAI propounded discovery on
10  parties of the State Action. In August 2005 and January 2006, Debtors filed Case Management
11  Conference Statements with the state court and represented to the state court, inter alia, "The
12  Calpine Defendants anticipate that plaintiff's document discovery will involve an enormous volume
13  of documents. Expert witness discovery will also be necessary."

14  On December 20, 2005, December 21, 2005, February 3, 2006, and May 2, 2006,
15  various Debtors filed petitions for bankruptcy effectively staying prosecution of the State Action.
16  Notices of the bankruptcy and the stay were filed in the State Action and served on SAI.

17  At least three Defendants to the State Action, namely Calpine Geysers Company,
18  L.P., Santa Rosa Geothermal Company, L.P., and Sonoma Geothermal Partners, L.P. served
19  discovery responses and indicated that documents responsive to SAI document requests were
20  transferred to Geysers Power Company, LLC on December 22, 2000 as part of a Agreement for
21  Purchase and Sale Of Assets. According to these same entities, Santa Rosa Geothermal Company,
22  L.P. changed its name to Calpine Geysers Company, L.P. on December 20, 1993, Sonoma
23  Geothermal Partners, L.P. was a general partner of Santa Rosa Geothermal Company, L.P., Calpine
24  Sonoma, Inc. was a general partner of Santa Rosa Geothermal Company, L.P. A Bill of Sale And
25  Assignment And Assumption Agreement and Memorandum Of Bill Of Sale And Assignment And
26  Assumption Agreement dated December 2000 provided by Debtors to SAI in the State Action is
27  attached hereto as Exhibit D. Otherwise, these discovery responses did not provide any substantive
28  information relative to the State Action.

On or about July 18, 2006, the remainder of State Action was stayed by the court because the named defendants and potential doe defendants were Debtors.

On July 27, 2006, SAI timely filed Proofs of Claim as indicated in the Objection, Exhibit D[2]. Attached to each Proof of Claim was an "Attachment to Proof of Claim" which detailed the factual background of the State Action, identified the substantive issues, and invited Debtors to contact SAI if it wanted to review the supporting documents currently available. SAI's proofs of claims do not carry specific figures because Debtors have thus far failed or refused to provide SAI with an annual certification from its chief financial office as required by the underlying agreements, prevented SAI from conducting an audit, and not provided documentation or discovery in the State Action and the bankruptcy stay has thus far prevented SAI from prosecuting the State Action and conducting related discovery. For example, Debtors' admitted failure and refusal to provide an annual certification of the NPI calculation (income and expenses) is by itself a breach of the underlying agreements; Debtors admitted inclusion of expenses from other plants not subject to the underlying agreements is by itself a breach of the underlying agreements; and Debtors' admitted "apportionment" of expenses from other plants and improper characterization as general overhead expenses for unrelated plants as "direct expenses" is by itself a breach of the underlying agreements.

The only practical issues are securing a determination of the proper amount of expenses to be used to properly calculate the NPI and monies owing to SAI and, if Debtors' continue to breach the agreements, a court judgment declaring the rights and obligations of SAI and the Debtors under the underlying agreements and requiring specific performance. As virtually all the factual and documentary evidence used to determine the amounts paid and payable to SAI pursuant to the underlying agreements rests with and/or are generated by Debtors, their purported ignorance is unpersuasive. SAI's claims, depending on and subject to the results of the audit and accounting, are estimated to range from the mid-$100,000 range to several hundreds of thousands, plus interest and attorneys fees as provided for in the underlying agreements.

Debtors have never requested any information regarding SAI's Proofs of Claim.

---

[2]SAI only attaches one of the six Proofs of Claim as they are similar.

On April 5, 2007, Calpine and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), filed DEBTORS' ELEVENTH OMNIBUS OBJECTION TO PROOFS OF CLAIMS, EQUITY INTEREST CLAIMS, UNLIQUIDATED CLAIMS, ANTICIPATORY CLAIMS, CLAIMS TO BE ADJUSTED AND WRONG DEBTOR CLAIMS TO BE ADJUSTED) (the "Objection"). The Objection, specifically pages 7-8, paragraphs 21-24, and Exhibit D, seek to disallow and expunge timely filed Proofs of Claim on the grounds:

> "23.    The reason that the Debtors are objecting to these Unliquidated Claims is because the Bar Date set in these Chapter 11 Cases was more than eight months ago and the Chapter 11 Cases have been pending for more than a year, while the claimants who filed these claims still have not supplemented their proofs of claim to substantiate and liquidate the claims or provided the Debtors with any additional information regarding the Unliquidated Claims. The Debtors have thoroughly reviewed their books and records and other information concerning each Liquidated Claims that has been made available to them, and submit that without additional information from the claimants, the Unliquidated Claims are unenforceable under section 502 (b)(1) of the Bankruptcy Code or any other applicable law or agreement."

By the Objection, the Debtors, the holders of written contracts, holders of the documentation regarding the income and expenses relating to the written contracts, the parties to a written contracts, the defendants in a filed civil action, and the parties withholding information from SAI, seek to disallow, without discovery, hearing, or trial, SAI's timely filed Proofs of Claims and eliminate SAI's pre-petition and the State Action.

On April 27, 2007, SAI timely filed a response to Debtors' Objection indicating this motion would be forthcoming. In addition, the response indicated, in part, that the Objection must be withdrawn or overruled as Debtors cannot be allowed to ignore their contractual obligations to SAI, withhold documents and evidence from SAI, prevent SAI from pursuing its State Action, take advantage of the bankruptcy stay, not ask claimant for additional information, and then, on short notice, try to expunge these timely filed Proofs of Claim, and otherwise mislead this court regarding Debtors' alleged investigation and lack of knowledge.

**III. LEGAL AUTHORITY AND ARGUMENT:**

**A. Relief From Stay:**

It is axiomatic that Section 362 (d) sets forth the various grounds for relief from the automatic stay. Moving parties seek relief from stay pursuant to Section 362(d)(1),(2), and (e).

Cause exist as it is necessary to permit pre-petition litigation to be concluded in another forum. (In re Castlerock Properties, 781 F.2d 159 (9th Cir. 1986) Packerland Packing Co., Inc. v. Griffith Brokerage Co. (In re S. Kemble), 776 F.2d 802 (9th Cir. 1985); In re Pro Football Weekly, Inc. 60 B.R. 824 (N.D. Ill. 1986))

The State Action must be tried and should be tried in Santa Clara County. Santa Clara County is, the proper, best, and most convenient forum for SAI, Debtors, non-Debtor parties, and witnesses . Northern California is home for SAI, home of Debtors, home for all non-party witness, home for the subject West Ford Flat facility, home of SAI's counsel, home of Debtors and non-party defendants' counsel, home of practically every factual witness, and the relevant records. Northern California is the only practical and cost effective option to resolve this lease dispute.

Further, the State Court action, as with virtually all such civil action filed within the State of California's state court system and in particular Santa Clara County, is subject to the Trial Delay Reduction Act (aka "Fast Track") which requires timely prosecution and timely trials.

**B. Abstention:**

Pursuant to 11 U.S.C. 1334 abstention is in order. 11 U.S.C. 1334, provides, in pertinent part:

> "(c)(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction."

SAI submits abstention is applicable to the State Action.

**IV.  CONCLUSION**

SAI submits that cause exist for relief from stay and abstention so SAI may continue prosecution of the State Court action against Debtors and non-debtors.

Dated: May 7, 2007  
CAMPEAU GOODSELL SMITH  
/s/ William J. Healy  
William J. Healy  
Attorneys for Creditor SAI

**MOTION FOR RELIEF FROM STAY**
9