KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
James J. Mazza, Jr. (admitted pro hac vice)
Chad J. Husnick (admitted pro hac vice)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE:** ) | **CHAPTER 11** |
| ) | |
| **CALPINE CORPORATION, ET AL.,** ) | **CASE NO. 05-60200 (BRL)** |
| ) | **JOINTLY ADMINISTERED** |
| **DEBTORS.** ) | |
| ) | |

**SUPPLEMENT TO DEBTORS' FIRST AMENDED JOINT PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE
UNITED STATES BANKRUPTCY CODE**

Dated: August 27, 2007

# TABLE OF CONTENTS

**DOCUMENT**

**EXHIBIT NUMBER**

**SOLICITATION MATERIALS**

    Solicitation Procedures ........................................................................... 1

**BANKRUPTCY DOCUMENTS**

    Retained Causes of Action.................................................................... 2

    List of Entities Excepted from Certain POR Provisions........................................ 3

    Contingent and Unliquidated Claims...................................................... 4

**DOCUMENTS RELATED TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

    Assumed Executory Contracts and Unexpired Leases ........................................... 5

    Rejected Executory Contracts and Unexpired Leases ........................................... 6

    Rejected Indemnification Obligations for Former Employees ............................. 7

    Repudiated FERC Jurisdictional Contracts ........................................................... 8

    Conditionally Assumed Executory Contracts and Unexpired Leases ................... 9

    Guarantees and Other Non-Executory Obligations Subject to Reinstatement ....... 10

**FINANCIAL DOCUMENTS**

    Liquidation Analysis............................................................................. 11

    Projections............................................................................................ 12

**CORPORATE DOCUMENTS**

    Management and Director Equity Incentive Plan.................................... 13

    Amended and Restated Bylaws of Calpine Corporation ........................ 14

    Restated Certificate of Calpine Corporation........................................... 15

    Entities To Be Merged or Eliminated .................................................... 16

| DOCUMENT | EXHIBIT NUMBER |
|----------|---------------|

Term Sheet Regarding Selection of Post-Emergence Board of
Directors of Reorganized Calpine Corporation ...................................................... 17

Term Sheet for Proposed Trading Restrictions on
Reorganized Calpine Common Stock ................................................................... 18

# Exhibit 11

Liquidation Analysis

**Calpine Liquidation Analysis**

A.      Introduction

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying the Liquidation Analysis (the "Notes").  Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

The Liquidation Analysis estimates potential Cash distributions to Holders of Allowed Claims and Interests in a hypothetical chapter 7 liquidation of the Debtors' assets.  Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtors prepared the Liquidation Analysis with the assistance of their advisors.

B.      Scope, Intent, and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.  No independent appraisals were conducted in preparing the Liquidation Analysis.  NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS.  ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules and Proofs of Claim Filed to date.  In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, wind-down costs, trustee fees, tax liabilities, and certain lease and contract rejection damages Claims.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis.  For purposes of the Liquidation Analysis, the Debtors' estimates of Allowed Claims contained in the Liquidation Analysis references specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to Holders of Allowed Claims and Interests are based on ranges of Allowed Claims and Interests.  Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS

INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## Global Notes to the Liquidation Analysis

1.         Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on December 31, 2007 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estates. Should multiple Trustees be appointed to administer the Estates, lower recoveries and higher administrative costs could result and distributions to Creditors could be delayed.

2.         Primary Assets of the Debtors

The Liquidation Analysis assumes a liquidation of all of the Debtors' assets, including the Debtors' interests in all non-Debtor Affiliates after third-party claims against such Affiliates are satisfied. The Debtors have two major categories of assets. The first category consists of seventy-two power generating facilities (the "Power Assets") primarily owned by Calpine Power Company and Calpine International Holdings, Inc. The second category consists of a portfolio of trading assets, primarily consisting of energy and commodity trading contracts (the "CES Contracts"), held by Calpine Energy Services, L.P. ("CES"), a subsidiary of Calpine Energy Services Holdings, Inc. The remainder of Calpine Corporation's "first tier" subsidiaries are shell companies that hold no material saleable assets, and, as such, no value is attributed to them in the Liquidation Analysis. The Debtors' NOLs are assumed to offset federal taxes (*e.g.*, capital gains) expected to be incurred by the Trustee in a liquidation; any NOLs remaining are ascribed no value in the Liquidation Analysis because the remaining NOLs do not retain value in a chapter 7 liquidation. The Liquidation Analysis does not attribute any value to the Debtors' intangible assets such as the Calpine tradename. Finally, other than certain Cash the Debtors will receive from the Canadian Debtors' arising out of the CCAA Proceeding, the Liquidation Analysis does not attribute any value to the Canadian Debtors' assets.

3.         Going-Concern Liquidation of Power Assets

The Liquidation Analysis assumes that the Trustee will attempt to maximize recoveries for Creditors by continuing to operate the Power Assets during the chapter 7 liquidation and then selling each Power Asset (along with any related assets) as going-concerns, subject to certain discounts described below. The Liquidation Analysis also assumes that the Trustee will assume and assign to the purchaser of such Power Assets all contracts related to that particular facility's operations. The Liquidation Analysis assumes that the Trustee will be able to continue to fund the Debtors' operations during the liquidation process using projected operating cash flow generated by the Power Assets and proceeds generated by the sale of the Power Assets and the CES Contracts. The Liquidation Analysis assumes an "orderly" liquidation, under which the liquidation of the Power Assets would occur over a period of twelve months starting on the Conversion Date. If the Power Assets' cash flows or estimated sale proceeds fall below estimates, however, the Trustee may not have sufficient funds to operate the Debtors' business for long enough to conduct an orderly liquidation and instead may have to engage in distressed sales of the Power Assets. The amount of proceeds realized in such distressed sales likely would be materially lower than those assumed in the Liquidation Analysis.

