KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Helena C. Huang (HH 9892)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO ASSUME THE CONSTRUCTION AND OPERATING AGREEMENT BETWEEN THE CITY OF SANTA ROSA AND GEYSERS POWER COMPANY, LLC AND (B) APPROVING CERTAIN AMENDMENTS THERETO**

PLEASE TAKE NOTICE that at 10:00 a.m. (ET) on September 11, 2007, the Debtors, by their counsel, shall appear before the Honorable Judge Burton R. Lifland, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 623, or soon thereafter as counsel may be heard, and present the Debtors' Motion for Entry of an Order (a) Authorizing the Debtors to Assume the Construction and Operating Agreement between the City of Santa Rosa and Geysers Power Company, LLC and (b) Approving Certain Amendments Thereto.

PLEASE TAKE FURTHER NOTICE that the Hearing may be adjourned thereafter from time to time without further notice.

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (in either case, with a hard copy delivered directly to Chambers) and shall be served upon: (a) counsel to the Debtors, Kirkland & Ellis LLP, 153 E. 53rd Street, New York, New York 10022, Attn: Helena C. Huang, and Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601, Attn: David R. Seligman and Adam Paul; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.: Paul Schwartzberg, (c) counsel to the Unofficial Committee of Second Lien Debtholders, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064, Attn.: Alan W. Kornberg, Andrew N. Rosenberg, Elizabeth R. McColm; (d) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attn.: Michael S. Stamer, Philip C. Dublin, Alexis Freeman; (e) counsel to the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn.: Gary Kaplan; (f) counsel to the City of Santa Rosa, Heller Ehrman LLP, Seven Times Square, New York, New York 10036, Attn: Russell L. Reid, Jr. and Timothy S. Mehok; and (g) Office of the City Attorney, City of Santa Rosa, 100 Santa Rosa Avenue, Room 8, Santa Rosa,

California 95404, Attn: Suzanne C. Rawlings, Asst. City Attorney so as to be received no later

than September 7, 2007 at 12:00 p.m. (ET).

Dated:  August 29, 2007
      New York, New York

                                Respectfully submitted,

                                 /s/  Marc Kieselstein
                                Richard M. Cieri (RC 6062)
                                Marc Kieselstein (admitted *pro hac vice*)
                                David R. Seligman (admitted *pro hac vice*)
                                Edward O. Sassower (ES 5823)
                                Helena C. Huang (HH 9892)
                                KIRKLAND & ELLIS LLP
                                Citigroup Center
                                153 East 53rd Street
                                New York, New York 10022-4611
                                Telephone:  (212) 446-4800
                                Facsimile:  (212) 446-4900

                                Counsel for the Debtors

**Hearing Date: September 11, 2007 at 10:00 a.m. (ET)**
**Objection Deadline: September 7, 2007 at 12:00 p.m. (ET)**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Helena C. Huang (HH 9892)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|   |   |
|---|---|
| In re: | ) |
|  | ) |
|  | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
|  | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
|  | ) |

_____

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS
TO ASSUME THE CONSTRUCTION AND OPERATING AGREEMENT BETWEEN THE
CITY OF SANTA ROSA AND GEYSERS POWER COMPANY, LLC AND (B)
APPROVING CERTAIN AMENDMENTS THERETO**

The above-captioned debtors (collectively, the "Debtors") file this motion (the "Motion")

seeking entry of an order, substantially in the form attached hereto as Exhibit A, (a) authorizing the

Geysers Power Company, LLC ("GPC") to assume that certain Construction and Operating

Agreement with the City of Santa Rosa, California (the "City") pursuant to section 365 of the

Bankruptcy Code and (b) approving certain amendments thereto.  In support of this Motion, the

Debtors respectfully state as follows:

**Jurisdiction**

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This

matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory predicates for the relief requested herein are sections 105(a), 363(b) and 365 of the Bankruptcy Code, Bankruptcy Rule 6006 and Rule 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for Southern District of New York (the "Local Rules").

## Background

4.        On December 20, 2005 (the "Petition Date"), the Debtors filed their voluntary petitions for relief (the "Reorganization Cases") under chapter 11 of the Bankruptcy Code.[1] The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.        On January 9, 2006, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") in these Reorganization Cases. On May 9, 2006, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee"). No trustee or examiner has been appointed in these Reorganization Cases.

6.        Calpine Corporation ("Calpine" and, together with its direct and indirect subsidiaries including GPC, the "Company") is involved in the development, construction, ownership and operation of power generation facilities and the sale of electricity and its by-product, thermal energy, primarily in the form of steam, predominantly in North America. The Company operates the largest fleet of natural gas-fired power plants in North America. The Company has ownership interests in, and operates, gas-fired power generation and cogeneration facilities, pipelines, geothermal steam fields and geothermal power generation facilities.

7.        The Company owns, leases and operates power plants throughout the United States and in Canada. The Company also has interests in several plants under active construction. The

---

[1]    Certain of the Debtors filed their chapter 11 petitions after December 20, 2005.

Company markets electricity produced by its generating facilities to utilities and other third party purchasers while thermal energy produced by the gas-fired power cogeneration facilities is sold primarily to industrial users.  The Company offers to third parties energy procurement, liquidation and risk management services, engineering and repair and maintenance services.

### Construction and Operating Contracts

8.     GPC owns nineteen geothermal electric generating facilities (collectively, the "Geysers Facilities") located in Sonoma and Lake Counties, California.  GPC (as successor-in-interest to Union Oil Company of California, NEC Acquisition Company and Thermal Power Company) and the City are parties to the Construction and Operating Agreement for the Santa Rosa Recharge Project, dated as of April 14, 1998 (as amended by a First Amendment, dated as of June 10, 2004, the "Construction and Operating Agreement"), attached hereto and incorporated herein as Exhibit B, pursuant to which the City agreed, *inter alia*, to construct and operate a water supply pipeline between the City and the Geysers Facilities and for the City to provide GPC with tertiary treated, recycled water so that GPC could inject the water for the purpose of recharging its subsurface steam reservoir.

9.     The Debtors have determined, in their sound business judgment, that assuming the Construction and Operating Agreement and continuing to perform their obligations thereunder is in the best interest of the Debtors, subject to amending certain terms of the Construction and Operating Agreement.

10.     To this end, the Debtors commenced negotiations with the City to amend the Construction and Operating Agreement in June 2006.  As a result of the good faith negotiations between the parties, and subject to the approval of this Court, the Debtors and the City have executed the Second Amendment to the Construction and Operating Agreement, dated as of August 14, 2007 (the "Second Amendment"), attached hereto and incorporated herein as Exhibit C.

11.     The Second Amendment provides, among other things, an increase in the daily average water supply from approximately 11 mgd to 20 mgd, to be phased-in over time, and guaranteed annual delivery and acceptance volumes, which would be subject to liquidated damages for failure to perform.  Acceptance by GPC of the increased water quantity is contingent on receiving all necessary governmental authorizations for increasing the quantity of delivered water. In addition, the Second Amendment eliminates GPC's current obligations to provide a $28 million letter of credit for the next 16 years and to fund a $30 million financial assurance fund over a 25-year period.  Instead, the Second Amendment substitutes a Calpine Corporation parent guarantee, along with an annual payment of $300,000 per year for 15 years, in lieu of the letter of credit and financial assurance fund.  It also includes an extension of the Construction and Operating Agreement by four years to 2037 and a mutual termination fee.  Finally, the Second Amendment limits the City's first right of refusal to purchase part of GPC's power supply facilities to 180 days following termination of the Agreement.

12.     The Debtors believe the Second Amendment allows GPC to obtain additional water from the City and eliminates the requirement for certain financial assurance funds, therefore increasing the cash flow of the Debtors by a minimum amount of $12 million for the term of the Construction and Operating Agreement, as amended.  Overall, the Second Amendment provides a significant gain to the gross margins of the Debtors' current business plan.  Given the significant improvement the Debtors have obtained through the Second Amendment, the Debtors have determined, in their business judgment, that the assumption of the Construction and Operating Agreement, as modified by the Second Amendment, at this time is in the best interests of their businesses, their estates and the parties in interest.

13.     The effectiveness of the Second Amendment is contingent, among other things, upon Bankruptcy Court approval of the assumption of the Construction and Operating Agreement pursuant to section 365 of the Bankruptcy Code.

### Relief Requested

14.     By this Motion, the Debtors seek authority to (a) assume the Construction and Operating Agreement, as amended, pursuant to section 365 of the Bankruptcy Code and (b) enter into the Second Amendment.  The Debtors believe that the Construction and Operating Agreement is beneficial to the ongoing successful operation of the Geysers Facilities both during and upon emergence from chapter 11.  Given the benefits provided by the Construction and Operating Agreement, the Debtors believe the relief requested is in the best interests of the estates and is well within the exercise of the Debtors' sound business judgment.

### Basis for Relief

I.     **The Court Should Approve the Assumption of the Construction and Operating Agreement Pursuant to Section 365 of the Bankruptcy Code.**

   A.     *Assumption of the Construction and Operating Agreement is in the Debtors' Best Interests.*

15.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  A contract is executory where performance remains due, to some extent, on both sides. See Shoppers World Cmty. Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.), 2001 WL 1112308, at *1, 6 (S.D.N.Y. 2001) (finding that substantial material obligations remained to be performed by both the contracting parties such that the contract was still executory); Eastern Air Lines, Inc. v. Ins. Co. of PA (In re Ionosphere Clubs, Inc.), 85 F.3d 992, 998-99 (2d Cir. 1996).

16.     The standard to be applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved

is the "business judgment" test, which requires that the debtor have determined that the requested assumption or rejection would be beneficial to its estate. See, e.g., In re Group of Inst. Investors, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943) (noting "the question [of assumption] is one of business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (finding that to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one); In re Nat'l Sugar Ref. Co., 26 B.R. 765, 767 (Bankr. S.D.N.Y. 1983) (holding that absent invalidation, a debtor seeking to assume a profitable contract should be allowed to do so); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996) (finding that the decision to assume was good business judgment where assumption would allow the debtor estate to substantially reduce an outstanding proof of claim and receive payments in the future).

17.    Upon finding that the debtor has exercised its sound business judgment in determining that the assumption or rejection of an executory contract or unexpired lease is in the best interests of the debtors, its creditors and all parties in interest, the court should approve such assumption or rejection under section 365(a) of the Bankruptcy Code. See, e.g., In re Riodizio, Inc., 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997); In re Bradlees Stores, Inc., 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989).

18.    Some courts have defined the elements of the business judgment standard in the context of an assumption of an executory contract or unexpired lease as (a) whether the contract or lease is profitable or advantageous to the debtor, and (b) whether the estate will be able to perform its contractual obligations under the contract or lease. See Nat'l Sugar, 26 B.R. at 765; In re Del Grosso, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990). Under the "business judgment" standard, the

6

debtor's decision to assume or reject "should not be interfered with, absent a showing of bad faith or abuse of business discretion."  See In re Chipwich, Inc., 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985).

19.     The Debtors have determined, in the exercise of their business judgment, that it is in the best interests of the Debtors to assume the Construction and Operating Agreement, as amended. As previously stated, the Debtors' relationship with the City is important to the continued operations of the Geysers Facilities.  After determining the importance of this relationship, the Debtors analyzed the Construction and Operating Agreement and the potential consequences of its assumption or rejection.  The Debtors then began negotiations with the City to improve the economics of the Construction and Operating Agreement and now have reached a beneficial agreement with the City that increases value for the Debtors on a going forward basis.

20.     Indeed, the Debtors' estates will save a minimum of $12 million over the remaining term of the amended Construction and Operating Agreement as a direct result of the Second Amendment.  The Second Amendment also ensures that the parties continue their relationship for at least 30 years.  Thus, the Debtors have determined, in their business judgment, that assumption of the Construction and Operating Agreement at this time is in the best interests of the Debtors' estates and their creditors.

**B.       The Debtor Has Provided for Adequate Assurance and Payment of Cure Amounts.**

21.     By entering into the Second Amendment, the City has by implication agreed that any amounts necessary to cure the defaults under the Construction and Operating Agreement (the "Cure Amount") pursuant to section 365(b)(1)(A) of the Bankruptcy Code have been fully satisfied and, in fact, no further Cure Amount is required from the Debtors to assume the Construction and Operating Agreement, as amended by the Second Amendment; provided, however, that the assumption of the Construction and Operating Agreement shall not reduce, expunge, eliminate or

otherwise affect the City's claim against the Debtors based on the Geysers fire (designated as Claim No. 5540).

22.    The Second Amendment provides that Calpine Corporation will provide a parent guaranty of the payment, up to a maximum of $41.2 million, of all of GPC's obligations under the Construction and Operating Agreement, thereby eliminating the requirement for a letter of credit and other financial assurances under the Construction and Operating Agreement.  The Debtors submit that upon approval of the Second Amendment, the Debtors will have fully cured all defaults arising under the Construction and Operating Agreement that are required to be cured by section 365(b)(1)(A) of the Bankruptcy Code (after giving effect to section 365(b)(2) of the Bankruptcy Code).

23.    Finally, the Debtors believe they have adequate financial capacity to perform their obligations under the Construction and Operating Agreement pursuant to section 365(b)(1)(C). First, the Debtors have access to a $5 billion debtor in possession credit facility.  Second, Calpine is issuing a guaranty of the timely payment of all of GPC's obligations under the Construction and Operating Agreement.  As such, the Debtors are confident that they will be able to meet the obligations under the Construction and Operating Agreement going forward.  The Debtors submit that there is sufficient adequate assurance of future performance present here and accordingly they should be authorized to assume the Construction and Operating Agreement.

## **Memorandum of Law**

24.    This Motion includes citations to the applicable authorities and a discussion of their application to this Motion.  Accordingly, the Debtors respectfully submit that such citations and discussion satisfy the requirement that the Debtors submit a separate memorandum of law in support of this Motion pursuant to Rule 9013-1 of the Local Rules.

## Notice

25.    Notice of this Motion has been provided to: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Creditors' Committee; (c) counsel to the administrative agents for the Debtors' prepetition secured lenders; (d) counsel to the ad hoc committees; (e) the indenture trustees pursuant to the Debtors' secured indentures; (f) counsel to the Debtors' postpetition lenders; (g) the Securities and Exchange Commission; (h) the Internal Revenue Service; (i) the United States Department of Justice; (j) counsel to the Equity Committee; (k) all parties entitled who have requested notice pursuant to Bankruptcy Rule 2002; (l) counsel to the City of Santa Rosa, Heller Ehrman LLP, Seven Times Square, New York, New York 10036, Attn: Russell L. Reid, Jr. and Timothy S. Mehok; and (m) Office of the City Attorney, City of Santa Rosa, 100 Santa Rosa Avenue, Room 8, Santa Rosa, California 95404, Attn: Suzanne C. Rawlings, Asst. City Attorney.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.  A copy of the Motion is also available on the website of the Debtors' notice and claims agent, Kurtzman Carson Consultants LLC, at http://www.kccllc.net/calpine.

