# REPORT OF COURT-APPOINTED EXPERT
# BRIDGE ASSOCIATES LLC CONCERNING VALUATION OF
# CALPINE CORPORATION AND AFFILIATED DEBTORS

## EXECUTIVE SUMMARY



**BRIDGE ASSOCIATES LLC**
DECEMBER 18, 2007

**Introduction and Background Facts**

1.  By order dated November 20, 2007 (the "Order"), and with the consent of the Parties, the United States Bankruptcy Court for the Southern District of New York appointed Bridge Associates LLC ("Bridge") to serve as its Court-Appointed Expert in *In re Calpine Corporation, et al.*, Case No. 05-60200 (BRL) (collectively, "Calpine" or "the Debtors"), pursuant to Federal Rule of Evidence 706(a) to determine the Debtors' total enterprise value ("TEV"). Bridge was working for the Court, not any of the parties to the reorganization cases. This is a crucial distinction.

2.  Before Bridge's appointment, three sets of expert reports and rebuttal reports that presented widely divergent calculations of the Debtors' TEV were filed in the Calpine cases. These reports had been submitted to the Court by Miller Buckfire & Co. LLC ("MB") and PA Consulting Group ("PA") on behalf of the Debtors; Lazard Frères & Co. LLC ("Lazard") and ICF International ("ICF") on behalf of the Official Committee of Unsecured Creditors (the "UCC"); and by Perella Weinberg Partners ("PWP") and Altos Management Inc. ("Altos") on behalf of the Official Committee of Equity Security Holders of Calpine Corporation ("Equity," and with the UCC and the Debtors, the "Parties").

3.  Measuring from the lowest valuation that the Parties calculated by any recognized valuation method to the highest, the range was anywhere from $11.9 billion to $25.5 billion, a variance of $13.6 billion. These numbers were so far apart, and some aspects of the methodologies by which they were calculated were so dramatically different, that reconciling them was extremely difficult. In addition, the Parties' "mid-point" values varied by $8.1 billion, ranging from $16.3 billion to $24.4 billion - again a dramatic difference.

4.      The Court's Order appointed Bridge "as the expert to assist this Court in determining, *inter alia*, the Debtors' enterprise values for the purposes of confirmation" of the Debtors' Plan of Reorganization.  It was Bridge's task to recommend a valuation upon which the Court could rely.

5.      The Court's Order also directed Bridge to assist the Court in determining, "the reasonableness of the Parties' assumptions on the supply/demand and future prices of natural gas with respect thereto."  For this purpose, the Court approved the appointment of MRW and Associates, Inc. ("MRW") "as an energy expert to assist and to act at the direction and in support of Bridge's assignment."

6.      Bridge retained the law firm of Togut, Segal & Segal LLP ("Togut") to assist in the preparation of its report, to provide advice concerning relevant legal and strategic issues, and to obtain information necessary for the report from the parties and their counsel.

**Scope and Approach**

7.      After the Court entered its Order, Bridge and MRW began work on preparing their expert reports.

8.      At the same time, Anthony Schnelling of Bridge and Albert Togut of the Togut firm, Bridge's counsel, requested and received the Court's permission to embark on a parallel course to determine if it was possible to open up discussions with the Parties about a settlement of their difference in opinion over valuation and also about a global settlement of their overall differences about distributions to be received under the plan.  Initially, Messrs. Schnelling and Togut met with the Debtor, and then the two committees, including a meeting in California with the Co-Chairman of the UCC and its counsel.  In each of these meetings, Messrs. Schnelling and Togut explored the bases of the Parties' disagreement as to how the Debtors' TEV should be

calculated. There were many discussions over the next nine days culminating in a joint meeting with all of the Parties to discuss resolution of their differences which was held on Sunday, December 16, 2007. The following day, December 17, 2007, the Court was scheduled to begin the confirmation hearings, which were to include four days of trial over valuation issues.

9. After extremely difficult and protracted discussions, with all Parties participating, Messrs. Schnelling and Togut helped catalyze a global settlement among the parties. As part of their agreement, the Parties determined and agreed upon a TEV of $18.95 billion, which they found to be reasonable and appropriate for the Calpine Debtors. This value was not provided by Bridge and indeed, Bridge advised the Parties that Bridge would have to continue its work to see if it could support that settlement value as reasonable. However, it was agreed among the Parties that, assuming the TEV adopted by the parties was deemed reasonable by Bridge and accepted by the Court, at least four days of a trial in the Bankruptcy Court over valuation issues would be eliminated as well as the attendant risk and expense to all parties.

10. To prepare its report, given the great disparity between the Parties' respective TEV calculations and the abbreviated time available for review and evaluation, Bridge undertook a comparative, critical analysis of the Parties' TEV calculations and their rationales. At the same time, MRW undertook a comparative, critical analysis of the Parties' assumptions concerning the Debtors' financial projections and energy-related price and supply assumptions.

11. In support of its analysis, Bridge: reviewed the Parties' reports and rebuttal reports; met with each of the Parties to discuss their positions; submitted sets of written questions to the Parties to solicit their views on material issues; and reviewed financial information concerning the Debtors, including their business plan, amendments to their business plan and

financial projections for the period 2008 to 2013 ("Forecast Period"). Bridge also reviewed MRW's work assessing the reasonableness of the Debtors' financial projections.

12. Bridge's first step in evaluating the Debtors' TEV was to identify the key assumptions that the Financial Experts shared as well as their most significant differences. To assist in this process, Bridge sent a series of formal information requests to the Parties, including a request that they identify their five principal criticisms of each of the other Parties' TEV calculations.

