| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | FOR PUBLICATION |
|---|---|
| In re:<br><br>CALPINE CORPORATION, et al.<br><br>Debtors. | Chapter:   11<br><br>Case No.:  05-60200 (BRL)<br>            Jointly Administered |

**MEMORANDUM DECISION AND ORDER DENYING MOTION OF COMPANIA INTERNACIONAL FINANCIERA, S.A., COUDREE GLOBAL EQUITIES FUND, STANDARD BANK OF LONDON AND LEONARDO CAPITAL FUND SPC FOR A LIMITED STAY PENDING APPEAL OF <u>CONFIRMATION ORDER AND PLAN MODIFICATION ORDER</u>**

Before the Court is the motion (the "Stay Motion") of Compania Internacional Financiera, S.A., Coudree Global Equities Fund, and Standard Bank of London, whose investments are each managed by Yomi Rodrik (collectively, the "Rodrik Group"), and Leonardo Capital Fund SPC (the "Leo Group," and together with the Rodrik Group, the "Objecting Shareholders"), seeking what they characterize as a "limited or partial" stay pending appeal of this Court's Findings of Fact, Conclusions of Law, and Order Confirming Sixth Amended Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Confirmation Order") and Order Approving Motion Seeking Approval of Immaterial Modifications to the Debtors' Joint Plan of Reorganization Without the Need for Further Solicitation of Votes (the "Plan Modification Order") pursuant to Rule 8005 of the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules").  Calpine Corporation and its affiliated debtor entities (the "Debtors"), the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and the Unofficial Committee of Second Lien Debtholders object on the grounds that, *inter alia*, even a "limited stay" would threaten the Debtors' reorganization, jeopardize the Debtors' valuable exit financing commitment and potentially burden the estates

with almost a billion dollars in additional expense. For the reasons set forth below, the Stay Motion is denied.

## BACKGROUND

On December 20, 2005 (the "Petition Date"), the Debtors commenced these Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On January 9, 2006, the United States Trustee for the Southern District of New York appointed the Creditors' Committee and subsequently, on May 9, 2006, appointed the Official Committee of Equity Security Holders (the "Equity Committee").

**The Disclosure Statement and Solicitation**

On June 20, 2007, the Debtors filed their Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") as well as their Disclosure Statement for Debtors' Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Disclosure Statement"). The Court approved the Disclosure Statement by order dated September 26, 2007.

Following the Disclosure Statement hearing, this Court entered a plan solicitation procedures order which, among other things, established a discovery schedule for the Confirmation proceedings and the deadline to file objections to the Plan. Pursuant to the scheduling order, on November 20, 2007, each of the Debtors, Creditors' Committee and Equity Committee submitted expert reports in support of its respective views on total enterprise value ("TEV") and publicly disclosed such views in filings with this Court. Inclusive of distributable cash, the Debtors' expert's mid-point total distributable value estimate was $20.883 billion, the Creditors' Committee's expert's mid-point distributable

value estimate was $17.783 billion, and the Equity Committee's expert's mid-point total distributable value estimate was $25.8 billion. Based on these estimates and the Debtors' litigation adjusted claims estimate of $21.085 billion, both the Debtors and the Creditors' Committee asserted that unsecured creditors would not be paid in full, and equity security holders would not be entitled to any recovery under the Plan. In addition, the Court-retained experts submitted an expert report that supported a finding of a New Calpine TEV of $18.95 billion. No other party submitted an expert report.

Both prior to and subsequent to disclosure of the experts' valuations, the parties engaged in extensive discovery. Thirteen different parties in interest promulgated 441 requests for production of documents, over 2 million pages of documents were produced by the Debtors, and nearly 157,000 pages were produced by other respondents; five different parties promulgated 105 interrogatories; three different parties promulgated 157 requests to admit; over 20 depositions were conducted; and eight expert reports were prepared by the Debtors, the Creditors' Committee and the Equity Committee, along with six rebuttal reports. Fifty-two objections to confirmation of the Plan were filed. Despite their ability to do so, the Objecting Shareholders did not participate in the discovery or confirmation process or file an objection to Confirmation. They simply voted against the Plan. The Plan was subsequently amended a number of times and all objections to confirmation were either withdrawn or resolved.

Under the provisions of the Plan, the Debtors will issue New Calpine Stock for distribution to creditors on account of allowed claims and as a part of a management and director equity incentive plan. The Plan and the Debtors' operations will be funded

3

through a $7.6 billion secured exit-financing facility that the Debtors initially obtained last spring in a favorable debt market.

