**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------

In re

   Calpine Corporation, et al.,

       Reorganized Debtors.

Chapter 11

Case No. 05-60200 (BRL)

Jointly Administered

-----------------------------------------------------------

APPEARANCES:

KIRKLAND & ELLIS LLP
Attorneys for the Reorganized Debtors,
153 East 53rd Street
New York, New York 10022
212-446-4800
Richard M. Cieri, Esq.
Marc Kisselstein, Esq.
David R. Seligman, Esq.
James J. Mazza, Esq.

KIRKLAND & ELLIS LLP
655 15th Street, N.W. Suite 1200
Washington, D.C. 20005
202-879-5000
James W. Draughn, Jr., P.C.
Ashley C. Parrish, Esq.

HAYNES AND BOONE, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202
214-651-5000
Robert D. Albergotti, Esq.
Werner A. Powers, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
Attorneys for the Official Committee of Unsecured Creditors
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000
Michael S. Stamer, Esq.
Philip C. Dublin, Esq.
Kenneth A. Davis, Esq.

Before: Burton R. Lifland,
  United States Bankruptcy Judge

**DECISION AND ORDER GRANTING CLAIMS OBJECTION**

Calpine Corporation ("Calpine") and its affiliated reorganized debtors (collectively, the "Reorganized Debtors" or "Calpine") seek entry of an order granting Calpine's objection ("Objection"), pursuant to section 502 of title 11, United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure, to claims filed by Panda Energy International Inc. and PLC II LLC (collectively, "Panda").[1] At issue are $200 million rejection damage claims (the "New Proofs of Claims") which Calpine argues are nothing more than repackaged, relabeled, untimely versions of previously filed and deliberately withdrawn $200 million prepetition claims. These New Proofs of Claim were filed one month after Calpine's plan of reorganization became effective and more than nineteen months after the claims bar date. For the reasons set forth below, this Court sustains Calpine's Objection.

**Background**

Beginning in June 2000, Calpine and Panda entered into a series of agreements relating to the development of certain of Panda's power projects. The first of the agreements — referred

---

[1] This Court has jurisdiction over this Objection under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409. *See also* Bench ruling denying motion for preliminary injunction to stay proceedings in bankruptcy court, Transcript of Preliminary Injunction Hearing before the Honorable Jane J. Boyle, United States District Judge, p. 90, dated July 28, 2008 ("Texas Transcript") ("the Bankruptcy Court has every right and every bit of jurisdiction to proceed on those factors that are presently before it, including the viability of the proofs of claim and the nature of the contracts as they are described in the schedules by the defendants in the bankruptcy and the other issues presently before it.").

to as the Development Rights Agreement (the "DRA") — was executed on June 14, 2000, between Calpine and Panda and several of Panda's affiliated companies (including PDC Development Holdings, LLC, and Panda Merchant Power Holding, LLC).

On June 23, 2000, Calpine and PLC II LLC, one of Panda's affiliates, entered into a loan agreement (the "Loan Agreement"), under which PLC II LLC issued two promissory notes due December 1, 2003, to Calpine for a total of $33,546,286 and Panda Energy International, Inc. signed a guaranty agreement (the "Guaranty Agreement") guaranteeing PLC II LLC's loan obligations. The loan was secured by Panda's entitlement to a percentage of the future net profits derived from any power project Calpine ultimately purchased under the DRA.

Under the terms of the DRA, Panda granted to Calpine the exclusive right to purchase from Panda all of its interest in up to eight power projects representing more than 10,000 MW of gas-fired generation. *See* DRA, Art. 5.1. The DRA provided that if Calpine elected to exercise its exclusive rights to acquire a power project from Panda, Calpine would "have the right to exercise its sole discretion in making all decisions regarding the management and operation" of each power project it acquired. *See* DRA, Art. 4.8. The DRA also established certain commitments between the parties concerning the continued development of the power projects until such time, if any, that Calpine elected to exercise its right to acquire any individual project. All projects were expected to be ready for potential transfer between June 2000 and July 2001. *See* DRA, Schedule 2.

