UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————
In re:                                      )    CHAPTER 11
                                            )
CALPINE CORPORATION, et al,                 )    Case No. 05-60200 (BRL)
                                            )    Jointly Administered
                                            )
                          Debtor.           )
———————————————————)

# SAI TRUST'S MEMORANDUM OF LAW IN SUPPORT
# OF MOTION FOR SUMMARY JUDGMENT

**NICOLETTI HORNIG & SWEENEY**
**Attorneys for Robert Membreno**
*Trustee for SAI Trust*
**Wall Street Plaza**
**88 Pine Street**
**New York, New York 10005**
**(212) 220-3830**

Of Counsel:
Lawrence C. Glynn

## Table of Contents

PRELIMINARY STATEMENT ........................................................................... 1

STANDARD OF REVIEW FOR SUMMARY JUDGMENT ..................................... 1

FACTS ........................................................................................................... 2

ARGUMENT ................................................................................................... 2

POINT I

    DEBTORS BREACHED THE AGREEMENT FOR PURCHASE AS A MATTER
    OF LAW ..................................................................................................... 2

POINT II

    THE SUBJECT MATTER OF THE CONTRACT *SUB JUDICE* IS ONE SPECIFIC
    PLANT AND NO OTHER ............................................................................ 3

        A)    The Contract ................................................................................... 3

        B)    The Project ..................................................................................... 3

POINT III

    UNDER THE AGREEMENT FOR PURCHASE, SAI TRUST IS ENTITLED TO
    A NET PROFITS INTEREST OF 4.55% EMANATING FROM THE PROJECT .......... 4

        A)    The Agreement for Purchase Terms ............................................. 4

        B)    The Definition of the Term "Net Profits Interest" Must Be
            Determined from the Instrument Creating It ................................. 5

        C)    Debtors and/or Their Predecessors-In-Interest Provided an
            Explanation and Guidance as to Line Items Comprising NPI
            in 1989 ........................................................................................... 6

        D)    The 1989 Explanation of Line Items Comprising NPI
            Prepared by Debtors and/or Their Predecessors-In-Interest
            Became the Course of Dealings Between the Parties for 11
            Years ............................................................................................. 8

POINT IV

       THE ISSUE OF WHAT IS TO BE INCLUDED IN THE NPI STATEMENT HAS
       BEEN THE SUBJECT OF A PRIOR SETTLEMENT AGREEMENT ........................... 9

POINT V

       DEBTORS ARE ESTOPPED FROM INSERTING "ALLOCATED EXPENSES"
       AND CHARGING 15% OF SAID EXPENSES UNDER THE DOCTRINES OF
       CLAIM PRECLUSION AND ISSUE PRECLUSION AS THE ISSUE OF WHAT
       IS TO BE INCLUDED IN THE NPI STATEMENT HAS BEEN THE SUBJECT OF
       A PRIOR LAWSUIT AND JUDGMENT .................................................................. 11

POINT VI

       DEBTORS HAVE BREACHED THE AGREEMENT FOR PURCHASE BY
       FAILING TO CERTIFY ANY OF THE NPI STATEMENTS SINCE APRIL, 2001
       ............................................................................................................................ 13

POINT VII

       DEBTORS HAVE BREACHED THE IMPLIED COVENANT OF GOOD FAITH
       AND FAIR DEALING IMPLICIT IN ALL CONTRACTS ............................................ 16

POINT VIII

       SAI TRUST'S DAMAGES ................................................................................... 17

## Table of Authorities

**Cases**

*Atlas Corp. V. Clovis Nat. Bank,* 737 P.2d 225, 232 (Utah, 1987) ............................................... 6

*Burdette v. Carrier Corp.,* 158 Cal.App.4th 1668, 71 Cal.Rptr.3d 185 (Cal.App. 3 Dist. 2008) ................................................................................................................................... 12

*Celotex v. Catrett,* 477 U.S. 317, 322 (1986) ........................................................................ 1

*Christy v. Petrol Resources Corp.* 102 N.M. 58, 691 P.2d 59, 62 (App.1984) ............................ 6

*City of Hollister v. Monterey Ins. Co.,* 2008 WL 2894844, *23 (Cal.App. 6 Dist. 2008) ........... 16

*Goenaga v. March of Dimes Birth Defects Found,* 51 F.3d 14, 18 (2d Cir. 1995) ....................... 1

*Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.,* 89 Cal.App.4th 1042, 1051, 107 Cal.Rptr.2d 645 (Cal.App. 1 Dist. 2001) ................................................... 7

*Noble v. Draper,* 160 Cal.App.4th 1, 11, 73 Cal.Rptr.3d 3 (Cal.App. 3 Dist. 2008) ................. 12

*Reichart v. General Ins. Co. of American,* 68 Cal.2d 822, 442 P.2d 377 (Cal. 1968) ................... 2

*Wall Street Network, Ltd. v. New York Times Co.,* 80 Cal.Rptr.3d 6, 12 (Cal.App. 2 Dist. 2008) ................................................................................................................................... 2

*Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370 (Cal. 1995) ............. 16

*Zevnik v. Superior Court,* 159 Cal.App.4th 76, 82, 70 Cal.Rptr.23d 817 (Cal.App. 2 Dist 2008) ................................................................................................................................... 12

**Statutes**

Cal. Civ. Proc. Code. § 1856(c) ........................................................................................ 6

