**Hearing Date: September 24, 2008, at 10:00 a.m. (ET)**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Jeffrey S. Powell (admitted *pro hac vice*)
Mark E. McKane (admitted *pro hac vice*)

Counsel for the Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )<br>)<br>) Chapter 11 |
| Calpine Corporation, et al., | )<br>)<br>) Case No. 05-60200 (BRL) |
| Reorganized Debtors. | ) Jointly Administered<br>) |

**REORGANIZED DEBTORS' RESPONSE TO SAI TRUST'S MOTION FOR SUMMARY JUDGMENT**

Calpine Corporation and the other above-captioned reorganized debtors (collectively, the Reorganized Debtors) respond to SAI Trust's Motion for Summary Judgment regarding its proofs of claim. The Reorganized Debtors have properly interpreted the Purchase Agreement's provisions for calculating the NPI payments.[1] By the plain language of the Purchase Agreement – and the only reasonable interpretation of that Purchase Agreement – the Reorganized Debtors were authorized to, and did, properly allocate and attribute a portion of the direct operating

---

[1] Unless otherwise defined herein, all capitalized terms shall be defined as used in the Reorganized Debtors' Motion For Summary Adjudication Discharging SAI Trust's Claim Nos. 6309, 6314, 6315, 6316, 6327, and 6238 ("the Reorganized Debtors' Motion"). Docket No. 7913.

expenses from the Geysers to the West Ford Plant for purposes of calculating SAI Trust's monthly and annual NPI. The Reorganized Debtors have correctly determined and paid SAI Trust all it is due each month. The allocation formula used by the Reorganized Debtors is a fair and commercially reasonable method for allocating direct operating expenses for those direct, but not necessarily exclusive, operating expenses associated with West Ford Plant. While full of rhetoric, SAI Trust's Motion does not contain any legal or factual grounds sufficient for this Court to find that its proofs of claim are valid or that the Reorganized Debtors breached the Purchase Agreement. This Court should deny SAI Trust's Motion on multiple grounds.

*First*, the Reorganized Debtors properly interpret the Purchase Agreement and properly calculate and pay the monthly NPI to SAI Trust. There is nothing in the Purchase Agreement that limits the Reorganized Debtors' ability to manage the West Ford Plant as a part of the consolidated Geysers unit and nothing that prevents the Reorganized Debtors from using an allocation of direct operating expenses for those categories of expenses properly included in the NPI calculation. SAI Trust sold any management interest in the West Ford Plant decades ago and it cannot force the Reorganized Debtors to operate the West Ford Plant as a stand-alone plant today. Nor can it force the Reorganized Debtors to exclude categories of expenses that are permissible under the Purchase Agreement and Exhibit F thereto because the expenses are in those categories allocated from the consolidated operations.

*Second*, there is no factual connection between SAI Trust's earlier complaints in 1992 and 1995 and this litigation and there is no possible estoppel or preclusion arising from the earlier disputes. The Reorganized Debtors have never had any opportunity – much less a full and fair opportunity – to litigate these issues before the Court because the 1992 and 1995 disputes arose *years before* the Reorganized Debtors' management decision to consolidate

2

operations at the Geysers. Neither the 1992 nor the 1995 dispute discussed or addressed the use of *any* metric for calculating the Operating Expenses used in the calculation of the NPI. As a result, there is no basis to preclude or estop the Reorganized Debtors from fully and fairly litigating this dispute now.

*Third*, SAI Trust cannot prevail on its claim that the Reorganized Debtors breached the Purchase Agreement by failing to certify the annual NPI Reports because it cannot prove any damages that are proximately caused by certification of the reports. Well established California law requires that damages be proximately caused by an alleged breach. SAI Trust cannot show any link between the certification and its alleged damages because SAI Trust receives the same monthly report with detailed financial information and journal-specific backup detail today that it always has. Each monthly report is created in the ordinary course of the Reorganized Debtors' business operations and is fair and accurate to the best of the accounting group's ability. SAI Trust's alleged damages do not arise from a lack of fair and accurate financial information or a lack of access to the Reorganized Debtors' books and records. Without a causal link between certification and its alleged damages, SAI Trust's argument in Point VI must fail.

