KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David Seligman  (admitted *pro hac vice*)
Jeffrey S. Powell (admitted *pro hac vice*)
Mark E. McKane (admitted *pro hac vice*)
Christopher W. Keegan (admitted *pro hac vice*)

Counsel for the Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ) | |
| In re: ) | |
| ) | Chapter 11 |
| Calpine Corporation, <u>et al.</u>, ) | |
| ) | Case No. 05-60200 (BRL) |
| Reorganized Debtors. ) | Jointly Administered |
| ) | |

**THE REORGANIZED DEBTORS' RESPONSE TO SAI TRUST'S LOCAL RULE 56.1**
**STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The evidence relied upon by SAI Trust, in the form of Mr. Membreno's declaration, does not support its motion for summary judgment.  Pursuant to Local Rule 56.1, submissions must be restricted to concise statements of material facts.  Broad assertions not supported by specific facts, legal arguments and conclusory assertions are in violation of Local Rule 56.1's requirements and should be disregarded.  <u>See Doe v. National Bd. of Podiatric Medical Examiners</u>, Case No. 03 Civ. 4034. 2004 WL 912599 at *3-4 (S.D.N.Y April 29, 2004 ) (discussing appropriate remedies when movant fails to submit evidence sufficient to meet its burden, including declining to consider "those aspects of a supporting affidavit that do not appear to be based on personal knowledge contain admissible hearsay or make generalized and

conclusory statements) (citing <u>Hollander v. American Cyanamid Co.</u>, 172 F.3d 192, 198 (2d. Cir.1999)). Mr. Membreno's declaration does not establish his personal knowledge of several alleged material facts, contains broad sweeping assertions unsupported by any specific facts, and includes legal arguments lifted directly from SAI Trust's Motion for Summary Judgment, complete with case citations.  To the extent SAI Trust's evidence is nothing more than recitation of its allegations and legal arguments set forth in its Motion for Summary Judgment, the Reorganized Debtors incorporate their Response to SAI Trust's Motion for Summary Judgment in response to such allegations.[1]

Subject to these objections, the Reorganized Debtors respond as follows to SAI Trust's Local Rule 56.1 statement.

**SAI Trust Alleged Fact No. 1:**

1.  On or about May 17, 1987, SAI Geothermal, Inc. (hereinafter "SAI") and Freeport McMoRan Resource Partners, L.P. ("Freeport") entered into an agreement entitled "Agreement For Purchase And Sale Of Assets (hereinafter "Agreement For Purchase")  See Declaration of Robert Membreno dated August 6, 2008, hereinafter "Membreno Dec.", at ¶ 3 and Exhibit "A" annexed thereto.

**Response to No. 1:**

It is undisputed that on or about May 17, 1987, SAI Geothermal, Inc. (hereinafter "SAI") and Freeport McMoRan Resource Partners, L.P. ("Freeport") entered into an agreement entitled "Agreement For Purchase And Sale Of Assets.

---

[1]   Unless otherwise defined herein, all capitalized terms shall be defined as used in the Reorganized Debtors' Motion for Summary Adjudication Discharging SAI Trust's Claim Nos. 6309, 6314, 6315, 6316, 6327, and 6238 or the Reorganized Debtors' Response to SAI Trust's Motion for Summary Judgment.

**SAI Trust Alleged Fact No. 2:**

2.    Pursuant the Agreement for Purchasing, Article I, ¶ 1.2(e), after commercial operation of a geothermal power plant to be constructed by Freeport known as West Ford Flat located in Sonoma County, California, Freeport was contractually obligated to pay SAI a Net Profits Interest (hereinafter "NPI") representing the right to receive a monthly payment in an amount equal to 6% of the Net Income for the month.  Membreno Dec., ¶ 4.

**Response to No. 2:**

It is undisputed, but immaterial that the Agreement for Purchase, Article I, ¶ 1.2(e) states "after the Date of First Commercial Operation, Buyer shall pay Seller the amount of the Net Profits Interest; commencing as provided in Section 1.5" and that, at the time the contract went into effect, the annual payment was equal to 6% of the Net Income for the month.  Whether SAI Trust's predecessor-in-interest was entitled to a payment of 6% of Net Income after First Commercial Operation is not relevant to any dispute before this Court today.

**SAI Trust Alleged Fact No. 3:**

3.    Thereafter, SAI thereafter transferred a portion of its rights to receive NPI to SAI Trust and SAI Trust now holds a 4.55% NPI in the gross revenues of West  Ford Flat. Membreno Dec., ¶ 5.

**Response to No. 3:**

It is undisputed that SAI Trust now holds a 4.55% Net Profit Interest in the gross revenues of West Ford Flat.

**SAI Trust Alleged Fact No. 4:**

4.    Effective July 2, 1990, Freeport assigned its interest in, to, and under the Agreement

for Purchase and a Standard Offer 4 Power Purchase Agreement it received from Pacific Gas &
Electric Company ("Assigned Agreements") to Santa Rosa Geothermal Company, L.P.
(hereinafter "Santa Rosa").  Membreno Dec., ¶ 6.

**Response to No. 4:**

Undisputed, but immaterial as the parties' various transfers of interest related to the West
Ford Plant are not a disputed issue, as SAI Trust acknowledges in its papers.  <u>See</u> <u>e.g.</u>,
"Declaration of Marc Membreno" filed on June 11, 2008, docket number 4893.

**SAI Trust Alleged Fact No. 5:**

5.  On January 1, 1994, Santa Rosa amended its partnership name to Calpine Geysers
Company, L.P. (hereinafter "Calpine Geysers").  Membreno Dec., ¶ 7.

**Response to No. 5:**

Undisputed, but immaterial as the parties' various transfers of interest related to the West
Ford Plant are not a disputed issue, as SAI Trust acknowledges in its papers.  <u>See</u> <u>e.g.</u>,
"Declaration of Marc Membreno" filed on June 11, 2008, docket number 4893.

**SAI Trust Alleged Fact No. 6:**

6.  The term "NPI" is unambiguously defined in §§ 1.5, 1.6, 9.10 and Exhibit "F" of the
Agreement for Purchase.  Membreno Dec., ¶ 8, Exhibit "A".

**Response to No. 6:**

Whether "NPI" is unambiguously defined in the Purchase Agreement and Exhibit F
attached thereto is not a material fact for either SAI Trust or the Reorganized Debtors to
determine as interpretation of the contract is a question of law for the Court.  <u>Roden v.</u>
<u>AmerisourceBergen Corp.</u>, 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007).  Further, SAI Trust fails

to identify any admissible evidence in support of this alleged undisputed fact as Mr. Membreno's unsupported assertion is not based upon admissible evidence nor is he competent to testify on the interpretation of the contract terms at issue.

**SAI Trust Alleged Fact No. 7:**

7.    At the time of issuance of the very first NPI statement (representing the August, 1989 NPI payment), Calpine's predecessor, Freeport, simultaneously submitted a detailed explanation of the line items comprising the NPI statement for the West Ford Flat power plant on December 13, 1989.  Membreno Dec., ¶ 9 and Exhibit "B" annexed thereto.

**Response to No. 7:**

It is undisputed but immaterial that Calpine's predecessor provided a letter, dated December 13, 1989 outlining the line items comprising the NPI statement for the West Ford Flat power plant.  Regardless of what is set forth in the December 13, 1989 each monthly NPI reports provided to SAI Trust provide financial detail and include support for both the revenue and cost calculations used to determine the monthly NPI payments.  See First Tipton Decl. at ¶ 5; see also monthly reports attached as Exhibit F to Membreno Declaration.

**SAI Trust Alleged Fact No. 8:**

8.    According to this explanation, the following items were to be used in calculating NPI payable to SAI: Electric Revenue, Interest Income from Overnight Deposits, Escrow Balance, Royalty Payments, Lease Operating Expenses, Overhead, Property Taxes, Capital Additions - Major construction, Capital Additions - Overhead, Capital Additions - Development Capital, Project Financing, Invested Capital and Loan Proceeds.  Membreno Dec., ¶10.

**Response to No. 8:**

It is undisputed, but immaterial that the December 13, 1989 letter identified the categories of expenses payable to SAI Trust as Electric Revenue, Interest Income from Overnight Deposits, Escrow Balance, Royalty Payments, Lease Operating Expenses, Overhead, Property Taxes, Capital Additions - Major construction, Capital Additions - Overhead, Capital Additions - Development Capital, Project Financing, Invested Capital and Loan Proceeds. Regardless of what is set forth in the December 13, 1989 each monthly NPI reports provided to SAI Trust provide financial detail and include support for both the revenue and cost calculations used to determine the monthly NPI payments. See First Tipton Decl. at ¶ 5; see also monthly reports attached as Exhibit F to Membreno Declaration. Further, the proper categories of expenses are set forth in the Purchase Agreement and Exhibit F thereto. See Exhibit A to Membreno Declaration at §§ 1.5, 9.10 and Exhibit F thereto.

