UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

In re:                      )    CHAPTER 11

                                     )

CALPINE CORPORATION, et al,     )    Case No. 05-60200 (BRL)

                                     )    Jointly Administered

                                     )

             Reorganized Debtors.     )

_____)

## SAI TRUST'S MEMORANDUM OF LAW IN OPPOSITION TO DEBTORS' MOTION FOR SUMMARY JUDGMENT

**NICOLETTI HORNIG & SWEENEY**
**Attorneys for Robert Membreno**
***Trustee for SAI Trust***
**Wall Street Plaza**
**88 Pine Street**
**New York, New York 10005**
**(212) 220-3830**

Of Counsel:
Lawrence C. Glynn

**Table of Contents**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

POINT I

      "ALLOCATED EXPENSES" FROM OTHER PLANTS UNDER CALPINE'S
      CONTROL ARE NOT PERMITTED AS THE "PROJECT" IS THE WEST FORD
      FLAT PLANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

POINT II

      CALPINE HAS NOT CONSISTENTLY AND CORRECTLY APPLIED ITS
      INTERPRETATION TO THE AGREEMENT FOR PURCHASE. CALPINE
      UNILATERALLY INSERTED ITS NEW "INTERPRETATION" OF THE
      AGREEMENT FOR PURCHASE BEGINNING IN APRIL 2001 . . . . . . . . . . . . . . . . . 6

POINT III

      THE FINANCIAL REPORTS "SUPPORTING" THE NPI CALCULATIONS ARE
      UNCERTIFIED AND MEANINGLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT IV

      CALPINE UNILATERALLY AND IMPROPERLY ALTERED THE METHOD
      FOR CALCULATING NPI BY INCLUDING ALLOCATED EXPENSES FROM
      POWER PLANTS THAT ARE NOT MENTIONED IN THE AGREEMENT FOR
      PURCHASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

POINT V

      CALPINE'S INTERPRETATION OF THE AGREEMENT FOR PURCHASE IS
      PURE FICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

i

POINT VI

DEBTORS' "CONCLUSION" IS, NOT SURPRISINGLY, AS BACKWARDS AS
THEIR ANALYSIS OF THE CONTRACT AT ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT VII

DEBTORS CONCLUSION IGNORES A PRIOR SETTLEMENT AGREEMENT
BETWEEN THESE IDENTICAL PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

POINT VIII

DEBTORS CONCLUSION IGNORES A JUDGMENT FOLLOWING A TRIAL
BETWEEN THESE IDENTICAL PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT IX

THE TERMS OF THE AGREEMENT FOR PURCHASE ARE EXPLAINED BY
THE ELEVEN YEAR COURSE OF DEALING BETWEEN THE PARTIES . . . . . . . 23

POINT X

SUMMARY OF IMPROPER ALLOCATED EXPENSES AND 15% OVERHEAD
CHARGED BY CALPINE IN MONTHLY NPI STATEMENTS BEGINNING IN
APRIL 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Table of Authorities

**Cases**

*Burdette v. Carrier Corp.*, 158 Cal.App.4th 1668, 1688, 71 Cal.Rptr.3d 185 (Cal.App. 3 Dist. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.*, 89 Cal.App.4th 1042, 1051, 107 Cal.Rptr.2d 645 (Cal.App. 1 Dist. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Noble v. Draper*, 160 Cal.App.4th 1, 11, 73 Cal.Rptr.3d 3 (Cal.App. 3 Dist. 2008) . . . . . . . . 22

*Zevnik v. Superior Court*, 159 Cal.App.4th 76, 82, 70 Cal.Rptr.23d 817 (Cal.App. 2 Dist 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Treatises**

Cal. Civ. Proc. Code. § 1856(c) (West 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

31 Cal.Jur.3d Evidence § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# PRELIMINARY STATEMENT

This memorandum of law is respectfully submitted on behalf of Robert Membreno, as Trustee of SAI Trust (hereinafter "SAI Trust") in opposition to the motion for summary judgment brought by Reorganized Debtors (hereinafter "Debtors.") [1]

While Debtors make numerous creative arguments to justify their improper and unjustified accounting methods, all of which are in breach of the Agreement For Purchase And Sale Of Assets between SAI Geothermal, Inc. (hereinafter "SAI") and Freeport McMoRan Resource Partners, L. P. ("Freeport") entered into on or about May 17, 1987 (hereinafter "Agreement For Purchase"). Membreno Dec. at ¶¶3-7, the issue that must first be addressed is whether Debtors had any basis under the terms of the Agreement for Purchase, or otherwise, for even including "Allocated Expenses" attributable to any plant other than West Ford Flat. As set forth in detail in SAI Trust's brief in support of its motion for summary judgment, it is wholly improper for Debtors to unilaterally insert this extremely broad, nebulous category of expenses for power plants which were never even contemplated at the time of drafting the Agreement for Purchase. Further, the direct operating expenses which were permitted under the Agreement for Purchase and Exhibit "F" thereto were at all times limited to "the Project", i.e., West Ford Flat. SAI Trust sees no reason why or how Debtors should be permitted to alter the clear word of the Agreement.

---

[1]     The Declaration of Guy Tipton, Regional Controller for the Geysers, in Support of Debtors' Objection to SAI Trust's Motion for Relief from Stay and Reply to SAI Trusts's Response to the Debtor's Eleventh Omnibus Claims Objection to SAI Trust's Proofs of Claim, is incorporated by reference in the Declaration of Guy Tipton in Support of Debtors' Motion for Summary Judgment. The former will be identified as Tipton Dec. 1, the latter as Tipton Dec. 2.  In Tipton Dec. 1, Calpine had the audacity to present to this Court completely redacted "financial reports" in support of its misguided argument that Debtors have provided "support for both the revenue and cost calculations used to determine the monthly NPI payments." While the issue now before the Court has nothing to do with the sufficiency of the supporting information sent with each monthly NPI, SAI Trust is nevertheless confounded as to how Debtors can even make such an argument when the information that has been provided on a monthly basis is as meaningless as the blank pages submitted to this Court as Exhibits to Tipton Dec. 1 and which are now incorporated by reference in Debtors motion for summary judgment.

Importantly, it is not disputed that the Agreement for Purchase was limited to the West Ford Flat plant. Guy Tipton states: "SAI Trust sold its interest in the 1984 QF power purchase agreement between PG&E and SAI Geothermal, Inc. to Freeport, but retained the rights to monthly net profit interest payments from operation of the *West Ford Plant.*" Tipton Dec. 2, ¶5. (Emphasis added). Thus, Guy Tipton has now conceded that the NPI at issue was, indeed, limited to West Ford Flat. This undisputed fact should be the end of the inquiry. Debtors breached the Agreement for Purchase the moment they unjustifiably began including "Allocated Expenses" attributable to any plant other than West Ford Flat.