K&E 11869236.13

In addition, there is a risk that the Trustee would be unable to liquidate all of the Power Assets as going-concerns because the Bankruptcy Court may only allow the Trustee to operate the Debtors' business for a "limited period" under section 721 of the Bankruptcy Code. While the Bankruptcy Code does not set forth a specific time period under which a chapter 7 trustee is allowed to operate a debtor's business, the Bankruptcy Court may conclude that the twelve-month period assumed in the Liquidation Analysis exceeds the time contemplated by the Bankruptcy Code. Should the Bankruptcy Court limit the Trustee's operation of the Power Assets, proceeds from the sale of such assets likely would decrease.

4.      Liquidation of CES Contracts

The Liquidation Analysis assumes that the Trustee will continue to perform under the CES Contracts only to the extent required to liquidate such contracts. The Liquidation Analysis assumes that the Trustee will assume any CES Contracts with positive cash flows and assign such Contracts to buyers for value. The Liquidation Analysis further assumes that the Trustee will reject CES Contracts with negative cash flows, resulting in additional rejection damages Claims in a chapter 7 liquidation. The value of any trading contracts associated with a particular Power Asset is reflected in the value attributed to that Power Asset.

5.      Substantive Consolidation of the Estates

Consistent with the structure of the Plan, the Liquidation Analysis assumes that the Estates will be substantively consolidated into a single Estate from which all distributions to Creditors are made. As discussed in further detail in the Disclosure Statement, during the Chapter 11 Cases, the Debtors and their advisors spent over eighteen months analyzing, among other things, Calpine's corporate structure and accounting methods to determine if substantive consolidation of the Estates was necessary and appropriate. Following their in-depth analysis, the Debtors and their advisors concluded that, as a result of Calpine's integrated and complex corporate structure, the heavy volume of intercompany transactions necessitated thereby, and the scarcity of accounting resources that could be dedicated to intercompany bookkeeping during periods of substantial growth that appeared to result in needlessly convoluted and often inaccurate methods of accounting for intercompany claims, substantive consolidation is not only appropriate, but is in the best interests of Creditors. The analysis performed by the Debtors' advisors uncovered myriad systematic and endemic weaknesses in Calpine's intercompany accounts that led to a high rate of errors and inaccuracies. These weaknesses, error and inaccuracies have forced the Debtors' advisors to conclude that the accuracy of the Intercompany Claims as recorded cannot be presumed and that such Claims must be reconciled in order to establish even a minimal amount of accuracy. Based upon the age and sheer number of transactions, coupled with the scope of the related accounting issues, the Debtors' advisors cannot say with any confidence that the intercompany claims could be reconciled in a time and cost effective manner, even with unlimited funds and time to do so. Therefore, the separate administration of the Estates and the segregation of the commingled assets and liabilities would entail prohibitive costs and resultant delays with no assurance that such disentanglement could even be accomplished.

Accordingly, the Liquidation Analysis assumes that, as a result of the extensive entanglement of the Intercompany Claims and the prohibitively expensive cost of conducting a full reconciliation of such Claims, the Trustee would choose not to expend estate resources, which would otherwise be available for distributions to Creditors and Interest Holders, on such a task. Further, because the Debtors believe that Creditors did not rely on the separate credit of individual Debtors, there is minimal prejudice, if any, to Creditors resulting from substantive consolidation. Thus, the Liquidation Analysis assumes that the Trustee would be successful in obtaining authority to substantively consolidate the chapter 7 estates. As a result, Intercompany Claims are ignored for purposes of the Liquidation Analysis.

Should the Bankruptcy Court not authorize substantive consolidation of all of the Estates in a chapter 7 liquidation, recovery percentages in the Liquidation Analysis could change materially.

6.      Liquidation Analysis Waterfall and Recovery Ranges

The Liquidation Analysis assumes that the proceeds generated from the liquidation of the Power Assets and the CES Contracts, plus Cash estimated to be held by the Debtors on the Conversion Date and estimated preference action recoveries, will be available to the Trustee (the "Liquidation Proceeds"). The Trustee then would use the Liquidation Proceeds to satisfy non-Debtor liabilities (as described in further detail below), Secured Claims, the costs and expenses of the liquidation, including wind-down costs and Trustee fees (the "Liquidation Costs"), and such additional Administrative and Priority Claims that are estimated to be incurred in a chapter 7 liquidation. Any remaining net Liquidation Proceeds would then be allocated to Creditors and Interest Holders in accordance with the priorities set forth in section 726 of the Bankruptcy Code. The Liquidation Analysis provides for high and low recovery percentages for Claims and Interests upon the Trustee's application of the Liquidation Proceeds. The high and low recovery ranges reflect a high and low range of estimated Liquidation Proceeds from the Trustee's sale of the Power Assets.