26.    No prior application for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request an entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) authorizing the Debtors to assume the Construction and Operating Agreement (as amended by the Second Amendment) pursuant to section 365 of the Bankruptcy Code; (b) approving entry into the Second Amendment to the Construction and Operating Agreement; and (c) granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:  August 29, 2007
        New York, New York

Respectfully submitted,

 /s/  Marc Kieselstein
 Richard M. Cieri (RC 6062)
 Marc Kieselstein (admitted *pro hac vice*)
 David R. Seligman (admitted *pro hac vice*)
 Edward O. Sassower (ES 5823)
 Helena C. Huang (HH 9892)
 KIRKLAND & ELLIS LLP
 Citigroup Center
 153 East 53rd Street
 New York, New York  10022-4611
 Telephone:  (212) 446-4800
 Facsimile:  (212) 446-4900

 Counsel for the Debtors

## **EXHIBIT A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | ) Chapter 11 |
| Calpine Corporation, <u>et</u> <u>al.</u>, | ) |
|  | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
|  | ) |

**ORDER (A) AUTHORIZING THE DEBTORS TO ASSUME THE CONSTRUCTION
AND OPERATING AGREEMENT BETWEEN THE CITY OF SANTA ROSA AND
GEYSERS POWER COMPANY, LLC; AND (B) APPROVING CERTAIN
AMENDMENTS THERETO**

Upon the motion (the "Motion")[1] of the above-captioned debtors (collectively, the "Debtors") for entry of an (a) Authorizing the Debtors to Assume the Construction and Operating Agreement between the City of Santa Rosa and Geysers Power Company, LLC and (b) Approving Certain Amendments Thereto; it appearing that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties in interest; it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); it appearing that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; notice of this Motion and the opportunity for a hearing on this Motion was appropriate under the particular circumstances and that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED

1.      The Motion is approved in its entirety.

2.      The Second Amendment to the Construction and Operating Agreement is approved in its entirety.

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

3.       The Debtors are deemed to have assumed the Construction and Operating Agreement, as amended by the Second Amendment, pursuant to section 365 of the Bankruptcy Code.

4.       There are no cure amounts required to be paid prior to the assumption of the Construction and Operating Agreements and the Debtors are deemed to have fully cured all defaults arising under the Construction and Operating Agreement that are required to be cured by section 365(b)(1)(A) of the Bankruptcy Code (after giving effect to section 365(b)(2) of the Bankruptcy Code).

5.       The City is barred and permanently enjoined from asserting against the Debtors any default, claim or liability existing, accrued, arising or relating to the Construction and Operating Agreement for the period prior to the entry of this Order; provided, however, that nothing herein shall reduce, expunge, eliminate or otherwise affect the City's claim against the Debtors based on the Geysers fire (designated as Claim No. 5540).

6.       The Debtors have demonstrated adequate assurance of future performance and have satisfied the requirements of section 365(b)(1)(C) of the Bankruptcy Code.

7.       The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

8.       All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

9.       The requirement set forth in Rule 9013-1(b) of the Local Rules that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

10.    To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

11.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated: September __, 2007

_____
United States Bankruptcy Judge

## **EXHIBIT B**

Construction and Operating Agreement

4/17/98

24245.23

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

CITY OF SANTA ROSA
OFFICE OF THE CITY ATTORNEY
100 SANTA ROSA AVENUE
P.O. BOX 1678
SANTA ROSA, CA. 85402-1678

# CONSTRUCTION AND OPERATING AGREEMENT
## SANTA ROSA GEYSERS RECHARGE  PROJECT

Between

City of Santa Rosa

and

Union Oil Company of California
NEC Acquisition Company
Thermal Power Company

## TABLE OF CONTENTS

RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.   PROJECT RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.   PROJECT PERMITS AND TITLE . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4.   DESIGN AND CONSTRUCTION OF PROJECT . . . . . . . . . . . . . . . . . 3

5.   PAYMENT OF COSTS AND EXPENSES . . . . . . . . . . . . . . . . . . . . . . 3

6.   OPERATION AND MAINTENANCE OF THE PROJECT . . . . . . . . . . . 3

7.   DELIVERY AND ACCEPTANCE OF WATER . . . . . . . . . . . . . . . . . . . 4

8.   QUALITY OF WATER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9.   NO RESALE OF WATER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10.  JOINT OVERSIGHT COMMITTEE . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

11.  DUTIES OF JOINT OVERSIGHT COMMITTEE . . . . . . . . . . . . . . . . . 5

12.  DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

13.  FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

14.  LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15.  SUPPLY INTERRUPTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16.  TERM OF AGREEMENT AND PAYMENT TO CITY . . . . . . . . . . . . . 7

17.  DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18.  COVENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

19.  LETTER OF CREDIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

20.  TERMINATION OF AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

i

21.   SPECIFIC PERFORMANCE .......................................... 10

22.   NO COMPENSATION .............................................. 10

23.   ASSIGNMENTS .................................................. 10

24.   INSURANCE .................................................... 10

25.   INDEMNITY .................................................... 11

26.   NO DEDICATION OF FACILITY .................................... 12

27.   NO THIRD PARTY BENEFICIARIES ................................. 12

28.   GOVERNING LAW ............................................... 12

29.   OBLIGATIONS AND RELATIONSHIP OF THE PARTIES ................. 12

30.   SECTION HEADINGS ............................................ 13

31.   ENTIRE AGREEMENT ........................................... 13

32.   NONDISCRIMINATION IN EMPLOYMENT ........................... 13

33.   COMPLIANCE WITH LAWS ....................................... 13

34.   SEVERABILITY ................................................ 14

35.   WAIVER ...................................................... 14

36.   AMENDMENT AND MODIFICATION ............................... 14

37.   NOTICES ..................................................... 14

38.   RECORDATION ................................................ 15

      WITNESS .................................................... 16

      EXHIBITS ................................................... 17

ii

# CONSTRUCTION AND OPERATING AGREEMENT
# SANTA ROSA GEYSERS RECHARGE PROJECT

THIS CONSTRUCTION AND OPERATING AGREEMENT ("Agreement"), is entered into this __14th__ day of __April_____, 1998, between the CITY OF SANTA ROSA ("CITY") and UNION OIL COMPANY OF CALIFORNIA, NEC ACQUISITION COMPANY and THERMAL POWER COMPANY (collectively "U-N-T").

## RECITALS

A.    CITY desires to deliver water to U-N-T for injection into U-N-T's steamfield at The Geysers.

B.    U-N-T desires to accept water for injection into its steamfield at The Geysers.

C.    The Parties desire to construct and operate certain facilities for the transportation and injection of the water.

## AGREEMENT

1.    DEFINITIONS

1.1    "Annual Amount" means 4,015 million gallons of water, each year.

1.2    "Emergency" means an unanticipated event which causes a malfunction of either Party's facilities, preventing either the delivery or the acceptance of water.

1.3    "Independent Engineer" means the engineering firm or successor engineering firm that is retained by the Parties to serve as the Independent Engineer.

1.4    "Joint Oversight Committee" (JOC) means that committee comprised of six members, three representatives each from CITY and U-N-T, established to share information and coordinate each Party's respective operation and maintenance work, the environmental review process, the construction of the Project, and implementation of the Mitigation Monitoring and Operation Plan.

1.5    "Point-of-Delivery" means the point at which CITY delivers water to U-N-T located at the discharge flange of the storage distribution tanks near the terminus of Pine Flat Road. The exact location and design of the Point-of-Delivery shall be specified in the Project's engineering plans and specifications.

1

1.6   "Project Completion" means that point in time when the Project has been constructed, tested successfully in accordance with Project specifications, the facilities are ready for full operation, and the Project has been accepted in writing by the JOC.

1.7   "Santa Rosa Geysers Pipeline Project" (Project) means the project for the construction and operation of a pipeline for the transportation of water to The Geysers steamfield for injection purposes, consisting of a main pipeline approximately thirty-four miles in length, the corresponding pipeline pumps, tanks, a Point-of-Delivery connection, metering stations, utility power supply, control systems for such facilities, and a Geysers injection system.

1.8   "Third Party" means any person or entity (governmental or private) other than CITY or U-N-T.

2.   PROJECT RESPONSIBILITY

2.1   U-N-T shall provide all necessary labor, materials, and capital for construction of the pipeline and related facilities from the Point-of-Delivery to The Geysers steamfield and The Geysers injection system, which includes conversion-to-injection of existing wells and construction of the electric supply facilities to pumping stations two, three and four, or substitute pumping stations (as shown on Exhibit 1), including main step down transformers; all as set forth in Exhibit "2."

2.2   CITY shall provide all necessary labor, materials, and capital for construction of the pipeline and related facilities from Delta Pond to the Point-of-Delivery as set forth in Exhibits 1 and 2, except for electric supply facilities to be constructed by U-N-T.

3.   PROJECT PERMITS AND TITLE

3.1   Each Party shall apply for and secure, all permits and other licenses, rights-of-way and easements necessary for the completion of its portion of the Project.

3.2   That portion of the Project between the Point-of-Delivery and The Geysers and the electric supply facilities for pumping stations two, three and four shall be the exclusive property of U-N-T. CITY shall have no rights or obligations for that portion of the Project except as specifically provided for by this Agreement.

3.3   That portion of the Project between the Point-of-Delivery and Santa Rosa, except the electric supply system for pumping stations two, three and four, shall be the exclusive property of CITY. U-N-T shall have no rights or obligations for that portion of the Project except as specifically provided for by this Agreement.

2

4.    DESIGN AND CONSTRUCTION OF THE PROJECT

4.1    Each Party shall conduct the design and construction of its portion of the Project, as set forth in Exhibit 2 and use its best effort to complete construction in a timely manner.

4.2    Each Party shall obtain an agreement in writing from each consultant and general contractor who performs work on the Project requiring that each consultant or contractor hold harmless, indemnify and defend each Party from all liability from its acts and omissions related to the Project.

4.3    Each Party shall obtain an agreement in writing from each consultant and contractor who performs work on the Project requiring that each consultant and contractor name both Parties as additional insureds under all insurance policies obtained in connection with the Project.

4.4    Each Party shall prepare complete engineering plans and specifications for its portion of the Project.

4.5    Operations shall commence ("Commencement of Operations") no later than 30 days after Project Completion.

4.6    U-N-T shall bury electrical service between pumping stations two, three and four, if CITY has an obligation by contract or mitigation to bury electrical service.

5.    PAYMENT OF COSTS AND EXPENSES

5.1    CITY is responsible for payment of all costs, authorized by CITY and incurred to administer, plan, permit, design, engineer, acquire, construct, inspect, review, evaluate, and manage CITY's portion of the Project, and to acquire the rights-of-way for CITY's portion of the Project.

5.2    U-N-T is responsible for payment of all costs, authorized by U-N-T and incurred to administer, plan, permit, design, engineer, acquire, construct, inspect, review, evaluate, and manage U-N-T's portion of the Project, and to acquire the rights-of-way for U-N-T's portion of the Project.

6.    OPERATION AND MAINTENANCE OF THE PROJECT

6.1    Each Party shall operate, maintain and replace as necessary that portion of the Project which it constructs.

6.2.    CITY shall pay the cost of electricity to operate pumping station one.

3

6.3   U-N-T shall provide the electricity, at no cost to CITY, to operate pumping stations two, three and four, or any substitute stations.

## 7.   DELIVERY AND ACCEPTANCE OF WATER

7.1   Upon Commencement of Operations, CITY shall deliver to U-N-T at the Point-of-Delivery the Annual Amount as reduced by amounts of water authorized by the JOC for supply interruption as set forth in Section 15 or excused as provided in Section 13. Delivery of water shall be at the rates set forth in Exhibit 3. Failure of U-N-T to provide electricity pursuant to Section 6.3 shall be considered a failure of U-N-T to accept water, not a failure of CITY to deliver water.

7.2   Upon Commencement of Operations, U-N-T shall accept from CITY at the Point-of-Delivery the Annual Amount as reduced by amounts of water authorized by the JOC for supply interruption as set forth in Section 15 or excused as provided in Section 13. Acceptance of water shall be at the rates set forth in Exhibit 3.

7.3   For the purpose of measuring the Parties' compliance with this section, the year shall be the twelve-month period commencing on the first day of the month following Commencement of Operations.

## 8.   QUALITY OF WATER

8.1   The water shall be treated to the requirements of the California Department of Health Services; Title 22 for tertiary wastewater treatment, or its substitute regulation, and at the Point of Delivery shall meet the requirements of Exhibit 4. CITY shall notify U-N-T of any material change to the water quality that occurs during the term of this Agreement.

8.2   U-N-T shall have access to CITY facilities and records for the purpose of either testing or verifying the quality of the water.

8.3   If the water delivered by CITY does not meet the requirements set forth in Exhibit 4, then at U-N-T's option, U-N-T may: I) accept the water delivered; ii) require CITY to supply water exclusively from the Laguna Wastewater Treatment Plant which meets the requirements of Exhibit 4 until the water quality problem is corrected; or iii) reject the water reserving all remedies provided by this Agreement and by law.

## 9.   NO RESALE OF WATER

U-N-T shall not sell water delivered by CITY for any purpose other than The Geysers geothermal operations.

4

10.   JOINT OVERSIGHT COMMITTEE

10.1   The Parties shall establish the JOC. The goal of the JOC shall be to achieve maximum efficiency of the overall Project.

10.2   Each Party shall designate its representatives within 10 days following execution of this Agreement and each Party shall provide notice to the others pursuant to Section 37.

10.3   The JOC shall keep written minutes of its meetings.

10.4   Each Party may, by written or oral notice to the other Party, designate an alternate or substitute to act as its representative in the absence of any of its regular members or to act on specified occasions with respect to specific matters.

11.   DUTIES OF JOINT OVERSIGHT COMMITTEE

11.1   The JOC shall have no authority to modify this Agreement. At least two U-N-T representatives shall be present at all meetings. Each Party shall have one vote on the JOC and all decisions shall be unanimous.

11.2   The JOC shall share information between the Parties and coordinate the operations of the parties in order to achieve maximum efficiency of the overall Project, including seismic mitigation monitoring, and resolve disputes between the Parties.

11.3   The JOC shall adopt written operating policies, including, but not limited to:

11.3.1      Procedures to balance flows to the injection facilities to the greatest extent practical;

11.3.2      Notification and operating procedures for minor flow interruptions and maintenance activities; and

11.3.3      Procedures for Emergencies.

11.4   The JOC shall be responsible for the periodic review and/or modification of the water quality parameters of Exhibit 4. Sampling protocol shall be established by the JOC.

11.5   The JOC shall meet either in person or by telephone whenever requested by a member of the JOC.

11.6   If the JOC is unable to act on any issue raised by a member of the JOC, the JOC shall refer the issue to mediation under Section 12.

5

12.    DISPUTE RESOLUTION

12.1    All unresolved disputes between the Parties arising under this Agreement shall be submitted to non-binding mediation pursuant to the following procedure and terms:

12.1.1    After the Parties have conducted reasonable and good faith negotiations to resolve disputes under this Agreement, either Party may request, in writing, that a dispute be mediated pursuant to this section.

12.1.2    The Independent Engineer shall act as mediator.

12.1.3    Within seven (7) days of the receipt of the written request to mediate, the Parties shall meet to schedule the mediation process.

12.1.4    Each Party shall bear one-half (½) of the cost of the mediation.

12.1.5    Either Party may pursue any legal or equitable remedies that it may have if the mediation process described in this section is not successfully concluded within sixty (60) days of the receipt of a written request for mediation pursuant to Section 12.1.1 above.

13.    FORCE MAJEURE

13.1    No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to or materially contributed to by an act of God, war, fire, earthquake, windstorm, flood, and other natural catastrophe, civil disturbance or disobedience, labor disputes, vandalism, sabotage, terrorism, restraint by order of a court or administrative agency with jurisdiction, which such Party could not reasonably have been expected to avoid and which by exercise of due diligence has been unable to overcome.

13.2    The Party whose performance is affected by force majeure shall, as soon as practicable, but in any event no later than 14 days thereafter, give written notice of the event of force majeure to the other Party.