13. Bridge then independently evaluated both the key assumptions that the Financial Experts shared and the Parties' principal disagreements and criticisms of each others' key assumptions. Bridge focused on the material differences between the Parties, which it defined as differences that appeared to have an effect on TEV greater than $150 million (less than 1% of the lowest mid-point value) or that one or more Parties identified as a principal criticism of the others' methodology. Of necessity, Bridge did not attempt to investigate every difference between the Parties' factual assertions or assumptions that might potentially be relevant to calculating TEV.

14. Having reviewed the information the Parties provided, and having reached its own conclusions about what range of TEVs would be appropriate for the Debtors, Bridge determined to present its conclusions as recommended adjustments to the Debtors' TEV as calculated by the Debtors' expert MB. Bridge determined to do so for the sake of simplicity because each of the other expert teams used the energy related pricing and supply assumptions made by the Debtors' energy expert (PA) as the basis for their own review and analysis and because MB's methodology was relatively clearly delineated in its reports. Notwithstanding the foregoing decision on presentation, in reaching its conclusions Bridge reviewed and analyzed not just MB's

analysis but all three of the reports and rebuttal reports prepared by the Parties' experts; Bridge made adjustments to each expert's conclusions in reaching its own conclusion as to valuation, as more particularly explained in Bridge's full report to the Court which has been filed under seal.

15. Bridge concluded that a series of adjustments should be made to the Debtors' TEV as MB had calculated it. Some of the adjustments increase the calculated TEV, whereas others reduce it. The principal differences between Bridge's and MB's calculations of the Debtors' TEV are as follows:

(a) ***Selection of Guideline Companies.*** Bridge concluded that only NRG Energy, Inc. and Dynegy, Inc. are sufficiently "comparable" companies for valuation purposes. Bridge does not agree that Mirant Corporation, Reliant Energy, Inc. or Ormat Technologies, Inc. (which was treated as comparable only by PWP) are sufficiently similar to the Debtors to provide a meaningful comparison.

(b) ***Increasing the Debtors' "Multiple" by a Subjective "Premium" when using the "comparable companies" ("CompCo") valuation method.*** Bridge concluded that the Debtors' "multiple" for CompCo valuation purposes should not be increased by a subjective "premium" as MB proposed.

(c) ***Adjustments to the weighted average cost of capital ("WACC") discount rate used in discounted cash flow ("DCF") analysis.*** Bridge concluded that MB's DCF analysis should be modified by changing the Debtors' "WACC" discount rate in several specific ways, including the cost of debt, the cost of equity, the debt to capital ratio and the "beta" and "alpha" measures of volatility.

(d) *Updated stock prices.* Bridge concluded that MB's valuation should be modified to take account of changes in the market prices of the relevant comparable companies as of Bridge's Valuation Date.

(e) *Inclusion of the Debtors' net operating loss ("NOL") in CompCo Valuation.* Bridge concluded that the value of the Debtors' NOL's should be added to MB's CompCo valuation, subject to certain adjustments.

(f) *Perpetuity Growth Rate.* Bridge concluded that MB should have used a higher "perpetuity growth rate" in calculating the "terminal value" for its DCF analysis.

16. In calculating TEV, Bridge assumed projections of the Debtors' earnings that had been submitted to Court by the Debtors' expert PA. Bridge did so based on the recommendation of MRW, which concluded that while it believed that certain significant adjustments needed to be made to PA's earnings projections, the upwards and downwards adjustments MRW recommended largely offset each other and therefore – given the inherent uncertainties – it would be reasonable to use PA's earnings projections as the basis for Bridge's analysis.[1]

17. Based on the foregoing procedures, Bridge was able to confirm that the Parties' agreement that the Debtors' TEV be in the amount of $18.95 billion in fact fell within Bridge's calculated range of appropriate TEV valuations.

18. Based also on the procedures discussed above and as set out in detail in Bridge's report, filed with this Court under seal pursuant to the Court's order regarding the need to hold confidential certain information used in connection with all of the valuations performed in this case[2], Bridge's expert opinion is that $18.95 billion, as the Parties agreed in their settlement

---

[1] We also note that each of the expert report and rebuttal reports chose to accept PA's earnings projections as the basis for their analysis.

[2] *See* Amended Stipulated Protective Order entered by the Court on October 24, 2007.

negotiations, is a reasonable total enterprise valuation for Calpine Corporation and its affiliated debtors.

19. Based, in part, upon Bridge's full report to the Court, the Court entered an order confirming Calpine's reorganization plan in which, in paragraph 64, the Court makes the following finding about the settlement reached with Messrs. Schnelling and Togut's assistance:

> The Warrant Term Sheet was negotiated in good faith and at arms-length among the Debtors, the Creditors' Committee, and the Equity Committee and their respective Professionals with the leadership, input, guidance, and encouragement of the expert appointed by the Court under Rule 706 of the Federal Rules of Evidence and its Professionals. The Warrant Term Sheet represents a fair and reasonable compromise and settlement of the Equity Committee's objections to Confirmation and the disputes regarding the value of the Debtors and provides a fair recovery to Calpine's shareholders under the circumstances of the Chapter 11 Cases. Based upon the value available for distribution to Holders of Allowed Claims and Interests, the Plan is fair and equitable with respect to Holders of Class E-1 Interests.

Dated: New York, NY
       January 4, 2008

                                              Respectfully submitted,

                                              TOGUT, SEGAL & SEGAL, LLP
                                              By: /s/ <u>Albert Togut</u> (9759)
                                              Richard Milin, Esq. (7755)
                                              One Penn Plaza
                                              New York, New York 10119
                                              Phone: (212) 594-5000
                                              Fax: (212) 967-4258
                                              Counsel for Bridge Associates LLC,
                                              the Court's Expert