On December 18, 2007, the Debtors filed a Motion Seeking Approval of Immaterial Modifications to the Debtors' Joint Plan of Reorganization Without the Need for Further Solicitation of Votes (the "Plan Modification Motion").  As previously found by this Court, the Plan Modification Motion did not materially and adversely affect the treatment of equity security holders.  Contrary to the assertions of the Objecting Shareholders, at no time was equity guaranteed to receive any distribution on account of their interests pursuant to the Plan.  When the Debtors announced their updated TEV on November 20, 2007, the mid-point value provided no recovery of any kind to equity security holders.  The Plan was simply a waterfall Plan with distributions to creditors and equity security holders based upon an enterprise value <u>to be determined by this Court</u>, based in large part on the reports of the industry experts, at the confirmation hearing.  Based on those reports and the representations of all the parties, this Court found the TEV of $18.95 billion was justified and reasonable.  Under the terms of the Plan, at that level, equity holders would receive no distribution on account of their interests.  However, due to negotiations among the parties, equity holders were guaranteed the right to receive warrants ("New Calpine Warrants") rather than no distribution at all.  As such, the Plan as confirmed, actually improved equity's position.

Although the Equity Committee initially objected to the Plan and Disclosure Statement, the Equity Committee eventually settled its confirmation objection and the need for a valuation trial was eliminated.  Accordingly, the Plan Modification Order was

entered and the Debtors' Plan was confirmed at the confirmation hearing held on December 19, 2007.

**The Reconsideration Motion**

On December 31, 2007, the Objecting Shareholders, who had previously voted against the Plan, moved for reconsideration of the Plan Modification Order and the Confirmation Order (the "Reconsideration Motion") claiming both that the modifications to the Plan were material and that there was no notice of the plan modifications or meaningful opportunity for the Objecting Shareholders to be heard. *See* Reconsideration Motion, at pp. 8-15. More specifically, the Objecting Shareholders contend that they relied on the Equity Committee to pursue any objections to confirmation.

As noted by this Court in its bench ruling denying the Reconsideration Motion on January 14, 2008, the Objecting Shareholders are sophisticated investors who purchased post-petition over 5 percent of the Debtors' common stock between March and September 2007, when the Debtors were in the early stages of the Plan confirmation process. Despite the size of their investments, the risks involved, the existence of notice of the confirmation hearing and all other applicable deadlines, the Objecting Shareholders as a matter of volition did not participate in the confirmation process and despite their acquired stake, apparently did not monitor the Chapter 11 Cases, nor request electronic notice. The Objecting Shareholders, like any interested party, had substantial notice and opportunity to participate in the discovery and confirmation process. Other interested parties were hyperactive in this part of the proceedings. Having failed to participate in the process, the Court found the request for a "do over" inappropriate and, accordingly, for the reasons set forth in this Court's comprehensive bench ruling, denied the

5

Reconsideration Motion.[1]  *See* Transcript of Hearing on Reconsideration Motion; *see also* Minute Order Denying Motion for Reconsideration dated January 15, 2008 [docket no. 7404].

On January 18, 2007, the Objecting Shareholders filed their notice of appeal of the Confirmation Order, the Plan Modification Order and the order denying the Reconsideration Motion (the "Appeal").  Simultaneously therewith, the Objecting Shareholders filed the Stay Motion seeking what they describe as a "limited stay" of the Confirmation Order to obtain (a) a stay of the distribution of New Calpine Warrants to existing shareholders and (b) the issuance and reservation of (i) sufficient shares of New Calpine Stock to cover any shares that must be issued assuming all of the New Calpine Warrants are ultimately exercised, plus (ii) an additional 300,000,000 shares for the benefit of existing shareholders pending the outcome of the Appeal.  On January 22, 2008, both the Debtors and the Creditors' Committee filed objections asserting that the Objecting Shareholders (w) improperly seek to modify the Debtors' confirmed Plan; (x) fail to make the requisite showing to justify a stay pending appeal; (y) have requested a stay that is far from "limited" and would have far reaching consequences; and (z) are not entitled to a stay pending appeal unless they post a bond to cover the full amount of potential harm.