Under the terms of the DRA, if Calpine ultimately elected to exercise its rights to acquire any given project, Calpine would reimburse Panda for the costs Panda incurred in developing that project. *See* DRA, Art. 5.2(a). In addition, if Calpine elected to acquire a project, Panda

3

would be entitled to a percentage of the future net profits derived from the project, provided, however, that any profits received by Panda would be applied first to the outstanding balance on the $33 million in loans owed to Calpine. *See* DRA, Art. 5.3. Calpine's exclusive acquisition rights terminated in September 2000 after it gave notice of its "Negative Final Decision." *See* DRA, Art. 3.2.

Calpine ultimately elected to exercise its rights with respect to only one of Panda's power plant projects: the Oneta power plant in Oklahoma. On July 20, 2000, Calpine entered into an equity purchase agreement with Panda under which Calpine took over the Oneta project (the "Equity Purchase Agreement"). Calpine asserts that it invested substantial capital into the Oneta project and reimbursed Panda for the development costs incurred before Calpine took control of the project. *See* DRA, Art. 5.2(a). In return for making this investment, Calpine gained exclusive management rights for the Oneta power plant, including "the right to exercise its sole discretion in making all decisions regarding the management and operations" of Oneta. *See* DRA, Art. 4.8. In September 2000, Calpine notified Panda that it would not acquire its other projects.

On November 5, 2003, Panda sued Calpine in the United States District Court for the Northern District of Texas, Dallas Division (the "Texas District Court"). *See* Panda Energy Int'l Inc., et al. v. Calpine Corp., et al., No. 3:03-CV-02692D. Panda sought damages flowing from Calpine's alleged breach of its obligations under the DRA and other agreements, as well as an accounting arising from Calpine's alleged failure to construct and properly operate the Oneta project. *See* Panda's complaint filed November 5, 2003 (the "Original Complaint"). Panda amended the Original Complaint (the "Amended Complaint") on February 17, 2005 .

4

The allegations in both the Original and Amended Complaints center on alleged misrepresentations supposedly made by Calpine between February 15, 2000 and June 5, 2000, during the negotiations of the DRA. *See id.* ¶¶ 20-29. According to Panda, Calpine purportedly misrepresented its intentions concerning the acquisition of Panda's power projects and the use of certain turbines. *See id.* Panda also complained that, between 2001 and 2003, Calpine failed to fully construct the Oneta power plant and to work diligently to ensure that the plant earned revenue. *See id.* ¶¶ 34-40. In addition, Panda blamed Calpine for Panda's inability to repay its loan to Calpine, which matured and became due on December 1, 2003. *See id.* ¶ 41.

On January 9, 2004, Calpine filed a counterclaim (the "Counterclaim") against Panda and its affiliates for breach of contract and default under the Loan Agreement, the two promissory notes, and the Guaranty Agreement. Calpine initially sought damages in the amount of $31 million. Including accrued interest, costs of collection, and attorneys fees, damages are now estimated to exceed more than $45 million.

While the lawsuit remained pending in the Texas District Court, on December 20, 2005 (the "Petition Date"), Calpine filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[2] On January 3, 2006, Calpine filed a suggestion of bankruptcy to inform the Texas District Court that Panda's action against Calpine was subject to the automatic stay under section 362 of the Bankruptcy Code. Two days later, on January 5, 2006, the Texas District Court issued an order administratively closing the case "without prejudice" to reopening at the conclusion of chapter 11 proceedings or upon a lifting of the automatic stay.

---

[2] Certain of the Reorganized Debtors filed petitions for relief subsequent to the Petition Date.

On April 16, 2006, Calpine filed its schedules of assets and liabilities with this Court, including a schedule of executory contracts and unexpired leases which included the DRA, the Loan Agreement and the Equity Purchase Agreement (collectively, the "Panda Agreements"). On April 26, 2006, this Court entered an order setting August 1, 2006 (the "Bar Date"), as the deadline for parties with claims against the Debtors arising prior to the Petition Date to file proofs of claim.

On July 13, 2006, Panda timely filed proofs of claim (the "Original Proofs of Claim"), based on the claims it had asserted in the Texas District Court. The Original Proofs of Claim stated that Panda had an unsecured claim against Calpine worth "in excess of $200 million." Panda attached the Amended Complaint it had filed against Calpine in the Texas District Court to its Original Proofs of Claim, along with a description of the lawsuit.