**Treatises**

5 E. Kuntz, *A Treatise on the Law of Oil & Gas* § 63.5 (1978) ...................................................... 5

31 Cal.Jur.3d Evidence § 371 ........................................................................................... 5

## PRELIMINARY STATEMENT

Robert Membreno, as Trustee for SAI Trust, ("SAI Trust") respectfully submits this Memorandum of Law in support of its motion for summary judgment seeking 1) declaratory relief that the Agreement of Purchase and Sale of Assets has been breached by Debtors beginning on or about April, 2001 and that such breach has continued monthly to the present date; 2) declaratory relief compelling Debtors to specifically perform under said agreement in accordance with the clearly expressed terms set forth therein and in accordance with the eleven (11) year course of conduct and dealings which had been established between SAI Trust and Debtors, its predecessors-in-interest, subsidiaries, parents and affiliated companies; 3) contract damages from April, 2001 to present, as set forth in SAI Trust's Rule 56.1 Statement of Undisputed Material Facts, and 4) pre-judgment interest at the rate of 9 per cent per annum from April, 2001 to present.

## THE STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* The movant's burden will be satisfied if it can show an absence of evidence to support an essential element of the nonmoving party's claim. *Goenaga v. March of Dimes Birth Defects Found*, 51 F.3d 14, 18 (2d Cir. 1995).

## FACTS

The Court is respectfully referred to SAI Trust's 56.1 Statement and the Declaration of Robert Membreno (hereinafter "Membreno Dec.") for a complete recitation of the facts of this matter.

## ARGUMENT

## POINT I

## DEBTORS BREACHED THE AGREEMENT FOR PURCHASE AS A MATTER OF LAW

The standard elements of a claim for breach of contract are: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff. *See Reichart v. General Ins. Co. of American*, 68 Cal.2d 822, 830, 442 P.2d 377 (Cal. 1968); *Wall Street Network, Ltd. v. New York Times Co.*, 80 Cal.Rptr.3d 6, 12 (Cal.App. 2 Dist. 2008).

The contract at issue is an agreement entitled "Agreement For Purchase And Sale Of Assets (hereinafter "Agreement For Purchase") entered into on May 17, 1987 between SAI Trust's predecessor-in-interest, SAI Geothermal, Inc. (hereinafter "SAI") and Freeport McMoRan Resource Partners, L. P. ("Freeport"). Membreno Dec., ¶3 and Exhibit "A" thereto. As set forth in detail in SAI Trust's 56.1 Statement and the Membreno Dec., SAI Trust was and continues to be entitled to receive 4.55% of the Net Profits Interest (sometimes referred to herein as "NPI") generated by operations of a geothermal plant known as West Ford Flat. Beginning in April, 2001, Debtors began breaching the contract by deducting from this 4.55% NPI expenses which were neither expressly, implicitly nor remotely permitted in the Agreement for Purchase. Debtors' breach of the contract cannot be seriously disputed, and summary judgment must be granted in favor of SAI Trust.

## POINT II

### THE SUBJECT MATTER OF THE CONTRACT *SUB JUDICE* IS ONE SPECIFIC PLANT AND NO OTHER

A) **The Contract**

It should be noted from the outset that even the most cursory review of the contract at issue will readily alert any breathing reader to one very clear and undeniable fact, *to wit*, that the only geothermal power plant ever mentioned in the Agreement for Purchase is the plant known as West Ford Flat. In fact, the Agreement for Purchase goes so far as to set forth the precise location of the plant that is the subject of this contract. Amazingly, this exceedingly fundamental concept of contract interpretation is completely lost on Debtors and their counsel in their bizarre attempts to justify allocating expenses from 15 other plants, acquired long after this Agreement for Purchase was entered, to the West Ford Flat plant - 15 plants which were not in existence and never even contemplated by the original contracting parties. That it is now necessary to argue with Debtors as to whether or not they can allocate costs emanating from any plant other than West Ford Flat defies logic.

B) **The Project**

The "Project", which is the subject of this contract dispute, is clearly defined in the very first page of the Agreement of Purchase under the section entitled Recitals at ¶ 2. The Agreement for Purchase states:

> Pursuant to the PPA (Power Purchase Agreement), PGandE has agreed to purchase the electricity generated by a thirty (30) megawatt geothermal steam powered electric generating plant (the "Project") to be constructed, maintained and operated by Seller, and to make capacity payments to Seller in respect of the Project, on the terms and conditions set out in the PPA."

3

See Membreno Dec., Exhibit "A."

The Agreement for Purchase incorporates by reference the PPA (contained within Exhibit "A") which, under Article 3, ¶(b), states that Seller (SAI Geothermal, the predecessor to SAI Trust) shall provide capacity and energy from its "30,000 kw [equals 30 Megawatts] Facility located at Section 33, Township 12 North, Range 9 West (MDBM), Sonoma County, California," i.e., West Ford Flat.

Thus, there can be no doubt as to the subject matter for the Agreement for Purchase. It was, in May, 1987, a 30 Megawatt facility located at Section 33, Township 12 North, Range 9 West (MDBM), Sonoma County, California. Nothing more. Nothing less. And, some 21 years later, the subject matter of the contract at issue remains a 30 Megawatt facility located at Section 33, Township 12 North, Range 9 West (MDBM), Sonoma County, California. That this truism may present inconvenience to Debtors and/or its accountants is of no import and certainly is not a basis for denying SAI Trust's motion for summary judgment.