*Fourth*, there is no breach of any implied covenant because the Reorganized Debtors consistently pay SAI Trust the full value of its NPI every month and it receives the full benefit under the Purchase Agreement. SAI Trust sold any management interest in the West Ford Plant long ago, yet today it is still attempting to argue that the Reorganized Debtors acted in bad faith by consolidating the West Ford Plant with 18 other plants to create one of the most efficient steam fields in the United States. SAI Trust's argument in Point VII highlights the full extent and the absurdity of its position. SAI Trust cannot control the operation of the West Ford Plant and cannot limit the Reorganized Debtors' management of the plants at the Geysers.

*Fifth*, SAI Trust improperly expands its alleged damages to include postpetition, pre-confirmation damages. SAI Trust failed to file any request or claim for payment of administrative expenses and it limited its proof of claim to "pre-petition matters." SAI Trust's postpetition, pre-confirmation damages were discharged by confirmation of the Debtors' Sixth Amended Joint Plan of Reorganization (the "Plan") and SAI Trust cannot expand its damages claim now.

Now is the time for the Court to resolve this contractual dispute and discharge SAI Trust's proofs of claim. The Reorganized Debtors request that the Court deny SAI Trust's Motion for Summary Judgment, grant the Reorganized Debtors' Motion and discharge SAI Trust's proofs of claim.

**ARGUMENT**

**I.    THE REORGANIZED DEBTORS PROPERLY INTERPRET THE PURCHASE AGREEMENT AND PROPERLY CALCULATE THE MONTHLY NPI PAYMENT.**

Nothing in the Purchase Agreement limits the Reorganized Debtors' ability to manage the West Ford Plant as part of the consolidated Geysers field. Likewise, nothing in the Purchase Agreement precludes the Reorganized Debtors from allocating permissible categories of costs and expenses that are necessary for the operation of the West Ford Plant and are accounted for as part of the consolidated operations of the Geysers. See Reorganized Debtors' Motion at ¶¶ 18-21, 24 and 31-37 for further analysis. The Reorganized Debtors properly charge those categories of costs and expenses that are explicitly permitted under the Purchase Agreement and Exhibit F to the Purchase Agreement in calculating the NPI payments. See First Tipton Decl. ¶¶ 11-13. That certain of those categories are now allocated based on consolidated operations at the Geysers is not a breach of the Purchase Agreement. Rather than address the categories of costs and expenses used in the NPI calculation, SAI Trust focuses on the definition of the "Project" in

4

the Purchase Agreement.[2] It then argues that it is entitled to an NPI payment derived exclusively from the "Project." See Motion at Points I-III. SAI Trust's argument fails for three independent reasons.

First, the Reorganized Debtors do not allocate any other plants' share of costs in calculating the monthly NPI payments. See Reorganized Debtors' Motion at ¶¶ 18-19, 24. Allocated Expenses is not a "new" category and was only added to the monthly NPI report to maintain transparency in its accounting of the NPI payment. See Tipton Declaration in Support of the Reorganized Debtors' Response to SAI Trust's Motion for Summary Judgment, dated September 10, 2008 (the "Third Tipton Decl.") at ¶¶ 4-6. Allocated Expenses and Lease Operating Expenses are both independent subcategories of "Operating Expenses" and do not overlap. Id. As set forth in the Reorganized Debtors' Motion, the allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs. Reorganize Debtors' Motion at ¶¶ 18-19, 24. The allocated expenses subcategory represents those categories of expenses and operations that are permitted under the Purchase Agreement and Exhibit F to the Purchase Agreement that are allocated from consolidated business operations.