**SAI Trust Alleged Fact No. 9:**

9. Notably absent from this list is any mention of the term "Allocated Expenses." More notable is the fact that for approximately 11 years thereafter, there was no charge for "Allocated Expenses." Membreno Dec., ¶11 and Exhibit "C" annexed thereto, which is the very first NPI statement received from Debtors on or about December 13, 1989, representing the first NPI for August, 1989 to SAI Trust.

**Response to No. 9:**

It is undisputed but immaterial that the monthly reports did not include the term "Allocated Expenses. Allocated Expenses are a subset of Lease Operating Expenses included after the Geysers made the management decision to consolidate operations of the West Ford Plant with the Geysers after it came to own substantially all of power plants at the Geysers.

Second Tipton Decl. at ¶ 6.  The Allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs.  First Tipton Decl. at ¶¶ 12-13.  Allocated expenses are not a new category of expenses, but are those categories of expenses and operations that are allocated from consolidated business operations. Third Tipton Decl. at ¶¶ 4-5, 10.

**SAI Trust Alleged Fact No. 10:**

10. Under the heading "Operating Expenses", the following line item entries are included:  Royalty Payments (Not Subject to Overhead); Lease Operating Expenses, and Overhead 15% (which is 15% of the Lease Operating Expenses).  There is no entry for "Allocated Expenses."  Membreno Dec., ¶12.

**Response to No. 10:**

It is undisputed but immaterial that the August 1989 NPI report did not contain an entry for "Allocated Expenses."  The Allocated Expenses are a subset of Lease Operating Expenses included after the Geysers made the management decision to consolidate operations of the West Ford Plant with the Geysers after it came to own substantially all of power plants at the Geysers. Second Tipton Decl. at ¶ 6.  The Allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs.  First Tipton Decl. at ¶¶ 12-13.  Allocated expenses are not a new category of expenses, but are those categories of expenses and operations that are allocated from consolidated business operations. Third Tipton Decl. at ¶¶ 4-5, 10.

**SAI Trust Alleged Fact No. 11:**

11. These Operating Expenses were the course of dealing established between SAI Trust

and Debtors and/or their predecessors-in-interest for more than 11 years.  Membreno Dec., ¶13.

**Response to No. 11:**

Disputed.  Whether the "Operating Expenses" identified in the December 13, 1989 letter constitute a course of dealing between SAI Trust and the Reorganized Debtors is a question of law and not properly a material fact.  SAI Trust fails to identify any admissible evidence in support of this alleged undisputed fact as his unsupported assertion is not based upon admissible evidence nor is he competent to testify on the interpretation of the contract terms at issue.  The "Operating Expenses" included in the NPI reports between 1989 and 2001 always included the same categories of permissible expenses as the "Operating Expenses" included in the NPI reports between 2001 and the current date.  Third Tipton Decl. ¶¶4-5, 10.  Allocated Expenses are a subset of Lease Operating Expenses included after the Geysers made the management decision to consolidate operations of the West Ford Plant with the Geysers after it came to own substantially all of power plants at the Geysers.  Second Tipton Decl. at ¶ 6.  The Allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs.  First Tipton Decl. at ¶¶ 12-13.  Allocated expenses are not a new category of expenses, but are those categories of expenses and operations that are allocated from consolidated business operations.  Third Tipton Decl. at ¶¶4-5, 10.


**SAI Trust Alleged Fact No. 12:**

12. Conversely, commencing with the April, 2001 NPI statement submitted by Calpine, a new line item entry appeared under the heading "Allocated Expenses."  Membreno Dec., ¶14 and Exhibits "D", "E" and "F" annexed thereto.

**Response to No. 12:**

Undisputed but immaterial.  While the monthly NPI reports starting in April 2001 included a sub-heading for "Allocated Expenses" under "Operating Expenses," the categories of costs and expenses included in Allocated Expenses had always been included as Operating Expenses.  The Reorganized Debtors added the sub-heading for Allocated Expenses to provide transparency in their NPI calculation.  Third Tipton Decl. at ¶ 4.  Allocated Expenses are a subset of Lease Operating Expenses included after the Geysers made the management decision to consolidate operations of the West Ford Plant with the Geysers after it came to own substantially all of power plants at the Geysers.   Second Tipton Decl. at ¶ 6.  The Allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs.  First Tipton Decl. at ¶¶ 12-13.  Allocated expenses are not a new category of expenses, but are those categories of expenses and operations that are allocated from consolidated business operations.  Third Tipton Decl. at ¶¶4-5, 10.

**SAI Trust Alleged Fact No. 13:**

13. Prior to April, 2001, there was no entry for "Allocated Expenses."  Membreno Dec., ¶14 and Exhibits "D" through "F."

**Response to No. 13:**

Undisputed but immaterial as the Allocated Expenses are a subset of Lease Operating Expenses included after the Geysers made the management decision to consolidate operations of the West Ford Plant with the Geysers after it came to own substantially all of power plants at the Geysers.  Second Tipton Decl. at ¶ 6.  The Allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs.  First Tipton Decl. at ¶¶ 12-13.  Allocated expenses are not a new category of expenses, but are those

categories of expenses and operations that are allocated from consolidated business operations.
Third Tipton Decl. at ¶¶4-5, 10.

**SAI Trust Alleged Fact No. 14:**

14. Calpine has offered no explanation for its unilateral decision to include "Allocated Expenses" which prior to April, 2001, were not charged. Membreno Dec., ¶15.

**Response to No. 14:**

Disputed but immaterial. Whether the Reorganized Debtors properly include allocated expenses in the NPI calculation is a question of law for the court to decide. Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007). Further, the Reorganized Debtors on at least two occasions met with SAI Trust to explain the allocated expenses and the calculation of the NPI payment. First Tipton Decl. ¶ 8. The Reorganized Debtors also provided supplemental information on multiple occasions when SAI Trust requested such information. First Tipton Decl. ¶¶ 5-7.

**SAI Trust Alleged Fact No. 15:**

15. Nor has Calpine explained the basis for charging a 15% overhead charge on the sum of "Allocated Expenses" and "Lease Operating Expenses." Membreno Dec., ¶16.

**Response to No. 15:**

Disputed but immaterial. The Reorganized Debtors on at least two occasions met with SAI Trust to explain the allocated expenses and the calculation of the NPI payment. First Tipton Decl. ¶ 8. The Reorganized Debtors also provided supplemental information on multiple occasions when SAI Trust requested such information. First Tipton Decl. ¶¶ 5-7. Further, the basis for charging 15% overhead charge on the sum of "Operating Expenses" is set forth in the

plain language of the Purchase Agreement and Exhibit F attached thereto and is a question of law

for the Court to resolve.  <u>Roden v. AmerisourceBergen Corp.</u>, 67 Cal. Rptr. 3d 26, 39 (Cal. Ct.

App. 2007).  As set forth in Exhibit F of the Purchase Agreement, overhead charges are to be set

at "fifteen percent of the cost of Operating the Joint Property" exclusive of certain costs.

Because the Allocated Expenses represent a portion of the "cost of Operating the Joint Property"

they are included in the 15% Overhead charge.  Third Tipton Decl. at ¶ 8.


**SAI Trust Alleged Fact No. 16:**

16. The 15% overhead charge had been based solely upon the "Lease Operating

Expenses."  This had been the course of dealings established between SAI Trust and Debtors

and/or their predecessors-in-interest for more than 11 years.  Prior to April, 2001, the overhead

charge on each and every single NPI was 15% of Lease Operating Expense only.  Membreno

Dec., ¶16.

**Response to No. 16:**

The facts asserted in statement number 16 are disputed-in-part but immaterial.  First, the

Reorganized Debtors do not dispute that prior to consolidation of the West Ford Plant, the

monthly NPI reports included only the "Lease Operating Expenses" to represent the cost of

operating the West Ford Plant.  The Reorganized Debtors incorporate their response to SAI

Trust's alleged fact number 13.  Once the consolidation occurred, the "Operating Expenses"

were broken down into sub-categories of both "Lease Operating Expenses" and "Allocated

Expenses."  As set forth in Exhibit F of the Purchase Agreement, Overhead Charges are set at

"fifteen percent of the cost of Operating the Joint Property" exclusive of certain costs.  Because

the Allocated Expenses represent a portion of the "cost of Operating the Joint Property" they are

included in the 15% Overhead charge.  Third Tipton Decl. at ¶ 8.  Further, whether the

"Operating Expenses" identified in the December 13, 1989 letter constitute a course of dealing

between SAI Trust and the Reorganized Debtors is a question of law and not properly a material

fact.   SAI Trust fails to identify any admissible evidence in support of this alleged undisputed

fact as his unsupported assertion is not based upon admissible evidence nor is he competent to

testify on the interpretation of the contract terms at issue.