Further, Debtors' explanation for the insertion of "Allocated Expenses" is unavailing and does not alter the fact that the contract was breached, and it certainly does not provide a justification for breaching a contract. The explanation offered by Calpine is that they no longer treat West Ford Flat as a stand-alone plant. At ¶12 of Tipton Dec. 1, Mr. Tipton states that:

> For the past 6 years Calpine has used a commercially reasonable method of allocation to determine direct operating expenses when calculating the Net Profits Interest. Because the West Ford Plant is no longer a stand-alone plant, Calpine allocates costs (sic) the West Ford Plant based on the yearly budgeted costs in relation to the other plants at the Geysers' facility.

Firstly, Calpine is not contractually permitted to use a "commercially reasonable method of allocation to determine direct operating expenses when calculating the Net Profits Interest." Rather, Calpine is permitted to calculate Net Profits Interest in accordance with the Agreement of Purchase. Secondly, to whom is this a "commercially reasonable method" of accounting? Calpine? Perhaps this is code for "we're going to do whatever saves us money even if it is unauthorized, unsupported and in clear breach of a contract." While this may be what Mr. Tipton means by "commercially

reasonable method", unfortunately, Mr. Tipton's and Calpine's hopes and dreams as to the way things "should be" (in their collective minds) are no basis for unilaterally altering the terms of an agreement that had been in effect for some 11 years prior.

<center>**ARGUMENT**</center>

<center>**POINT I**</center>

<center>**ALLOCATING EXPENSES FROM OTHER PLANTS UNDER CALPINE'S CONTROL IS NOT PERMITTED AS THE "PROJECT" IS THE WEST FORD FLAT PLANT**</center>

Debtors' brief is wrought with inaccuracies and misstatements from the outset. At ¶3, Debtors state that "[b]y the plain language of the [Agreement for Purchase] - and the only reasonable interpretation of that [Agreement for Purchase] - the Reorganized Debtors were authorized to, and did, properly allocate and attribute a portion of the direct operating expenses from the consolidated geysers field ("The Geysers") to the West Ford Plant for purposes of calculating SAI Trust's monthly and annual NPI." This argument is as untenable as it is unreasonable. Allowing expenses from other plants to be attributed to West Ford Flat, the only power plant ever mentioned or even contemplated at the time of the Agreement for Purchase, is not a reasonable interpretation. It is a ludicrous interpretation. SAI Trust is not interested in what Calpine believes is a more commercially reasonable approach for Calpine. SAI Trust simply wants Calpine to abide by the contract.

At ¶12, Debtors set forth the definition of Net Income as stated in the Agreement for Purchase, but emphasize only a self-serving portion of the definition in sub-paragraph (ii). Pursuant to the Agreement for Purchase, Net Income is defined as the gross revenues being received by Buyer from the Project minus the sum of the following:

> (ii) all **Project** *direct operating expenses* (excluding depreciation).

<center>3</center>

(iii) general and administrative expenses associated with the Project,

(iv) if the Project or a portion thereof is financed through Project
Financing, principal, interest, reserves and any fees payable in respect
of the Project Financing.

Membreno Dec., Exhibit "A", §9.10. (Emphasis added.)

Debtors ignore the fact that in this definition, all revenues and expenses described in the contract are specific to "the Project". The "Project" is West Ford Flat. Nothing more, nothing less. Debtors point out that Exhibit F to the Agreement for Purchase is a "standard 'Accounting Procedure Joint Operations' section of model contracts drafted by the Committee on Petroleum Accounting Standards. There is no reference to SAI Geothermal or Freeport in Exhibit F, and the parties did not draft Exhibit F." Debtors Br., ¶13. Debtors thus agree that Exhibit F is mere boilerplate. Debtors desperately attempt to use this boilerplate accounting model set forth in Exhibit F to the agreement to vastly expand the scope of the actual Agreement for Purchase to include 18 other plants which were never contemplated at the time this agreement was drafted. Debtors conveniently ignore the clear, unmistakable, undeniable definition that the "Project" is the West Ford Flat Power Plant in the first instance, and then insist that the term "Project" can be whatever they want it to be - - 18 plants, or 19 plants or maybe someday 100 plants! - - all to suit their needs *du jour* and make their accountants' lives easier. Unfortunately, this is not contract interpretation. This is fiction writing.

Debtors go on to state "there is no definition of 'direct operating expenses' in either the [Agreement for Purchase] or in Exhibit F" (Debtors' Br., ¶12) which apparently gives them license to make one up and label it "Allocated Expenses". Firstly, such an argument is tantamount to questioning the definition of the word "is." SAI Trust posits that the term "direct operating

expenses" means exactly what it says and that only a party hellbent on parsing and contorting the English language into its most unnatural and absurd form[2] would even attempt such verbal gymnastics, and it certainly does not equate to the unreasonable, unilateral and 11 year *ex post facto* definition Calpine now seeks to attribute it nor justify Debtors' breach of the Agreement for Purchase.

Secondly, in case there truly is any doubt as to the definition of "direct operating expenses" and what that term encompassed (which SAI Trust denies), the term was further explained by, of all parties, Calpine's predecessor, way back in December 1989. See Membreno Dec., Exhibit "B." Those direct operating expenses, as set forth in the December 1989 letter agreement, consist of the following: Royalties, Lease Operating Expenses, Overhead, Property Taxes, Capital Additions - Major Construction, Capital Additions - Overhead, Capital Additions - Development Capital, Project Financing and Invested Capital. Absent from this definition provided by Calpine's predecessor in 1989 is any mention of "Allocated Expenses." Calpine has simply taken it upon itself to make this term up. Importantly, the term "Lease Operating Expenses" in this December 1989 letter from Calpine's predecessor is defined as:

> Actual costs incurred in the operation of the Plant. Labor costs and related payroll burden are limited to those individuals identified as billable under Exhibit F of the Agreement for Purchase and Sale of Asset dated May 18, 1987.

Once again, there is no mention of "Allocated Expenses"in this definition which must put to rest any further debate as to what expenses can and cannot be included in the monthly NPI

---

[2]

 In order to justify such "noble" goals as achieving "efficiencies and cost savings associated with economies of scale" (Debtors Br., ¶16) all at the expense of the person who put his blood, sweat and tears into the creation of the West Ford Flat plant in the first place.

statements. There was no inclusion or even mention of "Allocated Expenses" then. There will be no

inclusion of "Allocated Expenses" now.

Further, the December 1989 letter agreement, just like the Agreement for Purchase, makes

no mention of using "budgeted" figures, and makes no reference to including expenses for any plant

other than West Ford Flat. Debtors' argument is whole cloth, and their breach of the Agreement for

Purchase is palpable. Debtors' motion for summary judgment must be denied.