7.      Factors Considered in Valuing Hypothetical Liquidation Proceeds

Certain factors may limit the amount of the Liquidation Proceeds available to the Trustee. Certain of these factors that relate specifically to the liquidation of the Power Assets and CES Contracts are discussed in further detail below. In addition, it is possible that distribution of the Liquidation Proceeds would be delayed while the Trustee and his or her professionals become knowledgeable about the Chapter 11 Cases and the Debtors' business and operations. This delay could materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

K&E 11869236.13

# CALPINE LIQUIDATION ANALYSIS

| Notes | | Claim Amount | Value | | Recovery | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| 1 | Power Plant Liquidation Value | | $10,066 | $12,205 | | |
| 2 | CES Liquidation Value | | 518 | 518 | | |
| 3 | Cash and Equivalents | | 1,706 | 1,706 | | |
| | **Gross Liquidation Proceeds Available for Distribution** | | $12,291 | $14,430 | | |
| 6 | DIP Claims | 4,188 | 4,188 | 4,188 | 100.0% | 100.0% |
| | **Proceeds Available to Admin and Priority Claims** | | $8,103 | $10,242 | | |
| 4 | Winddown Costs | 512 | 512 | 512 | 100.0% | 100.0% |
| 5 | Trustee Fees | 106 - 127 | 106 | 127 | 100.0% | 100.0% |
| 7 | Administrative Claims | 77 | 77 | 77 | 100.0% | 100.0% |
| 7 | Priority Claims | 1 | 1 | 1 | 100.0% | 100.0% |
| 7 | Priority Tax Claims | 70 | 70 | 70 | 100.0% | 100.0% |
| | **Net Liquidation Proceeds Available to Secured Claims** | | $7,338 | $9,455 | | |
| 8 | Second-Lien Debt Claims | 3,898 | 3,898 | 3,898 | 100.0% | 100.0% |
| 8 | Other Secured Claims | 101 - 110 | 101 | 110 | 100.0% | 100.0% |
| | **Proceeds Available to Unsecured Claims** | | $3,338 | $5,447 | | |
| 9 | Senior Note Claims | 802 | 507 | 802 | 63.3% | 100.0% |
| 9 | General Note Claims | 2,312 | 806 | 1,338 | 34.9% | 57.9% |
| 9 | ULC I Settlement Claims | 3,649 | 1,272 | 2,112 | 34.9% | 57.9% |
| 9 | Canadian Intercompany Claims | 335 | 117 | 194 | 34.9% | 57.9% |
| 9 | Rejection Damages Claims | 1,226 | 428 | 710 | 34.9% | 57.9% |
| 9 | General Unsecured Claims | 207 | 72 | 120 | 34.9% | 57.9% |
| 9 | Unsecured Deficiency Claims | 226 - 389 | 136 | 131 | 34.9% | 57.9% |
| | **Proceeds Available to Subordinated Unsecured Claims** | | - | $40 | | |
| 10 | Subordinated Unsecured Claims | 653 | - | 40 | - | 6.1% |
| | **Proceeds Available to Interests** | | - | - | | |
| 11 | Interests | | - | - | - | - |

C.     Specific Notes to the Asset and Liability Assumptions Contained in the Liquidation Analysis

The Liquidation Analysis refers to certain categories of assets and liabilities.  The numerical designation below corresponds to each line item with a specific note.

1.     Power Plant Liquidation Value

As stated above, the Liquidation Analysis assumes that the Trustee sells the Power Assets as going-concerns over a twelve-month period.  In determining the estimated proceeds from the sale of each Power Asset, the Debtors took into account factors specific to each Power Asset and factors affecting the value of the Debtors' entire portfolio of Power Assets.  The Debtors analyzed each Power Asset, reviewed the Projections as they apply to each Power Asset, and estimated a sale value for each Power Asset based upon, among other things: the projected financial results for each Power Asset (determined by the projected power and fuel prices in each region and the terms of any contracts at each Power Asset); each Power Asset's geographical location and the market characteristics of each geographical region; contracts associated with each Power Asset, including the tenor, price, and other key terms of such contracts; Power Asset operating characteristics such as age, generation technology, and fuel efficiency; each Power Asset's operating, maintenance, and, if applicable, start-up costs; and capital expenditure requirements for maintaining each Power Asset.

After reviewing the foregoing specific factors on a region-by-region basis, the Debtors discounted the sale proceeds for each Power Asset, to reflect, among other things, the following factors: (a) the practical difficulties of selling, in a compressed time frame, power assets throughout the United States representing over 22,000 MW of generating capacity; (b) the impact of seventy-two generating facilities simultaneously becoming available for sale in the market by one seller (*i.e.*, the Trustee) over a relatively short period of time; (c) the expected adverse effect the conversion to a chapter 7 liquidation would have on management and employee morale and customers' willingness to transact with, and extend credit to, the Trustee during the liquidation process; (d) the risk of intervention of regulatory authorities in connection with the operation of a project in a chapter 7 liquidation; and (e) the "as is" nature of the asset sales, given the Trustee's limited ability to provide representations and warranties and indemnities to purchasers.  The Liquidation Analysis also assumes that all the Power Assets are sold complete with all operating assets, and does not reflect the practical difficulties, if any, of combining, or separating and re-combining, assets that may be held by multiple Debtors or any limitations on the assumption and assignment of any contracts and leases.  Any such difficulty likely would decrease the total value the Trustee could obtain for the Power Assets.