13.3    The Parties shall use their best efforts and cooperate with each other to mitigate the effects of force majeure.

14.    LITIGATION

The parties recognize that *Alexander Valley Association, et al. v. City of Santa Rosa, et al.*, Sonoma County Superior Court No. 218536, and *National Audubon Society, et al. v. City of Santa Rosa, et al.*, Sonoma County Superior Court No. 218540, have been filed seeking to decertify the EIR for the Geysers Project and enjoin the Project. CITY and

U-N-T shall negotiate in good faith any modifications to this Agreement required by the effect of these suits.

15.   SUPPLY INTERRUPTIONS

15.1   To allow maintenance or in an Emergency, the JOC may authorize an interruption of delivery and acceptance of water. The Parties' respective duty to deliver and accept water under this Agreement is temporarily suspended during a supply interruption authorized by the JOC.

15.2   The Parties shall use their best efforts to minimize the length of supply interruption.

16.   TERM OF AGREEMENT AND PAYMENT TO CITY

16.1   This Agreement shall become effective when executed by both Parties and shall remain in force for a period of thirty years from Project Completion; provided, however, that U-N-T shall have the right to terminate this Agreement at any time after the twentieth year by giving written notice to CITY no later than two years before the proposed termination date. If CITY terminates this Agreement pursuant to Section 20, or if U-N-T terminates this Agreement prior to the end of the thirtieth year pursuant to the preceding sentence, U-N-T shall provide to CITY $3 million per year for each year or part of a year (to a maximum of ten years) that the 30-year term of the contract is reduced. To fulfill this obligation, U-N-T shall, by making annual payments by the end of each year during years 6 through 15, purchase a financial instrument each year, to be held in a trust which names CITY as beneficiary, that will guaranty that the institution issuing the financial instruments will distribute to CITY all amounts necessary to satisfy this obligation. The Trust shall provide that the financial institution distribute to U-N-T, through annual disbursements during years 21 through 30, all amounts not required to satisfy U-N-T's obligation to CITY under this Section 16.1. The financial instruments shall be approved in writing by CITY's Director of Administrative Services, which approval shall not be unreasonably withheld, conditioned or delayed. To the extent U-N-T has purchased financial instruments for the trust prior to termination, CITY's right to proceeds of the trust shall survive termination of this Agreement. The recipient of the proceeds in each year shall be solely responsible for any taxes due on such proceeds. For examples of disbursements see Exhibit "7."

16.2   Upon termination, CITY shall have a right of first refusal to purchase all or part of the electric supply facilities for pumping stations two, three and four at the price and on the terms and conditions at which U-N-T has received a bona fide offer which U-N-T is willing to accept.

17.   DEFAULT

If either Party to this Agreement defaults in respect to any of its material obligations under this Agreement, the non-defaulting Party may notify the defaulting Party in writing,

7

setting out in what respects the non-defaulting Party deems the defaulting Party to be in default. If within thirty (30) days or such other period as agreed to by the Parties in writing after receipt of notice, the defaulting Party has corrected the default alleged by the non-defaulting Party, the defaulting Party shall no longer be in default. Neither the service of notice, nor the doing of acts by the defaulting Party aimed to correct any or all of the alleged defaults, shall be deemed an admission or presumption that the defaulting Party has failed in any respect to perform its obligations hereunder. If the defaulting Party fails to correct all or any of the alleged defaults within the allowable time, the non-defaulting Party, after having exhausted the required mediation procedures in Section 12 shall have the option to declare the defaulting Party in breach of this Agreement or seek specific performance as provided in Section 21.

18.    COVENANTS

18.1    If in any year CITY delivers less than 95% of the Annual Amount as reduced pursuant to Section 7.1, CITY shall use its best efforts to make up the amount that is less than 95% in the two succeeding years. CITY shall get credit for water which CITY is capable of delivering but which U-N-T does not accept as required by this Agreement, up to 1.1 times the rates specified in Exhibit "3" or 12.1 mgd, whichever is less.

18.2    If in any year CITY delivers less than 95% of the Annual Amount as reduced pursuant to Section 7.1, and CITY fails to make up the shortfall in the two succeeding years, then CITY shall pay U-N-T the amount specified in Exhibit 6, unless CITY has terminated this Agreement pursuant to Section 20.

18.3    If in any year U-N-T accepts less than 95% of the Annual Amount as reduced pursuant to Section 7.2, and U-N-T fails to accept enough water to make up the shortfall in the two succeeding years, then U-N-T shall pay CITY the amount specified in Exhibit 6, unless U-N-T has terminated this Agreement pursuant to Section 20. CITY may, but shall not be required to, make up the shortfall not accepted by U-N-T. U-N-T shall get credit for water which U-N-T is capable of accepting, but which CITY does not deliver, up to 1.1 times the rates shown in Exhibit "3" or 12.1 mgd, whichever is less.

18.4    The credit that U-N-T is entitled to in any given year under Section 18.3 above shall not exceed 10% of the Annual Amount.

19.    LETTER OF CREDIT

Upon the determination of the JOC that CITY's portion of the Project is completed, U-N-T shall provide CITY with an irrevocable Letter of Credit from a financial institution (with a long-term debt rating of "A" by Moody's or Standard and Poors) licensed to do business and doing business in the State of California as approved in writing by CITY's Director of Administrative Services, which approval shall not be unreasonably withheld,

8

conditioned or delayed, in the form attached as Exhibit 5 and in an initial amount of $30 million for a cumulative period of twenty years from the date of issuance. Each year, commencing with the second year of this Agreement, U-N-T may reduce the amount of the Letter of Credit by 1/30th of the original amount. U-N-T, with CITY's cooperation, shall notify the issuer in writing of the reduction. CITY shall be entitled to demand payment of the full amount of the Letter of Credit if, but only if, CITY first terminates this Agreement pursuant to Section 20.1. If the issuing bank's long-term debt rating is downgraded below an "A" rating by both Moody's and Standard & Poors, U-N-T shall provide CITY with a substitute Letter of Credit complying with the terms of this section. Presentation by CITY of the Letter of Credit shall be CITY's sole and complete remedy for all breaches or alleged breaches of this Agreement by U-N-T, provided, however, that CITY shall be entitled to all accrued amounts under Section.18 as of the termination date, and the trust as provided for under Section 16.1 of this Agreement. If U-N-T prevails in its challenge of CITY's presentation of the draft under this Section 19, then in addition to any other remedy that may be available to U-N-T, CITY shall pay to U-N-T the amount of the Letter of Credit drawn by CITY plus 10% simple interest annually, from the date drawn until repaid by CITY, on the principal amount. For examples of disbursements see Exhibit "7."

20.    TERMINATION OF AGREEMENT

20.1    CITY may terminate this Agreement if:

20.1.1    U-N-T fails to accept at least 80 percent of three times the Annual Amount as reduced pursuant to Sections 7.1 and 7.2 in any 36-month period; or

20.1.2    U-N-T fails to accept at least 50 percent of one-sixth of the Annual Amount as reduced pursuant to Sections 7.1 and 7.2 in any two-month period; or

20.1.3    U-N-T has breached this Agreement as provided in Section 17, except that CITY may only terminate for U-N-T's failure to accept water in conformance with Section 20.1.1 or 20.1.2; or

20.1.4    All members of U-N-T are insolvent; or

20.1.5    CITY receives notice of non-renewal of the Letter of Credit required in Section 19 and U-N-T does not provide evidence of a replacement Letter of Credit 30 days prior to the date of expiration of the current Letter of Credit.

20.2    U-N-T may terminate this Agreement if:

20.2.1    CITY fails to deliver at least 80 percent of three times the Annual Amount as reduced pursuant to Sections 7.1 and 7.2 in any 36-month period; or

20.2.2    CITY fails to deliver at least 50 percent of one-sixth of the Annual

9

Amount as reduced pursuant to Sections 7.1 and 7.2 in any two-month period; or

20.2.3   CITY has breached this Agreement as provided in Section 17, except that U-N-T may only terminate for CITY's failure to deliver water as set forth in Sections 18.2.1 or 18.2.2.

20.2.4   CITY files for bankruptcy.

## 21. SPECIFIC PERFORMANCE

In addition to other remedies upon default, the non-defaulting Party may obtain specific performance of this Agreement, including a temporary restraining order and preliminary injunction to prevent a default of this Agreement or to compel performance by the defaulting party

## 22. NO COMPENSATION

The representatives of each Party to this Agreement shall serve without compensation except for reimbursements made in accordance with this Agreement or as expressly agreed to, in writing, by both Parties.

## 23. ASSIGNMENTS

No Party shall assign, either in whole or in part, any of the rights, duties or obligations created or imposed under this Agreement without the prior written consent of the other Party, except to another Party to this Agreement or to a subsidiary, affiliate or any other entity succeeding to all or substantially all of the affected interests and assets of that Party provided that such subsidiary, affiliate or succeeding Party shall assume the assigning Party's obligations hereunder in writing. No delegation of any obligation owed, or of the performance of any obligation, by any Party, may be made without the prior written permission of the other Party. Any attempted assignment or delegation shall be wholly void and totally ineffective for all purposes unless made in conformity with this Section 23. Consent may be withheld, refused, or conditioned if the economic viability of the other Party is a concern; provided, however, that consent may not be unreasonably withheld, conditioned or delayed.

## 24. INSURANCE

24.1   Each Party shall maintain the following minimum insurance coverages during the term of this Agreement, or in the alternative, a Party may provide Notice of Self-Insurance to the other Party in the amounts specified in Sections 24.1.1, 24.1.2 and 24.1.4 below. Any Party providing a notice of Self-Insurance must supply evidence of fiscal responsibility reasonably satisfactory to the other Party, including where appropriate audited financial statements:

10

24.1.1 Workers compensation insurance with statutory limits and Employer's Liability with a limit of $1,000,000 for all persons employed in the construction and operation of the Project, in accordance with applicable law.

24.1.2 Commercial general liability insurance covering and insuring against liability for both bodily injury and/or property damage, in an amount of not less than three million dollars ($3,000,000) combined single limit coverage per occurrence, including, but not limited to, endorsements for personal injury, premises-operations, products and completed operations, explosion hazard, and blanket contractual and independent contractors liability.

24.1.3 Any consultant or contractor employed in support of Project construction shall maintain coverages similar to those required in Section 24.1.4 and professional liability insurance for protection against claims arising out of the performance of their services, caused by errors, omissions or other acts for which they are liable, in an amount of not less than one million dollars ($1,000,000), or any other amount deemed appropriate by the JOC.

24.1.4 Business automobile liability insurance covering owned, non-owned and hired automobile for a combined single limit of at least Three Million Dollars ($3,000,000).

24.2 Each Party shall secure, in favor of each of the other Party, a waiver of subrogation rights from the carrier that issues a policy of general liability or automobile liability insurance pursuant to the proceeding sections. Each insured Party shall cause the public liability insurer to acknowledge its waiver of subrogation in writing by appropriate liability policy endorsement. If a Party is self-insured, such Party hereby waives all claims of right to subrogation or liability against the other Party, or against the insurer of the other Party.

25.   INDEMNITY

25.1 CITY's Responsibilities: CITY shall, to the fullest extent permitted by law, defend, indemnify and hold harmless U-N-T, its present and future members, officers, directors, employees and agents from and against (a) any and all liabilities and losses resulting from claims or causes of action by any third party to the extent that claims or causes of action arise out of, or are in any way related to, CITY's active negligence or willful misconduct in the performance of CITY's responsibilities under this Agreement, and (b) the consequences of CITY's violation or alleged violation of permits, statutes, ordinances, orders, rules or regulations of any governmental entity to the extent that a violation or alleged violation arises out of, or is in any way related to, CITY's responsibilities.

25.2 U-N-T's Responsibilities: U-N-T shall, to the fullest extent permitted by law,

11

defend, indemnify and hold harmless CITY, their present and future members, officers, directors, employees and agents from and against (a) any and all liabilities and losses resulting from claims or causes of action by any third party, to the extent that claims or causes of action arise out of, or are in any way related to, U-N-T's active negligence or willful misconduct in the performance of U-N-T's responsibilities under this Agreement, and (b) the consequences of U-N-T's violation or alleged violation of permits, statutes, ordinances, orders, rules or regulations of any governmental entity to the extent that a violation or alleged violation arises out of, or is in any way related to, U-N-T's responsibilities.

25.3    Insurers' Responsibilities:  The provisions of this section shall not be construed to relieve any insurer of its obligation to pay any insurance proceeds under any insurance policy.

25.4    Notwithstanding anything contained herein, neither party shall be responsible to the other for consequential or indirect damages.

26.    NO DEDICATION OF FACILITY

Any undertaking by a Party under any provision of this Agreement is rendered strictly as an accommodation and shall not constitute the dedication of any facility by the undertaking Party to the public, to the other Party or to any Third Party. CITY shall have no interest in any steamfield facility owned or operated by U-N-T and shall not be responsible for any shutdown, abandonment or cleanup of any steamfield facility. U-N-T shall have no interest in CITY's facilities and shall not be responsible for any repairs, shutdown, abandonment or cleanup of any CITY facilities.

27.    NO THIRD PARTY BENEFICIARIES

None of the promises, rights or obligations contained in this Agreement shall inure to the benefit of any person or entity not a Party to this Agreement.

28.    GOVERNING LAW

This Agreement shall be governed by the laws of the State of California, without reference to its conflict of laws rules.

29.    OBLIGATIONS AND RELATIONSHIP OF THE PARTIES

29.1    Each Party shall use its best efforts and work diligently, in good faith, and in a timely manner to carry out the duties and obligations imposed by this Agreement.

29.2    Each Party shall provide to the other Party services to permit efficient and reliable operations under this Agreement as follows:

12

29.2.1.  If the services can be readily performed or obtained by the providing Party using its existing personnel, equipment and facilities, without making material alteration in its operations and at a nominal cost to the providing Party, the services shall be provided free of charge.

29.2.2.  If the criteria specified in Section 29.2.1 are not met, the Parties shall mutually agree to a reasonable charge reflecting the providing Party's incremental cost in providing the services to the other Party.

29.3  The covenants, obligations, rights and liabilities of the Parties under this Agreement are intended to be several and not joint or collective, and nothing herein is intended to create an association, joint venture, trust, or partnership, or to impose a trust or partnership covenant, obligation or liability on or with regard to CITY or U-N-T.

29.4  Except as expressly provided for in this Agreement or other Project agreements, no Party shall be deemed the agent of or have the right or power to bind any other Party.

30.    SECTION HEADINGS

The section headings contained in this Agreement are for convenience of reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

31.    ENTIRE AGREEMENT

This Agreement represents and contains the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes any and all prior oral and written agreements and understandings. No promises, agreements, or warranties additional to this Agreement shall be deemed to be a part hereof, nor will any alteration, amendment or modification hereto be effective unless confirmed in writing by both Parties.

32.    NONDISCRIMINATION IN EMPLOYMENT

No Party to this Agreement shall discriminate against any employee or firm because of race, creed, color, sex, national origin, physical disability, ancestry, mental disability, medical condition, marital status, or age (over forty).

33.    COMPLIANCE WITH LAWS

Both Parties shall comply with all applicable federal, state, and local laws and the rules and regulations of any federal, state, local or other government agency having jurisdiction over the activities and operations conducted pursuant to this Agreement.

13

34.    SEVERABILITY

In the event that any term, covenant or condition of this Agreement or the application of any such term, covenant or condition shall be held invalid as to any person, entity or circumstance by any court or agency having jurisdiction, such term, covenant or condition shall remain in force and effect to the extent not held invalid, and all other terms, covenants and conditions of this Agreement and their application shall not be affected thereby but shall remain in full force and effect unless a court holds that such provisions are not severable from the other provisions of this Agreement.