---

[1]  At the hearing, the Court granted the Debtors' oral motion to strike speculative industry hearsay commentaries prepared by Dahlman Rose & Co and Lehman Brothers, which were gratuitously attached as exhibits to the Objecting Shareholders reply memorandum of law.

## DISCUSSION

Bankruptcy Rule 8005 governs the procedures for seeking a stay pending appeal. *See* Fed. R. Bankr. P. 8005. A party seeking a stay has the "heavy burden" to demonstrate (1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected. *See ACC Bondholders v. Adelphia Commc'ns Corp.* (*In re Adelphia Commc'ns Corp.*), 361 B.R. 337, 346 (S.D.N.Y. 2007); *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002); *Silverman v. Nat'l Union Fire Ins.* (*In re Suprema Specialties, Inc.*), 330 B.R. 93, 95 (S.D.N.Y. 2005). Although there is authority within the Second Circuit to support both the propositions asserted by the Debtors' and the Creditors' Committee that all four criteria must be established before a stay is granted, as well as the balancing test approach emphasized by the Objecting Shareholders, the Court finds that the Objecting Shareholders have failed to meet their burden under either of these tests. *See In re Tower Automotive, Inc.*, No. 05-10578, 2006 WL 2583624, at *1 (Bankr. S.D.N.Y. June 28, 2006) ("The moving party carries a 'heavy burden' in that 'all four criteria must be satisfied to some extent before a stay is granted.'"); *Fox v. Mandiri* (*In re Perry H. Koplik & Sons, Inc.*), No. 02-B-40648, 2007 WL 781905, at *2 (Bankr. S.D.N.Y. Mar. 13, 2007) ("The test for granting a stay under Bankruptcy Rule 8005 is conjunctive-as noted by the word "and" between the third and fourth factors. Thus, each of the four requirements must be satisfied."); *In re Turner*, 207 B.R. 373, 375 (2d Cir. B.A.P. 1997) ("[f]ailure to satisfy one prong of this standard for granting a stay will doom the motion."); *compare with In re Adelphia Commc'ns*

*Corp.*, 361 B.R. at 346 ("the Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed."); *Mohammed*, 309 F.3d at 100 ("[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff [ ] will suffer absent the stay. Simply stated, more of one excuses less of the other."); *In re Megan-Racine Associates, Inc.*, No. 96-CV-292, 1996 WL 167681, *5 (N.D.N.Y. Apr. 1, 1996) ("A court should balance four factors in determining whether to grant a stay pending appeal pursuant to Bankr. R. 8005...").

**Irreparable Harm**

A showing of irreparable harm is the "principal prerequisite for the issuance" of a stay under Bankruptcy Rule 8005. *Adelphia Commc'ns Corp.*, 361 B.R. at 347; *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66-67 (2d Cir. 2007) ("we have stated that '[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction,' and that, accordingly, 'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'") (citations omitted). The moving party must prove that it faces irreparable harm that is "neither remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). The Objecting Shareholders allege that absent the relief requested in the Stay Motion, the distribution of New Calpine Warrants and New Calpine Stock, with no reservation for existing shareholders, would likely occur before the resolution of the Appeal, rendering it moot. However, merely invoking equitable mootness as the Objecting Shareholders have done

8

here – a risk that is present in any post-confirmation appeal of a chapter 11 plan – is not sufficient to demonstrate irreparable harm. *In re Bd. of Directors of Multicanal S.A.*, No. 04-10280, 2005 Bankr. LEXIS 1865, at *6 (Bankr. S.D.N.Y. Jan. 6, 2005) ("[t]here is substantial authority, however, that the risk of an appeal being rendered moot does not in and of itself constitute irreparable harm, even if it may be a relevant factor."); *In re Baker*, CV05-3487, 2005 WL 2105802, *9 (E.D.N.Y. Aug. 31, 2005 ("As other courts have noted, the possibility that an appeal will be rendered moot by a denial of stay does not, in and of itself, constitute irreparable harm.").

Other than mootness, the Objecting Shareholders contend that they will be irreparably harmed because the Debtors were grossly undervalued. However, the Objecting Shareholders have made no showing and have submitted no affidavits, declarations, or other appropriate evidence demonstrating that they are entitled to greater distributions. *See In re United Pan-Europe Commc'ns N.V.,* No. 02-16020, 2003 WL 221819, 10 at *4 (S.D.N.Y. Jan. 30, 2003) (holding that "[i]n light of [its] conclusory allegations, Movieco has failed to show irreparable harm"); *In re Penn-Dixie Indus.*, Inc., 6 B.R. 832, 837 (Bankr. S.D.N.Y. 1980) (denying emergency relief because "there has been no demonstration … of any real injury whatsoever that would result from a denial of the relief sought"); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998) (denying relief where "[t]he only evidence [of irreparable harm is] the conclusory and unsubstantiated assertions of irreparable injury").