On October 17, 2006, Panda voluntarily withdrew its Original Proofs of Claim.[3] After Panda withdrew its Original Proofs of Claim, Calpine determined that it was in the estates' best interest to move forward litigating the Counterclaim in the Texas District Court and, on October 3, 2007, Calpine moved to lift the stay on the Texas District Court litigation. On November 14,

---

[3] It is unclear to this Court, and apparently to the Texas District Court (*see* Texas Transcript at p. 64), why Panda withdrew its claims in light of the well established law that Panda would subsequently be barred from any recovery for prepetition claims from the Calpine estates. (*See* Texas Transcript at 81, "It thus appears that by operation of law, defendants were released and discharged in December '07 from the same claims plaintiffs are currently trying to assert in Texas."). At the hearing in Texas, Panda's attorney seem to argue that equity holders didn't have to file claims but it is unclear what that had to do with Panda's claims in the Texas District Court Action. (See Texas Transcript at 26-27). However, that argument was not pursued in this Court.

2007, this Court granted Calpine's lift stay motion (the "Lift Stay Order")[4] and the litigation between Panda and Calpine in the Texas District Court resumed.

On December 19, 2007, this Court entered an order (the "Confirmation Order") confirming Calpine's Sixth Amended Joint Plan of Reorganization ("Plan"). Pursuant to Article V of the Plan, any executory contract not expressly assumed or rejected by the Effective Date of the Plan was deemed rejected. Under the Plan, claims for rejection damages could be filed up to thirty days after the effective date. On January 31, 2008, Calpine filed a notice of occurrence of the effective date of the Plan (the "Effective Date").

On February 27, 2008, Panda filed the New Proofs of Claim seeking the same $200 million it sought in its Original Proofs of Claim based upon its Complaint in the Texas District Action. The New Proofs of Claim, however, assert that the damages sought are "rejection damages" claims purportedly caused by operation of the Plan. Because the DRA, the Loan Agreement, and the Equity Purchase Agreement were each listed on Calpine's schedules as executory contracts, Panda asserts in its New Proofs of Claim that the Panda Agreements were executory and were rejected under the Plan. As a result, Panda asserts that it is entitled to recover rejection damage's claims.

---

[4] The Lift Stay Order also provided that
> nothing in this Order shall affect, impair, prejudice, or expand any of (a) Panda's rights, claims, and defenses in this Court or the Panda Litigation, including, without limitation, that any claim against the Debtors arising out of or related to the Panda Litigation is allegedly not discharged, waived or untimely or (b) the Debtors' rights, claims, and defenses in this Court or in the Panda Litigation, including, without limitation, that any claim against the Debtors arising out of or related to the Panda Litigation is allegedly discharged, waived, or untimely.

See Lift Stay Order, ¶ 2 (ecf. # 6596).

On June 17, 2008, Calpine filed its Objection to Panda's Claims asserting that the claims were not timely filed and do not assert proper rejection damage's claims[5] because none of the Panda Agreements were executory when the Plan went effective.

**Discussion**

*Executoriness*

Section 365 of the Bankruptcy Code permits a chapter 11 debtor-in-possession to assume or reject executory contracts. *See* 11 U.S.C. § 365(a). Rejection under section 365(a) simply means that the court will permit the debtor to breach the contract with the result that the contractual obligations will be reduced to unsecured claims for prepetition damages pursuant to section 365(g)(1). *See COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 378 (2d Cir. 2008). The Bankruptcy Code does not define the term "executory contract" but the Second Circuit Court of Appeals has characterized an executory contract as one "on which performance remains due to some extent on both sides." *Id.* at 379 (citing *Eastern Air Lines, Inc. v. Ins. Co. of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992 (2d Cir. 1996); *see also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5844, 6303 (The legislative history of section 365 states that "though there is no precise definition of what contracts are executory, it

---

[5] On June 27, 2008 Panda filed a motion to to abate, stay or in the alternative to limit or continue the hearing on the Objection to allow the Texas District Court to proceed to a final determination of factual issues in the Panda Litigation prior to conducting the Claims Objection hearing. Panda also filed a motion in the Texas District Court seeking to enjoin Calpine from prosecuting its Objection in this Court. Both of those motions were denied after each court considered and parsed out their respective jurisdictions over the matters pending before each Court. *See* 7/28/08 Texas Transcript at 90; bench ruling of the undersigned denying motion to abate, stay or in the alternative to limit or continue hearing on Reorganized Debtors' objection to Panda Energy International, Inc's Plc II LLC's claims, Transcript of Hearing, (ECF# 7880).