## POINT III

### UNDER THE AGREEMENT FOR PURCHASE, SAI TRUST IS ENTITLED TO A NET PROFITS INTEREST OF 4.55% EMANATING FROM THE PROJECT

Having established what "the Project" is, there can be no logical debate that the Net Profits Interest to which SAI Trust was entitled was to be derived from anything other than "the Project."

**A) The Agreement for Purchase Terms**

§1.5 of the Purchase Agreement states, in pertinent part:

§1.5   Payment of Net Profits Interest.
Buyer shall begin to pay the Net Profits Interest.... The amount of the Net Profits Interest shall be calculated and paid monthly in arrears not alter than the 20th day of the following month....

4

§1.6 of the Purchase Agreement states:

§1.6 Audit Rights of Seller.

> Buyer shall maintain complete and accurate accounting
> records of the accounts which are used to calculate the Net
> Profits Interest. Within 60 days after the end of each fiscal
> year of buyer, commencing with the fiscal year of Buyer in
> which the Date of First Commercial Operation occurs, it shall
> furnish Seller with a statement **certified by Buyer's chief
> financial officer** showing in reasonable detail the calculation
> of the Net Profits Interest for the fiscal year then ended.

§9.10 of the Purchase Agreement contains definitions of various terms. Therein, Net Profits

Interest "shall mean, *with respect to the Project*, the right to receive a payment each month,

commencing as provided in Section 1.5, for the life of the Project, but not longer than 30 years...."

See Membreno Dec., Exhibit "A." Thus, any attempt by Debtors to calculate NPI based upon any

plant other than "the Project" (West Ford Flat), can only be a breach of the Agreement for Purchase,

and summary judgment must be granted in favor of SAI Trust. Nevertheless, as set forth in great

detail herein, this is precisely what Debtors have attempted to do commencing in April, 2001.

**B) The Definition of the Term "Net Profits
Interest" Must Be Determined from the
Instrument Creating It**

There is no body of law that clearly defines the nature and incidents of the net profits

interest. "Because the term 'net profits interest' has no uniform meaning, we believe that 'the nature

of the [net profits] interest and the rights of its owner must be determined *from the provisions of the*

*instrument which created it.*'" *Atlas Corp. V. Clovis Nat. Bank*, 737 P.2d 225, 232 (Utah, 1987)

(emphasis added) citing 5 E. Kuntz, *A Treatise on the Law of Oil & Gas* § 63.5 (1978); *Christy v.*

*Petrol Resources Corp.* 102 N.M. 58, 691 P.2d 59, 62 (App.1984).

5

It is clear that Debtors do not wish to determine the definition of Net Profits Interest ("NPI") "from the instrument which created it", but would rather impose their own self-serving, unilateral, non-negotiable definition because it is more convenient for them. It is equally clear that Debtors seek to apply this "more convenient definition" 11 years *ex post facto*. This mustn't be permitted.

As set forth, *supra*, Net Profits Interest "shall mean, *with respect to the Project*, the right to receive a payment each month, commencing as provided in Section 1.5, for the life of the Project, but not longer than 30 years...." As this definition of NPI is clearly limited to "the Project" and, as set forth previously, "the Project" was very narrowly defined in the Agreement for Purchase as "a 30 Megawatt facility located at Section 33, Township 12 North, Range 9 West (MDBM), Sonoma County, California", the fact that Debtors have taken it upon themselves to calculate NPI based upon any plant other than West Ford Flat should be evidence enough that Debtors have breached the contract, and the inquiry should end here.

**C) Debtors and/or Their Predecessors-In-Interest**
**Provided an Explanation and Guidance as to Line**
**Items Comprising NPI in 1989**

The terms of a written contract may be explained or supplemented by the parties' course of dealing. *See* Cal. Civ. Proc. Code. § 1856(c) (West 2008) ("The terms set forth in a writing ... may be explained or supplemented by course of dealing or usage of trade or by course of performance."); *see also* 31 Cal.Jur.3d Evidence § 371 ("[T]he terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may be explained or supplemented by course of dealing or usage of trade or by course of performance."). The parties' course of dealing may determine the meaning of a contract term or may add an agreed

6

but unstated term. *See Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.,* 89 Cal.App.4th 1042, 1051, 107 Cal.Rptr.2d 645 (Cal.App. 1 Dist. 2001).

At the time of issuance of the very first NPI statement (representing the August, 1989 NPI payment), Debtors' predecessor, Freeport, simultaneously submitted a detailed explanation of the line items comprising the NPI statement for the West Ford Flat power plant on December 13, 1989. Membreno Dec., ¶9 and Exhibit "B" annexed thereto.

Exhibit "B" is important for two key reasons. First, as if there was any doubt as to the seemingly unambiguous language of the Agreement for Purchase[1] regarding which plant is at issue, the December 13, 1989 letter reaffirmed exactly which plant was being discussed. It states, in pertinent part, "[a]s requested, the following is an explanation of the line items comprising the SAIT-APT Net Profits Interest Statement for the *Wet Ford Flat power plant.*" (Emphasis added.)