Further, the Reorganized Debtors properly include Allocated Expenses in the 15% Overhead charge included in the NPI. Overhead charges are set in the Purchase Agreement as 15% of "all costs of Operating the Joint Property". See Purchase Agreement at Ex. F, Section III. B. As both Lease Operating Expenses and Allocated Expenses are "Operating Expenses" and "costs of Operating the Joint Property" under the Purchase Agreement, the Reorganized

---

[2] The Reorganized Debtors do not dispute that the "Project" as set forth in the Purchase Agreement is the 30 Megawatt facility now referred to as the West Ford Plant and no other facility, plant or field at the Geysers.

5

Debtors properly include Allocated Expenses as the basis for the Overhead charges. See Third Tipton Decl. ¶ 8.

Second, the Purchase Agreement does not limit, in any manner, the Reorganized Debtors' ability to manage the West Ford Plant as part of the consolidated Geysers. Any interpretation of the Purchase Agreement limiting the Reorganized Debtors' ability to manage the Geysers or giving some control over the management of the West Ford Plant to SAI Trust would lead to an absurd result. SAI Trust's interpretation would force the Reorganized Debtors to operate the West Ford Plant on a stand-alone basis – giving SAI Trust a management right over the West Ford Plant that it no longer has – or exclude entire categories of expenses that are permissible under the Purchase Agreement – enriching SAI Trust in a manner never intended under the Purchase Agreement. Reorganized Debtors' Motion ¶¶ 38-41. Neither is a reasonable interpretation and neither is consistent with the plain language of the Purchase Agreement. Id.

Third, while SAI Trust seeks to narrowly limit the calculation of the NPI as limited to costs "solely" or "exclusively" at the West Ford Plant by focusing on the definition of "Project," the relevant language is broader. The plain language of the Purchase Agreement contains language like "cost associated with," and Exhibit F to the Purchase Agreement permits "any cost … necessary and proper to Joint Operations." Id. at ¶ 35.

Further, the Reorganized Debtors have always used only those permissible categories of costs and expenses necessary to operate the West Ford Plant when they calculate SAI Trust's NPI payment. See Reorganized Debtors' Motion at ¶¶ 22-23, 31. Throughout the entire duration of the NPI payments the methodology has remained the same. Third Tipton Decl. ¶¶ 4-5, 10. After consolidation, the Reorganized Debtors broke down the "Operating Expenses" to include subcategories for "Lease Operating Expenses" and "Allocated Expenses." The only

6

potentially relevant course of dealing between the parties supports the Reorganized Debtors' calculation of the NPI payments using the categories of costs and expenses permissible under the Purchase Agreement and Exhibit F thereto.

The December 13, 1989 letter which identifies Lease Operating Expenses as "actual costs incurred in the operation of the Plant [and] [l]abor costs and related payroll burden are limited to those individuals identified as billable under Exhibit F of the Agreement for Purchase and Sale of Asset dated May 18, 1987" bolsters the Reorganized Debtors' argument. Both in 1989 and today, the Reorganized Debtors charge SAI Trust those costs necessary to operate the West Ford Plant and limit the categories of costs and expenses to those identified under the Purchase Agreement and Exhibit F thereto.

**II.    THE REORGANIZED DEBTORS ARE NOT ESTOPPED, BARRED OR PRECLUDED FROM ALLOCATING EXPENSES IN ACCORD WITH THE PLAIN LANGUAGE OF THE PURCHASE AGREEMENT.**

Collateral estoppel is an equitable concept based on fundamental principals of fairness. *Sandoval v. Superior Court*, 140 Cal. App. 3d 932, 941 (Cal. App. 1983). Collateral estoppel is limited to those matters where the party against whom the earlier decision is asserted had a ***full and fair*** opportunity to litigate the issue. See Kremer v. Chemical Construction, 456 U.S. 461, 480-481 (1982). The collateral estoppel effect of a judgment only extends to the facts in issue as they existed ***at the time the prior judgment was rendered***. See People v. Lopez, 146 Cal. App. 4th 1263, 1272 (Cal. App. 2006) (citing People v. Carmony, 99 Cal. App. 4th 317, 322 (Cal. App. 2002)). As Points IV and V of their Motion, SAI Trust argues that a 1995 Settlement Agreement and a 1992 Judgment from the Santa Clara County Superior Court somehow preclude