**SAI Trust Alleged Fact No. 17:**

17. In accordance with §1.6 of the Agreement for Purchase, NPI statements are to be

certified by the chief officer of Calpine Corporation (hereinafter "Calpine") annually.

Membreno Dec., ¶17.

**Response to No. 17:**

It is undisputed that pursuant to section 1.6 of the Purchase Agreement annual NPI

reports are to be certified by the chief financial officer.


**SAI Trust Alleged Fact No. 18:**

18. Prior to 2000, year end NPI statements prepared by Calpine and/or its wholly owned

subsidiary(ies) were certified by Calpine's and/or its predecessors-in-interest's chief financial

officer annually.  Membreno Dec., ¶18.

**Response to No. 18:**

It is undisputed that the Reorganized Debtors' and/or their predecessors-in-interest's

chief financial officer certified the annual NPI reports prior to 2000.


**SAI Trust Alleged Fact No. 19:**

19. In fact, between August, 1989 and approximately the end of the fiscal year, 2000, a

period of 11 years, all NPI statements prepared by Calpine and/or its wholly owned

subsidiary(ies) were certified by Calpine's and/or its predecessors-in-interest's chief financial

officer annually.  Membreno Dec., ¶19.

**Response to No. 19:**

Disputed.  SAI Trust received monthly NPI statements, but only the annual NPI reports

were certified.  Exhibit F to the Membreno Declaration shows monthly NPI reports without

certification.  Further, the Purchase Agreement does not require all NPI statements to be

certified.  Ex. A to Membreno Declaration § 1.6.


**SAI Trust Alleged Fact No. 20:**

20. However, since April, 2001, annual certifications have ceased to be prepared by

Calpine and/or its wholly owned subsidiary(ies).  Membreno Dec., ¶20.

**Response to No. 20:**

It is undisputed that since 2001 the annual NPI reports have not been certified by the

Reorganized Debtors' chief financial officer.


**SAI Trust Alleged Fact No. 21:**

21. Since 2001, no officer of Calpine, or its wholly owned subsidiary(ies) have certified

any year end statement as required under the Agreement for Purchase.  Membreno Dec., ¶21.

**Response to No. 21:**

It is undisputed that since 2001 the annual NPI reports have not been certified by an

officer of the Reorganized Debtors.

**SAI Trust Alleged Fact No. 21:**

22. Failure to provide annual certified NPI statements is a clear breach of the Agreement

for Purchase.  §1.6 of the Purchase Agreement states, in pertinent part:

> Audit Rights of Seller.
>
> Buyer shall maintain complete and accurate accounting records of the accounts
> which are used to calculate the Net Profits Interest.  Within 60 days after the end
> of each fiscal year of buyer, commencing with the fiscal year of Buyer in which
> the Date of First Commercial Operation occurs, it shall furnish Seller with a
> statement **certified by Buyer's chief financial officer** showing in reasonable
> detail the calculation of the Net Profits Interest for the fiscal year then ended.

Emphasis added. Membreno Dec., ¶22, Exhibit "A."

**Response to No. 22:**

Whether the Reorganized Debtors breached the Purchase Agreement is a question of law

for the Court to determine and is not a material fact for either SAI Trust or the Reorganized

Debtors to determine.  Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct.

App. 2007).  To the extent the breach of the Purchase Agreement is properly a material fact, it is

disputed and the Reorganized Debtors' incorporate by reference their arguments set forth in their

Response to SAI Trust's Motion for Summary Judgment.  Further, SAI Trust fails to identify any

admissible evidence in support of this alleged undisputed fact as his unsupported assertion is not

based upon admissible evidence nor is he competent to testify on the interpretation of the

contract terms at issue.

**SAI Trust Alleged Fact No. 23:**

23. SAI Trust holds a right to conduct annual audits of the operations of West Ford Flat

after receipt of an annual certified NPI Statement in accordance with §1.6 of the Agreement for

Purchase.  §1.6 of the Purchase Agreement states, in pertinent part:

Seller (SAI) and its authorized representatives shall have the right, upon reasonable notice to buyer and between 9 A.M. and 5 P.M. weekdays to audit Buyer's records to determine whether the calculation of the Net Profits Interest during the fiscal year then ended was in accordance with this Agreement.

Membreno Dec., ¶23, Exhibit "A."

**Response to No. 23:**

Disputed.  SAI Trust holds a right to conduct annual audits of the operations of West Ford Flat upon reasonable notice to the Reorganized Debtors.  The Purchase Agreement does not limit SAI Trust's audit rights to after the receipt of any annual NPI report whether certified or not.  See Third Tipton Decl. ¶ 9, Ex. A to Membreno Declaration § 1.6.


**SAI Trust Alleged Fact No. 24:**

24. Following an auditing for the period July 1, 1990 through December 21, 1990, and calendar year 1991 (the "1990 and 1991 audit") a Settlement Agreement was entered February 28, 1995 (hereinafter "Settlement Agreement").  Membreno Dec., ¶24 and Exhibit "H."

**Response to No. 24:**

Undisputed but immaterial.  The 1995 Settlement Agreement does not address Operating Expenses or whether the Reorganized Debtors properly allocate direct operating expenses pursuant to the Purchase Agreement.  The Settlement Agreement is limited to financing and interest charges which are, and always have been, a completely separate section of the NPI calculation than the disputed Operating Expenses.  See e.g. Monthly Reports attached as Ex. F to Membreno Declaration.  The Settlement Agreement identified three categories of adjustments to the NPI payments: (1) "Overnight Interest" for bank accounts holding revenues generated by West Ford Plant, (2) revenue related from the termination of an escrow account, and (3) funds

related to re-financing of the West Ford Plant, with a lower interest rate and longer amortization period.  See Ex. H to the Membreno Declaration.

**SAI Trust Alleged Fact No. 25:**

25. As set forth in the Settlement Agreement, the manner in which future NPI statements would be prepared was agreed[2] by SAI Trust, Sonoma Geothermal Partners, L.P., (hereinafter "Sonoma"), Calpine Sonoma Inc. (hereinafter "Calpine Sonoma") and Calpine, the parties thereto.  Membreno Dec., ¶25.

**Response to No. 25:**

Disputed, but immaterial.  The 1995 Settlement Agreement does not address Operating Expenses or whether the Reorganized Debtors properly allocate direct operating expenses pursuant to the Purchase Agreement and is limited to the financing and interest charges which are, and always have been, a separate section of the NPI monthly report.  See Ex. F to Membreno Declaration.  Further, the Settlement Agreement states:

> Except as specifically set forth herein, nothing herein shall affect the rights, duties or obligations of SAI Trust and Calpine in and under the Agreement for Purchase, specifically including, but not limited to Sections 1.6 and 9.5.  Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, Calpine agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement …

Ex. H at pg. 8, ¶ 8. A.  The Settlement Agreement explicitly requires the parties to continue to calculate and prepare the NPI reports "in accordance with the Agreement for Purchase" for issues not included in the Settlement Agreement.  Further, the 1995 Settlement Agreement was entered into by Calpine Geysers Company, L.P., formerly known as Santa Rosa Geothermal Company, L.P., Calpine Corporation, Freeport McMoRan Resource Partners, Limited

---

2    Now for a second time, including the original agreement entered into on May 18, 1987.

Partnership and SAI Trust by Robert J. Membreno, Trustee.    <u>See</u> Ex. H to Membreno

Declaration at pg. 1.

**<u>SAI Trust Alleged Fact No. 26:</u>**

26. In addition to an agreement as to the manner in which NPI Statements would be

prepared, as a result of this Settlement Agreement, the manner in which payments of net profits

for 1992 and thereafter was agreed by the parties thereto.  Membreno Dec., ¶26.

**<u>Response to No. 26:</u>**

Disputed.  The Reorganized Debtors incorporate their response to SAI Trust alleged fact

number 25 and state further that the 1995 Settlement Agreement does not address Operating

Expenses or whether the Reorganized Debtors properly allocate direct operating expenses

pursuant to the Purchase Agreement.   The Settlement Agreement is limited to financing and

interest charges which are, and always have been, a completely separate section of the NPI

calculation than the disputed Operating Expenses.  <u>See e.g.</u> Monthly Reports attached as Ex. F to

Membreno Declaration.  The Settlement Agreement identified three categories of adjustments to

the NPI payments: (1) "Overnight Interest" for bank accounts holding revenues generated by

West Ford Plant, (2) revenue related from the termination of an escrow account, and (3) funds

related to re-financing of the West Ford Plant, with a lower interest rate and longer amortization

period.   <u>See</u> Ex. H to the Membreno Declaration.   There is no further discussion of the

calculation of the NPI payment and there is no admissible evidence submitted by SAI Trust, as

Mr. Membreno's general allegation is unsupported by any specific facts as required by Local

Rule 56.1.