<div align="center">

**POINT II**

**CALPINE HAS NOT CONSISTENTLY AND CORRECTLY APPLIED ITS INTERPRETATION TO THE AGREEMENT FOR PURCHASE. CALPINE UNILATERALLY INSERTED ITS NEW "INTERPRETATION" OF THE AGREEMENT FOR PURCHASE BEGINNING IN APRIL 2001**

</div>

Calpine claims that it "has consistently and correctly applied its interpretation of the Purchase

Agreement and always applied direct costs to the NPI calculation." Debtors Br., ¶18. This is untrue.

First, the contract is not subject to Calpine's self serving, unilateral interpretation. The contract

speaks for itself. Second, if Calpine has been so consistent and correct, then why, since April 2001,

has SAI Trust been charged additionally each month for the same expenses? Thirdly, as detailed in

SAI Trust's principle brief, Calpine has not consistently performed in accordance with the contract

and admits as much in their motion for summary judgment:

> Initially, the four plants, including the West Ford [Flat] Plant, spread
> across The Geyers, and Calpine continued to operate the plants as
> stand-alone entities. As a stand-alone entity, Calpine managed the
> plant separate from the others and costs and expenses necessary to
> operate West Ford [Flat] Plant were accounted separately. *However,
> once Calpine acquired substantially all of the power plants* (sic) *it
> managed the West Ford [Flat] Plant as part of their consolidated
> operations and accounted for the costs necessary to operate West
> Ford Plant accordingly.*

<div align="center">

6

</div>

Debtors Br., ¶15. (Emphasis added).

Perhaps in Calpine's alternate universe, this glaring dichotomy of accounting practices passes for consistency. This admission cements the facts: 1) that there was a course of dealing between the parties *vis-à-vis* the West Ford Flat plant; 2) that the West Ford Flat power plant was managed separately; 3) that costs and expenses necessary to operate West Ford Flat were accounted separately, and 4) that the course of dealing was altered, unilaterally, to benefit Calpine. This admission effectively eliminates any genuine issue of fact. Simply stated, there was a contract and Calpine has breached it. Calpine's motion for summary judgment must be denied and SAI Trust's motion shall be granted.

Debtors go on to make their delusional assertion that SAI Trust is somehow seeking to rewrite the Agreement for Purchase. In Debtors' "Summary of SAI Trust's Dispute", at ¶23 of Debtors' brief, Calpine "takes exception to the windfall SAI Trust would receive...by rewriting the definition of Net Income to read, in part, 'minus...(ii) all Project direct operating expenses (excluding depreciation and excluding any Project direct operating expenses associated with centralized operations, maintenance, testing, engineering or chemistry)....'" The audacity of Calpine is apparently boundless. SAI Trust seeks no windfall but merely seeks that which it is owed under the Agreement for Purchase and that which it had been receiving for 11 years prior to Calpine's unilateral decision to allocate expenses associated with its other plants in clear breach of that agreement.

Further, SAI Trust certainly does not seek any rewrite of the Agreement. SAI Trust merely seeks that the terms of the contract be enforced as written. The undeniable truth is that, as written, Calpine is permitted to deduct "all **Project** *direct operating expenses* (excluding depreciation)." As

7

set forth, *supra*, the term "direct operating expenses" is precisely what those words mean. The "Project" is the West Ford Flat plant, period. The word "Project" immediately preceeding the term "direct operating expenses" modifies that term so as to preclude all other interpretations. Thus, if one were to question, as Calpine now does, which "direct operating expenses" may be deducted, the answer is clearly set forth in the contract: direct operating expenses associated with "the Project" and no others. What is the project? The Project is "West Ford Flat" and no other.

The only conclusion that may be drawn from all of this is that it is not SAI Trust who is seeking to rewrite the clear, unambiguous Agreement for Purchase, it is Calpine. Calpine would like to rewrite the Agreement for Purchase, and specifically, the definition of Net Income, in part as, "minus... all *operating expenses* (excluding depreciation) whether or not actually incurred[3] and for whatever project and/or as many projects as we choose, disregarding the fact that this agreement only relates to one project known as the West Ford Flat power plant." Unabated, Debtors now seek summary judgment based upon such deplorable business practices. Their motion must be denied.

## POINT III

### THE FINANCIAL REPORTS "SUPPORTING" THE NPI CALCULATIONS ARE UNCERTIFIED AND MEANINGLESS

Debtors cavalierly state at ¶20 of their brief that "[e]very month SAI Trust receives financial reports showing the NPI calculations and break down of specific allocation of costs." This argument is troubling for two reasons. First, Calpine is putting the proverbial cart before the horse. The first question is whether or not these expenses are even permitted under the Agreement for Purchase.

---

[3] Note Calpine's repeated reference to "budgeted" expenses throughout its brief. As set forth in SAI Trust's principle brief, budgeted expenses are not actual expenses. They are unsupported, theoretical and fictitious expenses.

Only once this question is answered by this Court can a determination be made as to the legitimacy of these expenses. Thus, SAI Trust has moved for summary judgment arguing that there is no genuine issue of material fact that Debtors have breached the contract by inserting allocated costs based upon plants other than West Ford Flat commencing in April 2001.

Second, Debtors assertion is further belied by the fact that SAI Trust has asked repeatedly and will ask once again, if Debtors are so confident in the veracity of their "financial reports" in support of these unwarranted expenses, then why haven't Debtors certified their annual NPI statement as required under the plain language of the Agreement for Purchase? Debtors have continually breached this agreement by failing to certify any of the NPI statements as required under the contract. Membreno Dec., ¶¶37, 38, 51, 52. Section 1.6 of the Agreement for Purchase requires that NPI statements are to be certified by the chief financial officer of Calpine annually. Prior to 2000, year end NPI statements prepared by Calpine and/or its wholly owned subsidiary(ies) were certified by Calpine's and/or its predecessors-in-interest's chief financial officer annually. In fact, between August, 1989 and approximately the end of the fiscal year, 2000, a period of 11 years, all NPI statements prepared by Calpine and/or its wholly owned subsidiary(ies) were certified by Calpine's and/or its predecessors-in-interest's chief financial officer annually. However, since April 2001, annual certifications have ceased to be prepared by Calpine and/or its wholly owned subsidiary(ies). Since 2001, no officer of Calpine, or its wholly owned subsidiary(ies) has certified any year end statement as required under the Agreement for Purchase. Membreno Dec., ¶¶17-21, Rule 56.1 Statement, ¶17-21.

Failure to provide certified NPI statements is a clear breach of the Agreement for Purchase. §1.6 of the Purchase Agreement states, in pertinent part:

Audit Rights of Seller.

Buyer shall maintain complete and accurate accounting records of the accounts which are used to calculate the Net Profits Interest. Within 60 days after the end of each fiscal year of buyer, commencing with the fiscal year of Buyer in which the Date of First Commercial Operation occurs, it shall furnish Seller with a statement **certified by Buyer's chief financial officer** showing in reasonable detail the calculation of the Net Profits Interest for the fiscal year then ended.

Emphasis added.