As stated, consistent with the assumption that the Trustee will sell the Power Assets as going-concerns, the leases related to such Power Assets are assumed to be assigned and assumed by the buyers of such Power Assets.  Thus, the value of such leases are deducted from the Power Asset Liquidation Proceeds before such proceeds are made available to Creditors and Interest Holders.  In addition, the non-debtor project debt was deducted from the Power Asset Liquidation Proceeds before such proceeds are made available to Creditors and Interest Holders.  These non-Debtor liabilities are assumed to be satisfied before the Debtors benefit from their equity ownership in such assets.  Any Claim remaining after the value of the Power Asset is applied against its secured project financing or lease is reflected in the Unsecured Claim line item as a unsecured deficiency claim.

The Trustee's sale of the Power Assets as going-concerns may result in the incurrence of capital gains by the Trustee to the extent that proceeds obtained from the sale of any Power Asset exceeds that Power Asset's tax basis.  The Liquidation Analysis assumes that the Debtors' NOLs would exceed any capital gains and would be used by the Trustee to offset any such taxable gains.  In addition, the

exemption provided for in section 1146(a) of the Bankruptcy Code that permits a waiver of applicable state stamp and related transfer taxes is inapplicable in chapter 7 cases. The Trustee would be responsible for any such state taxes incurred. However, no estimates of such taxes are included in the Liquidation Analysis, which, if included, would reduce the proceeds generated by the sale of the Power Assets.

2.      CES Liquidation Value

As stated above, as part of its normal business operations, the Debtors maintain a portfolio of trading contracts not associated with any specific Power Asset. In determining the hypothetical chapter 7 liquidation value of these CES Contracts, the Debtors analyzed whether each CES Contract is cash flow-positive or cash flow-negative, based on each CES Contract's "mark-to-market" value, which measures the variance between the contract price and prevailing future market prices. The Liquidation Analysis assumes that CES Contracts determined to be cash flow-positive—in other words, "in-the-money" contracts—will be assumed by the Trustee and assigned to a purchaser for a specific price, the value of which is included in the Liquidation Proceeds. The Liquidation Analysis further assumes that CES Contracts determined to be cash flow-negative—in other words, "out-of-the-money" contracts—will be rejected by the Trustee, and will thus generate additional Claims based on the rejection of such contracts. The Liquidation Analysis also assumes that counterparties to CES Contracts rejected by the Trustee will apply any cash collateral to offset their rejection damage Claims, thus reducing the Cash assets available for distribution by the Trustee.

3.      Cash and Equivalents

Cash consists of cash balances as of December 31, 2007, including: (a) unrestricted cash in any of the Debtors' bank, operating, and reserve accounts; (b) restricted cash in any non-Debtor Affiliates' bank, operating, and reserve accounts; (c) cash currently posted in favor of counterparty contracts in the form of deposits that are assumed by the Trustee; (d) cash the Debtors expect to realize by performing under certain executory contracts; (e) certain settlements of Causes of Action the Debtors expect to be monetized prior to the Conversion Date; (f) any cash distributable to the Debtors from the Canadian Debtors' estates or otherwise arising out of the CCAA Proceedings; and (g) an estimated recovery by the Trustee of preference actions based on a preliminary analysis of payments made during the ninety-day preference period, viability of defenses to such preference actions, and the collectibility of such actions. Generally, the Liquidation Analysis assumes that the Trustee assumes and assigns contracts related to Power Assets to the purchaser of such Assets, and further assumes and assigns individual cash flow positive CES Contracts for value; thus, the Liquidation Analysis assumes that the Trustee will recover any Cash deposits held on account of such contracts upon assumption and assignment. Conversely, the Liquidation Analysis assumes that the applicable counterparty to rejected cash flow negative CES Contracts likely will apply any Cash held in such counterparty's favor against outstanding obligations under the relevant CES Contract. Therefore, it is assumed that such Cash is not recoverable unless the Cash held by the counterparty exceeds the estimated rejection or other damage claims under the applicable contract. In addition, other than the potential preference recoveries referred to above, the Liquidation Analysis does not assume any recoveries for any other avoidance actions.

**Liquidation Costs**

4.      Wind-Down Costs

To maximize recoveries on remaining assets, minimize the amount of Claims, and generally ensure an orderly liquidation, the Trustee will need to retain a substantial number of individuals currently employed by the Debtors during the chapter 7 liquidation process. These individuals will primarily be responsible for operating and maintaining the Debtor's assets, providing historical knowledge and insight

7

to the Trustee regarding the Debtors' businesses and the Chapter 11 Cases, and concluding the administrative wind-down of the business after the sale of the Debtors' assets. The Liquidation Analysis assumes that employee headcount associated with the Power Assets will be reduced to zero from the current levels over a twenty-four-month period, although the majority of any such employee-related costs are assumed to be incurred in the initial twelve-month period while the Trustee continues to operate the Power Assets. After the divestiture of the Power Assets, employee costs are assumed to decline substantially. The Liquidation Analysis assumes that the Debtors' employees that operate the CES Contracts would be reduced to zero from current levels over a twelve-month period.