35.    WAIVER

Any waiver at any time by a Party of its rights with respect to any matter arising in connection with this Agreement shall not be deemed a waiver with respect to any subsequent matter. Any waiver must be in writing.

36.    AMENDMENT AND MODIFICATION

This Agreement may be amended or modified in any way at any time by an instrument in writing signed by the Parties hereto.

37.    NOTICES

37.1    Any and all notices or other communications required or permitted by this Agreement or by law to be delivered to, served on by mail or fax, or given to either Party to this Agreement shall be dated and in writing and shall be deemed properly delivered, served, or given when personally delivered or faxed to the Party to whom it is directed or, five business days after deposited in the United States mail, first-class postage prepaid, addressed to the Parties as follows:

| Party | Address |
|-------|---------|
| City of Santa Rosa | Attn: Capital Projects Coordinator<br>Utilities Department<br>City of Santa Rosa<br>Municipal Services Center – South<br>69 Stony Circle<br>Santa Rosa, CA 95401<br>Fax No: (707) 543-3936 |

| Party | | Address |
|---|---|---|
| Union Oil Company of California | Attn: | General Manager Geothermal Operations Union Oil Company of California 1300 North Dutton Avenue Santa Rosa, CA 95401 Fax No: (707) 521-7603 |
| NEC Acquisition Co. | Attn: | NEC Acquisition Co. c/o Anthony J. Chasteen 1300 North Dutton Avenue Santa Rosa, CA 95401 Fax No: (707) 521-7603 |
| Thermal Power Company | Attn: | Thermal Power Company c/o General Counsel Calpine Corporation 50 West San Fernando Street San Jose, CA 95113 Fax No: (408) 975-4648 |

37.2    Any Party hereto may change its address for the purpose of Section 37.1 by giving written notice of such change in the manner prescribed by Section 37.1 to the other Party to this Agreement.

38.    RECORDATION

This Agreement may be recorded by either Party, after June 15, 1999, or any other date agreed to in writing by the Parties.

15

IN WITNESS WHEREOF, both Parties have executed this Agreement the day and year first above written.

CITY OF SANTA ROSA

By: _____

ATTEST:

By: _____

APPROVED AS TO FORM:

By: _____
     City Attorney

U-N-T

UNION OIL COMPANY OF CALIFORNIA

By: _____ UN

NEC ACQUISITION COMPANY

By: _____ UN

THERMAL POWER COMPANY

By: _____

PLEASE ATTACH NOTARY ACKNOWLEDGMENT
FOR EACH SIGNATURE

16

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of ___Sonoma___ } ss.

On __April 20, 1998__, before me, __Audrey Hooper, Notary Public__
Date                                      Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared __Sharon Wright__
Name(s) of Signer(s)

☒ personally known to me
☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within Instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the Instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the Instrument.

WITNESS my hand and official seal.

_Audrey Hooper_
Signature of Notary Public

AUDREY HOOPER
Commission # 1074377
Notary Public — California
Alameda County
My Comm. Expires Oct 1, 1999

Place Notary Seal Above

--- OPTIONAL ---

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: __Construction and Operating Agreement__
__Santa Rosa Geysers Recharge Project__
Document Date: __April 14, 1998__          Number of Pages: __Twenty-eight__

Signer(s) Other Than Named Above: __Thomas R. Sparks, Anthony J. Chasteen, and__
__Larry A. Krumland__

**Capacity(ies) Claimed by Signer**
Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1997 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA  91313-2402          Prod. No. 5907          Reorder: Call Toll-Free 1-800-876-6827

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of      Sonoma

} ss.

On  April 20, 1998 , before me,      Audrey Hooper, Notary Public
        Date                                    Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared  Thomas R. Sparks, Anthony J. Chasteen, and Larry A.
                      Krumland
                                    Name(s) of Signer(s)

⊐ personally known to me
x⊠x proved to me on the basis of satisfactory
evidence

to be the person(s) whose name(s) ~is/are
subscribed to the within instrument and
acknowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.

*[signature]*
Signature of Notary Public

**AUDREY HOOPER**
Commission # 1074377
Notary Public — California
Alameda County
My Comm. Expires Oct 1, 1999

Place Notary Seal Above

## — OPTIONAL —

*Though the information below is not required by law. It may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

Description of Attached Document

Title or Type of Document:  Construction and Operating Agreement
                            Santa Rosa Geysers Recharge Project

Document Date:  April 14, 1998              Number of Pages: Twenty-eight

Signer(s) Other Than Named Above:  Sharon Wright

Capacity(ies) Claimed by Signer

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1997 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402        Prod. No. 5907      Reorder: Call Toll-Free 1-800-876-6827

# EXHIBITS

EXHIBIT 1

Project Map



Pipeline for Field Distribution
Provided by Unocal and Calpine

Pump Stations
Electricity provided by Unocal
and Calpine

Geysers Storage Tank
Provided by City

P#4

P#3

Pine Flat
(uphill segment)

P#2

Alexander Valley

Pipeline to Geysers Storage Tank
Provided by City

Santa Rosa Plain

Pump Station #1
Electricity provided by City

Delta Pond, Santa Rosa

18



## EXHIBIT 2

## PROJECT SCOPE OF WORK

| ITEM | Responsibility |
|---|---|
| 1. Headworks | CITY |
| 2. Transport Pipeline to The Geysers<br>   a. Pipelines<br>   b. Pumping Stations<br>   c. Flow Control Reservoirs (tanks) | CITY |
| 3. Engineering, Technical, Admin, Legal<br>   for 1 and 2 | CITY |
| 4. Geysers Distribution Injection System<br>   Design & Construct | U-N-T |
| 5. Electric Supply Facilities to Pumping<br>   Stations 2, 3 and 4<br>   Design and Construct | U-N-T |
| 6. Engineering, Technical, Admin, Legal<br>   for 4 and 5 | U-N-T |

19



## EXHIBIT 3

## TABLE OF DELIVERY RATES

| Month | Flow (mgd) |
|---|---|
| January | 12.1 |
| February | 12.0 |
| March | 10.5 |
| April | 9.0 |
| May | 9.0 |
| June | 10.1 |
| July | 11.0 |
| August | 11.0 |
| September | 11.0 |
| October | 11.7 |
| November | 12.1 |
| December | 12.1 |

EXHIBIT 4

Water Quality Standards for U-N-T Acceptance and CITY Delivery
(See Section 8)

| Constituent or Characteristic | Maximum Monthly Average Level (mg/l except as noted) | Comments |
|---|---|---|
| Total Suspended Solids | 30 | |
| pH | 6.0-8.5 | Limits based on individual measurement (min-max range) |
| Biochemical Oxygen Demand | 10 | |
| Total Alkalinity | 200 | as CaCO₃ |
| Total Dissolved Solids | 600 | |
| Dissolved Oxygen | 10 | |
| Sodium | 100 | |
| Calcium-dissolved | 40 | |
| Magnesium-dissolved | 30 | |
| Boron | 2 | |
| Silica-dissolved | 25 | |
| Bicarbonate | 200 | |
| Chloride | 100 | |
| Sulfate-dissolved | 50 | |
| Total Sulfur | 25 | |
| Nitrate Nitrogen | 25 | |
| Iron-dissolved | 0.5 | |
| Arsenic | 0.03 | |
| Cadmium | 0.005 | |
| Chromium | 0.1 | |
| Copper | 0.2 | |
| Lead | 0.05 | |
| Mercury | 0.002 | |
| Nickel | 0.2 | |
| Selenium | 0.05 | |
| Zinc | 0.1 | |
| Total Coliform | <2.2* | MPN/100 ml. * Total Coliform is a 30-day median at the Laguna Plant. |

21

EXHIBIT 5

IRREVOCABLE LETTER OF CREDIT

No. _____

Amount: _____    Date: _____, 19_____

TO:    City of Santa Rosa
       Municipal Services Center – South
       69 Stony Circle
       Santa Rosa, CA 95401

       Attention: Capital Projects Coordinator
       Utilities Department

Gentlemen:

We hereby authorize you to draw on _____ {name of bank or financial institution}, _____ (address), at sight for the account of U-N-T the amount of _____ Dollars.

The City's draft or demand is to be accompanied by the following documents:

1.    A notarized certification by the City Manager of the City of Santa Rosa, California to the effect that the City has terminated the Construction and Operating Agreement – Santa Rosa Geysers Recharge Project dated _____, 1998, pursuant to Section 20 thereof.

2.    A notarized statement by the City Attorney of the City of Santa Rosa, California, listing the reason or reasons for the City's termination of the Agreement.

Any draft submitted hereunder must specifically mention the name and date of this Letter of Credit. The amount of the draft negotiated, together with the date of its payment, shall be endorsed by {Name of Bank here} on the reverse side of this original Letter of Credit. A draft or demand must be accompanied by this original Letter of Credit. All presentations must be made by the date of expiration, as automatically renewed as set forth below. This Letter of Credit expires on _____.

It is a condition of this Letter of Credit that it shall be deemed automatically extended without amendment for additional periods of one year from the present or any future expiration date, unless not less than 60 days prior to any such expiration date we shall notify you in writing by certified mail that we elect not to renew this Letter of Credit for any such additional periods.

22

The City of Santa Rosa and U-N-T shall before 14 days prior to the end of each year of the Letter of Credit, give us notice of the renewal and amount of the Letter of Credit for the following year. We hereby agree with you that any draft drawn hereunder which is in compliance with the terms of this Letter of Credit will be duly honored upon its presentation and upon delivery of the document, as specified above.

The commitments and obligations of the undersigned under this Letter of Credit are absolute and irrevocable for the term hereof. The liabilities of the issuer and of any nominated person or advisor under this Letter of Credit and interpretations of this Letter of Credit are governed by the laws of the State of California.

APPROVED AS TO FORM:

By: _____
Title _____

_____
City Attorney

23

## EXHIBIT 6

### Performance Payments

The payments required under Section 18, Covenants, will be calculated using Formula 1.

Formula 1:  $P_i = \$250{,}000 + \$67{,}000 \, (S_i\% - 5.000 - D_{H1} - D_{H2})$

The payment ($P_i$) will always be limited in accordance with logic Formulas 2 & 3.

Formula 2:  If $S_i\%$ is less than or equal to 5%, then $P_i = 0$

Formula 3:  If $S_i\%$ is greater than or equal to 20%, then $P_i = \$1{,}255{,}000$.

The following table of variables with their corresponding description and explanation are used throughout Exhibit 6. [Note: MG is used for million gallons of water.]

| Variable | Description | Explanation |
|---|---|---|
| $i$ | Index year, a number identifying the project year | The first year ($i=1$) commencing on the date of Project Completion. $i+1$ indicates the first year following the indexed year, and $i+2$ indicates the second year following the indexed year. |
| $P_i$ | Payment, dollars | The payment amount in dollars (never to exceed a maximum value of \$1,255,000) |
| $A_i$ | Yearly contract amount of water, in MG | Specified as 4,015 million gallons (as reduced pursuant to Sections 7.1 and 7.2, to the nearest million gallons) |
| $DA_i$ | Actual yearly water delivery/acceptance, in MG | Measured to the nearest million gallons. |
| $C_i$ | Credit for amount of water, in MG | Calculated to the nearest million gallons, the amount of water which City is capable of delivering but which U-N-T does not accept, or the amount of water U-N-T is capable of accepting but which City does not deliver, as required in Section 18. Annually determined to the nearest million gallons. |
| $TA_i$ | $DA_i + C_i$, actual plus calculated water delivery/acceptance, in MG | Total of the actual yearly delivery/acceptance plus the Credit for amount of water calculated. |
| $TS_i$ | Shortage of delivery/acceptance, in MG | Defined as $(A_i - TA_i)$, calculated negative values will be considered zero. |
| $S_i$ | Shortage of delivery/acceptance of water, in percentage | Defined as $(100 \times TS_i/A_i)$, (if $TS_i = 0$, then $S_i$ will be considered as zero.) |
| $TE_i$ | Excess of delivery/acceptance, in million gallons of water | Defined as $(TA_i - A_i)$, calculated negative values will be considered zero. |
| $E_i$ | Excess of delivery/acceptance of water, in percentage | Defined as $(100 \times TE_i/A_i)$, (if $TE_i = 0$, then $E_i$ will be considered as zero.) |
| $D_{H1}$ | Designated makeup amounts (in percentage) | Consisting of all or part of $E_{H1}\%$, as described in Mitigation by makeup. |
| $D_{H2}$ | Designated makeup amounts, in percentage | Consisting of all or part of $E_{H2}\%$, as described in Mitigation by makeup. |

24

**Mitigation by makeup:**

Mitigation of payments by makeup (required under Section 18, Covenants) will be determined using the following:

During years i+1 and i+2 the deliveries or acceptance, as the case may be, in excess of the contract amount ($E_i>0$) may be designated, by the Party responsible for payment of $P_i$, at the time such payment is due, to mitigate the shortfall in year i, thereby reducing $P_i$. The portion of $E_{i+1}$ so designated shall be $D_{i+1}$. The portion of $E_{i+2}$ so designated shall be $D_{i+2}$. Amounts assigned to a prior year's shortfall may not also be assigned to another year's shortfall.

At the end of year i+2, or upon termination of the contract, whichever occurs sooner, the remaining amount $P_i$ shall be due and payable by the appropriate Party. The computation shall proceed per Formula 1.

A simplified *illustrative table* showing calculations of performance payments for either Party with no impacts of mitigation by makeup or variation in the annual amount is below:

(assumptions: $A_i$=4,015; and $E_{i+1}$=0; and $E_{i+2}$=0)

| Delivery/Acceptance | | Payment |
|---|---|---|
| $DA_i$ (in million gal) | Shortage ($S_i$ %) | $P_i$ (in $) |
| 4015 | 0 | 0 |
| 3815 | 4.981 | 0 |
| 3814 | 5.006 | 250417 |
| 3700 | 7.846 | 440654 |
| 3500 | 12.827 | 774402 |
| 3300 | 17.808 | 1108151 |
| 3212 | 20 | 1255000 |
| 3000 | 25.28 | 1255000 |

25

A *detailed table* summarizing illustrative example calculations (examples A through F follow the table) of performance payments for either Party with various impacts of mitigation and varying annual amounts is below:

| Ex. | Year | AMOUNTS (gallons in millions) | | | | | | PAYMENTS |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | $i$ | $A_i$ | $DA_i$ | $C_i$ | $TA_i$ | $TS_i$ | $TE_i$ | $P_i$ |
| A | 24 | 3,800 | 3,600 | | 3,600 | 200 | 0 | 267,621 |
| B | 25 | 4,000 | 3,400 | | 3,400 | 600 | 0 | 310,903 |
| C | 26 | 3,800 | 3,500 | 200 | 3,700 | 100 | 0 | 0 |
| D | 27 | 3,300 | 3,600 | | 3,600 | 0 | 300 | 0 |
| E | 28 | 3,900 | 3,200 | | 3,200 | 700 | 0 | 734,745 |
| F | 29 | 3,500 | 3,600 | 100 | 3,700 | 0 | 200 | 0 |
| G | 30 | 3,800 | 3,000 | 50 | 3,050 | 750 | 0 | 1,237,379 |

The following examples A through F, assume the designated makeup amount equals all of the excess for the year evaluated, ( this means $D_i = E_i$).