Moreover, any harm the Objecting Shareholders may now face is a result of their own dilatory conduct. *See Mooreforce, Inc. v. U.S. Dept. of Transp.*, 243 F. Supp. 2d 425, 435 (M.D.N.C. 2003) (rejecting claim of irreparable harm where it resulted from

9

plaintiffs "own procrastination"); *In re Francis*, 15 B.R. 998, 1004 (Bankr. E.D.N.Y. 1981) (rejecting plaintiff's claims of irreparable harm because plaintiff found "itself in that position either by choice or neglect."). As set forth above, the Objecting Shareholders are sophisticated investors who could have (and should have) participated in the Confirmation process to diligently protect their interests – as they were entitled to do and as other equity holders opted do to – rather than relying solely on the efforts of the Equity Committee. Accordingly, the Objecting Shareholders have fallen well short of the requirement that harm be "actual and "imminent."

**Substantial Harm to Others**

In contrast, a stay would cause potentially substantial, irreversible injury to the Debtors, their creditors, and other stakeholders. As previously noted, the Debtors' operations will be funded through a $7.6 billion secured exit-financing facility. The Debtors' exit financing agreement, however, states that, as a condition of closing, the Court's confirmation order "shall not have been stayed ... or modified." A stay of the Confirmation Order would present a substantial risk that a condition precedent to financing will fail and the Debtors could lose their exit financing, forcing them back to restructuring, looking to obtain new exit financing in an unfavorable capital market environment.[2] The evidence shows that if the Debtors were required to negotiate a new exit financing commitment at this stage, the Debtors would incur an additional $900 million in aggregate interest expense alone.

---

[2] It is without contradiction that the Debtors advantageous financing arrangement was obtained when economic conditions were quite different. Given current economic conditions, funders have been quick to exploit any opportunity to withdraw from commitments made in a more permissive debt market.

In addition to the tremendous loss of the Debtors' current exit facility, the cost of remaining in Chapter 11 would be significant. The professional fees alone could cost the Debtors up to $17 million per month, while claims accruing on account of post-petition interest could reach approximately $70 million per month. Assuming a stay would delay the Debtors' emergence from Chapter 11 for even as little as three months, the Debtors' fees and interest expense costs alone could amount to over $250 million, a significant portion of which would have to be paid in cash upon emergence. *See In re Adelphia Commc'ncs Corp.*, 361 B.R. at 353 ("the accrual of interest is a real and significant harm that must be considered").

Even if the Objecting Shareholders had some basis for their request to require the Debtors to issue 300 million shares of stock - which they do not - such issuance will inevitably drive down stock prices, harming not only creditors - now the new shareholders - but will also harm existing shareholders by placing the New Calpine Warrants further out of the money. Based upon the affidavit of the Debtors' financial advisor and investment banker, stock prices could, in fact, decline by as much as $6 per share. *See* Affidavit of Samuel M. Greene in Support of Debtors' Response to the Bankruptcy Court's Order to Show Cause Why the Objecting Shareholders' Motion for a Stay Spending Appeal Should Not Be Granted, at ¶ 11.

Accordingly, the granting of a stay would pose very real and significant harm to the Debtors and other stakeholders.

**Substantial Likelihood of Success**

In addition to the pitfalls in the Stay Motion set forth above, the Objecting Shareholders have made no showing of a substantial possibility of success on appeal as

11

required to grant a stay under Bankruptcy Rule 8005.  In moving for reconsideration, the Objecting Shareholders failed to show that this Court made a manifest error of law or fact or to provide any new evidence that would have changed the outcome of the Court's decision to enter either the Plan Modification Order or the Confirmation Order.  *See* Fed R. Civ. P. 59; Local Rule 9023-1(a).  The Objecting Shareholders now simply rehash the same arguments regarding proper notice, due process, and their allegations that the Plan Modification Motion allowed for material modifications to the Plan that this Court previously rejected.  *See* Transcript of Hearing on Reconsideration Motion dated January 15, 2008; *see also* Minute Order Denying Reconsideration Motion.