generally includes contracts on which performance remains due to some extent on both sides.")
In *Penn Traffic*, the Second Circuit also recognized the Countryman test,[6] a somewhat more stringent test, which deems a contract executory if the "obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Id.* In other words, under Countryman's "material breach" test, a prepetition contract is executory when both sides are still obligated to render substantial performance. *In re Riodizio,* 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997).

Application of the Countryman definition requires consideration of the obligations of each party to determine if the remaining obligations are material. *In re Texscan,* 976 F.2d 1269, 1272 (9th Cir. 1992) (Material obligations on the part of each party must remain for a contract to be deemed executory); *accord In re C&S Grain Co.,* 47 F.3d 233, 237 (7th Cir. 1995) (Contract executory where "obligations of each party remain substantially unperformed."). "The executoriness analysis examines an agreement on its face to determine whether there are material obligations that require substantial performance from the parties." *See Shoppers World Community Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.),* Case No. 00-10633, 2001 WL 1112308, at *8 (S.D.N.Y. September 20, 2001) (emphasis added); *see also In re Exide Technologies,* 378 B.R. 762, 766 (Bankr. D. Del. 2007) (Court must look to "four corners" of agreement to determine "whether both parties have unperformed material obligations under the Agreement."). Executoriness and the debtor's rights with respect to assumption or rejection of an

---

[6] *See* Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L. Rev. 439, 460 (1973).

executory contract are normally assessed as of the petition date. *Penn Traffic,* 524 F.3d at 381.

The three agreements Panda asserts were executory - the DRA, the Loan Agreement, and the Equity Purchase Agreement - are not on their face executory. No mutual performance obligations remain under either the DRA, the Loan Agreement, or the Equity Purchase Agreement. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 n.6 (1984) (quoting H.R.Rep. No. 95-595, p. 347 (1977) (Executory contracts are those "on which performance remains due to some extent on both sides."); *see also In re Riodizio,* 204 B.R. at 424 (a contract is not executory if parties no longer "must still give something to get something").

First, there is no performance remaining due from Calpine under the Loan Agreement. Calpine already has lent Panda the funds called for under the Loan Agreement, the loan matured on December 1, 2003 and Calpine is seeking in its Counterclaim to collect funds owed under Panda's repayment obligation. *See In re Digicon, Inc.*, 71 Fed.Appx. 442 (5th Cir. 2003)("A contract is not executory if the only performance required by one side is the payment of money."); *In re Chateaugay Corp.* 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989) (holding that obligations for the payment of money only are insufficient to make an agreement executory."); H.R.Rep. No. 95-595, 95th Cong., 2d Sess. 347, reprinted in 1978 U.S. Code Cong. & Admin. News 6303-04 (The legislative history of the Bankruptcy Reform Act of 1978 states that a "note is not usually an executory contract if the only performance that remains is repayment")

Second, the Equity Purchase Agreement is fully performed. Calpine has already paid Panda for its equity interest in the Oneta plant. Panda fails to articulate any sort of remaining performance obligation under the Equity Purchase Agreement.

Third, under the DRA, Calpine's exclusive right to acquire up to eight power projects

from Panda has expired with Calpine having exercised this right solely with respect to the Oneta project. While Panda has asserted a claim against Calpine for the "Panda Cash Flow Interest" due under section 5.3 of the DRA with respect to the Oneta project, Panda itself has no material performance left under the DRA.

Moreover, Calpine would not gain any benefit by assuming the DRA because Panda had nothing left to give Calpine under that agreement. *See In re Bradlees Stores, Inc.*, 00-16033, 2001 WL 34809984 (Bankr. S.D.N.Y. March 28, 2001) (citing Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227, 228 (1989) ("the question of whether a contract is executory is determined by the benefits that assumption or rejection would produce for the estate.").