This document further supports SAI Trust's assertion that the NPI was clearly defined nearly 20 years ago. According to the explanation in Exhibit "B", the following items were used in calculating NPI payable to SAI:

> Electric Revenue
> Interest Income from Overnight Deposits
> Escrow Balance
>
> Royalty Payments
> Lease Operating Expenses
> Overhead
>
> Property Taxes
>
> Capital Additions - Major Construction

---

[1] Obviously, there should be no reason whatsoever to doubt the unambiguous language of this contract, as to do so would appear to be a "blivet." SAI Trust has no reason to dispute the clear language of the contract it entered into 21 years ago, but apparently, Calpine and its counsel does doubt its clarity.

Capital Additions - Overhead
Capital Additions - Development Capital

Project Financing

Invested Capital and Loan Proceeds

Membreno Dec., ¶10.

Notably absent from this list is any mention of the term "Allocated Expenses." More notable

is the fact that for approximately 11 years thereafter, there was no charge for "Allocated Expenses."

Membreno Dec., ¶11 and Exhibit "C" annexed thereto. Exhibit "C" is the very first NPI statement

received from Debtors' predecessor on or about December 13, 1989, representing the first NPI for

August, 1989 to SAI Trust.

**D)    The 1989 Explanation of Line Items
Comprising NPI Prepared by Debtors and/or
Their Predecessors-In-Interest Became the Course
of Dealings Between the Parties for 11 Years**

In reviewing the very first NPI statement (Exhibit "C"), under the heading "Operating

Expenses", the following line item entries are included:

Royalty Payments (Not Subject to Overhead)

Lease Operating Expenses

Overhead 15% (which is 15% of the Lease Operating Expenses).

Simply stated, there is no entry for "Allocated Expenses." Membreno Dec., ¶12.

This format of the NPI statement, including the Operating Expenses listed above, became

the course of dealing established between SAI Trust and Debtors and/or their predecessors-in-

interest for more than 11 years. Membreno Dec., ¶13.

8

In fact, for each monthly NPI statement prepared and submitted by Calpine and/or its predecessors-in-interest from August, 1989 through December, 2000, there was never once any mention of "Allocated Expenses." Commencing with the April, 2001 NPI statement, Debtors unilaterally and without any justification or explanation, inserted "Allocated Expenses" into the calculation for NPI. Membreno Dec., ¶14 and Exhibits "D" and "E" thereto.

In addition, Debtors began calculating overhead expenses as 15% of the sum of "Lease Operating Expenses" and "Allocated Expenses." For the 11 years prior to April, 2001, overhead was only 15% of "Lease Operating Expenses." Membreno Dec., ¶15, Exhibits "D", "E" and "F". While SAI has repeatedly insisted on an explanation of these charges from Calpine, it has become quite clear in briefing this matter for summary judgment that no explanation from Calpine is necessary as the charging of these expenses for the account of SAI Trust is wholly improper and: 1) not a part of the Agreement for Purchase; 2) not mentioned in the December 13, 1989 explanation of NPI line items; 3) not pertaining exclusively to the West Ford Flat power plant; 4) not a part of the 11 year course of dealings that had been established by the parties, and 5) not certified by the Chief Financial Officer (or any other employee) of the Debtors. Accordingly, these charges are in breach of the Agreement for Purchase and SAI Trust must be reimbursed with interest.

**POINT IV**

**THE ISSUE OF WHAT IS TO BE INCLUDED IN THE NPI STATEMENT HAS BEEN THE SUBJECT OF A PRIOR SETTLEMENT AGREEMENT**

Amazingly, the precise issue of the manner in which NPI is to be calculated was the subject of litigation and a settlement between these identical parties. Following an auditing for the period

9

July 1, 1990 through December 21, 1990, and calendar year 1991 (the "1990 and 1991 audit")[2] a

Settlement Agreement was entered on February 28, 1995 (hereinafter "Settlement Agreement"). See

Membreno Dec., ¶24 and Exhibit "H" annexed thereto.

As set forth in the Settlement Agreement, the manner in which future NPI statements would

be prepared was agreed[3] by SAI Trust, Sonoma Geotherm Partners, L.P., (hereinafter "Sonoma"),

Calpine Sonoma Inc. (hereinafter "Calpine Sonoma") and Calpine , the parties thereto. In addition

to an agreement as to the manner in which NPI Statements would be prepared, as a result of this

Settlement Agreement, the manner in which payments of net profits for 1992 and thereafter was

agreed by the parties thereto. Membreno Dec., ¶¶25-26, Exhibit "H."

Under §8 A. of the Settlement Agreement entitled "Miscellaneous", it states:

> Except as specifically set forth herein nothing herein shall affect the
> rights, duties or obligations of SAI Trust and CALPINE in and under
> the Agreement of Purchase, specifically including, but not limited, to
> Sections 1.6 and 9.5. Commencing with the Annual NPI Report for
> calendar year 1992 and continuing thereafter, CALPNE agrees to
> prepare said Annual NPI Reports, and all monthly reports, in
> accordance with the terms of the Agreement for Purchase and this
> Settlement Agreement; and CALPINE further agrees to make all NPI
> payments which may accrue in favor of SAI Trust pursuant thereto.

Membreno Dec., ¶27, Exhibit "H."

---

[2]

SAI Trust holds a right to conduct annual audits of the operations of West Ford Flat after receipt of
an annual certified NPI Statement in accordance with §1.6 of the Agreement for Purchase. §1.6 of
the Purchase Agreement states, in pertinent part:

> Seller (SAI) and its authorized representatives shall have the right, upon reasonable notice
> to Buyer and between 9 A.M. and 5 P.M. weekdays to audit Buyer's records to determine
> whether the calculation of the Net Profits Interest during the fiscal year then ended was in
> accordance with this Agreement.