7

the Reorganized Debtors from fully and fairly litigating this dispute now.[3] Neither argument has merit because there is no factual connection between those previous disputes and SAI Trust's proofs of claim. Nor can there be, as those earlier disputes predate the Reorganized Debtors' consolidation at the Geysers and the resulting allocation of costs by years.

The Reorganized Debtors have never had a full and fair opportunity to litigate whether to consolidate operations at the Geysers and allocate direct operating expenses was appropriate and cannot be precluded from doing so now. In 1992, the West Ford Plant operated as a stand-alone plant and the Reorganized Debtors were not allocating any operating expenses. That alone is fatal to SAI Trust's argument that the Reorganized Debtors are somehow precluded from litigating this dispute, and this Court should recognize Points IV and V as litigation tactics and nothing more.

Even if the timing of the dispute and the Reorganized Debtors' consolidation at the Geysers was close – which it is not – SAI Trust cannot prove three other key elements necessary for collateral estoppel. First, issues are "identical" only when there are identical factual allegations in the two proceedings. Lucido v. Superior Court, 51 Cal. 3d 335, 332 (Cal. 1990). Second, an issue is "actually litigated" when that issue is "properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." Barker v. Hill, 191 Cal. App. 3d 221, 226 (Cal. App. 1987). Third, an issue is "necessarily decided" when the issue was "not entirely unnecessary" to the prior proceeding. Castillo v. City of Los Angeles, 92 Cal. App. 4th 477, 482 (Cal. App. 2001). SAI Trust has the burden to prove each element and cannot do so here. Barker, 191 Cal. App. 3d at 226.

---

[3] It is unclear what argument SAI Trust makes in Point IV related to the 1995 Settlement Agreement. See infra at pg. 9-10.

The 1992 Judgment is limited to Paragraphs 1.2(b) and (c) of the Purchase Agreement and the calculations of "Invested Capital." Paragraphs 1.2(b) and (c) of the Purchase Agreement focus solely on the "Purchase Price" paid, while "Invested Capital" is a defined term related to the Buyer's cost of constructing the West Ford Plant and other costs incurred *prior* to the Date of First Commercial Operation. There is *no* discussion in the 1992 Judgment about Operating Expenses or what categories of direct operating expenses are properly included in the NPI calculation. There is *no* discussion of allocation of expenses from consolidated operations, nor could there be as the West Ford Plant was a stand-alone plant in 1992.

SAI Trust has not shown any evidence of what, if any, evidence was presented, what allegations were made in the pleadings, whether the Reorganized Debtors were permitted to fully litigate the issue of allocation of expenses or that any issue related to Operating Expenses was actually litigated and necessarily decided. On the face of the 1992 Judgment the court's decision rested solely on the narrow provisions of the Purchase Agreement discussed and there was no dispute over Operating Expenses. SAI Trust cannot reasonably argue the definition of "Net Profits Interest" or the definition of "Net Income" were "necessarily decided" in a dispute about the interpretation "Purchase Price" and "Invested Capital."

To the extent SAI Trust argues some form of preclusion based on the 1995 Settlement Agreement, that argument fares even worse because a private settlement agreement cannot give rise to any collateral estoppel effect. Le Parc Community Ass'n v. Workers' Com. Appeals Bd., 110 Cal. App. 4th 1161, 1174 (Cal. App. 2003). Collateral estoppel requires a judicial proceeding where issues are "actually litigated" and "necessarily decided." Zevnik v. Superior Court, 159 Cal. App. 4th 76, 82 (Cal. App. 2008). There is no evidence that the 1995 Settlement Agreement resolved any judicial proceedings or was ever approved by any Court in any manner.