**SAI Trust Alleged Fact No. 27:**

27. Under §8 A. of the Settlement Agreement entitled "Miscellaneous", it states:

Except as specifically set forth herein nothing herein shall affect the rights, duties or obligations of SAI Trust and CALPINE in and under the Agreement of Purchase, specifically including, but not limited, to Section 1.6 and 9.5. Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, CALPINE agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement; and CALPINE further agrees to make all NPI payments which may accrue in favor of SAI Trust pursuant thereto.

Membreno Dec., ¶27, Exhibit "H."

**Response to No. 27:**

Undisputed.

**SAI Trust Alleged Fact No. 28:**

28. The subject of the Agreement for Purchase was, and still is, a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. Membreno Dec., ¶28, Exhibit "H."

**Response to No. 28:**

Undisputed. However, SAI Trust failed to identify any admissible evidence in support of this alleged undisputed fact as its citation is to the 1995 Settlement Agreement and not to any relevant portion of the Purchase Agreement.

**SAI Trust Alleged Fact No. 29:**

29. The Settlement Agreement governs the relationship of the parties concerning a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. Membreno Dec., ¶29, Exhibit "H."

**Response to No. 29:**

Disputed, but immaterial.  SAI Trust does not provide any admissible evidence to support Mr. Membreno's general assertion about what "governs the relationship" of the parties.  The parties' relationship is governed by common law and statutory obligations, the relevant course of dealing, the Purchase Agreement as well as the relevant portions of the Settlement Agreement. The Settlement Agreement itself provides that "nothing herein shall affect the rights, duties or obligations of SAI Trust and Calpine in and under the Agreement of Purchase."  See Ex. H to Membreno Declaration § 8.A.

**SAI Trust Alleged Fact No. 30:**

30. There is not now, nor has there ever been, any contract between SAI Trust and Calpine, nor any of their respective predecessors, subsidiaries, affiliates and related entities, where the subject of the contract was any power plant other than West Ford Flat.  Membreno Dec., ¶30.

**Response to No. 30:**

Undisputed, but immaterial.  Whether there are any other contracts between SAI Trust and the Reorganized Debtors is irrelevant to any dispute before this Court.

**SAI Trust Alleged Fact No. 31:**

31. On February 24-28, 1992, a trial was held in the Superior Court of the State of California in and for the County of Santa Clara in the case of *Robert J. Membreno, Trustee of the SAI Trust v. Freeport McMoRan Partners, Limited Partnership, Calpine Corporation, Santa Rosa Geothermal Company L.P., Sonoma Geothermal Partners L.P., Calpine Sonoma, Inc., and Does 1 through 20, inclusive*, and a judgment was entered in that matter.  Membreno Dec., ¶¶31-

32 and Exhibit "I" thereto.

**Response to No. 31:**

Undisputed but immaterial. The only evidence submitted by SAI Trust does not show any factual nexus between the 1992 dispute and any issue relevant to the dispute before this Court.

**SAI Trust Alleged Fact No. 32:**

32. One of the issues decided as a result of the trial and Judgment was an attempt by Calpine to unilaterally alter the matter in which NPI was calculated,[3] a tactic that the trial court determined was not permitted as the COPAS percentage rates "were not part of the (Agreement of Purchase). Exhibits I, p3, ¶[2]. Membreno Dec., ¶34.

**Response to No.32:**

Disputed. SAI Trust has failed to provide any admissible evidence regarding the issues decided as a result of the trial. Mr. Membreno is not qualified to testify about what issues were actually litigated or decided as a result of the trial, nor has he supported his general allegations with specific facts as required. The Reorganized Debtors do not dispute that the 1992 Judgment states "With respect to the calculation of Invested Capital, the COPAS percentage rates utilized by defendants were not a part of the Agreement, the defendants may not use those COPAS percentage rates to determine the amount of its overhead with respect to the construction of the Project."

---

[3]    by varying the COPAS (Council of Petroleum Accountants Societies, Inc.)

**SAI Trust Alleged Fact No. 33:**

33. The issue of what can and cannot be used in calculating the NPI has already been fully litigated and adjudicated.  Membreno Dec., ¶34.

**Response to No. 33:**

Denied.  SAI Trust has failed to provide any admissible evidence regarding the issues decided as a result of the 1992 trial.  The scope of issues resolved in an earlier proceeding is a legal matter for the Court to resolve and not a material fact to be determined by the parties. Further, the 1992 Judgment is limited to analysis and discussion Paragraphs 1.2(b) and (c) of the Purchase Agreement and the calculations of "Invested Capital."  Paragraphs 1.2(b) and (c) of the Purchase Agreement focus solely on the "Purchase Price" paid and "Invested Capital" is a defined term related to the Buyer's cost of constructing the West Ford Plant and other costs incurred prior to the Date of First Commercial Operation.  There is no discussion in the 1992 Judgment about Operating Expenses or what categories of direct operating expenses are properly included in the NPI calculation.  There is no discussion of allocation of expenses from consolidated operations, nor could there be as the West Ford Plant was a stand-alone plant in 1992.  See Exhibit I to Membreno Declaration.

**SAI Trust Alleged Fact No. 34:**

34. Accordingly, Debtors are estopped by the principles of issue preclusion, claim preclusion and/or judicial estoppel from again attempting to alter the manner in which NPI is calculated under the terms of the Agreement for Purchase.

**Response to No. 34:**

Whether the Reorganized Debtors' are estopped by the principles of issue preclusion, claim preclusion and/or judicial estoppel are questions of law for the Court to resolve and are not

material facts.  The Reorganized Debtors' hereby incorporate by reference its argument set forth

in the Reorganized Debtors' Response to SAI Trust's Motion for Summary Judgment.  Further,

the Reorganized Debtors have never had a full and fair opportunity to litigate these issues before

this Court now – namely whether the Reorganized Debtors properly allocate costs and expenses

pursuant to the Purchase Agreement, particularly not in a dispute that pre-dates the consolidation

of the Geysers by nine years.  See e.g. Second Tipton Decl. ¶¶ 3-6.


**SAI Trust Alleged Fact No. 35:**

35. Between July, 1994 through December, 2000, **no** NPI statement prepared by Calpine

contained a line item entry for "Allocated Expenses."  Membreno Dec., ¶35.

**Response to No. 35:**

The Reorganized Debtors incorporate their response to Alleged Fact Nos. 9-13.


**SAI Trust Alleged Fact No. 36:**

36. Commencing in or about April, 2001, Calpine unilaterally began to include line item

expenses under the heading "Allocated Expenses."  Membreno Dec., ¶36.

**Response to No. 36:**

The Reorganized Debtors incorporate their response to Alleged Fact Nos. 9-13.


**SAI Trust Alleged Fact No. 37:**

37. The uncertified NPI statements that Calpine has provided since April, 2001 use

budgeted figures, as opposed to actual figures.  Membreno Dec., ¶37.

**Response to No. 37:**

Undisputed but immaterial.  The Reorganized Debtors use a commercially reasonable method of allocation to determine direct operating expenses when calculating the Net Profits Interest.  Because the West Ford Plant is no longer a stand-alone plant, Calpine allocates costs the West Ford Plant based on the yearly budgeted costs in relation to the other plants at the Geysers' facility.  First Tipton Decl. ¶¶ 12-15.

**SAI Trust Alleged Fact No. 38:**

38. The uncertified NPI statements that Calpine has provided since April, 2001 include costs and expenses attributable to facilities other than West Ford Flat which are not properly attributable to West Ford Flat under the Agreement for Purchase and not chargeable to SAI. Membreno Dec., ¶38.

**Response to No. 38:**

Disputed.  The Reorganized Debtors use a commercially reasonable method of allocation to determine direct operating expenses when calculating the Net Profits Interest.  Because the West Ford Plant is no longer a stand-alone plant, the Reorganized Debtors allocate costs the West Ford Plant based on the yearly budgeted costs in relation to the other plants at the Geysers' facility.  First Tipton Decl. ¶¶ 12-15.  The allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs and no allocations attributable to other plants are charged to the NPI Calculation.  Third Tipton Decl. ¶ 10.  West Ford Plant's yearly budgeted costs have fluctuated between 3% and 6% and the direct operating expenses reflect the applicable percentage.  First Tipton Decl. ¶ 13.  Further, whether allocated expenses are permissible under the Purchase Agreement and chargeable to SAI

Trust are questions of law and not properly a material fact to be determined by the parties.

Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007).