Calpine has not certified its statements and has thus repeatedly breached the Agreement for Purchase. Accordingly, Calpine's motion for summary judgment must be denied and SAI Trust's motion for summary judgment granted.

## POINT IV

### CALPINE UNILATERALLY AND IMPROPERLY ALTERED THE METHOD FOR CALCULATING NPI BY INCLUDING ALLOCATED EXPENSES FROM POWER PLANTS THAT ARE NOT MENTIONED IN THE AGREEMENT FOR PURCHASE

Debtors' most illogical and contradictory bit of absurdity is presented at ¶24 of its brief wherein they state, "SAI Trust is disingenuous when it asserts that six years ago the Reorganized Debtors began to use 'a completely different methodology for calculating NPI.'…. The methodology is unchanged. What has changed is that West Ford Plant is no longer a stand-alone plant…." Debtors' Br., ¶24. Debtors proceed to recite all the ways in which the methodology has changed as a result of this "change that really isn't a change," according to them. Calpine attempts to justify this "change that really isn't a change" with more nonsense. "To ensure maximum transparency, the Reorganized Debtors added a separate line item to the monthly NPI Reports to differentiate, for example, those

direct operating expenses that derived from dedicated staff and those that derived from centralized staff." Debtors' Br., ¶24.

Sorting through the circuitous double speak, it is abundantly clear that their accounting methodology has indeed changed and it has done so in a way that is not permitted under the Agreement for Purchase, as it includes a unilaterally added line item for "Allocated Expenses" from plants other than West Ford Flat. Debtors can attempt to justify its "management decision" (Debtors' Br., ¶24) to use a "commercially appropriate proxy" (Debtors' Br., ¶27) all it wants. SAI Trust is unfamiliar with any doctrine of contract interpretation that allows one party to a contract to unilaterally substitute a term in a contract with a "commercially appropriate proxy." Debtors have not set forth any authority for such a proposition. SAI Trust is entirely unswayed by their explanation. The Court must be as well.

In fact, Debtors expend a good deal of energy 1) defending their unilateral and improper "management decision" to insert a new line item for allocated expenses attributable to other plants it operates and 2) attempting to assert that it is SAI who is seeking to rewrite the Agreement for Purchase (Debtors' Br., ¶¶31-36) and go so far as to boldly assert that "there is nothing in the plain language that limits 'direct operating expenses' to those expenses solely or exclusively at the West Ford Plant". There is something in the plain language that limits "direct operating expenses." Debtors time and again continue to ignore the word which precedes the term "direct operating expenses." That word is "project". The direct operating expenses permissible under the Agreement for Purchase are limited to the "Project", and the "Project" is West Ford Flat. All of this is contained in the plain language of the Agreement for Purchase. Yet once again, the definition of "Project direct

operating expenses" in the Agreement for Purchase doesn't quite agree with Calpine's business plans and accordingly, they will take it upon themselves to modify the contract in a way that does.

Debtors next attempt to define the word "direct" contained in the term "direct operating expenses" and include at ¶36 of their brief the following:

> One of the Webster's dictionary definitions of "direct" is: "allocated or arising from a particular known agency, process, job, etc." with an example of "the new machine was listed by the accountant as a direct cost."

Counsel for SAI Trust has scoured Webster's Dictionary, both in print and on line versions, and has found no such definition of the word "direct" therein. Counsel was able, however, to find the "source" of this definition at http://www.noteaccess.com/ELEMENTS/Direction.htm, last viewed August 19, 2008.[4] It is the 9th listed definition. In any event, the actual Webster's Dictionary (print version)[5] definition of "direct" is, in pertinent part:

> **direct** *adj* [ME, fr. L *directus*, fr. pp. of *dirigere*] **3 :** characterized by close logical, causal, or consequential relationship <direct evidence> **4 :** NATURAL, STRAIGHTFORWARD **5 a :** marked by absence of an intervening agency, instrumentality, or influence.

Thus, applying these definitions to the term "Project direct operating expenses" means that the two terms "project" and "operating expenses" have a "close logical, causal, or consequential relationship" and are "marked by absence of an intervening agency, instrumentality, or influence." The term "project", as set forth in the Agreement for Purchase, is the West Ford Flat plant and no

---

[4]SAI Trust will leave for the Court to decide what weight should be assigned to the accuracy of this obscure website's definition of the term "direct".

[5] Meriam Webster's on-line dictionary is virtually identical to the print version. The Court is respectfully referred to http://www.merriam-webster.com/dictionary last viewed August 19, 2008

other. Applying this accepted, natural language to the Agreement for Purchase, it would be highly illogical to conclude that "operating expenses" could have a "close logical, causal, or consequential relationship" to something that was not even contemplated at the time of the contract, i.e., any plant other than West Ford Flat. Similarly, trying to shoehorn expenses from 18 other plants, as Debtors seek to do, into the term "project direct operating expenses" would certainly be the antithesis of "direct", *to wit* "marked by absence of an intervening agency, instrumentality, or influence." Black's Law Dictionary defines direct, in pertinent part, as:

> **2.** (Of a thing or a person) straightforward <a direct manner>. **3.** Free from extraneous influence; immediate.

Thus, the only "straightforward" definition that can be applied to the term "operating expenses" is that such expenses are related directly and straightforwardly to the "project" and that project is, as defined in the Agreement for Purchase, West Ford Flat. These expenses apply to West Ford Flat exclusive and absent of any intervening agency, instrumentality or influence such as the 18 other plants that Calpine has since acquired or the hopes and whims of Calpine's accountants and counsel. Of course, the foregoing analysis is the accepted method of contract interpretation embodied in the last antecedent rule.

It is equally clear that Debtors have now resorted not only to twisting the clear language of the contract, but also twisting clear definitions of the word "direct" in their desperate attempts to evade their contractual obligations. For even applying Debtors' somewhat indirect definition of "direct", the "particular known agency, job, etc.," to which "allocation" is appropriate is the West Ford Flat Plant. Allocating expenses from 18 other, indirect plants, would be non-particular agencies,

jobs, etc., and would be contrary to the clear, unambiguous language of the Agreement for Purchase which defines Net Income as:

the gross revenues being received by Buyer from the Project minus the sum of the following:

(ii) all ***Project direct operating expenses*** (excluding depreciation).

(Emphasis added.)

The inescapable truth is that Debtors are trying to rewrite the contract. Accordingly, their motion for summary judgment must be denied and SAI Trust's motion granted.