Wind-down costs consist of the regularly occurring general and administrative costs required to operate the Debtors' assets during the liquidation process, and the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors. The Liquidation Analysis estimates the wind-down costs associated with maintaining a workforce, including employee wages, severance, retention bonuses, and other expenses, to be 2.2% to 2.6% of Liquidation Proceeds, excluding Cash. In addition, the Liquidation Analysis estimates that any professionals employed by the Trustee will generate actual and necessary fees during the wind-down process of approximately 0.8% to 0.9% of Liquidation Proceeds. This estimate is based upon a detailed review of the professionals determined to be necessary in a hypothetical chapter 7 liquidation, and each professionals' likely length of service and depth of involvement. This estimate also takes into account the time that will be required for the Trustee and any professionals to become educated with respect to the Debtors' businesses and the Chapter 11 Cases.

5.      Trustee Fees

Although section 326 of the Bankruptcy Code provides for statutory Trustee fees of 3.0% for liquidation proceeds in excess of $1,000,000, the Liquidation Analysis assumes conservatively that the Bankruptcy Court will only authorize Trustee fees of 1.0% of Liquidation Proceeds excluding Cash. Should the Bankruptcy Court authorize Trustee fees in excess of 1.0%, the Liquidation Proceeds available for distribution to Creditors and Interest Holders may be materially reduced.

**Claims**

6.      DIP Claims

There is approximately $4 billion outstanding under the DIP Facility, which is assumed to be satisfied in full from the Liquidation Analysis. Additionally, during the course of the Chapter 11 Cases, the Debtors have issued letters of credit under the DIP Facility to certain counterparties to CES Contracts. For purposes of the Liquidation Analysis, the Debtors have assumed that, to the extent of any defaults under such CES Contracts, these letters of credit would be drawn by such counterparties, who would otherwise hold Administrative Claims.

7.      Administrative and Priority Claims

Administrative and Priority Claims consist of: (a) Claims entitled to administrative expense priority under section 503 of the Bankruptcy Code; (b) reclamation Claims under section 503(b)(9) of the Bankruptcy Code; and (c) Claims entitled to priority under section 507 of the Bankruptcy Code. Because the Debtors' post-petition payables primarily relate to the operation of their Power Assets, which are assumed to be sold as going-concerns, the Liquidation Analysis assumes that such payables will be paid in the ordinary course by the purchaser. Claims arising from the post-conversion rejection of contracts that were assumed during the Chapter 11 Cases or entered into postpetition are also included in this category.

8

8.     Second-Lien Debt and Other Secured Claims

Secured Claims consists of Second Lien Debt Claims and the outstanding project debt at the Debtors' Bethpage facility.  The Secured Claims category also includes certain miscellaneous obligations secured by Liens on certain of the Debtors' assets.

The Liquidation Analysis assumes that Allowed First Lien Debt Claims and Second Lien Debt Claims do not include any Makewhole Claims notwithstanding the settlement regarding the Second Lien Debt Makewhole Claims reached during the Chapter 11 Cases and approved by the Bankruptcy Court on August 8, 2007.  If the Second Lien Debt settlement remained in effect in a chapter 7 liquidation, Claims would likely be materially higher.  Further, should the Bankruptcy Court determine that additional Makewhole Claims associated with the First Lien Debt or the Second Lien Debt are Allowed, the projected recoveries for Creditors in the Liquidation Analysis would be reduced materially.

The Liquidation Analysis assumes that the Secured Claim Holders would not be entitled to default interest or interest-on-interest (*i.e.*, compound interest).  Should the Bankruptcy Court determine otherwise, projected recoveries for Creditors in the Liquidation Analysis would be reduced materially.

In addition to letters of credit issued under the DIP Facility to counterparties to CES Contracts, the Debtors have issued other letters of credit or provided cash collateral to various CES Contract counterparties.  The Liquidation Analysis assumes that, upon the rejection of any such CES Contracts by the Trustee, these secured counterparties will draw on their letters of credit or permanently apply any cash collateral they hold in full or partial satisfaction of their Claims.  Thus, only the remainder of such Secured Claims after application collateral is reflected in the Secured Claims line item.

9.     Unsecured Claims

The Liquidation Analysis assumes that the Trustee will distribute the Liquidation Proceeds on account of the Senior Note Claims, the General Note Claims, the Unsecured Convenience Class Claims, the ULC1 Settlement Claims, the Canadian Intercompany Claims, the Rejection Damages Claims, and General Unsecured Claims (which includes unsecured trade claims, third-party accounts-payable and unsecured deficiency claims) on a *pari passu* basis.  The Liquidation Analysis' estimates for each of the foregoing Classes is based upon the Debtors' estimates of remaining Claims in each Class after the Claims objection, reconciliation, and resolution process as set forth in the Disclosure Statement subject to certain adjustments.  The Liquidation Analysis includes certain additional Claims (primarily rejection damages Claims) resulting from conversion of the Chapter 11 Cases to chapter 7 cases.  For purposes of the Liquidation Analysis, these estimates do not include interest accrued after the Petition Date because the Liquidation Analysis concludes that Unsecured Creditors will not be paid in full and, therefore are not entitled to postpetition interest.  If such parties are entitled to postpetition interest, the projected recoveries for Subordinated Unsecured Claim Holders would be reduced materially.