Formula 1:   $P_i = \$250,000 + \$67,000 \, (S_i\% - 5.000 - D_{i+1} - D_{i+2})$

A.  Calculations for Year 24 in Year 27:

There is a 200 MG shortage in year 24 with an adjusted contract amount of 3,800 MG and no excess delivery in years 25 and 26.

$$
\begin{aligned}
S_{24} &= 100 \times 200 / 3,800 = 5.263\% \\
D_{25} &= 100 \times 0 / 4,000 = 0\% \\
D_{26} &= 100 \times 0 / 3,800 = 0\% \\
P_{24} &= \$250,000 + \$67,000 \times (5.263 - 5.000 - 0 - 0) = \$267,621
\end{aligned}
$$

B.  Calculations for Year 25 in Year 28:

There is a 600 MG shortage in year 25 with adjusted contract amounts of 4,000 MG, 3,800 MG, and 3,300 in years 25, 26, and 27 respectively.  There is an excess designated as makeup of 300 MG in year 27.

$$
\begin{aligned}
S_{25} &= 100 \times 600 / 4,000 = 15.000\% \\
D_{26} &= 100 \times 0 / 3,800 = 0\% \\
D_{27} &= 100 \times 300 / 3,300 = 9.091\% \\
P_{25} &= \$250,000 + \$67,000 \times (15.000 - 5.000 - 0 - 9.091) = \$310,903
\end{aligned}
$$

26

C. Calculations for Year 26 in Year 29:

There is a 100 MG shortage in year 26 with an adjusted contract amount of 3,800 MG, though there is no need to consider excess in following years as the shortage is less than 5 percent and there is no payment necessary.

$$S_{26} = 100 \times 100 / 3,800 = 2.631\%$$
$$\text{Because } S < 5\%, \quad P_{26} = \$0$$

D. Calculations for Year 27 in Year 30:

There is no shortage in year 27 though there is a significantly adjusted contract amount. There is no payment.

$$S_{27} = 100 \times 0 / 3,300 = 0\%$$
$$\text{Because } S < 5\%, \quad P_{27} = \$0$$

E. Calculations for Year 28 in Year 30:

There is a shortage of 700 MG in year 28 with an adjusted contract amount of 3,900 MG. There is designated makeup of excess of 200 MG with an adjusted contract amount of 3,500 MG in year 29. There is no excess with an adjusted contract amount of 3,800 MG in year 30.

$$S_{28} = 100 \times 700 / 3,900 = 17.949\%$$
$$D_{29} = 100 \times 200 / 3,500 = 5.714\%$$
$$D_{30} = 100 \times 0 / 3,800 = 0\%$$
$$P_{28} = \$250,000 + \$67,000 \times (17.949 - 5.000 - 5.714 - 0) = \$734,745$$

F. Calculations for Year 29 in Year 30:

There is no shortage in year 29 with an adjusted contract amount of 3,500 MG. There is no payment.

$$S_{29} = 100 \times 0 / 3,500 = 0\%$$
$$\text{Because } S < 5\%, \quad P_{29} = \$0$$

G. Calculations for Year 30 in Year 30:

There is a shortage of 750 MG with an adjusted contract amount of 3,800 MG in year 30. If there is no further contract years, then there is no excess possible and the payment is calculated for the year 30.

$$S_{30} = 100 \times 750 / 3,800 = 19.737\%$$
$$P_{30} = \$250,000 + \$67,000 \times (19.737 - 5.000 - 0 - 0) = \$1,237,379$$

27

# EXHIBIT 7

## EXAMPLES OF TERMINATION DISBURSEMENTS

The examples shown below illustrate the disbursements due CITY as provided in Sections 16 and 19 for termination in Year 3, 9, 18, 21 or 22 years and 3 months.

| Year of Termination | Dollars (in millions) for Section 16 | Dollars (in millions) for Section 19 |
|---|---|---|
| Year 3 | $0 | $28 in Year 3 |
| Year 9 | $3 in Year 21, 22, and 23 | $22 in Year 9 |
| Year 18 | $3 in Year 21, 22, 23, 24, 25 26, 27, 28, 29 and 30 | $13 in Year 18 |
| Year 21 | $3 in Year 21, 22, 23, 24, 25 26, 27, 28, 29 and 30 | $0 |
| Year 22 and 3 Months | $3 in Year 22, 23, 24, 25, 26 27, 28, 29 and 30 | $0 |

28

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

CITY OF SANTA ROSA
OFFICE OF THE CITY ATTORNEY
100 SANTA ROSA AVENUE
P.O. BOX 1678
SANTA ROSA, CA  95402-1678

**FIRST AMENDMENT**
to
**Construction and Operating Agreement**
**Santa Rosa Geysers Recharge Project**

This First Amendment dated as of June 10, 2004 (this "**Amendment**") to that certain Construction and Operating Agreement dated as of  April 14, 1998 (the "**Agreement**") by and between the City Of Santa Rosa ("**City**") and Geysers Power Company, LLC, a Delaware limited liability company ("**GPC**").

**RECITALS**

WHEREAS, City, Union Oil Company of California ("**Unocal**"), NEC Acquisition Company ("**NEC**") and Thermal Power Company ("**TPC**") originally entered into the Agreement on April 14, 1998;

WHEREAS, GPC is the successor-in-interest to each of Unocal's, NEC's and TPC's respective interests under the Agreement; and

WHEREAS, the City and GPC now desire to amend certain provisions of the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1.  Definitions.  For all purposes of this Amendment, except as otherwise defined or indicated herein, capitalized terms used but not otherwise defined herein are used as defined in the Agreement.

Section 2.  Amendments.  The amendments to the Agreement are set forth in Annex 1 hereto.  From and after the effectiveness of this Amendment, all references in the Agreement to

May 11, 2004                                    1

"this Agreement" (or words or phrases of a similar meaning) shall be deemed to be references to the Agreement as amended hereby unless the context otherwise specifically requires.

Section 3.    No Other Amendments or Modifications.    Except as expressly amended pursuant to this Amendment, all other provisions of the Agreement are unaffected, remain in full force and effect with no other amendments or modifications and are ratified and confirmed in all respects.

Section 4.    Effective Date.    This Amendment shall be effective as the date first above written.

Section 5.    Governing Law.    This Amendment shall be governed by the laws of the state of California, without reference to its conflict of laws rules.

Section 6.    Execution in Counterparts.    This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused this First Amendment to be duly executed as of the date first written above.

City Of Santa Rosa

By: _____
    Name:
    Title:

Attest: _____
By: _____
    Name:

Geysers Power Company, LLC

By: _____
    Name:    Dennis J. Gilles
    Title:    Vice President

By: _____
    Name:    W.T. Box, Jr.
    Title:    Vice President

APPROVED AS TO FORM:

By: _____
    City Attorney

May 11, 2004                            2

**Annex 1 to
First Amendment to
Construction and Operating Agreement**

**1        Amendments to Section 1 (entitled "Definitions")**

a.        A new Section 1.9 shall be added as follows:

      1.9    "Point-of-Electricity-Delivery" means the point at which GPC delivers electricity to City.  The location and design of the Point-of-Electricity-Delivery shall be specified in the Project's engineering plans and specifications.

**2.        Amendments to Section 3 (entitled "Project Permits and Title")**

a.        Existing Section 3.2 is deleted in its entirety and the following is substituted therefor:

      3.2    GPC shall be the sole and exclusive owner of (1) that portion of the Project between the Point-of-Delivery and the Geysers and (2) all electrical facilities between the Point-of-Electricity-Delivery and the Geysers.  City shall have no rights, liabilities or obligations (including without limitation any obligation to indemnify GPC) for such portion of the Project except as specifically provided for by this Agreement.

b.        Existing Section 3.3 is deleted in its entirety and the following is substituted therefor:

      3.3    City shall be the sole and exclusive owner of (1) that portion of the Project between the Point-of-Delivery and Santa Rosa and (2) all electrical facilities between the Point-of-Electricity-Delivery and pumping stations two, three and four.  GPC shall have no rights, liabilities or obligations (including without limitation any obligation to indemnify the City) for such portion of the Project except as specifically provided for by this Agreement.

c.        A new Section 3.4 shall be added as follows:

      3.4    Ownership and control of water delivered by the City and accepted by GPC shall transfer from City to GPC at the Point of Delivery.  The Parties shall have no rights or obligations for that portion of the Project and water owned by the other except as specifically provided for by this Agreement.

**3.        Amendments to Section 19 (entitled "Letter of Credit")**

a.        A Section number "19.1" shall be inserted immediately preceding the existing paragraph in Section 19.

May 11, 2004                                          3

b.    The following new Sections 19.2, 19.3, 19.4 and 19.5 shall be added at the end of Section 19:

19.2    Notwithstanding Section 19.1, the Letter of Credit contemplated thereunder shall not be required to be issued until the third year of this Agreement and shall be issued in the initial amount of $28 million, subject to reduction as provided in Section 19.1, for a cumulative period of eighteen years from the date of issuance.

19.3    As compensation to the City for its agreement under Section 19.2 to waive GPC's obligation to post the Letter of Credit during the first two years of this Agreement, within five business days following the date of execution of the First Amendment to this Agreement, GPC shall pay to the City the sum of $1,250,000.

19.4    In recognition of City's waiver of the Letter of Credit requirement during the first and second Agreement years in accordance with Section 19.2, in the event that City terminates the Agreement during either of such Agreement years pursuant to Section 20.1, then within five business days after GPC's receipt of a written demand from the City, GPC agrees to pay to the City the amount that City would have otherwise been entitled to draw down under the Letter of Credit (i.e., $30 million in the first year of this Agreement, and $29 million in the second year).  Any such written demand by the City shall include the two notarized documents referenced in the second paragraph of the form of Letter of Credit attached as Agreement Exhibit 5.

19.5    GPC's payment obligations under Section 19.4 shall be guaranteed by GPC's ultimate parent company, Calpine Corporation, pursuant to a Guarantee of even date with the First Amendment to this Agreement in the form attached hereto as Exhibit 8.

4.    **Amendments to Section 25 (entitled "Indemnity")**

a.    Existing Section 25.1 is deleted in its entirety and the following is substituted therefor:

25.1    City's Responsibilities:  Subject to and in accordance with Section 25.5, City shall, to the fullest extent permitted by law, defend, indemnify and hold harmless GPC, its present and future members, officers, directors, employees and agents from and against:

(a)    any and all claims, causes of action, demands, losses, damages, costs, expenses, penalties, fines and other legal liabilities (collectively "Liabilities") resulting from claims or causes of action by any third party to the extent arising out of (1) the portion of the Project owned by City, except to the extent caused by the active negligence or willful misconduct of GPC in the performance of GPC's responsibilities under this Agreement; or (2) the portion of the project owned by GPC, but only to the extent caused by the sole active negligence or willful misconduct of City in the performance of City's

May 11, 2004                                          4

responsibilities under this Agreement; or (3) any leakage or discharge from the Project pipeline occurring between the Point-of-Delivery and Santa Rosa; and

(b)    all Liabilities to the extent arising out of City's violation or alleged violation of permits, statutes, ordinances, orders, rules or regulations of any governmental entity.

b.    Existing Section 25.2 is deleted in its entirety and the following is substituted therefor:

25.2    GPC's Responsibilities:    Subject to and in accordance with Section 25.5, GPC shall, to the fullest extent permitted by law, defend, indemnify and hold harmless the City and its present and future officers, directors, employees and agents from and against:

(a)    any and all Liabilities resulting from claims or causes of action by any third party to the extent arising out of (1) the portion of the Project owned by GPC, except to the extent caused by the sole active negligence or willful misconduct of City in the performance of City's responsibilities under this Agreement; or (2) the portion of the Project owned by City, but only to the extent caused by the active negligence or willful misconduct of GPC in the performance of GPC's responsibilities under this Agreement; or (3) any leakage or discharge from the Project pipeline occurring between the Point-of-Delivery and Geysers; or (4) induced seismicity caused or alleged to be caused by the injection of Project water into the steamfields at the Geysers; and

(b)    all Liabilities to the extent arising out of GPC's violation or alleged violation of permits, statutes, ordinances, orders, rules or regulations of any governmental entity.

c.    The following new Sections 25.5 shall be added at the end of Section 25:

25.5    Third Party Indemnity Procedures:

25.5.1 If any legal proceedings shall be instituted or any claim or demand shall be asserted by any third party (a "Claim") in respect of which indemnification may be sought by any person or entity (each, an "Indemnitee") under Section 25.1 or 25.2, the Indemnitee shall promptly deliver written notice thereof, and a demand for indemnification, to the indemnifying party hereunder (the "Indemnitor"), specifying the nature of such legal proceedings, claim or demand and the amount or the estimated amount thereof to the extent then known.

25.5.2 The Indemnitor shall have the right, at its option and at its own expense, to retain counsel of its choice to represent both the Indemnitor and the Indemnitee jointly with regard to the defense of any such Claim, provided that counsel chosen by the Indemnitor does not have any conflicts of interest with regard to its representation of Indemnitee. The Indemnitee may participate in any such proceeding with counsel of its choice, which shall be at the

Indemnitee's own expense. The Indemnitee shall have a right to notice of any offers of settlement and advance notice of any settlement, and the Indemnitor shall not execute any settlement agreement that (a) provides for other than monetary payment without the Indemnitee's prior written consent, which consent shall not be withheld unreasonably or (b) does not include as an unconditional term thereof the giving of a release from all liability with respect to such Claim by each claimant or plaintiff to each Indemnitee that is subject to the third-party claim, without the Indemnitee's prior written consent, which consent shall not be withheld unreasonably. Notwithstanding the foregoing, the Indemnitee shall have the right to pay or settle any such Claim, provided that in such event it shall be deemed to have waived any right to indemnity therefor by the Indemnitor.

25.5.3.  If the Indemnitor elects not to defend any such Claim and the Indemnitee defends or settles the Claim, which settlement may be without the consent of the Indemnitor, the Indemnitee shall provide fifteen (15) days advance written notice of any settlement to the Indemnitor and shall act reasonably and in accordance with the Indemnitee's good faith business judgment.

25.5.4 The Indemnitor and the Indemnitee shall cooperate in all reasonable respects with each other in connection with the defense, negotiation or settlement of any such Claim. The Indemnitee shall use reasonable efforts to make available to the Indemnitor those partners, members, officers, employees and agents whose assistance, testimony or presence is necessary to assist the Indemnitor in evaluating and in defending any such Claim, and shall make available to the Indemnitor, without the necessity of subpoena or legal process, all documents reasonably requested by the Indemnitor.

25.5.5 Upon payment of a Claim by an Indemnitor pursuant to this Section 25, such Indemnitor, without any further action, shall be subrogated to any and all rights that the respective Indemnitees may have against third parties relating to such Claim, but only to the extent of the amount paid by such Indemnitor on account of such Claim, and such Indemnitees shall cooperate with the Indemnitor and give such further assistance as is reasonably necessary to enable the Indemnitor vigorously to enforce such subrogation rights.

State of _California_

County of _Sonoma_

On _6-8-04_ before me, Kevin J. Talkington, Notary Public,
DATE

personally appeared _Dennis J. Gilles_
NAME(S) OF SIGNER(S)

☒ Personally known to me – OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Kevin J. Talkington_
SIGNATURE OF NOTARY

```
KEVIN J. TALKINGTON
COMM. 1295023
Notary Public-California
SONOMA COUNTY
My Comm. Exp. March 23, 2005
ESI1
```

---

State of _California_

County of _Sonoma_

On _6-8-04_ before me, Kevin J. Talkington, Notary Public,
DATE

personally appeared _W. T. Box, Jr._
NAME(S) OF SIGNER(S)

☒ Personally known to me – OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Kevin J. Talkington_
SIGNATURE OF NOTARY

```
KEVIN J. TALKINGTON
COMM. 1295023
Notary Public-California
SONOMA COUNTY
My Comm. Exp. March 23, 2005
ESI1
```

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Sonoma_ } ss.