In addition to the reasons the Court gave denying the Reconsideration Motion, I also not that section 1127(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title." 11 U.S.C. § 1129(b).  The Objecting Shareholders do not qualify as 1127(b) plan proponents.

While the Objecting Shareholders colloquially refer to the relief they seek in the Stay Motion as "limited," in reality they seek to materially modify the agreed to and confirmed Plan by requiring the Debtors issue and reserve (i) sufficient shares to cover any shares that must be issued assuming all of the New Calpine Warrants are ultimately exercised, and (ii) an additional 300,000,000 shares for the benefit of existing shareholders pending the outcome of the Appeal.  As the Objecting Shareholders were not the proponents of the confirmed Plan, they are not authorized under Section 1127(b)

12

to modify the confirmed Plan. *In re Planet Hollywood Intern.*, 274 B.R. 391, 400 (Bankr. D. Del. 2001) (holding that creditor did not have standing to modify confirmed plan under Section 1127(b)); *see also In re Burk Development Co., Inc.*, 205 B.R. 778, 799 (Bankr. M.D. La. 1997) ("[a]s some courts have mentioned, only the plan proponent or the reorganized debtor, not the U.S. Trustee, has standing to attempt to modify a plan prior to substantial consummation...."). Accordingly, the Objecting Shareholders have not demonstrated a substantial possibility of success on appeal on that issue.

**Public Interests**

Lastly, there is a strong public "need for finality of decisions, especially in a bankruptcy proceeding." *In re Twenty-Six Realty Assocs., L.P.*, No. 95 CV 1262, 1995 WL 170124, at *16 (E.D.N.Y. apr. 4, 1995); *see also First Nat. Bank of Maryland v. Markoff*, 70 B.R. 264, 265 (S.D.N.Y. 1987) (recognizing the "public interest in timeliness and finality of bankruptcy proceedings."). "The public interest requires bankruptcy courts to consider the good of the case as a whole, and not individual [...] investment concerns .... the public interest cannot tolerate any scenario under which private agendas can thwart the maximization of value." *In re Adelphia Commc'ncs Corp.*, No. 02-41729, 2007 Bankr. LEXIS, at *414-415 (Bankr. S.D.N.Y. Jan. 3, 2007); *In re Baker*, 2005 WL at *10 ("[h]aving determined that the Debtor is unlikely to succeed on appeal, I find that the public interest is better served by allowing distributions under the Plan to proceed in an expeditious manner."); *In re Metiom, Inc.*, 318 B.R. 263, 272 (S.D.N.Y. 2004) ("[t]his Court finds that the public interest in the expeditious administration of bankruptcy cases as well as in the preservation of the bankrupt's assets for purposes of paying creditors,

rather than litigation of claims lacking a substantial possibility of success, outweighs the public interest in resolving the issues presented here on appeal.").

As set forth above and in the Court's recent bench decision denying the Reconsideration Motion, the Objecting Shareholders had ample opportunity to participate in the discovery and Plan confirmation process and chose of their own volition not to participate, but rather to rely entirely on the efforts of the Equity Committee. *See* Hearing on Reconsideration Motion; *see also* Minute Order Denying Reconsideration Motion. Clearly, the public interest does not support favoring the interests of those who idly sit on their rights.

**Bond Issue**

Even were this Court to find that the Objecting Shareholders had met the heavy burden necessary for the granting of a stay (a finding I do not make), no stay would be issued without the posting of a bond to cover the enormous risk of loss to the Debtors, their estates, creditors and interest holders in the range of $900 million to $1 billion. *See Westpoint*, 2007 WL 1346616, at *7 (party seeking stay "has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of supersedeas bond in the full amount of the judgment."); *In re Adelphia Commc'ncs Corp.*, 361 B.R. at 350. A $900 million bond would cover only the aggregate additional interest expense the Debtors could suffer if they were unable to close on their existing exit financing, and does not include the additional expenses detailed above that the Debtors would accrue if their emergence from chapter 11 is delayed. Accordingly, a $900 million bond would be a reasonable, justifiable measure of protection.

## CONCLUSION

For the reasons set forth above and at oral argument, the Stay Motion is denied.

It is so ordered.

Dated:  New York, New York
        January 24, 2008

    /s/ Burton R. Lifland_____
The Honorable Burton R. Lifland
United States Bankruptcy Judge