Panda argues either that the Panda Agreements together or the DRA alone constitute a partnership or joint venture agreement. Panda contends disingenuously that the Texas District Court has already found that the DRA constituted a joint venture between the parties. However, the Texas District Court was ruling on a Rule 12(b)(6) motion to dismiss Panda's Original Complaint and thus was required to accept the facts as pleaded as true for the limited purpose of that motion only. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (Explaining that when considering a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6), a court must accept all factual allegations in the complaint as true, even if the allegations are doubtful in fact). *See Panda Energy Int'l., Inc. v. Calpine Corp.*, 3:03-CV-2692-B, Memorandum Order, p.3, fn. 2 (N.D.Tex. Jan.1, 2005) ("The Court takes its facts from allegations in Plaintiff's Original Complaint and the parties briefing.")

The DRA, the Equity Agreement and the Loan Agreement are separate agreements that

each contains a merger clause establishing that each agreement is fully integrated.[7] Panda's primary argument however is that the DRA itself is a partnership agreement and as such is executory. It is facile to assume that all partnership agreements are executory contracts. As with any other agreement, if there are no material obligations that must be performed by the partners in a partnership, then the contract is not executory and is not governed by section 365 of the Bankruptcy Code. *See In re Baldwin*, BAP. No. EO-05-114, 2006 WL 2034217, *2 (10th Cir. BAP July 11, 2006) (rejecting appellant's contention that partnership agreement constituted an executory contract); *see also In re LaVail,* 144 B.R. 897 (Bankr. D. N.M. 1992) (rejecting notion that partnership interest must always be an executory contract); *cf. Meiburger v. Endeka Enterprises, L.L.C. (In re Tsiaoushis*), 383 B.R. 616, 618 (Bankr. E.D.Va. 2007) ("The effort is not to determine whether all general partnership agreements or all limited partnership agreements . . . are or are not executory contracts, but to determine whether a particular agreement is an executory contract.") *aff'd.,* 2007 WL 2156162 (E.D.Va. 2007); *In re Harms*, 10 B.R. 817, 821 (Bankr. Co. 1981)("Applying the Countryman definition to the limited partnership agreements, the Court would conclude that the agreements are not executory."); *see also Cloyd v. GRP*

---

[7] The *Burley v. Am. Gas & Oil Invs. (In re Heafitz),* 85 B.R. 274, 282-83 (Bankr. S.D.N.Y. 1988) case cited by Panda is inapposite. There the court considered a promissory note, that constituted the debtor-partner's unpaid contribution to the partnership and a partnership agreement as one where the trustee was seeking to collect on the debtor-partner's distribution although the debtor had never paid on the note. In addition to the note, the court looked to a section of the partnership agreement which provided that the debtor-partner was entitled to receive his distributive share only to the extent that such share exceeded unpaid principal and accrued interest on the note. Accordingly, the court found that the respective obligations "may not be deemed exclusive of one another." *Id.* at 279. Moreover, the partnership agreement and the note were not separate, fully integrated, merged clause agreements. *Id.* at 277 (The "promissory notes executed by Heafitz essentially incorporated and mirrored Section 5.6 of the Partnership Agreement...")

12

*Records*, 238 B.R. 328, 333 (Bankr. E.D. Mich. 1999) ("courts must make a determination [of executoriness] on a case-by-case basis").

Even if the DRA were somehow construed as a partnership agreement[8] there are no

---

[8] Panda makes much of the fact that the DRA requires that Calpine provide a form K-1 to Panda for tax reporting purposes demonstrating that the DRA is a partnership agreement. *See* DRA at ¶ 5.7 ("Reporting for Tax Purposes. Calpine shall provide to PLC II with respect to each tax year a form K- 1 setting forth the results to PLC II for such tax year."). However, Panda's own submissions belie that contention. In an earlier draft of the DRA, which provided that the nothing in the agreement shall be construed to make the parties partners or joint venturers, Calpine was also required to provide Panda with a form K-1. *See* Affidavit of L. Stephen Rizzieri, Ex. A, Draft dated 6/13/00,