Membreno Dec., ¶23, Exhibit "A."

[3] Now for a second time, including the original agreement entered into on May 18, 1987.

10

The subject of the Agreement for Purchase was, and still is, a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. The Settlement Agreement governs the relationship of the parties concerning a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. There is not now, nor has there ever been, any contract between SAI Trust and Calpine, nor any of their respective predecessors, subsidiaries, affiliates and related entities, where the subject of the contract was any power plant other than West Ford Flat. Membreno Dec., ¶¶28-30, Exhibit "H." Undeterred by their own agreement to calculate NPI in such a fashion, Debtors have undertaken to now calculate SAI Trust's NPI using expenses from plants which are unrelated to West Ford Flat and never once mentioned in the Agreement for Purchase nor in the Settlement Agreement. This fact is not in dispute and, accordingly, summary judgment in favor of SAI Trust is warranted.

**POINT V**

**DEBTORS ARE ESTOPPED FROM INSERTING "ALLOCATED EXPENSES" AND
CHARGING 15% OF SAID EXPENSES UNDER THE DOCTRINES OF CLAIM
PRECLUSION AND ISSUE PRECLUSION AS
THE ISSUE OF WHAT IS TO BE INCLUDED IN THE NPI STATEMENT HAS BEEN
THE SUBJECT OF A PRIOR LAWSUIT AND JUDGMENT**

On February 24-28, 1992, a trial was held in the Superior Court of the State of California in and for the County of Santa Clara in the case of *Robert J. Membreno, Trustee of the SAI Trust v. Freeport McMoran Resource Partners, Limited Partnership, Calpine Corporation, Santa Rosa Geothermal Company L.P., Sonoma Geothermal Partners L.P. , Calpine Sonoma, Inc., and Does 1 through 20, inclusive.* See Membreno Dec., ¶¶31-32 and Exhibit "I" thereto.

11

One of the issues decided at the conclusion of trial and resulting Judgment was an attempt by Calpine to unilaterally alter the manner in which NPI was calculated,[4] a tactic that the trial court determined was not permitted as the COPAS percentage rates (which Calpine took upon itself to insert) "were not part of the (Agreement of Purchase)." Membreno Dec., ¶33, Exhibit "I", p3, ¶2. Accordingly, the issue of what can and cannot be used in calculating the NPI has already been fully litigated and adjudicated.

Under California law[5], the doctrine of collateral estoppel, or issue preclusion, precludes the re-litigation of an issue in the second action if: "(1) the issue is identical to an issue decided in a prior proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided; (4) the decision in the prior proceeding was final and on the merits; and (5) the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding." *Zevnik v. Superior Court*, 159 Cal.App.4th 76, 82, 70 Cal.Rptr.23d 817 (Cal.App. 2 Dist 2008); *see also Noble v. Draper*, 160 Cal.App.4th 1, 11, 73 Cal.Rptr.3d 3 (Cal.App. 3 Dist. 2008); *Burdette v. Carrier Corp.*, 158 Cal.App.4th 1668, 1688, 71 Cal.Rptr.3d 185 (Cal.App. 3 Dist. 2008).[6]

---

[4] by varying the COPAS (Council of Petroleum Accountants Societies, Inc.) percentage rates.

[5] See Exhibit A, ¶9.6 which calls for California law to apply to the Agreement for Purchase.

[6] The analysis of collateral estoppel is virtually identical in the Second Circuit. Collateral estoppel, or issue preclusion, precludes the re-litigation of an issue where "'(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 146 (2d Cir. 2005) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

Here, all of the criteria have been met. First, the issue, i.e., whether charges to NPI can be unilaterally changed/added by Debtors and/or their predecessors-in-interest, is identical. This issue was, *inter alia*, fully litigated over a four day trial, satisfying the second criteria. The issue was necessarily decided and specifically addressed in the Judgment Following Trial. See Exhibit "I", p3,¶2, thus satisfying the third element. The decision in the prior proceeding was final and on the merits, and the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding, satisfying the remaining two elements. Further, as all of the parties to the 1994 trial and subsequent judgment are identical to parties to this litigation, and based upon the foregoing analysis, Debtors are barred by the doctrine of *res judicata* as well.

In short, this is not the first time Debtors have attempted to surreptitiously alter the manner in which NPI is calculated to the detriment of SAI Trust. Following the four day trial in California Superior Court, a judgment proscribing Debtors from altering the NPI calculation was entered. Debtors are either unaware of this judgment (best case scenario) or believe that they are above the law of this judgment. However, this is a distinction without a difference as either way, Debtors are barred under the doctrines of collateral estoppel and *res judicata* from once again attempting to alter the NPI calculation. These facts and this issue of law cannot be seriously disputed, and summary judgment in favor of SAI Trust must be granted.

## POINT VI

### DEBTORS HAVE BREACHED THE AGREEMENT FOR PURCHASE BY FAILING TO CERTIFY ANY OF THE NPI STATEMENTS SINCE APRIL, 2001

In addition to the numerous ways in which Debtors have breached the Agreement for Purchase beginning in April, 2001 set forth thus far, Debtors have also continually breached this

13

agreement by failing to certify any of the NPI statements as required under the contract. Membreno Dec., ¶¶37, 38, 51, 52.