9

Also, as with the 1992 Judgment, the 1995 Settlement Agreement does not address Operating Expenses at all. The Settlement Agreement is limited to financing and interest charges which are, and always have been, a completely separate section of the NPI calculation than the disputed Operating Expenses. See e.g. Monthly Reports attached as Ex. F to Membreno Declaration. The Settlement Agreement identified three categories of adjustments to the NPI payments: (1) "Overnight Interest" for bank accounts holding revenues generated by West Ford Plant, (2) revenue related from the termination of an escrow account, and (3) funds related to re-financing of the West Ford Plant, with a lower interest rate and longer amortization period. There is *no* discussion of Operating Expenses or what categories of direct operating expenses are properly included in the NPI calculation or allocation of any expenses.

Further, the plain language of the Settlement Agreement itself does not support any argument that the Reorganized Debtors are precluded because it states that other than the limited changes regarding financing and interest charges, all other portions of the monthly NPI shall be prepared "in accordance with the terms of the Agreement for Purchase." See Ex. H at § 8.A.

### III. THE REORGANIZED DEBTORS PROVIDE MONTHLY REPORTS WITH EACH NPI PAYMENT AND SAI TRUST CANNOT ASSERT ANY DAMAGES.

In California, a "breach of contract is not actionable without damages." Barmalea California, Inc. v. Reliable Interiors, Inc., 119 Cal. App. 4th 468, 473 (Cal. App. 2004) (citing Patent Scaffolding Co. v. William Simpson Const., 256 Cal. App. 2d 506, 511 (Cal. App. 1967). Damages for breach of contract are limited to those with a proximate connection "between the breach of the contract and the detriment thereby inflicted on the plaintiff." Automatic Poultry Feeder Co. v. Wedel, 213 Cal. App. 2d 509, (Cal. App. 1963); Cal. Civ. Code section 3300 ("In an action for breach of contract, the measure of damages is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary

10

course of things, would be likely to result therefrom"); Erlich v. Menezes, 21 Cal. 4th 543 (Cal. 1999) (citing Cal Civ. Code section 3300 in limiting contract damages).

A breach is only a proximate cause of alleged damages if it is a "substantial factor in bringing about that loss or damage." See Linden Partners v. Wilshire Linden Associates, 62 Cal. App. 4th 508, 531 (Cal. App. 1998) (affirming the trial court's jury instructions on proximate and substantial factor in breach of contract case); see also BAJI No. 3.76; Mitchell v. Gonzalez, 54 Cal. 3d 1041, 1052-53 (Cal. 1991). A "substantial factor" is something "which is more than slight, trivial, negligible or theoretical factor in producing a particular result." Espinosa v. Little Co. of Mary Hospital, 31 Cal. App. 4th 541 (Cal. App. 1995). While the court of appeals in Linden Partners affirmed the jury's judgment that the defendants' actions were a "substantial factor" and proximate cause of the damages, SAI Trust cannot do so. Linden Partners, 62 Cal. App. 4th at 531-32. SAI Trust's alleged damages do not arise from a lack of fair and accurate financial information or a lack of access to the Reorganized Debtors' books and records. Instead, the alleged damages arise from the dispute over interpretation of which categories of operating expenses are permissibly charged against the NPI calculation. Without a nexus between the alleged breach and damages, SAI Trust's claim fails.