**SAI Trust Alleged Fact No. 39:**

39. Commencing in April, 2001 (effective January, 2001) Calpine calculated the overhead expense based on both Lease Operating Expenses and "Allocated Expenses." Membreno Dec., ¶39.

**Response to No. 39:**

The Reorganized Debtors incorporate their response to SAI Trust alleged facts numbers 13-14.

**SAI Trust Alleged Fact No. 40:**

40. From July, 1994 through December, 2000, overhead was calculated solely based on Lease Operating Expenses.  Membreno Dec., ¶40.

**Response to No. 40:**

The Reorganized Debtors incorporate their response to SAI Trust alleged facts numbers 9-10.

**SAI Trust Alleged Fact No. 41:**

41. Journal entries which Debtors' claim support the "Allocated Expenses" are not specific to the West Ford Flat plant.  Membreno Dec., ¶41.

**Response to No. 41:**

Disputed-in-part but immaterial.  SAI Trust receives monthly reports with each monthly NPI payment.  First Tipton Decl. ¶¶ 9, 16.  SAI Trust has failed to provide any admissible

evidence about whether the journal entries are specific to the West Ford Plant.  Mr. Membreno does not have personal knowledge to support his general allegations about the Reorganized Debtors' accounting system or journal entries.  The monthly reports include support for both the revenue and cost calculations used to determine the monthly NPI payments.  The allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs and no allocations attributable to other plants are charged to the NPI Calculation.  While the line-item journal entries included as back-up support represent the full consolidated expenses of the appropriate unit at the Geysers, only West Ford Plant's allocated share of those journal entries are charged to SAI Trust.  Third Tipton Decl. ¶¶ 6, 9-10; First Tipton Decl. ¶¶ 9-11.

**SAI Trust Alleged Fact No. 42:**

42. An audit of the journal entries which Debtors claim support the "Allocated Expenses" attributable to West Ford Flat would be impossible given the lack of specificity for said journal entries.  Membreno Dec., ¶42.

**Response to No. 42:**

Disputed.  SAI Trust has failed to provide any admissible evidence about whether an audit would be possible or not as Mr. Membreno has not established any qualifications to proffer such an opinion nor does Mr. Membreno have personal knowledge to support his general assertion about the Reorganized Debtors' accounting system or journal entries.  The monthly reports are created in the ordinary course of the Reorganized Debtors' business operations and are prepared following guidelines similar to monthly royalty calculations.  The Reorganized Debtors utilize the same PeopleSoft database in calculating the NPI payments as it does for numerous other royalty payments.  The journal entries are properly accounted for as operating

expenses in the Reorganized Debtors' PeopleSoft database, complete with supporting information when appropriate.  The monthly NPI reports are fair and accurate to the best of the Reorganized Debtors' abilities at the time they are prepared and provided to SAI Trust. Third Tipton Decl. ¶¶ 6-9.  It would be possible to audit the Reorganized Debtors' calculation of the monthly NPI reports.  Such an audit would be a substantial undertaking, given the breadth and scope of SAI Trust's disputed claims, but it would be possible.  Third Tipton Decl. ¶¶ 6, 9-10. Finally, the Reorganized Debtors provide the underlying data necessary to confirm its calculation of the NPI to SAI Trust with each monthly report, in the form of the NPI calculation sheet and a query of the underlying data.  First Tipton Decl. ¶¶ 9, 16.


**SAI Trust Alleged Fact No. 43:**

43. Journal entries which Debtors claim support the "Allocated Expenses" attributable to West Ford Flat are, in fact, attributable to plants other than West Ford Flat.  Membreno Dec., ¶43.

**Response to No. 43:**

Disputed-in-part but immaterial.  Te Reorganized Debtors incorporate their response to SAI Trust's alleged fact number 41.


**SAI Trust Alleged Fact No. 44:**

44. There is no sound basis, in accordance with generally accepted accounting principles, for the unilateral change in accounting procedures that occurred on or about April, 2001. Membreno Dec., ¶44.

**Response to No. 44:**

Disputed but immaterial.  SAI Trust has not provided any admissible evidence that any change in accounting procedures was in accordance with generally accepted accounting principles as Mr. Membreno is not qualified to provide that opinion.  Further the Reorganized Debtors did not make any unilateral change in accounting procedures in calculating the monthly NPI payment.  The categories of costs and expenses included in Allocated Expenses had always been included as Operating Expenses.  The Reorganized Debtors added the sub-heading for Allocated Expenses to provide transparency in their NPI calculation.  Third Tipton Decl. at ¶ 6. Allocated Expenses are a subset of Lease Operating Expenses included after the Geysers made the management decision to consolidate operations of the West Ford Plant with the Geysers after it came to own substantially all of power plants at the Geysers.  Second Tipton Decl. at ¶ 6.  The Allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs.  First Tipton Decl. at ¶¶ 12-13.  Allocated expenses are not a new category of expenses, but are those categories of expenses and operations that are allocated from consolidated business operations.  Third Tipton Decl. at ¶¶ 4-5, 10.


**SAI Trust Alleged Fact No. 45:**

45. As a result of the unilateral change in accounting procedures undertaken by Debtors, SAI's net profit interest was less in each year over year period compared with any year between 1994 through 2000 inclusive, which is counterintuitive, as the basis for Calpine's consolidation of 16 plants which comprise the Geysers' Region was to reduce costs and increase profits. Membreno Dec., ¶45.

**<u>Response to No. 45:</u>**

Disputed but immaterial.  The categories of costs and expenses included in Allocated Expenses had always been included as Operating Expenses.  The Reorganized Debtors did not make any unilateral change in accounting procedures in calculating the monthly NPI payment.  The categories of costs and expenses included in Allocated Expenses had always been included as Operating Expenses.  The Reorganized Debtors added the sub-heading for Allocated Expenses to provide transparency in their NPI calculation.  Third Tipton Decl. at ¶ 6.  Allocated Expenses are a subset of Lease Operating Expenses included after the Geysers made the management decision to consolidate operations of the West Ford Plant with the Geysers after it came to own substantially all of power plants at the Geysers.  Second Tipton Decl. at ¶ 6.  The Allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs.  First Tipton Decl. at ¶¶ 12-13.  Allocated expenses are not a new category of expenses, but are those categories of expenses and operations that are allocated from consolidated business operations.  Third Tipton Decl. at ¶ 4-5, 10.  SAI Trust fails to provide any admissible evidence to support its assertion that the Reorganized Debtors sought to reduce costs and increase profits.  SAI Trust has no management right or control over the Reorganized Debtors and Mr. Membreno has no personal knowledge of those operations.

Further, SAI Trust's annual NPI payments in 1999 totaled $52,095.47, while the payments from 2001 through today have all been in excess of $412,000, including more than $600,000 in 2001.  Third Tipton Decl. ¶ 11.

**<u>SAI Trust Alleged Fact No. 46:</u>**

46. At no time was there a meeting of the minds between Debtors and SAI Trust to modify or alter the Agreement for Purchase beginning in 2001.  Membreno Dec., ¶46.

**Response to No. 46:**

Disputed-in-part but immaterial.  Whether there was a "meeting of the minds" between the Debtors to modify or alter the Purchase Agreement is a question of law for the Court to resolve and not a material fact.  Further, the parties dispute focuses on the interpretation of the plain language of the Purchase Agreement and there is no dispute about whether there was some alteration or amendment of the Purchase Agreement.  SAI Trust fails to identify any admissible evidence as Mr. Membreno does not have any first hand knowledge of the Reorganized Debtors' beliefs and/or state of mind.

**SAI Trust Alleged Fact No. 47:**

47. Debtors unilaterally altered the terms of the Agreement for Purchase beginning in 2001.  Membreno Dec., ¶47.

**Response to No. 47:**

Disputed.  The Reorganized Debtors incorporate their response to SAI Trust alleged facts numbers 44-45.

**SAI Trust Alleged Fact No. 48:**

48. Debtors' decision to unilaterally alter the terms of the Agreement for Purchase beginning in 2001 was a breach of the Agreement of Purchase.  Membreno Dec., ¶48.

**Response to No. 48:**

Whether the Reorganized Debtors breached the Purchase Agreement is a question of law for the Court to determine and is not a material fact for either SAI Trust or the Reorganized Debtors to determine.  Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007).  To the extent the breach of the Purchase Agreement is properly a material fact, it is

disputed and the Reorganized Debtors' incorporate by reference their arguments set forth in their Response to SAI Trust's Motion for Summary Judgment as well as their Response to SAI Trust's alleged facts numbers 44-45 and 47. Further, SAI Trust fails to identify any admissible evidence in support of this alleged undisputed fact as his unsupported assertion is not based upon admissible evidence nor is he competent to testify on the interpretation of the contract terms at issue.