## POINT V

## CALPINE'S INTERPRETATION OF THE AGREEMENT FOR PURCHASE IS PURE FICTION

Amazingly, Calpine states at ¶38 that "SAI Trust's argument that direct operating expenses cannot include allocation of expenses incurred in the operation of the West Ford [Flat] Plant improperly renders the [Agreement for Purchase] unreasonable and inoperative." Firstly, this badly misstates SAI Trust's argument. SAI Trust is arguing that inclusion of allocated expenses which are based upon the combined expenses of all of Calpine's power plants was not contemplated in the Contract and as such is improper. Calpine's reliance on the term "Joint Property" in Exhibit F to the Agreement for Purchase (Debtor's Br., ¶32) to advance its misguided argument is wholly disingenuous and bordering on comical, as none of these other 18 plants currently under Calpine's control were even contemplated at the time this Agreement for Purchase was drafted. Recall that Calpine, by its own admission, refers to Exhibit F to the Agreement for Purchase as a "standard 'Accounting Procedure Joint Operations' section of model contracts drafted by the Committee on

Petroleum Accounting Standards", i.e., boilerplate. Debtors Br., ¶13. Calpine continually ignores the reality that the "Project" as defined by the Agreement for Purchase is nothing other than West Ford Flat, and resorts to misplaced reliance on a generic term in a boilerplate accounting model to now drastically expand the scope of this agreement.

Secondly, SAI Trust is seeking only one interpretation of the Agreement for Purchase, i.e., the one that all parties had been using for 11 years prior to Calpine's unilateral change in accounting procedures. That interpretation, indeed the only reasonable interpretation, had been working quite well for a very long period of time.

Calpine next states "the categories of costs necessary to operate the plant have not changed." (Debtors' Br., ¶38). But how can this be, in light of the fact that beginning in April 2001, a new category of expenses entitled "Allocated Expenses", one that had never before been included in any NPI statement for 11 plus years suddenly emerged? In fact, for 11 years prior, and as explained *supra*, all "project direct operating expenses" had been addressed in the Lease Operating Expenses and Overhead. Beginning in April 2001, the lease operating expenses and overhead remained relatively unchanged as they had been prior to April 2001. However, the additional "Allocated Expenses" increased dramatically the amount deducted from NPI each month since April 2001. Additional, improper, unjustified and unsupported expenses from 18 other plants charged to SAI Trust's NPI translates to more money for Calpine. This is the epitome of a windfall.

Calpine uses the example of an employee who spends ten percent of his or her time at an adjacent plant in the Geysers field and ninety percent at the West Ford Flat plant. Prior to Calpine's unilateral alteration of the Agreement for Purchase terms, such an expense would be properly included as a Project direct operating expense and included in either "Lease Operating Expenses"

or "Overhead". However, since April 2001, such an expense is covered not only in "Lease Operating Expenses" and "Overhead", but also in Allocated Expenses. Membreno Dec., ¶14 and Exhibits "D" and "E" thereto.

Thus, this single employee working at West Ford Flat and other plants in the Geysers translates into a windfall for Calpine, not SAI Trust. SAI Trust is getting socked with fees arising from this one employee at least three times (as a "Lease Operating Expense", an "Allocated Expense" and as "Overhead"). Membreno Dec., Exhibit "F." For good measure, Debtors have unilaterally changed the calculation of Overhead as well. Prior to April 2001, "Overhead" was calculated as 15% of "Lease Operating Expenses." Effective April 2001, "Overhead" is now calculated as 15% of the sum of "Lease Operating Expenses" and "Allocated Expenses". Membreno Dec., ¶15, Exhibits "D", "E" and "F". Thus, this one employee has generated a whole new category of mystery charges which Calpine has surreptitiously inserted and conveniently labeled "Allocated Expenses" and has also generated an additional 15% windfall to Calpine under the newly defined category of "Overhead" to boot. That is quite a productive employee - - if you're Calpine.

Of course, one would expect that under Calpine's new accounting methodology, expenses under the categories of "Lease Operating Expenses" and "Overhead" would have decreased in light of the newly added "Allocated Expenses" category, if, as they claim, nothing has really changed. However, this is not the case. Quite to the contrary, charges for "Lease Operating Expenses" and "Overhead" have actually remained the same or increased since the implementation of Debtors' new methodology beginning in April 2001. A careful or even a casual review of Exhibits "F" and "G" to the Membreno Dec. confirms this truism. SAI Trust is not seeking any windfall. SAI Trust is merely trying to enforce the strict terms of the Agreement for Purchase and recoup what has been

a windfall to Calpine for seven years, and will continue to be a windfall to Calpine unless this Court puts an end to their accounting chicanery right here and now.

It is no surprise that Calpine's consolidation and "streamlining" efforts have paid dividends to Calpine, as they have taken it upon themselves to line their pockets with monies that rightfully belong to SAI Trust. Perhaps this explains what is fueling this unnecessary litigation. They apparently don't want this gravy train to stop anytime soon. However, Debtors' current bid for a *de facto* judicial endorsement of their fraudulent, underhanded, conniving ways should not be entertained any further. Debtors' motion for summary judgment must be denied and SAI Trust's motion for summary judgment granted.

## POINT VI

### DEBTORS' "CONCLUSION" IS, NOT SURPRISINGLY, AS BACKWARDS AS THEIR ANALYSIS OF THE CONTRACT AT ISSUE

Calpine concludes that "SAI Trust seeks a windfall through a blue-pencil revision of the Purchase Agreement that would strike many categories of direct operating expenses currently authorized pursuant to Exhibit F. Such a rewrite is not reasonable". See Debtor's Brief in Support of Motion for Summary Judgment, ¶42. This argument strains the limits of credulity for numerous reasons. First, it is certainly not SAI Trust that is seeking to rewrite the contract. Quite to the contrary, SAI Trust is seeking enforcement of the Agreement of Purchase, which, as detailed in SAI Trust's principle brief, Rule 56.1 Statement and Declaration of Robert Membreno, is limited to one plant and one plant only. That plant is West Ford Flat and no other. The Court must recognize that it is indeed Calpine who is attempting to rewrite a 20 year old agreement.

Debtors' argument also rings hollow in light of the very clear description of line item expenses provided by Debtors concurrently with the very first NPI statement in December, 1989. (Membreno Dec., Exhibit "B"). This document supports SAI Trust's assertion that the NPI, including what was to be considered "direct operating expenses" was clearly defined nearly 20 years ago. According to the explanation in Exhibit "B", the following items were used in calculating NPI payable to SAI:

Electric Revenue
Interest Income from Overnight Deposits
Escrow Balance

Royalty Payments                        )
Lease Operating Expenses                )       Direct Operating Expenses
Overhead                                )

Property Taxes

Capital Additions - Major Construction
Capital Additions - Overhead
Capital Additions - Development Capital

Project Financing

Invested Capital and Loan Proceeds

Membreno Dec., ¶10.

With respect to the direct operating expenses, there is no mention of "Allocated Expenses" therein. Thus, all of the "direct operating charges" repeatedly referred to in Debtor's Motion for Summary Judgment were clearly outlined both in the original Agreement of Purchase and the December 1989 explanation of expenses provided by Debtors' predecessor. SAI Trust is truly mystified as to how Debtors can now seek to alter the clear, unambiguous meaning of 1) the

Agreement of Purchase and 2) its own explanation of NPI calculations provided in December 1989 to now include operating charges attributable to any plant other than West Ford Flat. Quite to the contrary, it is Debtors who now seek to alter the meaning of the Agreement for Purchase, not SAI Trust.