The Liquidation Analysis assumes that General Note Claims do not include any Makewhole Claims.  Should the Bankruptcy Court determine otherwise, the projected recoveries for other unsecured Creditors in the Liquidation Analysis would be reduced materially.

Certain Unsecured Creditors hold Claims against one or more of the Debtors based on the guarantees by such Debtors of liabilities of other Debtors or non-Debtors.  Consistent with the assumption of substantive consolidation, such Creditors are assumed to receive only one Claim against the consolidated Estate for the primary obligation, which is included as a General Unsecured Claim in the Liquidation Analysis.

K&E 11869236.13

The Liquidation Analysis assumes that the Canadian Guarantee Claims will be paid in full in the CCAA Proceedings. Thus, the Liquidation Analysis does not include any Canadian Guarantee Claims. If the Canadian Guarantee Claims are not paid in full in the CCAA Proceedings, then recoveries in the Liquidation Analysis would be reduced.

10. Subordinated Unsecured Claims

Under the subordination provisions of the $650,000,000 7.75% Contingent Convertible Notes Due June 1, 2015 issued by Calpine, Holders of Senior Note Claims must be paid in full prior to the receipt of any Liquidation Proceeds by Holders of Subordinated Note Claims. Thus, the Liquidation Analysis assumes that the Trustee would distribute any Liquidation Proceeds to which Holders of Subordinated Note Claims would be entitled absent subordination to Holders of Senior Note Claims until the Holders of Senior Note Claims are paid in full. Only when the Senior Note Claims are satisfied in full does the Liquidation Analysis provide for any recovery to Subordinated Note Claims.

11. Interests

There are insufficient Liquidation Proceeds for Interests Holders to obtain any recovery in the Liquidation Analysis.

10

# Exhibit 12


Projections

<u>**Projections**</u>

The Projections consist of the following unaudited pro forma financial statements: a projected income statement (the "Income Statement") for January 1, 2007 through December 31, 2012; a projected cash flow statement (the "Cash Flow Statement") for January 1, 2007 through December 31, 2012; and a balance sheet (the "Balance Sheet") projected as of an assumed Effective Date of December 31, 2007. The Projections are based on the Debtors' April 2007 business plan and the forecasted consolidated financial results of the Debtors, the Reorganized Debtors, and their non-debtor Affiliates.

THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE PROJECTIONS ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTION THEREOF CONTAINED IN ARTICLE V OF THE DISCLOSURE STATEMENT.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, COMMODITY PRICE FLUCTUATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE VI OF THE DISCLOSURE STATEMENT ENTITLED "CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS

EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

## I.     Income Statement and Cash Flow Statement

### (A)     Market and Operational Drivers

"Gross profit" in the Income Statement is based on the financial performance of the Debtors' power generating assets using an approach independently established by the Debtors' Professionals to forecast the Debtors' various power generating assets across their operating areas. In particular, the Income Statement accounts for the conditions in each regional market, trading and risk management activities, and plant specific factors, such as plant operating characteristics. The Income Statement's projections for the years 2007 and 2008 rely on forward market commodity prices as of January 31, 2007 (except for the month of January 2007 for which commodity spot prices were used). The Income Statements' projections for years 2009 through 2012 are based on a price forecast and operating performance as developed by the Debtors' energy industry consultants.

K&E 11915879.4

**(B)    Plant Operating and Maintenance Costs**

The Income and Cash Flow Statements' plant operating and maintenance expense estimates are based on the Debtors' 2007 budget, which was established on a plant-by-plant and account-by-account basis by Calpine plant management and finance staff and approved by senior management.  Key budget items include labor, insurance, variable expenses for materials such as water and chemicals, maintenance activities, and property taxes.

For the years after 2007, expenses were adjusted for inflation as well as projected changes in plant dispatch levels.  For example, variable operating and maintenance estimates on a dollar per megawatt hour basis were adjusted for inflation at a rate of 2.3% per year and applied to projected plant dispatch profiles to adjust budgeted expenses.  Property tax estimates reflect property tax abatement agreements when applicable.

**(C)    Minority Interests**

While Calpine holds a 100% interest in most of its operating assets, it holds less than a 100% interest in certain assets.  The accounting treatment for such minority ownership interests varies based on the ownership structure of the asset.  For purposes of the Income and Cash Flow Statements, the Russell City plant (65% ownership by Calpine) and the Greenfield plant (50% ownership by Calpine) were assumed to be consolidate and minority interest adjustments were made.  These minority interest adjustments also are reflected in the pro forma Cash EBITDAR forecast.

**(D)    Sales, General, Administrative, and Other**

In addition to market and plant specific factors, the Income Statement reflects other items, such as corporate overhead, which comprises the majority of the expense included in Sales, General, Administrative, and Other category, to determine Net Income.  Major components of the Debtors' corporate overhead consist of salaries, benefits, bonuses, outside services, office space, equipment, office expense, insurance, and other miscellaneous expenses. The Debtors' corporate overhead budget for year 2007 was prepared on a "bottom-up" basis, with each department submitting budgets for the upcoming fiscal year.  Each department forecasted year 2007 expenditures by analyzing expected personnel requirements, salaries, and anticipated additional cost savings through reductions in non-personnel related overhead spending.  These cost expenditures include expenses at both the corporate and department level. For the years 2008-2012, corporate overhead expenses are projected to increase at an annual rate of 2.3%.