On _12 July, 2004_ , before me, _Tamara Taylor, Notary Public_
Date      Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Sharon Wright, Mayor_

☑ personally known to me
☐ proved to me on the basis of satisfactory evidence

**TAMARA L. TAYLOR**
Commission # 1297931
Notary Public - California
Sonoma County
My Comm. Expires Apr 18, 2005

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Tamara Taylor_
_Notary Public_

Place Notary Seal Above

─── OPTIONAL ───

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**
Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

**Exhibit 8**

**GUARANTY**

This GUARANTY dated as of June 10, 2004 ("Guaranty"), is made by Calpine Corporation, a Delaware corporation ("Calpine"), for the benefit of the City of Santa Rosa ("City").

WHEREAS, City, Union Oil Company of California ("Unocal"), NEC Acquisition Company ("NEC"), and Thermal Power Company ("TPC") have entered into that certain Construction and Operating Agreement, dated as of April 14, 1998 (the "Agreement");

WHEREAS, Geysers Power Company, LLC, a Delaware limited liability company and a subsidiary of Calpine ("GPC"), is the successor-in-interest to each of Unocal's, NEC's and TPC's respective interests under the Agreement;

WHEREAS, the Agreement was amended pursuant to the First Amendment, dated as of the date hereof, by and between City and GPC;

WHEREAS, this Guaranty is issued by Calpine to City pursuant to Section 19.5 of the Agreement, as amended.

NOW, THEREFORE, as an inducement to City to enter into the First Amendment with GPC, Calpine agrees as follows:

1    Guaranty.

    (i)    Calpine irrevocably and unconditionally guarantees to City the prompt and complete payment when due of amounts payable by GPC to City under Section 19.4 of the Agreement, as amended (the "Obligation").

    (ii)    Calpine's obligations under Section 1(i) of this Guaranty shall commence upon the date hereof and shall terminate on the earlier of the issuance of the Letter of Credit (such term to have the meaning set forth in the Agreement), or when the Obligation has been fully paid ("Termination Date").

    (iii)    The aggregate liability of Calpine under this Guaranty shall not exceed U.S. $30,000,000.00 (Thirty Million United States Dollars) at any time on or before the first anniversary of the date hereof or U.S. $29,000,000.00 (Twenty-Nine Million United States Dollars) at any time after the first anniversary of the date hereof.

    (iv)    This Guaranty is a guaranty of payment and, as such, not merely a guaranty of collection.  If GPC fails to pay all or any portion of the Obligation for any reason, Calpine will pay or cause to be paid such amount directly for GPC's benefit promptly upon City's demand therefor; provided, however that City has made prior demand on GPC in accordance with Section 19.4 of the Agreement.

(v)    Notwithstanding any provision of this Guaranty to the contrary, Calpine's liability arising out of or relating to this Guaranty shall in no event be greater than the liability of GPC under Section 19.4 of the Agreement, and all payments hereunder shall be made without reduction, whether by offset, payment in escrow, or otherwise, except to the extent of any defenses to payment which GPC may have under or in connection with the Agreement.

Calpine is liable for, and hereby indemnifies City for City's reasonable costs and expenses, including but not limited to, reasonable costs and disbursements, incurred in any effort to collect or enforce any of the obligations under this Guaranty, whether or not any lawsuit is filed. Notwithstanding anything to the contrary herein, this Guaranty shall continue to be effective or reinstated, as the case may be, if at any time payment of the Obligation, or any part thereof, is rescinded or must otherwise be returned by City upon the insolvency, bankruptcy or reorganization of GPC or otherwise, all as though such payment had not been made.

2.    <u>Calpine's Obligation</u>.  Subject to Sections 1 and 3, Calpine's obligations under this Guaranty are absolute and unconditional, shall remain in force until the Termination Date and shall not be released or discharged for any reason whatsoever prior thereto, including without limitation:

(i)    the extension of time for payment or performance of the Obligation or the amendment, extension or renewal of the Agreement or the Obligation, except that any such extension, amendment or renewal shall not enlarge Calpine's obligations under this Guaranty and Calpine shall have the benefit of any such extension, amendment or renewal to the same extent as GPC (e.g., if GPC's time for payment of the Obligation has been extended, Calpine shall have no obligation under this Guaranty to make payment of the Obligation until such time as GPC is required under the extension to make payment);

(ii)    any delay or failure by City to enforce or exercise any right or remedy under the Agreement, or waiver by City of any such right or remedy;

any transfer, assignment or mortgaging by City of any interest in the Agreement or this Guaranty;

the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets and liabilities, or the voluntary or involuntary receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization or other similar proceeding affecting GPC, or the disaffirmance of the Agreement in any such proceeding; or

(v)    the existence, validity, enforceability, perfection, release, or extent of any collateral for the Obligation.  City shall not be obligated to file any claim relating to the Obligation owing to it in the event that GPC becomes subject to a bankruptcy, reorganization, or similar proceeding, and the

failure of City to so file shall not affect Calpine's obligations hereunder.

3.    <u>Release and Assignment</u>.  Upon the transfer or assignment by GPC of the Agreement or any rights thereunder or the termination of the Agreement or any rights thereunder, Calpine's obligations under this Guaranty shall be released and discharged with respect to the Agreement or rights thereunder; provided that, with respect to any transfer or assignment, City shall have consented to such transfer or assignment, which consent shall not be unreasonably withheld or delayed.  City hereby agrees to enter into an agreement to evidence, or otherwise provide adequate assurance of, any such release or discharge.  Subject to this Section 3, Calpine may not assign this Guaranty or its obligations thereunder without prior written consent of City, which consent of City shall not be unreasonably withheld or delayed.

4.    <u>Waivers by Calpine</u>.  Calpine waives notice of the acceptance of this Guaranty, demand or presentment for payment to City or the making of any protest, notice of the amount of the Obligation outstanding at any time, notice of failure to perform on the part of GPC, notice of any amendment, modification or waiver of or under the Agreement, and all other notices or demands not specified hereunder.

5.    <u>Representations and Warranties</u>.  Calpine hereby represents and warrants that it has all necessary and appropriate powers and authority to execute and perform under this Guaranty and that such Guaranty constitutes its legal, valid and binding obligations enforceable against it in accordance with its terms (except as enforceability may be limited by bankruptcy, insolvency, moratorium and other similar laws affecting enforcement of creditors' rights in general principles of equity).

6.    <u>Miscellaneous</u>.  No Provision of this Guaranty may be amended or waived except by a written instrument executed by Calpine and City.  This Guaranty shall not be deemed to benefit any person except City.  This Guaranty shall be governed by the laws of the State of California.

7.    <u>Notices</u>.  Notices under this Guaranty shall be deemed received if sent to the address specified below: (i) on the day received if served by overnight express delivery, (ii) on the next business day if served by facsimile transmission when sender has machine confirmation that facsimile was transmitted to the correct fax number listed below, and (iii) four business days after mailing if sent by certified, first class mail, return receipt requested. Any party may change its address to which notice is given hereunder by providing notice of same in accordance with this Section 7.

|        |        |
|--------|--------|
| To: | City of Santa Rosa<br>100 Santa Rosa Avenue<br>Santa Rosa, CA 95402<br>Attn: Greg Scoles<br>Fax: (707) 543-3030 |
| To Guarantor: | Calpine Corporation<br>50 West San Fernando Street<br>San Jose, CA 95113<br>Attn: Corporate Treasurer<br>Fax: (408) 995-0505 |

With copy to:          Geysers Power Company, LLC
                       10350 Socrates Mine Road
                       Middletown, CA 95461
                       Attn:  Tom Box, Vice President
                       Fax:  (707) 431-6148

IN WITNESS WHEREOF, Calpine has executed this Guaranty as of the date first above written.

CALPINE CORPORATION

By:     _____

Name:  Michael Thomas

Title:    Senior Vice President

Date:   June 10, 2004


Name:  Robert Kelly

Title:    Chief Financial Officer

Date:   June 10, 2004


```
+-------------------------------------------------+
|  PLEASE ATTACH NOTARY ACKNOWLEDGEMENT           |
|                                                 |
|           FOR EACH SIGNATURE                    |
+-------------------------------------------------+
```

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Santa Clara_ } ss.

On _June 8, 2004_, before me, _Kitina Nahinu, Notary Public_
Date                                          Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Michael Thomas_
Name(s) of Signer(s)

[X] personally known to me
[ ] proved to me on the basis of satisfactory
evidence

> KITINA M. NAHINU
> Commission # 1441925
> Notary Public - California
> Santa Clara County
> My Comm. Expires Sep 26, 2007

to be the person(s) whose name(s) is/are
subscribed to the within instrument and
acknowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.

_Kitina M. Nahinu_
Signature of Notary Public

Place Notary Seal Above

---

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.*

### Description of Attached Document
Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed by Signer
Signer's Name: _____
[ ] Individual
[ ] Corporate Officer — Title(s): _____
[ ] Partner — [ ] Limited [ ] General
[ ] Attorney in Fact
[ ] Trustee
[ ] Guardian or Conservator
[ ] Other: _____

> RIGHT THUMBPRINT
> OF SIGNER
> Top of thumb here

Signer Is Representing: _____

© 1997 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402     Prod. No. 5907     Reorder: Call Toll-Free 1-800-876-6827

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Santa Clara_ } ss.

On _June 8, 2004_, before me, _Kitina Nahinu, Notary Public_
　　Date　　　　　　　　　　　Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Robert D. Kelly_
　　　　　　　　　　　　　　Name(s) of Signer(s)

☑ personally known to me
☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Kitina M. Nahinu_
　　　　　　　Signature of Notary Public

KITINA M. NAHINU
Commission # 1441925
Notary Public - California
Santa Clara County
My Comm. Expires Sep 26, 2007

Place Notary Seal Above

——————— *OPTIONAL* ———————
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _____

Document Date: _____    Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**
Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1997 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

## **EXHIBIT C**

Second Amendment to the Construction and Operating Agreement

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

CITY OF SANTA ROSA
OFFICE OF THE CITY ATTORNEY
100 SANTA ROSA AVENUE
P.O. BOX 1678
SANTA ROSA, CA  95402-1678

## SECOND AMENDMENT
### to
### Construction and Operating Agreement
### Santa Rosa Geysers Recharge Project

This Second Amendment dated as of August, 14, 2007, (this "**Second Amendment**") to that certain Construction and Operating Agreement dated as of April 14, 1998 (the "**Agreement**") by and between the City Of Santa Rosa ("**City**") and Geysers Power Company, LLC, a Delaware limited liability company ("**GPC**"), as amended by the First Amendment to Construction and Operating Agreement Santa Rosa Geysers Recharge Project dated as of June 10, 2004.

## RECITALS

WHEREAS, City, Union Oil Company of California ("**Unocal**"), NEC Acquisition Company ("**NEC**") and Thermal Power Company ("**TPC**") originally entered into the Agreement on April 14, 1998;

WHEREAS, GPC is the successor-in-interest to each of Unocal's, NEC's and TPC's respective interests under the Agreement;

WHEREAS, GPC and the City entered into a First Amendment (the "**First Amendment**") to the Agreement dated as of June 10, 2004; and

WHEREAS, the City and GPC now desire to further amend certain provisions of the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

July 18, 2007

Section 1.  Definitions.  For all purposes of this Second Amendment, except as otherwise defined or indicated herein, capitalized terms used but not otherwise defined herein are used as defined in the Agreement, as amended by the First Amendment.

Section 2.  Amendments.  The amendments to the Agreement provided for by this Second Amendment are set forth in Annex 1 hereto.  From and after the effectiveness of this Second Amendment (as set forth in Section 4, below), all references in the Agreement to "this Agreement" (or words or phrases of a similar meaning) shall be deemed to be references to the Agreement as amended by the First Amendment and this Second Amendment unless the context otherwise specifically requires.

Section 3.  No Other Amendments or Modifications.  Except as expressly amended pursuant to the First Amendment and this Second Amendment, all other provisions of the Agreement are unaffected, remain in full force and effect with no other amendments or modifications and are ratified and confirmed in all respects.

Section 4. Effective Date.  This Second Amendment and the parties' rights and obligations hereunder shall not become effective unless and until the Bankruptcy Court has entered an order approving this Second Amendment and the assumption of the Agreement, as modified by this Second Amendment, by GPC, pursuant to section 365 of the Bankruptcy Code (the "Order"); and such Order has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the Order or judgment was appealed or from which certiorari was sought.  GPC shall use commercially reasonable efforts to obtain the Order promptly following the execution and delivery of this Second Amendment.

Section 5.  **Joint Responsibility.**
1.      The parties agree that the City has complied with the California Environmental Quality Act (CEQA) prior to approving this Second Amendment and further agree that the parties shall be jointly liable for and shall share equally the costs of any claim for, or award for, attorneys' fees and costs arising out of any claim, action, or proceeding against the City or its agents, officers, or employees, to attack, set aside, void, or annul the City's approval of this agreement arising under CEQA,  regardless of whether, as a result of such action, the City is directed by a petition for writ of mandate to rescind the City's approval of this agreement.

2.      The parties shall promptly notify each other of any such claim, action or proceeding as soon as the matter comes to their attention.  The parties shall cooperate in the defense of any such claim, action, or proceeding and shall select and provide legal counsel at their own expense.

Section 6.  Covenant of GPC.  To the extent it is necessary GPC shall within 20 business days after execution by the City obtain the consent of its financing parties to this Second Amendment.

Section 7.  Governing Law.  This Second Amendment shall be governed by the laws of the state of California, without reference to its conflict of laws rules.

July 18, 2007

Section 8.  <u>Execution in Counterparts</u>.  This Second Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

**[Signature Page Follows]**

July 18, 2007

IN WITNESS WHEREOF, the parties have caused this Second Amendment to be duly executed as of the date first written above.

City Of Santa Rosa

By: _Bob Blanchard_
    Name:  BOB BLANCHARD
    Title:    Mayor

Geysers Power Company, LLC

By: _____
    Name:  Dennis J Gilles
    Title:   Sr. Vice President

Attest:

By: _____
    Name:  SUSAN STONEMAN
    Title:    City Clerk, Deputy

By: _____
    Name:
    Title:

APPROVED AS TO FORM:

By: _____  8/17/07
    City Attorney

---

**PLEASE ATTACH NOTARY ACKNOWLEDGEMENT**

**FOR EACH SIGNATURE**

---

July 18, 2007

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California  }
County of Sonoma  } ss

On <u>21 August 2007</u>, before me, <u>Tamara Taylor, Notary Public</u>, personally appeared <u>Bob Blanchard,</u>

☒    Personally known to me; or    ☐ Proved to me on the basis of satisfactory evidence

To be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

TAMARA L. TAYLOR
Commission # 1562042
Notary Public - California
Sonoma County
My Comm. Expires Apr 18, 2009

_____
Notary Seal

WITNESS my hand and official seal.

_Tamara L Taylor_
Notary Signature

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California  
County of Sonoma    } ss

On <u>22 August 2007</u>, before me, <u>Tamara Taylor, Notary Public</u>, personally appeared <u>Dennis J. Gilles,</u>

☐ Personally known to me; or

☒ Proved to me on the basis of satisfactory evidence

To be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.



TAMARA L. TAYLOR  
Commission # 1562042  
Notary Public - California  
Sonoma County  
My Comm. Expires Apr 18, 2009

WITNESS my hand and official seal.

_Tamara L Taylor_

_____    _____  
Notary Seal                     Notary Signature

**Annex 1 to**
**Second Amendment to**
**Construction and Operating Agreement**

All additions, deletions and revisions described are to original 1998 Construction and Operating Agreement Santa Rosa Geysers Recharge Project, as amended by the First Amendment.