> ¶ 5.6 No Partnership or Joint Venture. Nothing herein contained shall be construed to make the parties partners or joint venturers or to make either party liable for any obligations incurred by the other party in the conduct of its business. Panda is performing ~~its~~ any development activities hereunder for Calpine as an independent contractor. This Agreement shall not constitute Panda as the legal representative or agent of Calpine, nor shall Panda have the right or authority to assume, create or incur any liability or obligation, express or implied, against, or in the name of, or on behalf of Calpine or its Affiliates, except as provided in the Agency Agreement with respect to the El Dorado and Gila Project Companies.
>
> ¶ 5.7 Reporting for Tax Purposes. Notwithstanding Section, 5.6 hereof, the parties shall report the results of each Acquired Project as a partnership for federal income tax purposes for so long as PLC II has the Panda Cash Flow Interest with respect to such Project. Calpine shall provide to PLC II with respect to each tax year a form K-1 setting forth the results to PLC II for such tax year.

Moreover, paragraph 5.6 of the June 13 draft was replaced by a new paragraph that deleted the reference to partners but contained the same provisions regarding the parties' liabilities and Panda's performance as an <u>independent contractor</u>. *See* Affidavit of L. Stephen Rizzieri, Ex. B,

> ¶5.6 No Agency. Nothing herein contained shall be construed to make either party liable for any obligations incurred by the other party, in the conduct of its business or to have any obligation to the other party other than as expressly set forth herein. Panda is performing any development activities hereunder for Calpine as an independent contractor. This Agreement shall not constitute Panda as the legal representative or agent of Calpine, nor shall Panda have the right or authority to assume, create or incur any liability or obligation, express or implied, against, or in the name of, or on behalf of Calpine or its Affiliates.

13

material obligations outstanding on the part of Panda. The obligations that Panda asserts that arise from the DRA and are outstanding, if they do exist, are incidental, not material obligations that if breached would excuse Calpine's performance under the DRA. *See i.e.*, *In re Tsiaoushis*, 383 B.R. at 619 ("The failure to perform a remote and speculative fiduciary duty, if one exists, is not a 'material breach excusing the performance of the other.'"); *Samson v. Prokopf (In re Smith)*, 185 B.R. 285, 294 (Bankr. S.D. Ill. 1995) (Court found a "buy back" provision in limited partnership did not create a performance obligation on behalf of the partner but even if the Court assumed it did, it was not a "material" obligation. "Existence of the 'buy back' provision, therefore does not transform the limited partnership agreement into an executory contract . . . "); *In re Chateaugay*, 102 B.R. at 346 (contract not executory when "remaining obligation . . . is de minimis, remote, and /or insufficient . . . "); *In re Stein and Day Inc.*, 81 B.R. 263, 266 (Bankr. S.D.N.Y. 1988) (indemnification obligation did "not constitute a significant independent obligation which would cause the author's performance under the agreements to be viewed as incomplete and executory."); *cf. Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 954 (N.D. Ohio 1997) (finding that the obligation of continued association was a substantial one because of resulting tax and other consequences to the parties should debtor be allowed to reject the limited partnership agreement).

*Judicial Estoppel & the Schedule G Caveat*

Panda also argues that Calpine should be barred from arguing whether the Panda

---

Thus, the form K-1 provision is of little or no significance as to executoriness. Indeed no K-1 form was ever provided or requested prior to the institution of the Texas litigation in 2003. Clearly the parties deliberately avoided defining their relationship as one of partnership or joint venturers.

Agreements are executory because the Agreements were listed on Calpine's Schedule G and thus constitute a "binding judicial admission."

"Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *In re Rolland,* 317 B.R. 402, 421-22 (Bankr. C.D. Cal. 2004) (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir.1988), (quoting *In re Fordson Eng'g Corp.*, 25 B.R. 506, 509 (Bankr. E.D. Mich.1982). To be binding, admissions must be unequivocal statements of fact that require evidentiary proof, not statements of legal theories. *In re Teleglobe Commc'ns. Corp.*, 493 F.3d 345, 377 (3d Cir. 2007)*; Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972); *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber,* 407 F.3d 34, 45 (2d Cir. 2005) ("judicial admissions are statements of fact rather than legal arguments made to a court.")