In accordance with §1.6 of the Agreement for Purchase, NPI statements are to be certified by the chief financial officer of Calpine Corporation (hereinafter "Calpine") annually. Prior to 2000, year end NPI statements prepared by Calpine and/or its wholly owned subsidiary(ies) were certified by Calpine's and/or its predecessors-in-interest's chief financial officer annually.    In fact, between August, 1989 and approximately the end of the fiscal year, 2000, a period of 11 years, all NPI statements prepared by Calpine and/or its wholly owned subsidiary(ies) were certified by Calpine's and/or its predecessors-in-interest's chief financial officer annually. However, since April, 2001, annual certifications have ceased to be prepared by Calpine and/or its wholly owned subsidiary(ies). Since 2001, no officer of Calpine, or its wholly owned subsidiary(ies) have certified any year end statement as required under the Agreement for Purchase. Membreno Dec., ¶¶17-21, Rule 56.1 Statement, ¶17-21.

Failure to provide certified NPI statements is a clear breach of the Agreement for Purchase. §1.6 of the Purchase Agreement states, in pertinent part:

> Audit Rights of Seller.
>
> Buyer shall maintain complete and accurate accounting records of the accounts which are used to calculate the Net Profits Interest. Within 60 days after the end of each fiscal year of buyer, commencing with the fiscal year of Buyer in which the Date of First Commercial Operation occurs, it shall furnish Seller with a statement **certified by Buyer's chief financial officer** showing in reasonable detail the calculation of the Net Profits Interest for the fiscal year then ended.

Emphasis added.

Further, while not stated in the contract, it defies logic that Debtors have, for more than 7 years commencing in April, 2001, chosen to use budgeted or projected numbers in the already

14

meaningless NPI statements provided during that time period. Membreno Dec., ¶¶37, 51, 54, 58. It also defies generally accepted accounting principles ("GAAP"). In essence, Debtors have not only inserted a fraudulent line item expense (Allocated Expenses) relating to plants that are not remotely a part of the contract now at issue, and have not only tacked on an additional 15% of said fraudulent line item expense under the guise of "overhead" and apparently for no other reason than to add "good measure", and have not only failed to certify any of its NPI statements for the past seven years despite what is contractually required, and have not only ignored a prior settlement agreement that they entered freely and willingly into with SAI Trust, and have not only ignored a California Superior Court judgment specifically addressing this precise issue in a case with identical parties, but they have, in addition, made the business decision to base their accounting of NPI due and owing to SAI Trust on budgeted figures. Budgeted figures are projected figures. Budgeted figures are predicted figures. Budgeted figures are fictional and non-existent figures. Debtors are charging fraudulent expenses to SAI's account from plants that SAI has no interest nor privity with, and they're not even using actual charges! They are fictional charges. They are theoretical charges. They are bogus, fraudulent and thieving charges. Apparently, this is the insult following the injury.

Tellingly, the failure to certify these numbers demonstrates the fact that no one on behalf of Debtors is willing to ascribe their name to such fraudulent accounting. More importantly, the consistent failure to certify its numbers since April, 2001, is a clear breach of the Agreement for Purchase terms, and summary judgment in favor of SAI Trust must be awarded.

15

## POINT VII

### DEBTORS HAVE BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IMPLICIT IN ALL CONTRACTS

There can be no debate, and thus, no genuine issue of material fact, that commencing in April, 2001, Debtors unilaterally decided to ignore the clear intention of the parties at the time of entering into the Agreement for Purchase, and proceeded to breach this contract in all of the ways detailed herein.

It is well established that every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party will do anything to destroy or injure the right of the other party to receive the benefits of the contract. *See Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370 (Cal. 1995) ("[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's right to the benefits of the agreement."); *City of Hollister v. Monterey Ins. Co.,* 2008 WL 2894844, *23 (Cal.App. 6 Dist. 2008) (duty of good faith and fair dealing arises from every contract as an implied covenant generating both a contractual obligation and a duty in tort); *Pasadena Live, LLC v. City of Pasadena*, 114 Cal.App.4th 1089, 1094, 8 Cal.Rptr.3d 233 (Cal.App. 2 Dist. 2004) ("This covenant ... not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.")

By its decisions to: 1) cease accounting for West Ford Flat as a stand-alone plant, despite the clear language of the contract; 2) allocate expenses from other facilities it acquired, 3) unilaterally and unexplainedly add 15% of the unwarranted "Allocated Expenses" as "overhead"; 4) cease to

16

provide certified NPI's as required under the contract, and 5) use budgeted /projected/fictious figures as opposed to actual figures in the calculation of NPI's, all commencing in April, 2001 and all in contradiction to that which was set forth in the Agreement for Purchase, it cannot be seriously argued that Debtors have acted in good faith. Accordingly, Debtors have breached the duty of good faith and fair dealing as a matter of law. Therefore, SAI is entitled to summary judgment.