There is no nexus between the lack of certification and the accuracy of the financial information provided by the Reorganized Debtors. SAI Trust receives the same detailed financial information now as it always has, including when the annual NPI reports were certified. Third Tipton Decl. ¶ 7. The monthly reports include the costs and expenses broken down by category and include journal-specific entries as backup. First Tipton Decl. ¶¶ 5, 16. The monthly NPI reports are created in the ordinary course of the Reorganized Debtors' business operations. Third Tipton Decl. ¶¶ 6, 9. The Reorganized Debtors utilize the same PeopleSoft

database and procedure in calculating the NPI payments as it does for numerous other royalty payments. Id. Regardless of SAI Trust's unsubstantiated allegations of fraud or inaccuracy, the sole evidence in this dispute is that the monthly NPI calculations are fair and accurate to the best of the Reorganized Debtors' abilities at the time they are prepared and provided to SAI Trust. Id. Finally, the allocations used in determining the monthly NPI payment are a commercially-reasonable method of allocation to determine direct operating expenses when calculating the NPI, evidence which stands uncontroverted. See First Tipton Decl. ¶ 12.

While SAI Trust argues today that the monthly NPI reports are inaccurate because they are not certified, there is no evidence whatsoever to support its argument. To date SAI Trust has had ample opportunities to develop *some* evidence to support its claims. As set forth in the First Tipton Declaration, on two occasions Guy Tipton met with SAI Trust and its outside accountant to explain the NPI calculations. Id. ¶ 8. At other times, the Reorganized Debtors provided supplemental information to SAI Trust including lists of employees' names, titles and salaries or wage rates; various budgets, outlines of how the allocation percentages were calculated for each category of costs and expenses; and even preparing and providing pro forma financials of what the Reorganized Debtors would expect to see for operating costs had their accounting system been set up to treat the West Ford Plant as a stand-alone entity. Id. ¶¶ 5-8. Further, SAI Trust never sought to exercise its audit rights in the Purchase Agreement to determine on its own the accuracy of the monthly NPI reports and the Reorganized Debtors' allocation of operating expenses. Third Tipton Decl. ¶ 9. Section 1.6 of the Purchase Agreement permits SAI Trust access, on reasonable notice, to audit the Reorganized Debtors' books and records. That audit right is independent of any certification of the annual reports and was available to SAI Trust at any time. Despite all of the supplemental information and access to the Reorganized Debtors'

personnel, SAI Trust does not have any evidence of *any* overcharges in the monthly NPI payments.

Additionally, SAI Trust's allegations of overcharges or some form of fraud are not borne out by the facts. While SAI Trust did not like the result, Mr. Tipton's pro forma financials of what West Ford Plant would look like as a "stand-alone" plant showed that the West Ford Plant benefited from the consolidated operations. See First Tipton Decl. ¶ 7.

SAI Trust has the same information in the monthly reports today as it had in the reports that were certified. SAI Trust has access to the Reorganized Debtors' books and records and has requested and received supplemental information. It has either ignored the supplemental information or failed to pursue its audit rights, and, while it argues today that the reports are inaccurate, there is no evidence to support this purely speculative claim. Given the same full and accurate financial information SAI Trust receives each month and the access to supplemental information provided by the Reorganized Debtors, any alleged damages cannot be proximately caused by the lack of certification and without a valid claim for damages, SAI Trust's breach of contract argument fails. To the extent the Court determines that the Reorganized Debtors have breached the Purchase Agreement, SAI Trust's claim still fails as it cannot prove any damages proximately caused by such a breach.

**IV.   THE REORGANIZED DEBTORS' MANAGEMENT DECISION TO CONSOLIDATE OPERATIONS AT THE GEYSERS WAS IN GOOD FAITH.**

The Reorganized Debtors' decision to manage and operate the West Ford Plant as part of the consolidated Geysers unit is not in violation of the Purchase Agreement and cannot be the basis for a breach of the implied covenant of good faith. While California law imposes an implied covenant of good faith, the implied covenant cannot contradict the express terms of a contract. Carma Developers (Cal.) Inc. v. Marathon Development California, Inc., 2 Cal. 4th

342, 374 (Cal. 1992). Further, the scope of conduct prohibited by the covenant of good faith is "circumscribed by the purposes and express terms of the contract." Storek & Storek v. Citicorp Real Estate, Inc., 100 Cal. App. 4th 44, 56 (Cal. App. 1992).