**SAI Trust Alleged Fact No. 49:**

49. Debtors' decision to unilaterally alter the terms of the Agreement for Purchase beginning in 2001 was a breach of the Settlement Agreement. Membreno Dec., ¶49.

**Response to No. 49:**

Whether the Reorganized Debtors breached the Settlement Agreement is a question of law for the Court to determine and is not a material fact for either SAI Trust or the Reorganized Debtors to determine. Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007). To the extent the breach of the Settlement Agreement is properly a material fact, it is disputed and immaterial and the Reorganized Debtors' incorporate by reference their arguments set forth in their Response to SAI Trust's Motion for Summary Judgment as well as their Response to SAI Trust's alleged facts numbers 44-45 and 47. Further, SAI Trust fails to identify any admissible evidence in support of this alleged undisputed fact as his unsupported assertion is not based upon admissible evidence nor is he competent to testify on the interpretation of the contract terms at issue. Finally, the dispute at issue in this litigation is focused on the interpretation of the Purchase Agreement. SAI Trust has not argued that the Reorganized Debtors breached the Settlement Agreement and that issue is irrelevant to whether

SAI Trust's proofs of claim against the estate are valid or whether the Reorganized Debtors

breached the Purchase Agreement.


**SAI Trust Alleged Fact No. 50:**

50. Debtors' decision to unilaterally alter the terms of the Agreement for Purchase

beginning 2001 was contrary to a Judgment on an issue that had already been fully litigated

between these identical parties.  Membreno Dec., ¶50.

**Response to No. 50:**

Disputed.  The Reorganized Debtors incorporate their response to SAI Trusts alleged

facts numbers 44-45 an 47 to the extent SAI Trust argues that the Reorganized Debtors

unilaterally altered the terms of the Agreement Purchase.  Further, SAI Trust failed to introduce

any evidence that the 1992 Judgment relates in any way to the dispute at issue in this litigation.

There is evidence other than the unqualified and unsupported assertions by Mr. Membreno of

whether the issues in the 1992 dispute relate in any manner to the dispute at issue and what, if

any, issue was litigated in that dispute.  The Reorganized Debtors the incorporate by reference

their arguments set forth in their Response to SAI Trust's Motion for Summary Judgment.


**SAI Trust Alleged Fact No. 51:**

51. Calpine has completely ignored the undeniable, namely that Debtors' have (and

continue to) breach the underlying agreements with SAI, *inter alia*, by failing to provide a

certified NPI Statement singed by Debtors' Chief Financial Officer for at least four (4) years pre-

petition (and all post petition), using budgeted numbers as opposed to actual cost figures, and

calculating overhead.  SAI disputes Debtors' improper use of allocating costs from other plants

and including costs not subject to the agreement, allocating expenses from other plants as costs,

and charging an overhead percentage based on budgeted figures, inappropriate costs, and allocated costs.  Membreno Dec., ¶51.

**Response to No. 51:**

The Reorganized Debtors incorporate their response to SAI Trusts alleged facts numbered 9-13, 15, 16, 21, 37-38, and 48.

**SAI Trust Alleged Fact No. 52:**

52. SAI brought to Debtors' attention that it noticed increases in costs, inclusions of costs, and allocations of costs since receipt of its last statement certified by Debtors' chief financial officer.  Membreno Dec., ¶52.

**Response to No. 52:**

Undisputed that the Reorganized Debtors met on multiple occasions with SAI Trust and its representatives to discuss the NPI calculations.  See First Tipton Decl. ¶ 8; Third Tipton Decl. ¶ 12.

**SAI Trust Alleged Fact No. 53:**

53. SAI attempted to communicate with Debtors and determine whether these increases in costs, inclusions of costs, and allocations of costs are in accordance with the Agreement for Purchase and Settlement Agreement.  Membreno Dec., ¶52.

**Response to No. 53:**

Disputed-in-part.  The Reorganized Debtors met with SAI Trust on multiple occasions and provided substantial supplemental information in an effort to alleviate SAI Trust's concerns. First Tipton Decl. ¶¶ 5-8; Third Tipton Decl. ¶ 12.   The discussions focused on the proper

interpretation of the Purchase Agreement and not the Settlement Agreement. Third Tipton Decl. ¶ 12.

**SAI Trust Alleged Fact No. 54:**

54. Debtors have not provided SAI with statements certified by their chief financial officer. Membreno Dec., ¶52.

**Response to No. 54:**

The Reorganized Debtors incorporate their response to SAI Trust's alleged fact numbers 17-21.

**SAI Trust Alleged Fact No. 55:**

55. Debtors have not provided SAI with sufficient access to its records to determine whether the calculation of NPI (although uncertified by the chief financial officer) was in accordance with the Agreement For Purchase. Membreno Dec., ¶52.

**Response to No. 55:**

Disputed. See First Tipton Decl. ¶¶ 5-8. The Reorganized Debtors met with SAI Trust on multiple occasions and provided substantial supplemental information in an effort to alleviate SAI Trust's concerns. Id. ¶ 6-8. Further there is no evidence that SAI Trust requested an audit pursuant to the Purchase Agreement and SAI Trust does not assert that it ever did so. Third Tipton Decl. ¶ 9. See also contradictory statements in Membreno Decl. ¶ 42 (asserting that an audit would not be possible.)

**SAI Trust Alleged Fact No. 56:**

56. Debtors have not reasonably cooperated with SAI so SAI could conduct an audit of

the uncertified records.  Membreno Dec., ¶52.

**Response to No. 56:**

Disputed.  See First Tipton Decl. ¶¶ 5-8.  The Reorganized Debtors met with SAI Trust on multiple occasions and provided substantial supplemental information in an effort to alleviate SAI Trust's concerns.  Third Tipton Decl. ¶ 12.

**SAI Trust Alleged Fact No. 57:**

57. Debtors have not maintained complete and accurate accounting records of the accounts used to calculate NPI.  Membreno Dec., ¶52.

**Response to No. 57:**

Disputed.  SAI Trust has failed to provide any admissible evidence regarding whether the Reorganized Debtors' accounting records of the accounts used to calculate the NPI are complete or accurate.  Mr. Membreno's declaration, the only evidence cited, does not contain any factual support for his assertion, nor does it set forth any basis for Mr. Membreno to have any knowledge of the Reorganized Debtors' accounting records.  Further, the evidence submitted by the Reorganized Debtors shows that they met with SAI Trust and its accountants on multiple occasions, provided substantial supplemental information when requested by SAI Trust, and provided detailed financial information each month in support of the NPI calculation.  See First Tipton Decl. ¶¶ 9-11, 16.  Further, the NPI calculation is made in the ordinary course of the Reorganized Debtors' business operations, using the PeopleSoft database utilized by the entire Reorganized Debtors' for their business operations.  Third Tipton Decl. ¶¶ 6-7, 9.

**SAI Trust Alleged Fact No. 58:**

58. Debtors have not maintained accounting records sufficient to show in reasonable

detail the calculation of NPI in accordance with the Agreement for Purchase.  Membreno Dec., ¶52.

**Response to No. 58:**

Disputed.  SAI Trust has failed to provide any admissible evidence regarding whether the Reorganized Debtors' accounting records show in reasonable detail the calculation of the NPI. Mr. Membreno's declaration, the only evidence cited, does not contain any factual support for his assertion, nor does it set forth any basis for Mr. Membreno to have any knowledge of the Reorganized Debtors' accounting records.  Further, the evidence submitted by the Reorganized Debtors shows that they met with SAI Trust and its accountants on multiple occasions, provided substantial supplemental information when requested by SAI Trust, and provided detailed financial information each month in support of the NPI calculation.  See First Tipton Decl. ¶¶ 9-11, 16.  Further, the NPI calculation is made in the ordinary course of the Reorganized Debtors' business operations, using the PeopleSoft database utilized by the entire Reorganized Debtors' for their business operations.  Third Tipton Decl. ¶¶ 6-7, 9.  Finally, whether the NPI calculation is made in accordance with the Purchase Agreement is a question of law to be resolved by the Court and not a material fact to be determined by the parties.  Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007).

**SAI Trust Alleged Fact No. 59:**

59. Debtors have not maintained accounting records sufficient to show in reasonable detail the calculation of direct operating expenses and the general and administrative expenses in accordance with the Agreement for Purchase.  Membreno Dec., ¶52.