## POINT VII

### DEBTORS' CONCLUSION IGNORES A PRIOR SETTLEMENT AGREEMENT BETWEEN THESE IDENTICAL PARTIES

Debtors' argument is also completely contradicted by the Settlement Agreement (Membreno Dec., Exhibit "H") to which they were a party. As set forth in the Settlement Agreement, the manner in which future NPI statements would be prepared was agreed[6] by SAI Trust, Sonoma Geotherm Partners, L.P., (hereinafter "Sonoma"), Calpine Sonoma Inc. (hereinafter "Calpine Sonoma") and Calpine , the parties thereto. In addition to an agreement as to the manner in which NPI Statements would be prepared, as a result of this Settlement Agreement, the manner in which payments of net profits for 1992 and thereafter was agreed by the parties thereto. Membreno Dec., ¶¶25-26, Exhibit "H."

Under §8 A. of the Settlement Agreement entitled "Miscellaneous", it states:

> Except as specifically set forth herein nothing herein shall affect the rights, duties or obligations of SAI Trust and CALPINE in and under the Agreement of Purchase, specifically including, but not limited, to Sections 1.6 and 9.5. Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, CALPNE agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement; and CALPINE further agrees to make all NPI payments which may accrue in favor of SAI Trust pursuant thereto.

---

[6] Now for a second time, including the original agreement entered into on May 18, 1987.

Membreno Dec., ¶27, Exhibit "H."

The subject of the Agreement for Purchase was, and still is, a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. The Settlement Agreement governs the relationship of the parties concerning a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. There is not now, nor has there ever been, any contract between SAI Trust and Calpine, nor any of their respective predecessors, subsidiaries, affiliates and related entities, where the subject of the contract was any power plant other than West Ford Flat. Membreno Dec., ¶¶28-30, Exhibit "H." Undeterred by their own agreement to calculate NPI in such a fashion, Debtors have undertaken to now calculate SAI Trust's NPI using expenses from plants which are unrelated to West Ford Flat and never once mentioned in the Agreement for Purchase nor in the Settlement Agreement. Debtors are now requesting that this Court permit their unilateral rewrite of the Agreement for Purchase to include plants that were never contemplated at the time of the writing of the Agreement for Purchase. The Court cannot permit this. Debtors' motion for summary judgment must be denied and SAI Trust's motion for summary judgment must be granted.

## POINT VIII

### DEBTORS' CONCLUSION IGNORES A JUDGMENT FOLLOWING A TRIAL BETWEEN THESE IDENTICAL PARTIES

Debtors further demonstrate their ignorance of the history between these parties while thumbing their collective noses at things like written contracts and the entire judicial process by completely ignoring and/or overtly contradicting a Judgment from the Superior Court of California for the County of Santa Clara. See the Judgment Following Court Trial, Membreno Dec., Exhibit

20

"I". In that judgment, this precise issue, i.e, the manner in which NPI is to be calculated, was fully adjudicated following a four day trial in the case of *Robert J. Membreno, Trustee of the SAI Trust v. Freeport McMoran Resource Partners, Limited Partnership, Calpine Corporation, Santa Rosa Geothermal Company L.P., Sonoma Geothermal Partners L.P. , Calpine Sonoma, Inc., and Does 1 through 20, inclusive.* See Membreno Dec., ¶¶31-32 and Exhibit "I" thereto.

The issue arose after Calpine's first attempt to unilaterally alter the manner in which NPI was calculated by varying the COPAS (Council of Petroleum Accountants Societies, Inc.) percentage rates. The trial court determined this was not permitted as the COPAS percentage rates (which Calpine took upon itself to insert) "were not part of the (Agreement of Purchase)." Membreno Dec., ¶33,  Exhibit "I", p3, ¶2. Certainly, Calpine argued then, as they do now, that unilaterally inserting a COPAS rate that was not specifically set forth in the contract was nevertheless permissible because it was also not specifically proscribed in the contract. The trial court did not accept this untenable argument as to do so would allow for an infinite number of permutations to every single contract ever written where parties could unilaterally insert self serving terms whenever and wherever they saw fit, all under the disingenuous argument that "the contract doesn't say we can't." This specious argument was not accepted by the trial court in Santa Clara, and should not be given any consideration here.

Importantly, under California law[7], the doctrine of collateral estoppel, or issue preclusion, precludes the re-litigation of an issue in the second action if: "(1) the issue is identical to an issue decided in a prior proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided; (4) the decision in the prior proceeding was final and on the merits; and (5) the party against

---

[7] See Exhibit A, ¶9.6 which calls for California law to apply to the Agreement for Purchase.

whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding." *Zevnik v. Superior Court*, 159 Cal.App.4th 76, 82, 70 Cal.Rptr.23d 817 (Cal.App. 2 Dist 2008); *see also Noble v. Draper*, 160 Cal.App.4th 1, 11, 73 Cal.Rptr.3d 3 (Cal.App. 3 Dist. 2008); *Burdette v. Carrier Corp.*, 158 Cal.App.4th 1668, 1688, 71 Cal.Rptr.3d 185 (Cal.App. 3 Dist. 2008).[8]

Here, all of the criteria have been met. First, the issue of whether the manner in which charges to NPI are calculated can be unilaterally altered by Debtors and/or their predecessors-in-interest, is identical. This issue was, *inter alia*, fully litigated over a four day trial, satisfying the second criteria. The issue was necessarily decided and specifically addressed in the Judgment Following Trial. See Exhibit "I", p3,¶2, thus satisfying the third element. The decision in the prior proceeding was final and on the merits, and the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding, satisfying the remaining two elements. Further, as all of the parties to the 1994 trial and subsequent judgment are identical to parties to this litigation, and based upon the foregoing analysis, Debtors are barred by the doctrine of *res judicata* as well.

In short, this is not the first time Debtors have attempted to underhandedly alter the manner in which NPI is calculated to the detriment of SAI Trust. Following the four day trial in California Superior Court, a judgment proscribing Debtors from altering the NPI calculation was entered.

---

[8] The analysis of collateral estoppel is virtually identical in the Second Circuit. Collateral estoppel, or issue preclusion, precludes the re-litigation of an issue where "'(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 146 (2d Cir. 2005) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

Debtors are either unaware of this judgment (best case scenario) or believe that they are above the law of this judgment. However, this is a distinction without a difference as either way, Debtors are barred under the doctrines of *collateral estoppel* and *res judicata* from once again attempting to alter the NPI calculation. These facts and this issue of law cannot be seriously disputed. Debtors' motion for summary judgment must be denied and summary judgment in favor of SAI Trust must be granted.