**(E)    Reorganization and Other Restructuring Assumptions**

**1.    Restructuring Charges**

The Cash Flow Statement assumes that Calpine will incur approximately $361 million of cash restructuring charges in 2007.  These payments relating to the Chapter 11 Cases are comprised of professional fees, payment of administrative, priority, and other secured claims, management emergence bonuses, and relocation costs.  In addition, Calpine expects to incur approximately $50 million of restructuring charges in 2008, primarily from professional fees.

Professional fees were projected by examining the run-rate for professionals billing at hourly and fixed-rates for 2006 and estimating 2007 and 2008 run-rate billing levels, accounting for hold-backs, success fees, and projected post-exit work plans. Management emergence bonuses were calculated based on the formula provided for in the relevant employment agreement or incentive program.

### 2. Asset Rationalization

As of March 2007, Calpine had sold or turned-over eight projects or businesses since commencing the Chapter 11 Cases, generating net proceeds of $648 million and reducing project debt by $599 million and reducing lease obligations. The Projections assume additional net proceeds of $337 million will be raised via asset sales bringing total projected asset sales proceeds to $722 million for 2007. Calpine continues to evaluate its diverse asset portfolio and, therefore, any assumptions relating to the results of Calpine's asset rationalization efforts remain subject to material change. Moreover, assets are assumed to be sold at net "book value" and, therefore, will not include any impairment charges or any gains.

### 3. Contract Rationalization

"Contract rationalization" savings included in the Income and Cash Flow Statements are based on savings as a result of contracts and leases that have been terminated, repudiated, or restructured as of January 27, 2007. The Projections do not reflect any effect for restructuring the SCE contract. The contract rationalization process is expected to result in a material improvement in annual cash flow during the forecasted period.

### (F) Income Taxes

Generally, projected income taxes in the Income and Cash Flow Statements include both state income taxes and the federal alternative minimum tax, as well as provisions for deferred federal taxes. For purposes of forecasting potential taxable income, the Projections assume that Calpine retains sufficient NOLs to offset most taxable income during the forecasted period. However, a final assessment of Calpine's usable NOLs may vary based on the structure of the Plan and events occurring after the Effective Date. In addition, Reorganized Calpine's use of its NOLs may be subject to certain limitations under section 382 of the Internal Revenue Code, which could have a material impact on the level of income tax that the Reorganized Debtors would be required to pay. For the year 2008 only, the Projections reflect a $36 million payment by the Reorganized Debtors to the IRS based on the settlement of the IRS's 1997 – 2002 audit of Calpine.

### (G) Capital Expenditures and Major Maintenance

Capital expenditures and major maintenance reflected in the Income and Cash Flow Statements are for upkeep and investment in power generation assets. For purposes of the Projections, Calpine's capital expenditures are assumed to include maintenance and construction and investment capital expenditures. The Projections assume that Calpine will obtain third-party financing for a majority of its construction capital expenditures.

For years 2007 and 2008, the Projections estimate of capital expenditures reflect budgeted amounts for capitalized mandatory major maintenance, new plant construction, and other essential capital projects. Capital expenditures for years 2009 through 2012 are projected on a plant-by-plant basis.

### (H) Financing Activities

Principal payments and proceeds from borrowings reflected in the 2007 Cash Flow Statement reflect the receipt of proceeds from the Replacement DIP Facility, which were used to pay the Original DIP Facility and the CalGen Secured Debt. Additionally, the Cash proceeds from the New Credit Facility and the use of such Cash are both reflected in the Financing Activities section of the Cash Flow Statement.

## II. Balance Sheet

The Balance Sheet reflects the Reorganized Debtors' and their Affiliates' pro forma projected consolidated balance sheet as of the Effective Date, based upon the New Calpine Total Enterprise Value, which is the midpoint range of the total enterprise value of the Reorganized Debtors, as set forth in Article V of the Disclosure Statement. The Balance Sheet was developed from the December 31, 2006 balance sheet contained in Calpine's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, as adjusted for the projected income and cash flow for 2007 and may not be in accordance with generally accepted accounting practices. The Balance Sheet does not reflect the impact of generally accepted "fresh start" accounting. Adjustments were made to the December 31, 2007 balance sheet for illustrative purposes only to demonstrate the effect of the Plan on a pro forma balance sheet. The Debtors did not forecast changes in certain balance sheet items, which therefore remain constant on the Balance Sheet.

The Balance Sheet contains certain pro forma adjustments as a result of Plan Consummation. This opening balance sheet also includes the debt and other obligations of Calpine's non-debtor Affiliates, because these obligations will continue to remain outstanding and will be paid in the ordinary course of each non-debtor Affiliate's operations. Certain liabilities subject to compromise will be converted to equity as a result of the Reorganized Debtors' issuance of New Calpine Common Stock (based upon the New Calpine Total Enterprise Value) to satisfy Allowed Claims under the Plan. The projected opening cash balance includes certain cash items from the sale of claims and other working capital related items.

Calpine has adjusted Property, Plant & Equipment in order for the Balance Sheet to reflect assumed Reorganized Equity Value in the low claims case. The effect of "fresh start" accounting when implemented may result in changes in assets other than Property, Plant & Equipment to reflect the Reorganized Equity Value.