**1.     Amendments to Section 1 (entitled "Definitions")**

a.     The existing definition of "Annual Amount" in Section 1.1 shall be deleted and replaced in its entirety as follows:

  1.1     "Annual Amount" means 4,607 million gallons of water per year (identified as "Guaranteed Delivery" in Exhibit 3 – SCHEDULE I) beginning at the effective date of this Second Amendment, which CITY must deliver and GPC must accept, subject to the CITY's and GPC's compliance with all environmental and permitting requirements, including but not limited to the California Environmental Quality Act (CEQA). Annual Amount shall be prorated for the first year of this Second Amendment. CITY may increase the Annual Amount from SCHEDULE I to SCHEDULE II and to subsequent schedules, upon providing twenty four (24) months prior written notice from CITY to GPC, to a maximum Annual Amount of 5,543 million gallons of water per year (identified as "Guaranteed Delivery" in Exhibit 3 – SCHEDULE V).

b.     New Sections 1.10 and 1.11 shall be added as follows:

  1.10     "Optional Amount"  CITY may at its option, (identified as "City Option" as indicated in Exhibit 3), deliver additional water, beyond the Annual Amount, which GPC has first rights and must accept, subject to the CITY's and GPC's compliance with all environmental and permitting requirements, including but not limited to the California Environmental Quality Act (CEQA) .

  1.11     "Best Effort Amount" (identified as "Best Effort" as indicated in Exhibit 3) means additional water that CITY will endeavor to deliver and GPC will endeavor to accept, subject to the CITY's and GPC's compliance with all environmental and permitting requirements, but there shall be no penalty to either party for failure to deliver or to accept.

**2.     Amendments to Section 6 (entitled "Operation and Maintenance of the Project")**

a.     Existing Sections 6.2 and 6.3 shall be deleted in their entireties and replaced with the following:

  6.2     CITY shall pay the cost of electricity and other operating costs associated with pumping station one.

July 18, 2007

6.3    GPC shall provide the electricity, at no cost to CITY, to operate pumping stations two, three and four, or any substitute stations. As compensation to CITY for its agreement to eliminate GPC's obligation to purchase a financial instrument (original Agreement Section 16) and post a Letter of Credit (original Agreement Section 19), GPC shall pay CITY three-hundred thousand dollars ($300,000) on January 2, 2008, and three-hundred thousand dollars ($300,000) on the first business day following January 1st every year subsequent to 2008 through the year2022, inclusive.

**3.    Amendments to Section 7 (entitled "Delivery and Acceptance of Water")**

a.    Section 7.3 shall be deleted in its entirety and replaced as follows:

7.3    For purpose of measuring the Parties' compliance with this section, "year" shall mean "calendar year" which may be prorated in the first year of this Second Amendment.

**4.    Amendments to Section 8 (entitled "Quality of Water")**

a.    A new sentence shall be added to the end of Section 8.1 as follows:

CITY may choose to comply with Exhibit 4 – "Alternate 1", with 12 months prior notice to GPC.

**5.    Amendments to Section 16 (entitled "Term of Agreement and Payment to City")**

a.    Existing sections 16.1 and 16.2 shall be deleted in their entireties and replaced with the following:

16.1    This Agreement shall become effective when executed by both Parties and shall remain in force until December 31, 2037; provided, however, that either party shall have the right to terminate this Agreement at any time after January 1, 2028, by giving written notice to the other party at least two years prior to the proposed termination date.    If either party terminates this Agreement pursuant to Section 20, or after January 1, 2028, but prior to December 31, 2037, pursuant to the preceding sentence, that terminating party shall provide to the other party a Termination Fee as provided for in Exhibit 7. The Termination Fee shall be paid by check or wire transfer of immediately available funds.

16.2    Upon termination, if by GPC, GPC will exercise reasonable efforts to assist the City obtain from third parties an alternative power supply for the City's pumping stations two, three and four.  Further, upon termination, if by GPC, CITY shall have a right of first refusal to purchase all or part of the electric supply facilities listed on Exhibit 9  hereto for pumping stations two, three and four at the price and on the terms and conditions at which GPC has received a bona fide offer which GPC is willing to accept.  CITY's right of first refusal pursuant to this Section shall expire 180 days after the termination of this Agreement.

July 18, 2007

6.    **Amendments to Section 18 (entitled "Covenants")**

a.    Existing sections 18.1, 18.2, 18.3 and 18.4 shall be deleted in their entireties and replaced with the following:

18.1    If in any year CITY delivers less than 90% of the Annual Amount as may be reduced pursuant to Section 7.1, CITY shall use its best efforts to make up the amount that is less than 90% in the four succeeding years.  CITY shall get credit for water which CITY is capable of delivering but which GPC does not accept as required by this Agreement, up to 1.1 times the Guaranteed Delivery rates specified in Exhibit 3 .

18.2    If in any year CITY delivers less than 90% of the Annual Amount as may be reduced
pursuant to Section 7.1, and CITY fails to make up the shortfall in the four succeeding years, then CITY shall pay GPC the amount specified in Exhibit 6, unless CITY has terminated this Agreement pursuant to Section 20.

18.3    If in any year GPC accepts less than 90% of the Annual Amount or 90% of the Optional amount as may be reduced pursuant to Section 7.2, GPC shall use its best efforts to make up the amount that is less than 90% in the four succeeding years.  GPC shall get credit for water which GPC is capable of receiving but which CITY does not deliver as required by this Agreement, up to 1.1 times the Guaranteed Delivery rates specified in Exhibit 3.

18.4    If in any year GPC accepts less than 90% of the Annual Amount as may be reduced pursuant to Section 7.2, and GPC fails to make up the shortfall in the four succeeding years, then GPC shall pay the CITY the amount specified in Exhibit 6, unless GPC has terminated this Agreement pursuant to Section 20.

18.5    The credit that GPC is entitled to in any given year under Section 18.3 above shall not exceed 10% of the Annual Amount.

7.    **Amendments to Section 19 (entitled "Letter of Credit")**

a.    The entirety of Section 19 (including the caption thereof and all of Sections 19.1 through 19.5, inclusive), shall be deleted and replaced with the following:

19.    PARENT GUARANTY

19.1    The indirect parent company of GPC, Calpine Corporation, shall guaranty the timely payment of all GPC's obligations under this Agreement pursuant to the terms of the Guaranty attached hereto as Exhibit 8.

3

July 18, 2007

**8.**    **Amendments to Section 20 (entitled "Termination of Agreement")**

a.    Section 20.1 shall be deleted in its entirety and replaced with the following:

20.1 City may terminate this agreement if:

20.1.1  GPC fails to accept at least 80 percent of four times the Annual Amount as reduced pursuant to Sections 7.1 and 7.2 in any 48-month period; or

20.1.2  GPC fails to accept at least 50 percent of one-sixth of the Annual Amount as reduced pursuant to Sections 7.1 and 7.2 in any two-month period; or

20.1.3  GPC has breached this agreement as provided in Section 17, except that City may only terminate for GPC's failure to accept water in conformance with sections 20.1.1 or 20.1.2.

b.    Sections 20.1.4 and 20.1.5 shall be deleted in their entirety and not replaced.

c.    Section 20.2 shall be deleted in its entirety and replaced with the following:

20.2    GPC may terminate this Agreement if:

20.2.1  CITY fails to deliver at least 80 percent of four times the Annual Amount as reduced pursuant to Sections 7.1 and 7.2 in any 48-month period; or

20.2.2  CITY fails to deliver at least 50 percent of one-sixth of the Annual Amount as reduced pursuant to Sections 7.1 and 7.2 in any two-month period; or

20.2.3  CITY has breached this Agreement as provided in Section 17, except that GPC may only terminate this Agreement due to CITY's failure to deliver water if CITY fails to deliver water in the amounts set forth in Sections 20.2.1 or 20.2.2.

20.2.4  Intentionally Deleted

d.    New Section 20.3 and 20.4 shall be added as follows:

20.3    In the event this Agreement is terminated by CITY pursuant to Section 20.1, GPC shall pay CITY a Termination Fee in the amount set forth in Exhibit 7, within 90 days following the written notice of such termination.

20.4    In the event this Agreement is terminated by GPC pursuant to Section 20.2, CITY shall pay GPC a Termination Fee in the amount set forth in Exhibit 7, within 90 days following the written notice of such termination.

4

July 18, 2007

**9.**    **Amendments to Exhibits**

a.    Exhibits 3, 4, 5, 6, and 7 are deleted in their entirety and replaced with the new Exhibits attached hereto.

b.    A New Exhibit 9 is added.

**-- END --**

July 18, 2007

# EXHIBIT 3

## *(Schedules I – V)*
### (See Sections 1, 7 and 18)

- **Guaranteed Delivery.**  Amount of water required to be delivered by CITY which GPC must accept (not weather dependent)
- **CITY Option.**  Additional amount of water CITY may choose to deliver which GPC must accept (weather dependent)
- **Best Effort.**  Additional amount of water GPC may choose to request and which CITY may choose to deliver (weather dependent)
- Guaranteed Delivery, CITY Option and Best Effort amounts shown in Schedules I – V are calculated so that CITY can deliver this water while reserving additional non-weather dependent recycled water to:  1)  meet its 2007 recycling commitments (non-Geysers Recharge Project), and 2) allow for a phased implementation of up to 1,250 MGY of future recycling projects by the time Schedule V is implemented.
- GPC shall have the first rights to all water amounts shown in Schedules I-V up to and including the City Option and Best Effort Amounts.
- Monthly averages are millions of gallons per day
- Annual totals are in millions of gallons per year
- Annual amounts are the Total values in the Guaranteed Delivery column of the schedules

| Schedule I | | | |
|---|---|---|---|
| **Month** | **Guaranteed Delivery** | **City Option** | **Best Effort** |
| January | 17.0 | 0 | 3.0 |
| February | 16.9 | 0 | 3.1 |
| March | 10.5 | 0 | 9.5 |
| April | 9.0 | 0 | 5.7 |
| May | 9.0 | 0 | 10.0 |
| June | 10.5 | 0 | 9.5 |
| July | 10.5 | 0 | 8.6 |
| August | 11.3 | 0 | 4.9 |
| September | 11.6 | 0 | 2.8 |
| October | 11.7 | 0 | 4.2 |
| November | 16.9 | 0 | 3.1 |
| December | 16.9 | 0 | 3.1 |
| | | | |
| **Average** | **12.62** | **0** | **5.65** |
| **Total** | **4,607** | **0** | **2,062** |

6

July 18, 2007

| Schedule II | | | |
|---|---|---|---|
| Month | Guaranteed Delivery | City Option | Best Effort |
| January | 17.2 | 0.1 | 2.7 |
| February | 17.1 | 0.2 | 2.8 |
| March | 12.3 | 1.4 | 6.3 |
| April | 9.8 | 0.8 | 5.5 |
| May | 9.4 | 0.4 | 9.5 |
| June | 11.5 | 1.0 | 7.5 |
| July | 11.5 | 0.9 | 6.9 |
| August | 12.2 | 0.9 | 4.2 |
| September | 12.3 | 0.7 | 2.5 |
| October | 12.3 | 0.6 | 3.8 |
| November | 17.1 | 0.2 | 2.8 |
| December | 17.1 | 0.2 | 2.8 |
| Average | 13.29 | 0.62 | 4.79 |
| Total | 4,852 | 226.1 | 1,750 |

| Schedule III | | | |
|---|---|---|---|
| Month | Guaranteed Delivery | City Option | Best Effort |
| January | 17.3 | 0.3 | 2.4 |
| February | 17.3 | 0.4 | 2.4 |
| March | 14.1 | 1.4 | 4.6 |
| April | 10.5 | 1.5 | 5.4 |
| May | 9.8 | 0.8 | 8.9 |
| June | 12.5 | 2 | 5.5 |
| July | 12.4 | 1.7 | 5.5 |
| August | 13.0 | 1.5 | 3.6 |
| September | 13.0 | 0.9 | 2.6 |
| October | 12.9 | 1 | 3.7 |
| November | 17.3 | 0.4 | 2.4 |
| December | 17.3 | 0.4 | 2.4 |
| Average | 13.93 | 1.03 | 4.13 |
| Total | 5,084 | 375 | 1,508 |

7

July 18, 2007

| Schedule IV | | | |
|---|---|---|---|
| **Month** | **Guaranteed Delivery** | **City Option** | **Best Effort** |
| January | 17.5 | 0.5 | 2.1 |
| February | 17.4 | 0.5 | 2.1 |
| March | 15.8 | 1.4 | 2.8 |
| April | 11.3 | 2.3 | 5.2 |
| May | 10.2 | 1.2 | 8.4 |
| June | 13.5 | 2.5 | 4 |
| July | 13.4 | 1.7 | 4.8 |
| August | 13.9 | 1.5 | 3.8 |
| September | 13.7 | 0.9 | 3 |
| October | 13.4 | 1 | 4.6 |
| November | 17.4 | 0.5 | 2.1 |
| December | 17.4 | 0.5 | 2.1 |
| **Average** | **14.56** | **1.21** | **3.77** |
| **Total** | **5,314** | **442** | **1,374** |

| Schedule V | | | |
|---|---|---|---|
| **Month** | **Guaranteed Delivery** | **City Option** | **Best Effort** |
| January | 17.6 | 0.6 | 1.8 |
| February | 17.6 | 0.7 | 1.7 |
| March | 17.6 | 1.4 | 1 |
| April | 12.0 | 3 | 5 |
| May | 10.6 | 1.6 | 7.8 |
| June | 14.5 | 3 | 2.5 |
| July | 14.3 | 1.7 | 4 |
| August | 14.7 | 1.5 | 3.8 |
| September | 14.4 | 0.9 | 3.3 |
| October | 14.0 | 1 | 4 |
| November | 17.6 | 0.7 | 1.7 |
| December | 17.6 | 0.7 | 1.7 |
| **Average** | **15.19** | **1.40** | **3.20** |
| **Total** | **5,543** | **511** | **1,170** |

8

July 18, 2007

**EXHIBIT 4**
Water Quality Standards for GPC Acceptance and CITY Delivery
**(See Section 8)**

| Constituent or Characteristic | Maximum Monthly Average Level | | Comments |
| --- | --- | --- | --- |
| | Current | Alternate 1 | |
| Total Suspended Solids | 30 ppm | 10 ppm | |
| pH | 6.0-8.5 | 6.0-8.5 | Limits based on individual measurement (min-max range) |
| Biochemical Oxygen Demand | 10 ppm | 15 ppm | |
| Total Alkalinity | 200 ppm | 248 ppm | as $CaCO_3$ |
| Total Dissolved Solids | 600 ppm | 644 ppm | |
| Dissolved Oxygen | 10 ppm | 5 ppm | |
| Sodium | 100 ppm | 150 ppm | |
| Calcium-dissolved | 40 ppm | 46 ppm | |
| Magnesium-dissolved | 30 ppm | 30 ppm | |
| Boron | 2 ppm | 2 ppm | |
| Silica-dissolved | 25 ppm | 55.4 ppm | As $SIO_2$ |
| Phosphate | No Limit | 4 ppm | As P |
| Bicarbonate | 200 ppm | 248 ppm | |
| Chloride | 100 ppm | 150 ppm | |
| Sulfate-dissolved | 50 ppm | 51.8 ppm | |
| Total Sulfur | 25 ppm | 25 ppm | |
| Nitrate Nitrogen | 25 ppm | 25 ppm | Nitrate as N |
| Iron-dissolved | 0.5 ppm | 2.57 ppm | |
| Arsenic | 30 ppb | 30 ppb | |
| Cadmium | 5 ppb | 5 ppb | |
| Chromium | 100 ppb | 100 ppb | |
| Copper | 200 ppb | 200 ppb | |
| Lead | 50 ppb | 50 ppb | |
| Mercury | 2 ppb | 2 ppb | |
| Nickel | 200 ppb | 200 ppb | |
| Selenium | 50 ppb | 50 ppb | |
| Zinc | 100 ppb | 100 ppb | |
| Total Coliform | <2.2* | <2.2* | MPN/100 ml. * Total Coliform is a 30-day median at the Laguna Plant. |

ppm = parts per million        ppb = parts per billion

9

**EXHIBIT 5**

*Guarantee*

This GUARANTEE dated as of *August 21*, 2007 is made by Calpine Corporation ("**Guarantor**"), for the benefit of The City of Santa Rosa ("**THE CITY**"), and shall become effective concurrently with the effective date of the below-described Agreement.