When asking the court to invoke judicial estoppel, the requesting party must show that: "(1) his adversary 'advanced an inconsistent <u>factual</u> position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner.'" *Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) (quoting *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir. 1996) (emphasis added). Absent success in a prior proceeding**,** a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). Additionally, judicial estoppel is not applicable where there is no evidence that the "allegedly inconsistent statements were, when made, known to be false." *United States v. King*, 1998 U.S. App. LEXIS 28265, *4 (2d Cir. Nov. 9, 1998) (citing *Simon v.*

15

*Safelite Glass Corp.*, 128 F.3d 68, 73 (2d Cir. 1997) (judicial estoppel not appropriate where "first statement was the result of a good faith mistake or an unintentional error.")).

While this Court does not countenance sloppiness with regard to schedule preparation, it must be acknowledged that the Debtors' cases, the ninth largest chapter 11s ever filed, involved thousands of leases and contracts. Recognizing this, Calpine's schedules contained the caveat that "the presence of a contract ... on Schedule G does not constitute an admission that such contract ...is an executory contract." In light of the caveat, the listing of the Panda Agreements does not constitute an "unequivocal fact." Moreover, the determination of whether a contract is executory, is an issue for the Court to decide. *See Dollar Development I, LLC v. Village Green Prop., Ltd.*, Case No. 05-CV-858, 2006 WL 572709, *6 (W.D.Mich. Mar. 8, 2006) (rejecting argument that contract was executory because it was listed in a schedule of the debtor's plan of reorganization "because the issue is a question of law for the court to decide, the debtor's characterization of the Agreement would have no binding effect.")

Moreover, Panda cannot claim it relied on the schedules when it withdrew its Original Proofs of Claim. Where, as here, a party files and voluntarily withdraws proofs of claim before expiration of the bar date, it can hardly contend to have relied on the Debtors' schedules or seek to be excused from ignoring express disclaimers such as those contained in Schedule G. Once those claims had been withdrawn and the bar date had passed, Panda was barred from any recovery on those claims.[5]

---

[5] Panda's contention that it could reassert those claims in a "rejection damages" claim is incorrect. Panda's claims for prepetition damages, asserted in the Texas District Court are barred. Except for one unreported decision, *In re MCS/Texas Direct, Inc.*, Case No. 02-40229-DML-11 (Bankr. N.D. Tex. Mar. 30, 2004) (memo op.), which is contrary to well established law, the other cases cited by Panda do not stand for that proposition. Both *Phoenix Mutual Life*

**Conclusion**

Panda's claims arise from prepetition agreements and disputes with Calpine and originated long before the Petition Date. As such, Panda appropriately filed timely proofs of claim against the Calpine estates in order to recover on its claims. But when it withdrew those claims, Panda waived any right it had to collect on those claims. It is unclear to this Court why Panda voluntarily chose to withdraw its claims against the Calpine estates but the attempt to resurrect those claims by refiling them postconfirmation and labeling them rejection damages claims fails. It cannot be seriously disputed that all the claims that Panda seeks recovery in the Texas District Court are based on acts or omissions that allegedly occurred before the Petition Date and are thus discharged. The Panda Agreements are not executory, the New Proofs of Claim are untimely and barred.

---

*Ins. Co. v. Greystone III Joint Venture (In re Greystone II Joint Venture)*, 995 F.2d 1274 (5th Cir. 1991) and *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust* (*In re Nat'l Gypsum Co.*), 208 F.3d 498 (5th Cir. 2000) simply stand for the proposition that where the nondebtor party has no prepetition claim against a debtor, it is not a creditor with a provable claim unless the debtor rejects the contract. If the debtor assumes the contract, as in *Greystone,* the party has no claim. In addition, *Greenpoint Metallic Bed Co.*, 113 F.2d 881 (2d Cir. 1940) is inapposite as well because the pre-petition and rejection damages in *Greenpoint* were treated as separate claims in the debtor's bankruptcy. *Greenpoint*, 113 F.2d 881 (bankruptcy court initially granted employee pre-petition wages and denied post-petition wages because no proof of claim was filed, but court of appeals reinstated the rejection damages because the claim did not become due until the debtor rejected the employment contract).

Accordingly, for all the reasons set forth, Calpine's Objection to the New Proofs of Claim is sustained and the New Proofs of Claim are disallowed and expunged.

IT IS SO ORDERED.

Dated: New York, New York
August 4, 2008

/s/ Burton R. Lifland
United States Bankruptcy Judge