## POINT VIII

### SAI TRUST'S DAMAGES

SAI has suffered $583,698.61 in damages as of August 1, 2008. However, SAI Trust's damages are preliminary and partial, (as Debtors continue to breach the contract on a monthly basis) and do not include other potential damages/losses based on Debtors' use of budgeted figures and not actual figures, charging 15% overhead on budgeted figures and not actual figures and including allocated budgeted costs from other plants, and including costs not allowed to be included based on the parties contractual agreements and are limited to pre-petition matters. This preliminary calculation only addresses one area of damage/loss based on Debtors' improperly allocating budgeted costs (from other plants that were not the subject of any agreement and certainly not the subject of the Agreement for Purchase) to SAI on a percentage basis and then adding 15% of these unsupported and unjustified "Allocated Expenses" as overhead . This preliminary calculation is for the period pre-petition of January 2001 through May, 2008. Said amount totals $583,698.61. Membreno Dec., ¶58.

A table of all of the "Allocated Expenses" from January, 2001 through May, 2008, is set forth below for the Court's convenience. This includes the unauthorized addition of 15% of "Allocated

17

Expenses" to the overhead, as well as interest at the rate of 9% for each unauthorized charge from

April 1, 2001 through August 1, 2008. Membreno Dec., ¶59.


### SUMMARY OF IMPROPER ALLOCATED EXPENSES & 15% OVERHEAD CHARGED BY CALPINE IN MONTHLY NPI STATEMENTS BEGINNING IN APRIL, 2001

|  | Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|---|
|  | Jan-01 | - | - |  |  |
|  | Feb-01 | - | - |  |  |
|  | Mar-01 | - | - |  |  |
| Jan-Mar True up | Apr-01 | $210,877.99 | $9,594.95 | $6,476.59 | $971.49 |
|  | May-01 | 74,889.32 | 3,407.46 | 2,274.48 | 341.17 |
|  | Jun-01 | 107,243.43 | 4,879.58 | 3,220.50 | 483.08 |
|  | Jul-01 | 54,514.42 | 2,480.41 | 1,618.47 | 242.77 |
|  | Aug-01 | 104,038.44 | 4,733.75 | 3,053.27 | 457.99 |
|  | Sep-01 | 82,132.01 | 3,737.01 | 2,382.34 | 357.35 |
|  | Oct-01 | 87,599.98 | 3,985.80 | 2,511.05 | 376.66 |
|  | Nov-01 | 60,165.47 | 2,737.53 | 1,704.11 | 255.62 |
|  | Dec-01 | 35,148.38 | 1,599.25 | 983.54 | 147.53 |
|  | Jan-02 | 75,835.26 | 3,450.50 | 2,096.18 | 314.43 |
|  | Feb-02 | 65,889.48 | 2,997.97 | 1,798.78 | 269.82 |
|  | Mar-02 | 61,450.45 | 2,796.00 | 1,656.63 | 248.49 |
|  | Apr-02 | 41,621.72 | 1,893.79 | 1,107.87 | 166.18 |
|  | May-02 | 42,069.18 | 1,914.15 | 1,105.42 | 165.81 |
|  | Jun-02 | 37,943.85 | 1,726.45 | 984.08 | 147.61 |
|  | Jul-02 | 44,318.60 | 2,016.50 | 1,134.28 | 170.14 |
|  | Aug-02 | 53,364.83 | 2,428.10 | 1,347.60 | 202.14 |
|  | Sep-02 | 54,383.44 | 2,474.45 | 1,354.76 | 203.21 |
|  | Oct-02 | 62,323.49 | 2,835.72 | 1,531.29 | 229.69 |
|  | Nov-02 | 56,571.61 | 2,574.01 | 1,370.66 | 205.60 |
|  | Dec-02 | 57,514.97 | 2,616.93 | 1,373.89 | 206.08 |
|  | Jan-03 | 110,891.37 | 5,045.56 | 2,611.08 | 391.66 |
|  | Feb-03 | 93,134.88 | 4,237.64 | 2,161.20 | 324.18 |
|  | Mar-03 | 83,359.91 | 3,792.88 | 1,905.92 | 285.89 |
|  | Apr-03 | 104,483.34 | 4,753.99 | 2,353.23 | 352.98 |
|  | May-03 | 100,422.52 | 4,569.22 | 2,227.49 | 334.12 |
|  | Jun-03 | 90,554.96 | 4,120.25 | 1,977.72 | 296.66 |
|  | Jul-03 | 106,978.17 | 4,867.51 | 2,299.90 | 344.99 |
|  | Aug-03 | 94,185.34 | 4,285.43 | 1,992.84 | 298.93 |
|  | Sep-03 | 123,901.44 | 5,637.52 | 2,579.17 | 386.88 |
|  | Oct-03 | 111,313.10 | 5,064.75 | 2,279.14 | 341.87 |
|  | Nov-03 | 188,866.58 | 8,593.43 | 3,802.59 | 570.39 |
|  | Dec-03 | 229,528.23 | 10,443.53 | 4,542.94 | 681.44 |
|  | Jan-04 | 167,579.22 | 7,624.85 | 3,259.62 | 488.94 |

| Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|
| Feb-04 | 161,547.67 | 7,350.42 | 3,087.18 | 463.08 |
| Mar-04 | 112,971.97 | 5,140.22 | 2,120.34 | 318.05 |
| Apr-04 | 86,545.03 | 3,937.80 | 1,594.81 | 239.22 |
| May-04 | 78,569.62 | 3,574.92 | 1,421.03 | 213.15 |
| Jun-04 | 122,794.90 | 5,587.17 | 2,179.00 | 326.85 |
| Jul-04 | 94,911.07 | 4,318.45 | 1,651.81 | 247.77 |
| Aug-04 | 101,499.03 | 4,618.21 | 1,731.83 | 259.77 |
| Sep-04 | 83,585.29 | 3,803.13 | 1,397.65 | 209.65 |
| Oct-04 | 78,928.33 | 3,591.24 | 1,292.85 | 193.93 |
| Nov-04 | 66,402.70 | 3,021.32 | 1,065.02 | 159.75 |
| Dec-04 | 124,427.61 | 5,661.46 | 1,953.20 | 292.98 |
| Jan-05 | 89,187.80 | 4,058.04 | 1,369.59 | 205.44 |
| Feb-05 | 130,170.61 | 5,922.76 | 1,954.51 | 293.18 |
| Mar-05 | 101,011.86 | 4,596.04 | 1,482.22 | 222.33 |
| Apr-05 | 52,702.62 | 2,397.97 | 755.36 | 113.30 |
| May-05 | 100,652.98 | 4,579.71 | 1,408.26 | 211.24 |
| Jun-05 | 98,049.99 | 4,461.27 | 1,338.38 | 200.76 |
| Jul-05 | 106,146.17 | 4,829.65 | 1,412.67 | 211.90 |
| Aug-05 | 118,378.04 | 5,386.20 | 1,535.07 | 230.26 |
| Sep-05 | 126,453.65 | 5,753.64 | 1,596.64 | 239.50 |
| Oct-05 | 84,586.14 | 3,848.67 | 1,039.14 | 155.87 |
| Nov-05 | 138,265.49 | 6,291.08 | 1,651.41 | 247.71 |
| Dec-05 | 67,623.45 | 3,076.87 | 784.60 | 117.69 |
| Jan-06 | 68,587.29 | 3,120.72 | 772.38 | 115.86 |
| Feb-06 | 83,468.96 | 3,797.84 | 911.48 | 136.72 |
| Mar-06 | 88,906.62 | 4,045.25 | 940.52 | 141.08 |
| Apr-06 | 181,029.40 | 8,236.84 | 1,853.29 | 277.99 |
| May-06 | 82,321.61 | 3,745.63 | 814.67 | 122.20 |
| Jun-06 | 89,359.38 | 4,065.85 | 853.70 | 128.06 |
| Jul-06 | 61,919.82 | 2,817.35 | 570.15 | 85.52 |
| Aug-06 | 94,229.72 | 4,287.45 | 836.05 | 125.41 |
| Sep-06 | 91,056.30 | 4,143.06 | 776.82 | 116.52 |
| Oct-06 | 103,836.19 | 4,724.55 | 850.42 | 127.56 |
| Nov-06 | 62,095.79 | 2,825.36 | 487.37 | 73.11 |
| Dec-06 | 51,925.41 | 2,362.61 | 389.83 | 58.47 |
| Jan-07 | 143,611.4 | 6,534.32 | 1,029.16 | 154.37 |
| Feb-07 | 98,440.67 | 4,479.05 | 671.86 | 100.78 |
| Mar-07 | 149,880.64 | 6,819.57 | 971.79 | 145.77 |
| Apr-07 | 32,134.17 | 1,462.10 | 197.38 | 29.61 |
| May-07 | 196,530.30 | 8,942.13 | 1,140.12 | 171.02 |
| Jun-07 | 104,085.74 | 4,735.90 | 568.31 | 85.25 |
| Jul-07 | 61,754.34 | 2,809.82 | 316.10 | 47.42 |
| Aug-07 | 143,608.94 | 6,534.21 | 686.09 | 102.91 |
| Sep-07 | 113,970.38 | 5,185.65 | 505.60 | 75.84 |
| Oct-07 | 99,930.28 | 4,546.82 | 409.21 | 61.38 |
| Nov-07 | 97,249.99 | 4,424.87 | 365.05 | 54.76 |
| Dec-07 | 93,133.80 | 4,237.59 | 317.82 | 47.67 |
| Jan-08 | 106,738.52 | 4,856.60 | 327.82 | 49.17 |
| Feb-08 | 101,731.03 | 4,628.76 | 277.73 | 41.66 |
| Mar-08 | 98,089.94 | 4,463.09 | 234.31 | 35.15 |

19

| Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|
| Apr-08 | 105,704.12 | 4,809.54 | 216.43 | 32.46 |
| May-08 | 106,039.33 | 4,824.79 | 180.93 | 27.14 |
| | | $378,190.43 | $129,373.59 | $19,406.03 |

**Sub-total of unauthorized "Allocated Expenses"**                    $378,190.43

**Sub-total of unauthorized 15% of Allocated Expenses added to Overhead**                    56,728.56

**Interest on unauthorized "Allocated Expenses" at 9% per annum through 8/1/08**                    129,373.59

**Interest on unauthorized 15% of Allocated Expenses added to Overhead at 9% per annum through 8/1/08**                    19,406.03

**TOTAL**                    $583,698.61

## CONCLUSION

WHEREFORE, SAI Trust respectfully requests that this Honorable Court grant summary judgment in its favor and for such other and further relief as this court may deem just and appropriate.

Dated: New York, New York
August 13, 2008

Yours, etc.,

**NICOLETTI HORNIG & SWEENEY**
Attorneys for
*Robert Membeno, Trustee for SAI Trust*

By: _____
Lawrence C. Glynn (LG-6431)
Wall Street Plaza
88 Pine Street
New York, New York 10005
(212) 220-3830
NH&S File No.:        00000840LCG

20