In order to succeed on its claim, SAI Trust also needs to prove that the Reorganized Debtors acted objectively unreasonable or exercised discretion with a lack of good faith. Storek, 100 Cal. App. 4th at 59 (discussing discretion granted pursuant to contractual terms). "A decision is unreasonable when it is arbitrary, capricious or lacking in evidentiary support" and "a lack of good faith … suggest a moral quality, such as dishonesty, deceit or unfaithfulness to duty." Storek, 100 Cal. App. 4th at 59 (citing Guntert v. City of Stockton, 43 Cal. App. 3d 203, 209 (Cal. App. 1974)). There is no evidence that the Reorganized Debtors' efforts to consolidate 19 of the 22 plants at the Geysers into one of the most efficient steam fields in the United States was "arbitrary, capricious or lacking in evidentiary support."

While SAI Trust cites three cases for the general description of the implied covenant of good faith, none support its argument. Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th, 1 (Cal. 1995) and City of Hollister v. Monterey Ins. Co., 165 Cal. App. 4th 455 (Cal. App. 2008) are both insurance coverage disputes and discuss an insurer's obligation to provide coverage. In Waller, the California Supreme Court noted that a breach of the implied covenant required some additional allegation of wrongdoing, such as "delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters" or "numerous other tactics." Waller, 11 Cal. 4th at 36. In City of Hollister the court of appeals addressed estoppel arguments and did not even address the contours of any "implied covenant of good faith." 165 Cal. App. 4th 455. Finally, in Pasadena Live, LLC v. City of Pasadena, 114 Cal. App. 4th 1089, 1094 (Cal. App. 2004) the court of appeals held that the covenant is "limited to assuring compliance with the

14

express terms of the contract" and found that the defendant complied with the contract by considering proposals submitted by plaintiff. Id.

Even under the standard argued by SAI Trust – that a party cannot do anything to "destroy or injure the right of the other party to receive the benefits of the contract" – its claim fails because the Reorganized Debtors properly allocate direct operating expenses pursuant to the Purchase Order and pay SAI Trust all it is due each month.

## V. SAI TRUST IMPERMISSIBLY SEEKS UNTIMELY DAMAGES BEYOND ITS PROOFS OF CLAIM.

SAI Trust impermissibly seeks recovery for additional damages that are untimely and barred by the Reorganized Debtors' Plan. SAI Trust failed to file any request for administrative expenses and explicitly limited its proofs of claim to only "pre-petition matters." The administrative claims bar date is long past and SAI Trust cannot now expand its asserted damages from the estimate of $245,000 in its proofs of claim to the more than $550,000 identified in its Motion.

Pursuant to Section 1141(d)(1)(A) of the Bankruptcy Code the Reorganized Debtors' Plan discharged "any debt that arose before the date of such confirmation." Courts consistently have held that Section 1141(d)(1)(A) should be interpreted as written and debtors are permitted to discharge postpetition, pre-confirmation claims. See generally Taylor v. Freeland & Kronz, 503 U.S. 638 (1992); United States v. Ron Pair Enterprises, Inc., 489 U.S. 235. The Eleventh Circuit Court of Appeals held that confirmation of a debtor's chapter 11 plan discharged the debtor from postpetition, pre-confirmation debts pursuant to an executory contract that was neither assumed nor rejected by the debtor prior to or as part of its plan of reorganization. In re Sure-Snap Corp., 983 F.2d 1015, 1018-19 (11th Cir. 1993). Similarly, in In re Benjamin Coal Co., 978 F.2d 823, 826 (3d Cir.1992), the Third Circuit held that "the confirmation of the

15

Chapter 11 plan discharged the administrative claim previously granted to" the creditor. The Court of Appeals explained that "the discharge of all existing claims, including administrative claims, upon confirmation of a Chapter 11 plan is unambiguous ... in the Bankruptcy Code". Id. at 827. See also In re Dahlgren Intern., Inc., 147 B.R. at 403 and n. 14; In re Christopher, 148 B.R. 832 (Bankr. N.D.Tex.1992).