**Response to No. 59:**

Disputed.  SAI Trust has failed to provide any admissible evidence regarding whether the Reorganized Debtors' accounting records show in reasonable detail the calculation of direct operating expenses and the general and administrative expenses in accordance with the Purchase Agreement.  Mr. Membreno's declaration, the only evidence cited, does not contain any factual support for his assertion, nor does it set forth any basis for Mr. Membreno to have any knowledge of the Reorganized Debtors' accounting records.  Further, the evidence submitted by the Reorganized Debtors shows that they met with SAI Trust and its accountants on multiple occasions, provided substantial supplemental information when requested by SAI Trust, and provided detailed financial information sufficient to confirm the calculation of the NPI payment each month.  See First Tipton Decl. ¶¶ 9-11, 16.  Further, the NPI calculation is made in the ordinary course of the Reorganized Debtors' business operations, using the PeopleSoft database utilized by the entire Reorganized Debtors' for their business operations.  Third Tipton Decl. ¶¶ 6-7, 9.  Finally, whether the NPI calculation is made in accordance with the Purchase Agreement is a question of law to be resolved by the Court and not a material fact to be determined by the parties.  Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007).


**SAI Trust Alleged Fact No. 60:**

60. Debtors have not properly accounted for the general and administrative expenses in accordance with the Agreement for Purchase.  Membreno Dec., ¶52.

**Response to No. 60:**

Disputed.   Whether the NPI calculation is made in accordance with the Purchase Agreement is a question of law to be resolved by the Court and not a material fact to be

determined by the parties.  Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007).  Further, SAI Trust has failed to provide any admissible evidence regarding whether the Reorganized Debtors' accounting records show in reasonable detail the calculation of direct operating expenses and the general and administrative expenses in accordance with the Purchase Agreement.  Mr. Membreno's declaration, the only evidence cited, does not contain any factual support for his assertion.  Finally, the Reorganized Debtors provide detailed financial information sufficient to confirm the calculation of the NPI payment each month.  See First Tipton Decl. ¶¶ 9-11, 16.

**SAI Trust Alleged Fact No. 61:**

61. Debtors have not identified and accounted for many costs associated with the operation of the power plant governed by the Agreement for Purchase.  Membreno Dec., ¶52.

**Response to No. 61:**

Disputed.   Whether the NPI calculation is made in accordance with the Purchase Agreement is a question of law to be resolved by the Court and not a material fact to be determined by the parties.  Roden v. AmerisourceBergen Corp., 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007).  Further, SAI Trust has failed to provide any admissible evidence regarding whether the Reorganized Debtors' accounting records show in reasonable detail the calculation of direct operating expenses and the general and administrative expenses in accordance with the Purchase Agreement.  Mr. Membreno's declaration, the only evidence cited, does not contain any factual support for his assertion.  Finally, the Reorganized Debtors provide detailed financial information sufficient to confirm the calculation of the NPI payment each month.  See First Tipton Decl. ¶¶ 9-11, 16.

**SAI Trust Alleged Fact No. 62:**

62. Debtors have improperly included "allocated costs" to SAI which were never included for any of the monthly NPI's from August, 1989 through December, 2000, and have failed and refused to identify and account for many costs associated with the operation of the power plants governed by the Agreement For Purchase. Membreno Dec., ¶52.

**Response to No. 62:**

Disputed. The Reorganized Debtors incorporate their responses to SAI Trust's alleged facts numbers 9-13, 52-60.

**SAI Trust Alleged Fact No. 63:**

63. In an effort to resolve the ongoing disputes regarding Debtors' non-compliance with the Agreement for Purchase and Settlement Agreement, SAI and its counsel met with Debtors, representative employees of Debtors, and Debtors' counsel. Such discussions did not resolve the ongoing disputes. Membreno Dec., ¶53.

**Response to No. 63:**

Disputed-in-part. Whether the Reorganized Debtors are in compliance with the Purchase Agreement is a matter of law for the Court to resolve and not a material fact for the parties to resolve. Additionally, the Reorganized Debtors met with SAI Trust on multiple occasions and provided substantial supplemental information in an effort to alleviate SAI Trust's concerns. First Tipton Decl. ¶ 8. The Debtors incorporate their response to SAI Trust's alleged fact number 53.

**SAI Trust Alleged Fact No. 64:**

64. However, Debtors acknowledged, *inter alia*, that they were unaware of the underlying

agreements.  Membreno Dec., ¶53.

**Response to No. 64:**

      Disputed.  SAI Trust has not provided any admissible evidence that supports its allegation that the Reorganized Debtors were unaware of the Purchase Agreement.  There is no explanation for why the Reorganized Debtors provided a monthly NPI payment to SAI Trust if it was not required to do so by the Purchase Agreement.  Third Tipton Decl. ¶ 12.  Further, Mr. Membreno's declaration fails to identify whether he was present at the meetings, when such an alleged statement was made and who at the Reorganized Debtors' allegedly made such a statement and such a statement, if made, is inadmissible hearsay.  Such vague and unsupported allegations are not admissible evidence sufficient to support a material fact.  Further, Mr. Tipton, who was present at meetings with SAI Trust representatives has been aware of the contractual requirement to provide SAI Trust with monthly NPI payments throughout his tenure at the Reorganized Debtors.  Third Tipton Decl. ¶ 12.

**SAI Trust Alleged Fact No. 65:**

      65. Debtors acknowledged, *inter alia*, that they have not complied with the underlying agreements in several respects.  Membreno Dec., ¶53.

**Response to No. 65:**

      Disputed but immaterial.  SAI Trust has not provided any admissible evidence that supports its allegation that the Reorganized Debtors believed they failed to comply with he Purchase Agreement.  Mr. Membreno's declaration fails to identify whether he was present at the meetings, when such an alleged statement was made and who at the Reorganized Debtors' allegedly made such a statement and such a statement, if made, is inadmissible hearsay.  Such vague and unsupported allegations are not admissible evidence sufficient to support a material

fact.  Even if accurate, the question of whether the some individual at the Reorganized Debtors subjectively believed that the Reorganized Debtors did not comply with the Purchase Agreement is irrelevant to the issue of whether the plain language of the Purchase Agreement permits the Reorganized Debtors to manage the West Ford Plant as part of the consolidated Geysers unit and allocate direct operating expenses in calculating the NPI payment.  Finally, Mr. Tipton, who was present at meetings with SAI Trust representatives recalls a discussion of the fact that the annual reports had not been certified by the Reorganized Debtors' chief financial officer, but no other statement about whether the Reorganized Debtors were complying with the terms of the Purchase Agreement in calculating the monthly NPI payments.  Third Tipton Decl. ¶ 12.


**SAI Trust Alleged Fact No. 66:**

66. Debtors  acknowledged,  *inter alia*,  that  they  have  not  maintained  the  books  and records in reasonable detail to properly calculate direct operating expenses and the general and administrative expenses in accordance with the underlying agreements.  Membreno Dec., ¶53.

**Response to No. 66:**

Disputed.    SAI  Trust  has  not  provided  any  admissible  evidence  that  supports  its allegation  that  the  Reorganized  Debtors  believed  they  failed  to  comply  with  he  Purchase Agreement.    Mr.  Membreno's  declaration  fails  to  identify  whether  he  was  present  at  the meetings,  when  such  an  alleged  statement  was  made  and  who  at  the  Reorganized  Debtors' allegedly  made  such  a  statement  and  such  a  statement,  if  made,  is  inadmissible  hearsay.    Such vague  and  unsupported  allegations  are  not  admissible  evidence  sufficient  to  support  a  material fact.  Further, Mr. Tipton, who was present at multiple meetings with SAI Trust's representatives does  not  believe  that  any  such  statement  was  ever  made.    Third  Tipton  Decl.  ¶ 12.    The

Reorganized Debtors' further incorporate their response to SAI Trust's alleged fact numbers 42 and 56-60.


**SAI Trust Alleged Fact No. 67:**

67. Debtors acknowledged, *inter alia*, that they have not properly accounted for the general and administrative expenses in accordance with the underlying agreements, but rather, caused SAI to bear the expenses from adjacent plants inconsistent with the underlying agreements due to their own accounting preferences.  Membreno Dec., ¶53.

**Response to No. 67:**

Disputed.    SAI Trust has not provided any admissible evidence that supports its allegation that the Reorganized Debtors believed they failed to comply with he Purchase Agreement.    Mr. Membreno's declaration fails to identify whether he was present at the meetings, when such an alleged statement was made and who at the Reorganized Debtors' allegedly made such a statement and such a statement, if made, is inadmissible hearsay.  Such vague and unsupported allegations are not admissible evidence sufficient to support a material fact.  Further, Mr. Tipton, who was present at multiple meetings with SAI Trust's representatives does not believe that any such statement was ever made.  The Reorganized Debtors' further incorporate their response to SAI Trust's alleged fact numbers 42, 56-60.