## POINT IX

### THE TERMS OF THE AGREEMENT FOR PURCHASE ARE EXPLAINED BY THE ELEVEN YEAR COURSE OF DEALING BETWEEN THE PARTIES

As if the foregoing examples of why Debtors argument is so fundamentally flawed are not enough, Debtors argument that it is SAI Trust which now seeks to rewrite the Agreement for Purchase is further contradicted by the 11 year course of dealings established between these parties. The terms of a written contract may be explained or supplemented by the parties' course of dealing. *See* Cal. Civ. Proc. Code. § 1856(c) (West 2008) ("The terms set forth in a writing ... may be explained or supplemented by course of dealing or usage of trade or by course of performance."); *see also* 31 Cal.Jur.3d Evidence § 371 ("[T]he terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may be explained or supplemented by course of dealing or usage of trade or by course of performance."). The parties' course of dealing may determine the meaning of a contract term or may add an agreed but unstated term. *See Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.*, 89 Cal.App.4th 1042, 1051, 107 Cal.Rptr.2d 645 (Cal.App. 1 Dist. 2001).

In reviewing the very first NPI statement (Membreno Dec., Exhibit "C"), under the heading "Operating Expenses", the following line item entries are included:

> Royalty Payments (Not Subject to Overhead)
>
> Lease Operating Expenses
>
> Overhead 15% (which is 15% of the Lease Operating Expenses).

Simply stated, there is no entry for "Allocated Expenses." Membreno Dec., ¶12. The "direct operating charges" which Debtors continue to defend in their motion for summary judgment, were already accounted for under these NPI statement line items. In fact, this format for the NPI statement, including the Operating Expenses listed above, became the course of dealing established between SAI Trust and Debtors and/or their predecessors-in-interest for more than 11 years. Membreno Dec., ¶13. Additionally, for each monthly NPI statement prepared and submitted by Calpine and/or its predecessors-in-interest from August 1989 through December 2000, there was never once any mention of "Allocated Expenses." This is because all of the charges attributable to West Ford Flat, i.e., the only plant ever mentioned in the Agreement for Purchase, were already accounted for under either Lease Operating Expenses or Overhead. Calpine has failed to explain the basis for these post-April 2001 additional "direct operating expenses." Calpine has failed to explain how all of these expenses, which never existed prior to April 2001 suddenly came into existence. This whole business of "allocated expenses" and *pro rata* share of multiple facilities smacks of double dipping, unjust enrichment and windfall payments. Which is precisely the reason why no CFO (or any other employee) of Calpine has been willing to certify any of its annual NPI statements since 2001. That person must know full well that to do so could possibly subject them to criminal prosecution.

In summary, Debtors' unilateral decision to start charging these additional "direct operating expenses" for the account of SAI Trust is wholly improper and 1) not a part of the Agreement for Purchase; 2) not mentioned in the December 13, 1989 explanation of NPI line items; 3) not pertaining exclusively to the West Ford Flat power plant; 4) not a part of the 11 year course of dealings that had been established by the parties, 5) already accounted for, as they were for 11 years prior, in the Lease Operating Expenses and Overhead charges; 6) not certified by the Chief Financial Officer (or any other employee) of the Debtors, and 7) based wholly on budgeted, i.e., fictitious, theoretical, un-incurred and hypothetical expenses. (Debtors' Motion for Summary Judgment, ¶18.) Accordingly, these charges are in breach of the Agreement for Purchase and SAI Trust must be reimbursed with interest; Debtors' motion for summary judgment must be denied, and SAI Trust's motion for summary judgment granted.

## POINT X

**SUMMARY OF IMPROPER ALLOCATED EXPENSES AND 15% OVERHEAD CHARGED BY CALPINE IN MONTHLY NPI STATEMENTS BEGINNING IN APRIL 2001**

As a result of Debtors' disregard of the terms of the Agreement for Purchase, SAI Trust has suffered damages in the amount of $583,698.61 through August 1, 2008. A table of SAI Trust's damages have been set forth below.

| | Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|---|
| | | | | | |
| | Jan-01 | - | - | | |
| | Feb-01 | - | - | | |
| | Mar-01 | - | - | | |
| Jan-Mar True up | Apr-01 | $210,877.99 | $9,594.95 | $6,476.59 | $971.49 |

| | Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|---|
| | May-01 | 74,889.32 | 3,407.46 | 2,274.48 | 341.17 |
| | Jun-01 | 107,243.43 | 4,879.58 | 3,220.50 | 483.08 |
| | Jul-01 | 54,514.42 | 2,480.41 | 1,618.47 | 242.77 |
| | Aug-01 | 104,038.44 | 4,733.75 | 3,053.27 | 457.99 |
| | Sep-01 | 82,132.01 | 3,737.01 | 2,382.34 | 357.35 |
| | Oct-01 | 87,599.98 | 3,985.80 | 2,511.05 | 376.66 |
| | Nov-01 | 60,165.47 | 2,737.53 | 1,704.11 | 255.62 |
| | Dec-01 | 35,148.38 | 1,599.25 | 983.54 | 147.53 |
| | Jan-02 | 75,835.26 | 3,450.50 | 2,096.18 | 314.43 |
| | Feb-02 | 65,889.48 | 2,997.97 | 1,798.78 | 269.82 |
| | Mar-02 | 61,450.45 | 2,796.00 | 1,656.63 | 248.49 |
| | Apr-02 | 41,621.72 | 1,893.79 | 1,107.87 | 166.18 |
| | May-02 | 42,069.18 | 1,914.15 | 1,105.42 | 165.81 |
| | Jun-02 | 37,943.85 | 1,726.45 | 984.08 | 147.61 |
| | Jul-02 | 44,318.60 | 2,016.50 | 1,134.28 | 170.14 |
| | Aug-02 | 53,364.83 | 2,428.10 | 1,347.60 | 202.14 |
| | Sep-02 | 54,383.44 | 2,474.45 | 1,354.76 | 203.21 |
| | Oct-02 | 62,323.49 | 2,835.72 | 1,531.29 | 229.69 |
| | Nov-02 | 56,571.61 | 2,574.01 | 1,370.66 | 205.60 |
| | Dec-02 | 57,514.97 | 2,616.93 | 1,373.89 | 206.08 |
| | Jan-03 | 110,891.37 | 5,045.56 | 2,611.08 | 391.66 |
| | Feb-03 | 93,134.88 | 4,237.64 | 2,161.20 | 324.18 |
| | Mar-03 | 83,359.91 | 3,792.88 | 1,905.92 | 285.89 |
| | Apr-03 | 104,483.34 | 4,753.99 | 2,353.23 | 352.98 |
| | May-03 | 100,422.52 | 4,569.22 | 2,227.49 | 334.12 |
| | Jun-03 | 90,554.96 | 4,120.25 | 1,977.72 | 296.66 |
| | Jul-03 | 106,978.17 | 4,867.51 | 2,299.90 | 344.99 |
| | Aug-03 | 94,185.34 | 4,285.43 | 1,992.84 | 298.93 |
| | Sep-03 | 123,901.44 | 5,637.52 | 2,579.17 | 386.88 |
| | Oct-03 | 111,313.10 | 5,064.75 | 2,279.14 | 341.87 |
| | Nov-03 | 188,866.58 | 8,593.43 | 3,802.59 | 570.39 |
| | Dec-03 | 229,528.23 | 10,443.53 | 4,542.94 | 681.44 |
| | Jan-04 | 167,579.22 | 7,624.85 | 3,259.62 | 488.94 |
| | Feb-04 | 161,547.67 | 7,350.42 | 3,087.18 | 463.08 |
| | Mar-04 | 112,971.97 | 5,140.22 | 2,120.34 | 318.05 |
| | Apr-04 | 86,545.03 | 3,937.80 | 1,594.81 | 239.22 |
| | May-04 | 78,569.62 | 3,574.92 | 1,421.03 | 213.15 |
| | Jun-04 | 122,794.90 | 5,587.17 | 2,179.00 | 326.85 |
| | Jul-04 | 94,911.07 | 4,318.45 | 1,651.81 | 247.77 |
| | Aug-04 | 101,499.03 | 4,618.21 | 1,731.83 | 259.77 |
| | Sep-04 | 83,585.29 | 3,803.13 | 1,397.65 | 209.65 |
| | Oct-04 | 78,928.33 | 3,591.24 | 1,292.85 | 193.93 |
| | Nov-04 | 66,402.70 | 3,021.32 | 1,065.02 | 159.75 |
| | Dec-04 | 124,427.61 | 5,661.46 | 1,953.20 | 292.98 |
| | Jan-05 | 89,187.80 | 4,058.04 | 1,369.59 | 205.44 |
| | Feb-05 | 130,170.61 | 5,922.76 | 1,954.51 | 293.18 |
| | Mar-05 | 101,011.86 | 4,596.04 | 1,482.22 | 222.33 |
| | Apr-05 | 52,702.62 | 2,397.97 | 755.36 | 113.30 |
| | May-05 | 100,652.98 | 4,579.71 | 1,408.26 | 211.24 |

| | Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|---|
| | Jun-05 | 98,049.99 | 4,461.27 | 1,338.38 | 200.76 |
| | Jul-05 | 106,146.17 | 4,829.65 | 1,412.67 | 211.90 |
| | Aug-05 | 118,378.04 | 5,386.20 | 1,535.07 | 230.26 |
| | Sep-05 | 126,453.65 | 5,753.64 | 1,596.64 | 239.50 |
| | Oct-05 | 84,586.14 | 3,848.67 | 1,039.14 | 155.87 |
| | Nov-05 | 138,265.49 | 6,291.08 | 1,651.41 | 247.71 |
| | Dec-05 | 67,623.45 | 3,076.87 | 784.60 | 117.69 |
| | Jan-06 | 68,587.29 | 3,120.72 | 772.38 | 115.86 |
| | Feb-06 | 83,468.96 | 3,797.84 | 911.48 | 136.72 |
| | Mar-06 | 88,906.62 | 4,045.25 | 940.52 | 141.08 |
| | Apr-06 | 181,029.40 | 8,236.84 | 1,853.29 | 277.99 |
| | May-06 | 82,321.61 | 3,745.63 | 814.67 | 122.20 |
| | Jun-06 | 89,359.38 | 4,065.85 | 853.70 | 128.06 |
| | Jul-06 | 61,919.82 | 2,817.35 | 570.15 | 85.52 |
| | Aug-06 | 94,229.72 | 4,287.45 | 836.05 | 125.41 |
| | Sep-06 | 91,056.30 | 4,143.06 | 776.82 | 116.52 |
| | Oct-06 | 103,836.19 | 4,724.55 | 850.42 | 127.56 |
| | Nov-06 | 62,095.79 | 2,825.36 | 487.37 | 73.11 |
| | Dec-06 | 51,925.41 | 2,362.61 | 389.83 | 58.47 |
| | Jan-07 | 143,611.4 | 6,534.32 | 1,029.16 | 154.37 |
| | Feb-07 | 98,440.67 | 4,479.05 | 671.86 | 100.78 |
| | Mar-07 | 149,880.64 | 6,819.57 | 971.79 | 145.77 |
| | Apr-07 | 32,134.17 | 1,462.10 | 197.38 | 29.61 |
| | May-07 | 196,530.30 | 8,942.13 | 1,140.12 | 171.02 |
| | Jun-07 | 104,085.74 | 4,735.90 | 568.31 | 85.25 |
| | Jul-07 | 61,754.34 | 2,809.82 | 316.10 | 47.42 |
| | Aug-07 | 143,608.94 | 6,534.21 | 686.09 | 102.91 |
| | Sep-07 | 113,970.38 | 5,185.65 | 505.60 | 75.84 |
| | Oct-07 | 99,930.28 | 4,546.82 | 409.21 | 61.38 |
| | Nov-07 | 97,249.99 | 4,424.87 | 365.05 | 54.76 |
| | Dec-07 | 93,133.80 | 4,237.59 | 317.82 | 47.67 |
| | Jan-08 | 106,738.52 | 4,856.60 | 327.82 | 49.17 |
| | Feb-08 | 101,731.03 | 4,628.76 | 277.73 | 41.66 |
| | Mar-08 | 98,089.94 | 4,463.09 | 234.31 | 35.15 |
| | Apr-08 | 105,704.12 | 4,809.54 | 216.43 | 32.46 |
| | May-08 | 106,039.33 | 4,824.79 | 180.93 | 27.14 |
| | | | $378,190.43 | $129,373.59 | $19,406.03 |

Sub-total of unauthorized "Allocated Expenses"    $378,190.43

Sub-total of unauthorized 15% of Allocated    56,728.56

Expenses added to Overhead

Interest on unauthorized "Allocated Expenses"    129,373.59

27

**at 9% per annum through 8/1/08**

| | |
|---|---|
| **Interest on unauthorized 15% of Allocated** | 19,406.03 |
| **Expenses added to Overhead at 9% per annum** | |
| **through 8/1/08** | |
| **TOTAL** | **$583,698.61** |

<div align="center">

### CONCLUSION

</div>

WHEREFORE, SAI Trust respectfully requests that this Honorable Court deny Debtors'
motion for summary judgment and grant summary judgment in favor of SAI Trust and award
damages to SAI Trust in the amount of $583,698.61 and for such other and further relief as this court
may deem just and appropriate.

Dated: New York, New York
      September 10, 2008

                         Respectfully submitted,

                         **NICOLETTI HORNIG & SWEENEY**
                         Attorneys for
                         *Robert Membeno, Trustee for SAI Trust*

                    By:  /s/ *Lawrence C. Glynn*
                         Lawrence C. Glynn (LG-6431)
                         Wall Street Plaza
                         88 Pine Street
                         New York, New York 10005
                         (212) 220-3830
                         NH&S File No.:      00000840LCG