On the Effective Date, the Reorganized Debtors will enter into the New Credit Facility and use the proceeds of that Facility and existing distributable Cash on hand to pay in full in Cash Allowed DIP Facility Claims, Administrative Claims, First Lien Debt Claims, Second Lien Debt Claims, Other Secured Claims, Other Priority Claims, and Unsecured Convenience Class Claims. On the Effective Date, actual Cash may vary from Cash reflected in the Balance Sheet

K&E 11915879.4

because of variances in the Projections and potential changes in the Debtors' need for Cash to consummate the Plan.

# Exhibit 17


# Term Sheet Regarding Selection of Post-Emergence Board of Directors of Reorganized Calpine Corporation

TO COME

# Exhibit 18

# Term Sheet for Proposed Trading Restrictions on Reorganized Calpine Common Stock

**Term Sheet for Proposed Trading Restrictions
on Reorganized Calpine Common Stock**

Reorganized Calpine's Restated Certificate of Incorporation will provide:

1.    No tax restrictions on trading (either buying or selling) after emergence from bankruptcy other than as provided herein.

2.    In the event that the following two events (the "Trigger Provisions") both occur, Reorganized Calpine's Board of Directors shall meet on an expedited basis to determine whether to impose trading restrictions on transfers of Calpine equity.  The Trigger Provisions are:

a.    The market capitalization of Calpine equity has dropped (determined without regard to extraordinary dividends) by at least 35% from the market capitalization that existed at bankruptcy emergence.  The market capitalization at emergence will be determined based on the weighted average trading price over the 30-day period following emergence, which price Calpine shall announce via press release and 8-K promptly after it is determined.  Whether the market capitalization has declined by 35% (the "Trigger Price") will be determined based on a rolling 30-day weighted average price.

b.    At least 25 percentage points of "owner shift" will have occurred with respect to Calpine equity for purposes of Section 382 of the Internal Revenue Code and the Treasury regulations thereunder (collectively, "Section 382") since Calpine's most recent "ownership change," as reasonably determined by Calpine (in consultation with outside counsel) in accordance with Section 382.

3.    The decision by Calpine's Board of Directors to impose trading restrictions will require a vote by 2/3 of such Directors.  Calpine shall promptly announce the imposition of such restrictions by means of a press release and the filing of an 8-K.

4.    If Calpine's Board of Directors votes to impose restrictions, the principal terms of such restrictions will be:

a.    Any acquisition of stock by a person or entity who is not a 5% shareholder of Calpine will be null and void ab initio as to the purchaser to the extent such acquisition causes such person or entity to become a 5% shareholder, unless the acquisition of such stock (i) has been approved by Calpine's Board of Directors, or (ii) will not result in an increase in an "owner shift" for purposes of Section 382 in excess of any "owner shift" that would have occurred if the seller had sold the same amount of stock in the market (e.g., because the stock is purchased from another 5% shareholder whose stock acquisition had caused an owner shift) (a "Permitted Acquisition").

b.      Any person or entity that is a 5% shareholder of Calpine shall not be permitted to acquire any additional stock of Calpine without the consent of Calpine's Board of Directors, unless the acquisition is a Permitted Acquisition.

Any shareholder seeking to use the "Permitted Acquisition" exception in the case of 4(a) or (b) above shall either (A) contemporaneously with such Permitted Acquisition, notify Calpine of such transaction, represent to Calpine that such transaction is a Permitted Acquisition and acknowledge that if such transaction is not a Permitted Acquisition it will be subject to the consequences set forth herein (form of such notice, representation and acknowledgement to be pre-agreed to facilitate rapid execution) or (B) prior to such transaction, notify Calpine of its intent to engage in a Permitted Acquisition and provide relevant factual information sufficient to establish that the acquisition will qualify as a Permitted Acquisition and within 10 days of such notice, Calpine shall indicate whether such proposed transaction will qualify as a Permitted Acquisition.

c.      There shall be no restriction on the ability of any person or entity to dispose of any reorganized Calpine stock.

d.      Calpine will announce by press release and 8-K if its Board of Directors shall determine that trading restrictions are no longer required, or if the Trigger Provisions are no longer satisfied.  Provided, however, that if trading restrictions shall be imposed following a decline in the value of Calpine's market capitalization, any increase in the value of Calpine's stock shall not result in the lapse of such restrictions unless such increase (determined on a weighted-average 30-day trading period) shall be at least 10% above the Trigger Price.

5.      All shareholders that have filed or would be required to file a Form 13D or 13G with the Securities and Exchange Commission shall be required to provide information to Calpine regarding such shareholder's ownership of Calpine stock, including the dates of the acquisition and disposition of such stock and the amounts of such acquisitions and dispositions, to the extent requested by Calpine.  Such information shall be provided within five business days of Calpine's request, and shall be subject to standard confidentiality provisions.

6.      The restrictions described herein, once in effect, shall be subject to the standard rules for corporations emerging from bankruptcy, including that any acquisitions of stock in violation of such restrictions shall be null and void ab initio without any action being taken by Calpine.  In addition, the Board's authorization to impose trading restrictions hereunder shall lapse on the fifth anniversary of Calpine's emergence from bankruptcy.  Any trading restrictions imposed prior to such fifth anniversary shall continue to apply until the Trigger Provisions are no longer satisfied.

7.      Terms used herein are intended to have the meanings ascribed to them under Section 382 and shall be construed accordingly.