WHEREAS, THE CITY and Geysers Power Company, LLC, a Delaware limited liability company ("**GPC**"), are parties to that certain Construction and Operating Agreement dated as of April 14, 1998 (the "**Agreement**"), subsequently amended as of June 10, 2004 (the "**First Amendment**"), and on August ___, 2007 (the "**Second Amendment**")], and pursuant to the terms of the AGREEMENT, GPC and THE CITY have agreed that Calpine Corporation shall provide to THE CITY this Guarantee as required thereby;

NOW, THEREFORE, as pursuant to the terms of the AGREEMENT, Guarantor agrees as follows:

1.      Guarantee.

(a)      Subject to the provisions hereof, Guarantor irrevocably and unconditionally guarantees to THE CITY the prompt and complete payment when due, of all amounts payable by GPC under the AGREEMENT and any amendments thereto other than contingent liabilities or indemnities which survive the termination of the AGREEMENT (each an "**Obligation**") commencing upon the effective date of this Guarantee and terminating ("**Termination Date**") when all Obligations have been paid; provided, however, that subject to the provisions below regarding costs and expenses, the aggregate cumulative liability of Guarantor under this Guarantee shall commence at forty-one million, two-hundred thousand($41,200,000) dollars and shall automatically decrease on January 1st of each subsequent year to the amount equal to the amount of the termination fee described for each year in Agreement Exhibit 7 plus the additional amount of up to one million, two-hundred thousand ($1,200,000) per year as provided in Section 18 and Exhibit 6, Table 6.1.

(b)      This is a guarantee of payment and not of collection. If GPC fails to pay any Obligation for any reason, Guarantor will pay or cause to be paid such Obligation directly for THE CITY's benefit within 5 business days after THE CITY's demand therefor to Guarantor and without THE CITY having to make prior demand on GPC. All payments hereunder shall be made without reduction, whether by offset, payment in escrow, or otherwise. Guarantor is liable for, and hereby indemnifies THE CITY for THE CITY's reasonable costs and expenses, incurred in any effort to collect or enforce any of the obligations under this Guarantee, whether or not any lawsuit is filed. Such indemnification obligation is in addition to the cap set forth above.

(c)    Notwithstanding anything to the contrary herein, this Guarantee shall continue to be effective or reinstated, as the case may be, if at any time payment of the Obligations, or any part thereof, is rescinded or must otherwise be returned by THE CITY upon the insolvency, bankruptcy or reorganization of GPC or otherwise, all as though the payment of such Obligations had not been made.

(d)    Notwithstanding anything to the contrary herein, Guarantor's liability arising out of or relating to this Guaranty shall in no event be greater than the liability of GPC under the Agreement, and all Guarantor obligations hereunder shall be subject to any and all defenses to payment which GPC may have under or in connection with the Agreement.

2.    Guarantor's Obligation.    Subject to paragraphs 1 and 3, Guarantor's obligations under this Guarantee are absolute and unconditional, shall remain in force until the Termination Date and shall not be released or discharged for any reason whatsoever prior thereto, including without limitation:

(i)    the extension of time for payment or performance of any Obligation or the amendment, extension or renewal of the AGREEMENT or any Obligation, except that any such extension, amendment or renewal shall not enlarge Guarantor's obligations under this Guarantee and Guarantor shall have the benefit of any such extension, amendment or renewal to the same extent as GPC (e.g., if GPC's time for payment of an Obligation has been extended, Guarantor shall have no obligation under this Guarantee to make payment of such Obligation until such time as GPC is required under the extension to make payment);

(ii)    any delay or failure by THE CITY to enforce or exercise any right or remedy under the AGREEMENT, or waiver by THE CITY of any such right or remedy;

(iii)    any permitted transfer, assignment or mortgaging by THE CITY of any interest in the AGREEMENT or this Guarantee;

(iv)    the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets and liabilities, or the voluntary or involuntary receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization or other similar proceeding affecting GPC, or the disaffirmance of the AGREEMENT in any such proceeding;

(v)    the existence, validity, enforceability, perfection, release, or extent of any collateral for such Obligations.    THE CITY shall not be obligated to file any claim relating to the Obligations owing to it in

the event that GPC becomes subject to a bankruptcy, reorganization, or a similar proceeding, and the failure of THE CITY to so file shall not affect Guarantor's obligations hereunder.

3.     <u>Release and Assignment</u>.  Upon the transfer or assignment by GPC of the AGREEMENT or any rights thereunder, or the termination of the AGREEMENT or any rights thereunder, Guarantor's obligations under this Guarantee shall be released and discharged with respect to the AGREEMENT or rights thereunder that are transferred or assigned, provided that, with respect to any transfer or assignment, THE CITY shall have consented to such transfer or assignment to the extent required under the AGREEMENT, and with respect to a termination, this Guarantee shall continue to be in effect to the extent that any Obligations remain outstanding under the terminated AGREEMENT and until such time as all such Obligations have been paid in full.  THE CITY hereby agrees to enter into any agreement to evidence, or otherwise provide adequate assurance of, any such release or discharge.  Subject to the foregoing sentences, Guarantor may not assign this Guarantee or its obligations thereunder without prior written consent of THE CITY, which consent shall not be unreasonably withheld or delayed

4.     <u>Waivers by Guarantor</u>.  Guarantor waives notice of the acceptance of this Guarantee, demand or presentment for payment to GPC or the making of any protest, notice of the amount of the Obligations outstanding at any time, notice of failure to perform on the part of GPC, notice of any amendment, modification or waiver of or under the AGREEMENT, and all other notices or demands not specified hereunder.

5.     <u>Representations and Warranties</u>.  Guarantor hereby represents and warrants that it has all necessary and appropriate powers and authority to execute and perform under this Guarantee and that such Guarantee constitutes its legal, valid and binding obligations enforceable against it in accordance with its terms (except as enforceability may be limited by bankruptcy, insolvency, moratorium and other similar laws affecting enforcement of creditors' rights in general principles of equity).

6.     <u>Miscellaneous</u>.  No Provision of this Guarantee may be amended or waived except by a written instrument executed by Guarantor and THE CITY.  This Guarantee shall not be deemed to benefit any person except GPC and THE CITY.  This Guarantee shall be governed by the laws of the State of California.  Guarantor agrees to postpone any rights it may acquire by way of subrogation under this Guarantee until all of the Obligations shall have been irrevocably paid to THE CITY in full.

7.     <u>Notices</u>.  Notices under this Guarantee shall be deemed received if sent to the address specified below: (i) on the day received if served by overnight express delivery, and (ii) four business days after mailing if sent by certified, first class mail, return receipt requested.  Any party may change its address to which notice is given hereunder by providing notice of same in accordance with this paragraph 7.

To THE CITY:    City of Santa Rosa
                     Office of the City Manager
                     City Hall

100 Santa Rosa Avenue, Room 10
Santa Rosa, CA 95404

Attn:   Deputy City Manager
Phone: (707) 543-3010
Facsimile: (707) 543-3030

To Guarantor:

Calpine Corporation
50 West San Fernando St.
San Jose, CA 95113

Attn:   VP, Assistant General Counsel
Phone:  925-479-6691
Facsimile:

With copy to:

Geysers Power Company, LLC
10350 Socrates Mine Road
Middletown, CA 95461

Attn:       Senior Vice President Geothermal
Phone:      (707) 431-6000
Facsimile:  (707) 431-6246

IN WITNESS WHEREOF, Guarantor has executed this Guarantee as of the date first above written.

Calpine Corporation, a Delaware company,

By: _____
Name: Robert P. May
Title: CEO Calpine Corp
Date: Aug 21, 2007

Subscribing Witness

By: _____
Name: James H. Horne
Title: Dir. of Business Services
Date: Aug. 23, 2007

GUARANTEE City of Santa Rosa
Exhibit 5
August 2007

STATE OF CALIFORNIA            )
                               )
COUNTY OF ___Lake___           )

On this 23rd day of August , 2007, before me Kevin J. Talkington, the
undersigned Notary Public, personally appeared __James H. Horne__ ,
personally known to me to be the person whose name is subscribed to the within
instrument, as a witness thereto, who, being by me duly sworn, deposed and said that he
was present and saw/heard acknowledged __Robert P. May__ the
same person described in and whose name is subscribed to the within and annexed
instrument in his authorized capacity as a party thereto, execute the same, and that said
affiant subscribed his name to the within instrument as a witness at the request of
__Robert P. May__ .

WITNESS my hand and official seal.

*Kevin J. Talkington*

Notary's Signature

> KEVIN J. TALKINGTON
> COMM. #1555598
> Notary Public - California
> Sonoma County
> My Comm. Expires Mar. 23, 2009

# EXHIBIT 6

## Performance Payments
## Annual Amount

Table 6.1        Payment obligations under Section 18 shall be determined based upon the percentage that the water delivered in a given year is below the Annual Amount or the water accepted in a given year is below the Annual Amount (Table 6.1) as such amounts may be reduced in accordance with Section 7.  This percentage shall be rounded to the nearest whole percent.  If the calculated percentage is between 0 and 10 percent then no payment is due.  If the calculated percentage is between 10 and 25 percent, the payment obligation shall be the amount indicated on table 6.1 below.  If the calculated percentage is greater than 25 percent, the payment is capped at $1,200,000; provided however, that the non-defaulting Party shall retain the termination rights and the right to receive the Termination Fee described in Section 20.

**Table 6.1**

| Percent below Annual Amount (As adjusted pursuant to Article 7) | Payment |
|---|---|
| 10 or less | 0 |
| 11 | $360,000 |
| 12 | $420,000 |
| 13 | $480,000 |
| 14 | $540,000 |
| 15 | $600,000 |
| 16 | $660,000 |
| 17 | $720,000 |
| 18 | $780,000 |
| 19 | $840,000 |
| 20 | $900,000 |
| 21 | $960,000 |
| 22 | $1,020,000 |
| 23 | $1,080,000 |
| 24 | $1,140,000 |
| 25 | $1,200,000 |
| Greater than 25 | $1,200,000 |

14

## Performance Payments
## Optional Amount

Table 6.2    Additional payment obligations under Section 18 shall be determined based upon the percentage that the water accepted in a given year is below the Optional Amount (Table 6.2) as such amounts may be reduced in accordance with Section 7. This percentage shall be rounded to the nearest whole percent. If the calculated percentage is between 0 and 10 percent then no payment is due. If the calculated percentage is between 10 and 25 percent, the payment obligation shall be the amount indicated on table 6.2 below. If the calculated percentage is greater than 25 percent, the payment is capped at $600,000; provided however, that the non-defaulting Party shall retain the termination rights and the right to receive the Termination Fee described in Section 20.

## Table 6.2

| Percent below Optional Amount (As adjusted pursuant to Article 7) | Payment |
|---|---|
| 10 or less | 0 |
| 11 | $180,000 |
| 12 | $210,000 |
| 13 | $240,000 |
| 14 | $270,000 |
| 15 | $300,000 |
| 16 | $330,000 |
| 17 | $360,000 |
| 18 | $390,000 |
| 19 | $420,000 |
| 20 | $450,000 |
| 21 | $480,000 |
| 22 | $510,000 |
| 23 | $540,000 |
| 24 | $570,000 |
| 25 | $600,000 |
| Greater than 25 | $600,000 |

15

July 18, 2007

**EXHIBIT 7**
**TERMINATION FEE**
**(See Section 20)**

GPC Termination Fee

| Year | Termination Payment | | Year | Termination Payment |
|------|---------------------|---|------|---------------------|
| 2007/08 | $40,000,000 | | 2023 | $25,000,000 |
| 2009 | $39,00,000 | | 2024 | $24,000,000 |
| 2010 | $38,000,000 | | 2025 | $23,000,000 |
| 2011 | $37,000,000 | | 2026 | $22,000,000 |
| 2012 | $36,000,000 | | 2027 | $21,000,000 |
| 2013 | $35,000,000 | | 2028 | $20,000,000 |
| 2014 | $34,000,000 | | 2029 | $18,000,000 |
| 2015 | $33,000,000 | | 2030 | $16,000,000 |
| 2016 | $32,000,000 | | 2031 | $14,000,000 |
| 2017 | $31,000,000 | | 2032 | $12,000,000 |
| 2018 | $30,000,000 | | 2033 | $10,000,000 |
| 2019 | $29,000,000 | | 2034 | $8,000,000 |
| 2020 | $28,000,000 | | 2035 | $6,000,000 |
| 2021 | $27,000,000 | | 2036 | $4,000,000 |
| 2022 | $26,000,000 | | 2037 | $2,000,000 |

CITY Termination Fee

| Year | Termination Payment | | Year | Termination Payment |
|------|---------------------|---|------|---------------------|
| 2007/08 | $20,000,000 | | 2023 | $12,500,000 |
| 2009 | 19,500,000 | | 2024 | $12,000,000 |
| 2010 | 19,000,000 | | 2025 | $11,500,000 |
| 2011 | $18,500,000 | | 2026 | $11,000,000 |
| 2012 | $18,000,000 | | 2027 | $10,500,000 |
| 2013 | $17,500,000 | | 2028 | $10,000,000 |
| 2014 | $17,000,000 | | 2029 | $9,000,000 |
| 2015 | $16,500,000 | | 2030 | $8,000,000 |
| 2016 | $16,000,000 | | 2031 | $7,000,000 |
| 2017 | $15,500,000 | | 2032 | $6,000,000 |
| 2018 | $15,000,000 | | 2033 | $5,000,000 |
| 2019 | $14,500,000 | | 2034 | $4,000,000 |
| 2020 | $14,000,000 | | 2035 | $3,000,000 |
| 2021 | $13,500,000 | | 2036 | $2,000,000 |
| 2022 | $13,000,000 | | 2037 | $1,000,000 |

16

July 18, 2007

**EXHIBIT 9**

*Electrical Transmission Facilities subject to first right of refusal*
(See Section 16.2)

The transmission line, poles, VFI switches, 21/4.16kV transformers from and including the 21 kv disconnect switch (SD 18-050) at the Socrates (Unit 18) power plant switch yard to the SRGRP pump station delivery points as listed below.  Also as part of the system are three 21/220V transformers and disconnect switches that are associated with two ROW owners and an SBC (Southwestern Bell Telephone Company) connection for a repeater station.

| Location | Point of Delivery |
|---|---|
| Bear Canyon Pumping Station (#2) | 4.16 kV Main Service Disconnect Switch |
| Mayacama Pumping Station (#3) | 4.16 kV Main Service Disconnect Switch |
| Pine Flat Pumping Station (#4) | 4.16 kV Main Service Disconnect Switch |

17

July 18, 2007