Consistent with the Bankruptcy Code, the Plan explicitly provides that all postpetition, pre-confirmation claims are discharged and enjoined. See Plan Art. VIII. A. and G. To the extent a party asserts a postpetition, pre-confirmation claim, the party was required to file a request for payment of an administrative expense within thirty days of exit. See Art. IX.B. The administrative claims bar date was March 1, 2008. SAI Trust failed to file any amended proof of claim or otherwise request payment of administrative expenses, and SAI Trust's Amended Proofs of Claim specifically state that they are "limited to pre-petition matters." See Proof of Claim 6309 at 4. SAI Trust's asserted damages should therefore be limited to the pre-petition matters asserted in its filed proofs of claim, consistent with the requirements to reserve for disputed claims provided in Art. VII.C.3 of the Plan.

There are no due process concerns regarding SAI Trust's failure to file a request for administrative expenses pursuant to the Plan. As the Court is aware, SAI Trust was an active participant in the Reorganized Debtors' bankruptcy proceedings, filing its first papers on October 13, 2006, and eleven other sets of papers before this current briefing. See docket nos. 2850, 2915, 4513, 4575, 4730, 4892, 5759, 5801, 6294, 7832, 7868, and 7864. SAI Trust also appeared before the Court on two different occasions. See Exs. A, B attached hereto. As an identified claim holder, SAI Trust received (among other notices) both the "Confirmation Hearing and Notice of Non-Voting Status with Respect to Disputed Claims" and notice of the

"Entry of Order Confirming the Sixth Amended Joint Plan of Reorganization of Calpine Corporation and Its Debtor Subsidiaries." See Exs. C, D attached hereto. Actual knowledge of the bankruptcy case such as SAI Trust's and receipt of notice is sufficient grounds to bar its non-filed administrative claim. See Matter of Phoenix Steel Corp., 105 B.R. 250, 253 (Bankr. D.Del. 1989) (actual notice of the debtor's bankruptcy case on the part of an administrative claimant was sufficient to discharge that entity's administrative claim); In re Christopher, 148 B.R. at 835-36, 836 n. 9 (due process requires only actual notice on the part of such claimants in the context of an individual bankruptcy before discharging administrative claims, but stating that a corporate debtor may need to provide formal notice to administrative claimants); In re Dahlgren Intern., Inc., 147 B.R. at 403 n. 14 ("confirmation of a plan of reorganization precludes all unaddressed pre-confirmation claims of those with notice of the plan and the proceedings related thereto"). SAI Trust is bound by the terms of the Reorganized Debtors' Plan approved by this Court and cannot assert its new claims for postpetition, pre-confirmation damages.

**CONCLUSION**

For all of the reasons stated herein, the Reorganized Debtors request that the Court deny SAI Trust's Motion for Summary Judgment and grant the Reorganized Debtors' request for Summary Adjudication Discharging SAI Trust's Proofs of Claim.

| | |
|---|---|
| Dated: September 10, 2008<br>San Francisco, California | Respectfully submitted,<br><br>  */s/ Christopher W. Keegan*  <br>Richard M. Cieri (RC 6062)<br>Marc Kieselstein (admitted *pro hac vice*)<br>David Seligman (admitted *pro hac vice*)<br>Jeffrey S. Powell (admitted *pro hac vice*)<br>Mark E. McKane (admitted *pro hac vice*)<br>Christopher W. Keegan (admitted *pro hac vice*)<br>KIRKLAND & ELLIS LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York  10022-4611<br>Telephone:  (212) 446-4800<br>Facsimile:   (212) 446-4900 |