**SAI Trust Alleged Fact No. 68:**

68. SAI has suffered $583,698.61 in damages as of August 1, 2008.  However, SAI Trust's damages are preliminary and partial, (as Debtors continue to breach the contract on a monthly basis) and do not include other potential damages/losses based on Debtors' use of budgeted figures and not actual figures, charging 15% overhead on budgeted figures and not

actual figures and including allocated budgeted costs from other plants, and including costs not allowed to be included based on the parties contractual agreements and are limited to pre-petition matters. This preliminary calculation only addresses one are of damage/loss cased on Debtors' improperly allocating budgeted costs (from other plants that were not the subject of any agreement and certainly not the subject of the Agreement for Purchase) to SAI on a percentage basis and then adding 15% of these unsupported and unjustified "Allocated Expenses" as overhead. This preliminary calculation is for the period pre-petition of January 2001 through May, 2008. Said amount totals $583,698.61. Membreno Dec., ¶58.

**Response to No. 68:**

Disputed. As set forth in their Motion for Summary Adjudication and in their Response to SAI Trust's Motion for Summary Judgment, SAI Trust has not suffered any damages and receives the full amount of NPI every month. The Reorganized Debtors incorporate their Motion for Summary Adjudication and their Response to SAI Trust's Motion for Summary Judgment herein. The Reorganized Debtors incorporate their response to SAI Trust's alleged fact number 69.

**SAI Trust Alleged Fact No. 69:**

69. A table of all of the "Allocated Expenses" from January, 2001 through May, 2008, is set forth below for the Court's convenience. This includes the unauthorized addition of 15% of "Allocated Expenses" to the overhead, as well as interest at the rate of 9% for each unauthorized charge from April 1, 2001 through August 1, 2008. Membreno Dec., ¶59, Rule 56.1, ¶69.

**Response to No. 69:**

Disputed. SAI Trust has not submitted any admissible evidence that lay a foundation for the chart contained in Mr. Membreno's declaration. Further, the Reorganized Debtors' are

permitted pursuant to the Purchase Agreement and Exhibit F attached thereto to allocate operating expenses and include 15% of those costs necessary for the Joint Operations in calculating the NPI payment.  See Third Tipton Decl. ¶ 8.  The Reorganized Debtors incorporate their response to SAI Trust's alleged fact number 15.

**SAI Trust Alleged Fact No. 70:**

70. SAI Trust is entitled to damages in the amount of $583,698.61, plus any damages resulting from further breaches of the Agreement for Purchase by debtors going forward in the manner calculated herein, plus post judgment interest at the rate of 9%.

**Response to No. 70:**

Disputed.  As set forth in their Motion for Summary Adjudication and in their Response to SAI Trust's Motion for Summary Judgment, SAI Trust has not suffered any damages and receives the full amount of NPI every month.  The Reorganized Debtors incorporate their response to SAI Trust's alleged fact number 68.

**THE REORGANIZED DEBTORS' ADDITIONAL UNDISPUTED MATERIAL FACTS IN SUPPORT OF THE REORGANIZED DEBTORS' RESPONSE TO SAI TRUST'S MOTION.**

1.   SAI Trust filed its "Limited Response of Robert Membreno, Trustee of SAI Trust to Debtors' First Omnibus Objection (Duplicative Claims, Beneficial Noteholder Claims and Equity Interest Claims)" on October 13, 2006.  See Docket No. 2850.

2.   SAI Trust filed its "Withdrawal of Limited Response of Robert Membreno, Trustee of SAI Trust to Debtors' First Omnibus Objection (Duplicative Claims, Beneficial Noteholder Claims and Equity Interest Claims)" on October 20, 2006.  See Docket No. 2915.

3.   SAI Trust filed its "Response of Robert Membreno, Trustee of SAI Trust to Debtors'

Eleventh Omnibus Objection to Proofs of Claims, Equity Interest Claims, Unliquidated Claims, Anticipatory Claims, Claims to be Adjusted and Wrong Debtors Claims to be Adjusted" on April 27, 2007.  <u>See</u> Docket No. 4513.

4.  SAI Trust filed its Motion for Relief from Stay Filed by William J. Healy on Behalf of Robert Membreno, Trustee of SAI Trust and related papers on May 7, 2007.  <u>See</u> Docket No. 4575.

5.  SAI Trust filed its Letter to the Honorable Burton R. Lifland Filed by William J. Healy on Behalf of Robert Membreno, Trustee of SAI Trust on May 25, 2007.  <u>See</u> Docket No. 4730.

6.  SAI Trust filed its "Further Response of Robert Membreno, Trustee of SAI Trust to Debtors' Eleventh Omnibus Objection to Proofs of Claims, Equity Interest Claims, Unliquidated Claims, Anticipatory Claims, Claims to be Adjusted and Wrong Debtor Claims to be Adjusted and Reply to Debtors' Objection to SAI's Motion for Relief from Stay" and related papers on June 11, 2007.  <u>See</u> Docket No. 4892.

7.  SAI Trust filed its "Response of Robert Membreno, Trustee of SAI Trust to Debtors' Eighteenth Omnibus Objection to Proofs of Claims, Equity Interest Claims, Unliquidated Claims, Anticipatory Claims, Claims to be Adjusted and Wrong Debtor Claims to be Adjusted" and related papers on September 4, 2007.  <u>See</u> Docket No. 5759.

8.  SAI Trust filed its "Response of Robert Membreno, Trustee of SAI Trust to Debtors' Eighteenth Omnibus Objection to Proofs of Claims, Equity Interest Claims, Unliquidated Claims, Anticipatory Claims, Claims to be Adjusted and Wrong Debtor Claims to be Adjusted" and related papers on September 7, 2007.  <u>See</u> Docket No. 5801.

9.  SAI Trust filed its "Response of Robert Membreno, Trustee of SAI Trust to Debtors'

Twenty Second Omnibus Objection to Proofs of Claims, Equity Interest Claims, Unliquidated Claims, Anticipatory Claims, Claims to be Adjusted and Wrong Debtor Claims to be Adjusted" and related papers on October 12, 2007. See Docket No. 6294.

10. SAI Trust filed its "Status Report of Robert Membreno, Trustee of SAI Trust Regarding Debtors' Eighteenth and Twenty Second Omnibus Objection to SAI Trust's Proofs of Claim" on June 9, 2008. See Docket No. 7822.

11. SAI Trust filed its "Status Report of Robert Membreno, Trustee of SAI Trust Regarding Debtors' Eighteenth and Twenty Second Omnibus Objection to SAI Trust's Proof of Claim" on July 22, 2008. See Docket No. 7868.

12. SAI Trust appeared before this Court for a hearing on January 30, 2008 regarding its Motion to Lift the Automatic Stay. See Keegan Declaration in Support of Reorganized Debtors' Response to SAI Trust's Motion for Summary Judgment, Ex. A and Docket No. 7746.

13. SAI Trust appeared before this Court for a chambers' conference on July 16, 2008. See Keegan Declaration in Support of Reorganized Debtors' Response to SAI Trust's Motion for Summary Judgment, Ex. B and Docket No. 7864.

14. SAI Trust received the "Confirmation Hearing and Notice of Non-Voting Status with Respect to Disputed Claims" on or around October 6, 2007. See Keegan Declaration in Support of Reorganized Debtors' Response to SAI Trust's Motion for Summary Judgment, Ex. C.

15. SAI Trust received the "Entry of Order Confirming the Sixth Amended Joint Plan of Reorganization of Calpine Corporation and Its Debtor Subsidiaries" on or around January 4, 2008. See Keegan Declaration in Support of Reorganized Debtors' Response to SAI Trust's Motion for Summary Judgment, Ex. D.

16. SAI Trust was aware of the Reorganized Debtors' bankruptcy case at least as early as

the date of its first filing in the case, October 13, 2006.  See Docket No. 2850.

17. SAI Trust's proofs of claim state that the asserted damages are "limited to pre-petition matters."  See Keegan Declaration in Support of Reorganized Debtors' Response to SAI Trust's Motion for Summary Judgment, Ex. E at page 4.

18. SAI Trust never filed an amended proof of claim requesting payment of administrative expenses.

19. SAI Trust never requested payment of administrative expenses.

20. The Purchase Agreement does not preclude the Reorganized Debtors from operating the West Ford Plant as a part of the consolidated Geysers business unit.  See Purchase Agreement attached as Ex. A to Membreno Declaration.


Dated: September 10, 2008                 Respectfully submitted,
       San Francisco, California

                                                       */s/ Christopher W. Keegan*
                                 Richard M. Cieri (RC 6062)
                                 Marc Kieselstein (admitted *pro hac vice*)
                                 David Seligman (admitted *pro hac vice*)
                                 Jeffrey S. Powell (admitted *pro hac vice*)
                                 Mark E. McKane (admitted *pro hac vice*)
                                 Christopher W. Keegan (admitted *pro hac vice*)
                                 KIRKLAND & ELLIS LLP
                                 Citigroup Center
                                 153 East 53rd Street
                                 New York, New York  10022-4611
                                 Telephone:  (212) 446-4800
                                 Facsimile:  (212) 446-4900