UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | CHAPTER 11 |
| ) | |
| CALPINE CORPORATION, et al, ) | Case No. 05-60200 (BRL) |
| ) | Jointly Administered |
| ) | |
| Debtor. ) | |
| ) | |

# SAI TRUST'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NICOLETTI HORNIG & SWEENEY
Attorneys for Robert Membreno
*Trustee for SAI Trust*
Wall Street Plaza
88 Pine Street
New York, New York 10005
(212) 220-3830

Of Counsel:
Lawrence C. Glynn

**PRELIMINARY STATEMENT**

This reply memorandum of law is respectfully submitted in further support of the motion for summary judgment brought by SAI Trust ("SAI"). The issue before the court is whether the heretofore unexplained and unsubstantiated expenses which mysteriously appeared in the monthly NPI statements in April 2001 are properly included in the calculation of NPI. SAI Trust contends that only direct operating expenses for the West Ford Flat Plant, and only the West Ford Flat, are permissible. As all of the expenses charged since April 2001 are based upon the consolidation of West Ford Flat and 18 other plants, a transformation that was never contemplated at the time the Agreement for Purchase was entered, Debtors have unilaterally rewritten the Agreement for Purchase (Declaration of Robert Membreno, hereinafter "Membreno Dec.", Exhibit "A") and any charges resulting from this accounting change are improper and in breach of the Agreement for Purchase. The Agreement for Purchase very explicitly limits the relationship of SAI Trust and Calpine to one, and only one, plant known as West Ford Flat.

As will be discussed in greater detail *infra*, Debtors have referred to various expenses which they claim are chargeable to SAI's NPI as: "direct operating expenses," (See Debtors' Brief in Support of its Motion for Summary Adjudication, hereinafter "Debtors Br.", generally); "allocated expenses," (Debtors Br., generally); "lease operating expenses" and/or "lease overhead expenses," (see Third Tipton Declaration, hereinafter "Third Tipton Dec." at ¶5 and Debtors' Response in Opposition to SAI's Motion for Summary Judgment, hereinafter "Debtors Resp." at p 5); "budgeted share of various maintenance costs and operation expenses," (Debtors Br., ¶19); "direct operating expenses associated with departments that directly support the plant on a non-exclusive basis," (Debtors' Br., ¶20); "direct operating costs associated with departments that are fully and exclusively dedicated to supporting the plant,"(Debtors' Br., ¶20); "a further refinement of direct operating

expenses necessitated by the implementation of operational efficiencies," (Debtors' Br., ¶24), and "direct operating expenses as the West Ford Plant's specific share of the consolidated operating expenses," (Debtors' Br., ¶31). In short, no matter what terminology Debtors try to use to justify these fraudulent charges, their unilateral decision to start charging these additional expenses for the account of SAI Trust is wholly improper and 1) not a part of the Agreement for Purchase; 2) not mentioned in the December 13, 1989 explanation of NPI line items; 3) not pertaining exclusively to the West Ford Flat power plant; 4) not a part of the 11 year course of dealings that had been established by the parties, 5) already accounted for, as they were for 11 years prior, in the Lease Operating Expenses and Overhead charges; 6) not certified by the Chief Financial Officer (or any other employee) of the Debtors, and 7) based wholly on budgeted, i.e., fictitious, theoretical, un-incurred and hypothetical expenses. Accordingly, these charges are in breach of the Agreement for Purchase and SAI Trust must be reimbursed with interest; Debtors' motion for summary judgment must be denied, and SAI Trust's motion for summary judgment granted.

## POINT I

### DEBTORS HAVE FAILED TO SUBMIT ANY FINANCIAL RECORDS OR DOCUMENTARY EVIDENCE IN SUPPORT OF ITS POSITION

The Court must take judicial notice of the fact that Calpine has failed to submit any of its "financial reports" (See Debtors' Brief in Support of its Motion for Summary Judgment, hereinafter "Debtors' Br." at ¶20) or "detailed financial information" or "journal specific entries" (See Debtors' Resp. at p 11) in response to SAI Trust's discovery demands. See Declaration of Lawrence C. Glynn, Esq. dated September 16, 2008, hereinafter "Glynn Dec." at ¶3. Nor has Calpine submitted any of its "financial reports," "detailed financial information" or "journal-specific entries" in any of its previous submissions to this Court. Glynn Dec. ¶5, nor in briefing its motion for summary judgment

or in opposition to SAI Trust's motion for summary judgment. Glynn Dec. at ¶6. Debtors have been unwilling to certify their numbers to SAI Trust for seven years and now, even their attorneys are unwilling to submit these "financial reports" as exhibits to either a Declaration or Affidavit to this Court. Intuitively, one would think that in defense of a contract interpretation (even one as misguided as Debtors) and in support of its legal and factual arguments, a party would submit some evidence to justify its position. Importantly, the fact that Debtors have failed to certify their annual NPI reports for seven years and have failed to attach them now to a signed Affidavit, Declaration or Certification, speaks volumes as to their veracity.

The word "certify" (a word that Debtors have patently ignored during the briefing of these summary judgment motions) is defined in Webster's New Collegiate Dictionary as:

> **1**: to attest authoritatively; as **a** : CONFIRM  **b** : to present in formal communication  **c** : to attest as being true or as represented or as meeting a standard  **2** : to inform with certainty : ASSURE

Debtors dismiss the importance of the use of this word in §1.6 of the Agreement for Purchase. Clearly, words in contracts don't mean much to those intent on breaching them. But the word "certify" is used in the Agreement for Purchase to ensure that the expenses deducted from the NPI are, in fact, legitimate. Debtors nonchalantly admit to having failed to certify a single annual NPI from 2001 forward. See Debtors Response to SAI Trust's Local Rule 56.1 Statement, hereinafter "Debtors 56.1 Resp.") at ¶¶20-21 and dismiss this omission as being a breach of the contract. They ignore that having failed to certify the annual NPI means that Calpine is unwilling to "attest authoritatively," or "confirm" or "present in formal communication" or "attest as being true" that their stated expenses are true and accurate. Debtors have provided no such certified evidence to SAI Trust or to this Court and the only conclusion that can be drawn is that the quality and legitimacy of the supporting documentation and financial reporting from Debtors (upon which they rely, but

won't produce) are at best meaningless and at worst, fraudulent. It can also be concluded that by refusing to certify the annual NPI statements as required in the Agreement for Purchase, Debtors have not acted in good faith at all. *See Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370 (Cal. 1995) ("[T]he covenant [of good faith] is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's right to the benefits of the agreement."); *City of Hollister v. Monterey Ins. Co.*, 2008 WL 2894844, *23 (Cal.App. 6 Dist. 2008) (duty of good faith and fair dealing arises from every contract as an implied covenant generating both a contractual obligation and a duty in tort); *Pasadena Live, LLC v. City of Pasadena*, 114 Cal.App.4th 1089, 1094, 8 Cal.Rptr.3d 233 (Cal.App. 2 Dist. 2004) ("This covenant ... not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.")

SAI Trust respectfully requests that the Court grant the negative inference that must be assigned to Calpine for their complete failure to act in good faith and provide any certified support for its claims that these expenses are legitimate. Simply stated, if Debtors are unwilling to certify their numbers, then they cannot claim these numbers to be true and accurate. Accordingly, failure to certify their numbers is a breach of the contract and SAI should not be charged for expenses that are not true and accurate, *quad erat demonstrandum*.

## POINT II

## DEBTORS NUMEROUS ATTEMPTS AT DEFINING AND EXPLAINING ITS UNAUTHORIZED, UNJUSTIFIED, UNSUPPORTED AND UNCERTIFIED MYSTERY EXPENSES HAVE APPROACHED THE POINT OF COMICAL

As if Debtors' unwillingness to certify its reports or present them now in support of their motion or in opposition to SAI's motion is not evidence enough of the disingenuous nature of their arguments, equally devastating is the fact that Calpine and its counsel can't even set forth with any particularity the precise nature of the uncertified expenses it unilaterally began charging in April 2001. Their entire argument is that these expenses are justified because Calpine says so, no certification necessary. Debtors make statements such as "the Reorganized Debtors allocate direct operating expenses to each individual power plant and steam field by determining its budgeted share of various maintenance costs and operation expenses and assessing those to the plants." The Court must see such unintelligible statements as this one for what they really are - - circuitous and meaningless doublespeak.

For example, Debtors repeatedly referred in their principle brief to "direct operating expenses" (see Debtors' Br. generally), but had great difficulty understanding this very straight forward term because it completely contradicts their unjustified accounting practices that began in 2001, and went so far as to awkwardly parse the meaning of the word "direct" to no avail. Debtors Br., ¶36. Debtors choose to ignore the fact that the term "Project" immediately preceding "direct operating expenses" in the Agreement for Purchase limited that which could be charged to the NPI to, of course, the Project, i.e., West Ford Flat.

Debtors next attempted to define the term "Allocated Expenses" but failed miserably in offering a clear, intelligible definition. In fact, Calpine and counsel have set forth no less than three

completely different definitions of this term just in briefing these motions for summary judgment. They first state that "Allocated Expenses and Lease Operating Expenses are both independent subcategories of 'Operating Expenses' and do not overlap." Debtors Resp., p5, citing to the Third Tipton Dec., ¶5. However, in his third declaration, Mr. Tipton states that "[a]fter consolidation the Reorganized Debtors broke down the 'Operating Expenses' category on the monthly NPI report to include categories for 'Lease Overhead Expenses' and 'Allocated Expenses.' Those categories do not overlap and are exclusive of each other." Third Tipton Dec., ¶5. Once again, Debtors are making this up as they go along, as we are now introduced to a completely new bit of Calpine jargon called "Lease Overhead Expenses." This term has never even been mentioned before the third Tipton declaration. Unabated, Calpine is ready to shove yet another uncertified mystery charge called "Lease Overhead Expenses" down the throat of SAI.

Undaunted, Calpine proceeds to state repeatedly throughout its Rule 56.1 Response that "Allocated Expenses are a *subset* of Lease Operating Expenses included after the Geysers made the management decision to consolidate operations of the West Ford Plant with the Geysers after it came to own substantially all of power plants [sic] at the Geysers." Debtors Rule 56.1 Response, ¶¶9-13, 35-36, 44-45, 49-51, emphasis added. Let's review. First, Debtors state that "Allocated Expenses" and "Lease Operating Expenses" are independent and do not overlap. Second, they introduce the never before heard of term "Lease Overhead Expenses" and third, they completely contradict themselves repeatedly by stating that "Allocated Expenses" are a subset of "Lease Operating Expenses." Well, which one is it? Are "Allocated Expenses" completely independent and not overlapping of "Lease Operating Expenses", or are "Allocated Expenses" a subset of "Lease Operating Expenses." Only one thing is clear and that is that they cannot be both as the terms are mutually exclusive.

It is even more clear that Debtors have absolutely no idea what they are talking about and are literally making this up as they go along. While they have gone a long way with this charade, it really is time that this Court put a stop to these games. SAI's motion for summary judgment must be granted and Debtors' motion denied, for if they can't even define what their uncertified allocated expenses are, and if they are going to continually fail to offer any evidence in support of their position, then how and why should SAI have to accept them as properly chargeable expenses? Does Calpine seriously believe that SAI should just sit back and accept it and say "thank you sir, may I have another?"

## POINT III

### IF LAW FIRMS FUNCTIONED LIKE CALPINE, ATTORNEYS WOULD BE IN MUCH TROUBLE

At this point, an analogy seems to be in order to further highlight the level of deceit and corruption that is potentially involved as a result of Debtors' actions. The Court will appreciate that attorneys must account for their time devoted to working on each matter and must provide detailed bills setting forth the nature of the work done and the amount of time for each task.

Imagine if attorneys were to adopt the new Calpine accounting method. Imagine a firm which represented a single power plant company beginning in, say, 1987. Imagine further that for 11 years, that firm worked on this power plant company's cases and accounted for and billed its time accordingly. However, somewhere during that time period, other power plant companies began using this firm's services. Then, one day, out of the blue and in order to make life simpler for the law firm's accounting department, the firm arbitrarily decided that going forward, instead of itemizing the work done specifically for each client, it was going to lump all of its power plant company clients together and allocate an arbitrary percentage of the total hours spent working for all of these various

clients to each of its individual clients. Certainly, under Calpine's accounting method, this would be justified, so long as the Retainer Agreement didn't specifically proscribe such unethical practices.

Taking this analogy one step further, now imagine that the firm was going to use budgeted figures in addition to the previously described arbitrary percentage of the total work it did for all of its power plant clients. Thus, the firm was not going to bill the individual client for work actually done, but instead was going to bill the client based upon an arbitrary percentage for work that the firm *expected it will have to do*, i.e., "budgeted" work. Under the new Calpine accounting method, the firm would justify this unheard of practice by telling its individual client, for example, that "we believe that your company is going to need to file three law suits against certain vendors this year, and defend 257 law suits that we anticipate will be brought by customers, vendors, competitors, state, local and the federal government." Unfettered, this firm could then bill its client 1) for a percentage of the firm's total work it does for all of its power plant clients and 2) for fictitious work it predicts it will have to do, regardless of whether the work actually gets done or whether any of this theoretical work would even be necessary. Nevertheless, in the world of the "Calpine accounting method", all of these unperformed attorney services would be billable, so long as the Retainer Agreement did not preclude this method.

As an attorney fully familiar with the pressure of reaching annual goals for billing, the Calpine method would be a welcome change and would seem too good to be true. Attorneys would be free to bill for all kinds of work that they "anticipated" needed to be done. For in reality, it would be too good to be true. It would be unethical and illegal. It would be stealing. The Court must see the sheer insanity of Calpine's position and must deny its motion for summary judgment and grant SAI's motion for summary judgment.

## POINT IV

## DEBTORS HAVE FAILED TO SUBMIT ANY FINANCIAL RECORDS OR DOCUMENTARY EVIDENCE IN SUPPORT OF ITS POSITION, REVISITED

Calpine states at ¶60 of their Rule 56.1 Response that it is SAI Trust who has "failed to provide any admissible evidence regarding whether the Reorganized Debtors' accounting records show in reasonable detail the calculation of direct operating expenses and the general and administrative expenses in accordance with the Purchase Agreement." SAI's counsel has requested these documents from Debtors repeatedly and Debtors have refused to provide a thing and have failed to support its motion for summary adjudication or its opposition to SAI's motion for summary judgment with one single piece of documentary evidence. It is thus quite convenient for Debtors to, on the one hand, not produce anything that may support its position, and then claim that SAI has not provided evidence. This type of underhanded, deceitful practice on the part of Debtors and its attorneys must not be tolerated by the Court and certainly should not be rewarded by either denying SAI's motion for summary judgment or granting Calpine's motion for summary adjudication.

## POINT V

## EXPENSES TO SAI'S NPI ACCOUNT HAVE AN INCREASED AN AVERAGE OF 31% EACH MONTH WHILE MONTHLY NPI PAYMENTS TO SAI HAVE DECREASED AN AVERAGE OF NEARLY $100,000.00 SINCE 2001 RESULTING IN A $722,878.83 WINDFALL TO CALPINE

Debtors' conveniently point out a comparison between the NPI for 1999 and the period from 2001 onward by stating "SAI Trust's annual NPI payments in 1999 totaled $52,095.47, while the payments form 2001 through today have been in excess of $412,000.00, including more than $600,000.00 in 2001." Debtors' Rule 56.1 Resp., ¶45, Third Tipton Dec., ¶11. It should be first noted that in addition to disingenuously selecting the worst year in the history of the relationship, 1999,

to make its misguided point, a review the monthly NPI payments in 1999 actually totaled negative $23,787.22, not positive $52,095.47. See Exhibit "G" to the Membreno Dec. Accordingly, Mr. Tipton's math in his third declaration is not even close. If this careless mathematical error is indicative of Mr. Tipton's accounting abilities, then why on earth should SAI trust his and Calpine's calculations of NPI's ever?

Mr. Tipton also conveniently neglects to point out that the annual NPI payments to SAI in 2000 were $887,356.78, the year before the breach of the Agreement for Purchase and unilateral change to accounting procedures. By contrast, the NPI payments in 2001 were $632,806.41, a 29% decline. When comparing the 2001 total NPI to the year 1998 ($936,766.60) the decline is an even more stark 32%. These numbers bear out the truism that the only party receiving a windfall as a result of Calpine's breach of the Agreement for Purchase was Calpine. This windfall came at the expenses of SAI and Debtors protestations to the contrary are belied by the numbers.

Mr. Tipton and Debtors further neglect to point out that Total Operating Expenses from January 1990 through December 2000 were $39,528,663.63, which is an average monthly Total Operating Expense of $299,459.57 (over a 132 month period). Conversely, Total Operating Expenses for the period December 2001 through May 2008 were $35,831,899.80, which is an average monthly Total Operating Expense of $391,369.66 (over an 89 month period). This means that under the new Calpine accounting method, Total Operating Expenses charged to SAI's NPI increased an average of 31% or $91,910.09 each month. Calpine can claim all it wants that "nothing has changed." However, the proof is in the proverbial pudding. If, as Calpine now claims, everything that was charged prior to 2001 continued to be charged following the accounting change, then how does that explain an average 31% increase in monthly expenses following this change?

A further examination of the monthly NPI statements reveals that during the period of 1994-2000, the seven year period immediately prior to Calpine's breach of the Agreement for Purchase and unilateral change of the method of accounting, the total NPI paid to SAI was $4,402,730.77. Conversely, during the period 2001 through 2007, the seven year period immediately following Calpine's breach of the Agreement for Purchase and unilateral change of the method of accounting, the total NPI paid to SAI was $3,679,851.94, a decline of $722,878.83. The monthly NPI payment to SAI over these two periods decreased from an average of $628,961.54 prior to 2001 to $525,693.13 after Calpine's change in accounting that, according to them, wasn't really any change at all. Once again, the numbers don't lie. In fact, the numbers confirm that Calpine's breach and unwarranted, unilateral amendment to the Agreement for Purchase has translated into a windfall of $722,878.83 to Calpine over that 7 year period and completely contradicts Debtors assertion that they have paid SAI that which is proper under the Agreement for Purchase. They haven't.

**SUMMARY OF ANNUAL NPI PAYMENTS TO SAI FOR YEARS 1994-2007**

| Year | Annual NPI to SAI |
|---|---|
| 1994 | $668,188.29 |
| 1995 | 605,274.72 |
| 1996 | 627,501.76 |
| 1997 | 701,429.83 |
| 1998 | 936,766.60 |
| 1999 | -23,787.21 |
| 2000 | 887,356.78 |
| **Total** | **$4,402,730.77** |

| Year | Annual NPI to SAI |
|---|---|
| 2001 | 632,806.41 |
| 2002 | 455,362.07 |
| 2003 | 522,886.08 |
| 2004 | 522,256.22 |
| 2005 | 424,463.50 |
| 2006 | 560,518.83 |
| 2007 | 561,558.83 |
| **Total** | **$3,679,851.94** |

POINT VI

GIVEN THE ONGOING NATURE OF DEBTORS BREACH, SAI'S DAMAGES
CONTINUE TO INCREASE EACH AND EVERY MONTH

Given the continuous nature of Debtors breach of the Agreement for Purchase, SAI's damages will continue to grow so long as the breach continues. Debtors specious arguments insinuating that SAI's damages are limited to "pre-petition matters" is illogical. Debtors breach commenced in April 2001, well before its Chapter 11 filing. Debtors' breach has been continuous from that time and throughout the entire reorganization process. SAI is not seeking to assert any "new" claim but is simply seeking damages from the continuous breach that began pre-petition, i.e., SAI is not seeking damages for any other breach of contract or cause of action it may have against Calpine post-petition and pre-confirmation.

> Under the bankruptcy rules, courts may permit post-bar date amendments to timely filed proofs of claim See Fed. R. Bankr. P. 7015 (Rule 15 of the Federal Rules of Civil Procedure governing amendment of pleadings applied in adversary proceedings); *In re Enron Corp.*, 419 F.3d 115 (2d Cir. 2005) at 133. In determining

whether a proposed amendment relates back to a timely-filed claim, courts first examine "whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." *In re Integrated resources*, 157 B.R. 66 (S.D.N.Y. 1993) at 70 (quoting *In re Black & Geddes, Inc.*, 58 B.R. 547 (Bankr. S.D.N.Y. 1983). A claim relates back to a timely filed claim if it "(1) corrects a defect of form in the original claim; (2) describes the original claim with greater particularity; or (3) pleads a new theory of recovery on the facts set forth in the original claim," *In re Enron Corp.*, 419 F.3d 115 (2d Cir. 2005) at 133 (quoting *In re McLean Indus.*, Inc., 121 B.R. 704, 708 (Bankr.S.D.N.Y. 1990))

*In re Calpine Corp.*, Nos. 05-60200 (BRL), 07 Civ. 8493 (JGK), 2007 WL 4326738 *4 (S.D.N.Y. Nov. 21, 2007).

If the "relation back" threshold is satisfied, courts then examine whether, under the facts of the case, it would be equitable to allow the amendment. *Id.* (citing 1 In re Integrated Resources, 157 B.R. at 70). Courts consider the following five equitable factors in determining whether to allow an amendment: (1) undue prejudice to the opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.*5 In re Integrated Resources, 157 B.R., at 70 (internal citation omitted). Rule 9006 of the Federal Rules of Bankruptcy Procedure governs the admission of late-filed new claims, as opposed to amendments. Rule 9006 provides in relevant part that "when an act is required or allowed to be done at or within a specified period ... by order of court, the court for cause shown may at any time in its discretion ... permit the act to be done where the failure to act was the result of excusable neglect." Fed. R. Bankr.P. 9006(b)(1). The "excusable neglect" standard was analyzed by the Supreme Court in *Pioneer Inv. Servs. Co. v. Brunswick Assocs., L.P.*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), and involves consideration of similar equitable factors as the second-prong of the test governing amendments, including: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* The justification for the delay is weighed most heavily in the "excusable neglect" analysis. *In re Enron*, 419 F.3d

122-23 (citing Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 368 (2d Cir.2003).

*In re Calpine Corp.*, Nos. 05-60200 (BRL), 07 Civ. 8493 (JGK), 2007 WL 4326738 *5 (S.D.N.Y. Nov. 21, 2007).

SAI's proof of claim sets forth in unequivocal language that "these figures are preliminary" due to the fact that the breach by Debtors was systemic and ongoing on a monthly basis. There is no prejudice to Debtors by amending the damages to reflect the reality that with each passing month and each passing breach by Debtors, the amount of improperly charged expenses continues to mount. Debtors cannot claim surprise by this amendment, as they have willfully chosen to continue their unwarranted accounting practices vis-à-vis SAI and in breach of the Agreement for Purchase throughout the reorganization proceedings. Further, there has been no delay on the part of SAI as Debtors' breach has recurred monthly for the past seven years and will continue in the future.

## POINT VII

### ATTORNEYS' FEES AND COSTS

Section 9.3 of the Agreement for Purchase (Membreno Dec., Exhibit "A") states:

> that if any legal action is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and either costs incurred in that action or proceeding.

SAI's legal fees incurred in enforcing the Agreement for Purchase to date total $150,466.58. In addition, SAI has incurred additional expenses for accountants it has hired to attempt to decipher the vague "support" Calpine has provided to determine if any of the improper charges are even legitimate. These expenses total $14,659.30.

# POINT VIII

## SUMMARY OF IMPROPER ALLOCATED EXPENSES & 15% OVERHEAD CHARGED BY CALPINE IN MONTHLY NPI STATEMENTS BEGINNING IN APRIL, 2001

|  | Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15% Overhead at 9% per annum |
|---|---|---|---|---|---|
|  | Jan-01 | - | - |  |  |
|  | Feb-01 | - | - |  |  |
|  | Mar-01 | - | - |  |  |
| Jan-Mar True up | Apr-01 | $210,877.99 | $9,594.95 | $6,476.59 | $971.49 |
|  | May-01 | 74,889.32 | 3,407.46 | 2,274.48 | 341.17 |
|  | Jun-01 | 107,243.43 | 4,879.58 | 3,220.50 | 483.08 |
|  | Jul-01 | 54,514.42 | 2,480.41 | 1,618.47 | 242.77 |
|  | Aug-01 | 104,038.44 | 4,733.75 | 3,053.27 | 457.99 |
|  | Sep-01 | 82,132.01 | 3,737.01 | 2,382.34 | 357.35 |
|  | Oct-01 | 87,599.98 | 3,985.80 | 2,511.05 | 376.66 |
|  | Nov-01 | 60,165.47 | 2,737.53 | 1,704.11 | 255.62 |
|  | Dec-01 | 35,148.38 | 1,599.25 | 983.54 | 147.53 |
|  | Jan-02 | 75,835.26 | 3,450.50 | 2,096.18 | 314.43 |
|  | Feb-02 | 65,889.48 | 2,997.97 | 1,798.78 | 269.82 |
|  | Mar-02 | 61,450.45 | 2,796.00 | 1,656.63 | 248.49 |
|  | Apr-02 | 41,621.72 | 1,893.79 | 1,107.87 | 166.18 |
|  | May-02 | 42,069.18 | 1,914.15 | 1,105.42 | 165.81 |
|  | Jun-02 | 37,943.85 | 1,726.45 | 984.08 | 147.61 |
|  | Jul-02 | 44,318.60 | 2,016.50 | 1,134.28 | 170.14 |
|  | Aug-02 | 53,364.83 | 2,428.10 | 1,347.60 | 202.14 |
|  | Sep-02 | 54,383.44 | 2,474.45 | 1,354.76 | 203.21 |
|  | Oct-02 | 62,323.49 | 2,835.72 | 1,531.29 | 229.69 |
|  | Nov-02 | 56,571.61 | 2,574.01 | 1,370.66 | 205.60 |
|  | Dec-02 | 57,514.97 | 2,616.93 | 1,373.89 | 206.08 |
|  | Jan-03 | 110,891.37 | 5,045.56 | 2,611.08 | 391.66 |
|  | Feb-03 | 93,134.88 | 4,237.64 | 2,161.20 | 324.18 |
|  | Mar-03 | 83,359.91 | 3,792.88 | 1,905.92 | 285.89 |
|  | Apr-03 | 104,483.34 | 4,753.99 | 2,353.23 | 352.98 |
|  | May-03 | 100,422.52 | 4,569.22 | 2,227.49 | 334.12 |
|  | Jun-03 | 90,554.96 | 4,120.25 | 1,977.72 | 296.66 |
|  | Jul-03 | 106,978.17 | 4,867.51 | 2,299.90 | 344.99 |
|  | Aug-03 | 94,185.34 | 4,285.43 | 1,992.84 | 298.93 |
|  | Sep-03 | 123,901.44 | 5,637.52 | 2,579.17 | 386.88 |
|  | Oct-03 | 111,313.10 | 5,064.75 | 2,279.14 | 341.87 |
|  | Nov-03 | 188,866.58 | 8,593.43 | 3,802.59 | 570.39 |
|  | Dec-03 | 229,528.23 | 10,443.53 | 4,542.94 | 681.44 |
|  | Jan-04 | 167,579.22 | 7,624.85 | 3,259.62 | 488.94 |
|  | Feb-04 | 161,547.67 | 7,350.42 | 3,087.18 | 463.08 |
|  | Mar-04 | 112,971.97 | 5,140.22 | 2,120.34 | 318.05 |
|  | Apr-04 | 86,545.03 | 3,937.80 | 1,594.81 | 239.22 |
|  | May-04 | 78,569.62 | 3,574.92 | 1,421.03 | 213.15 |
|  | Jun-04 | 122,794.90 | 5,587.17 | 2,179.00 | 326.85 |

| Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|
| Jul-04 | 94,911.07 | 4,318.45 | 1,651.81 | 247.77 |
| Aug-04 | 101,499.03 | 4,618.21 | 1,731.83 | 259.77 |
| Sep-04 | 83,585.29 | 3,803.13 | 1,397.65 | 209.65 |
| Oct-04 | 78,928.33 | 3,591.24 | 1,292.85 | 193.93 |
| Nov-04 | 66,402.70 | 3,021.32 | 1,065.02 | 159.75 |
| Dec-04 | 124,427.61 | 5,661.46 | 1,953.20 | 292.98 |
| Jan-05 | 89,187.80 | 4,058.04 | 1,369.59 | 205.44 |
| Feb-05 | 130,170.61 | 5,922.76 | 1,954.51 | 293.18 |
| Mar-05 | 101,011.86 | 4,596.04 | 1,482.22 | 222.33 |
| Apr-05 | 52,702.62 | 2,397.97 | 755.36 | 113.30 |
| May-05 | 100,652.98 | 4,579.71 | 1,408.26 | 211.24 |
| Jun-05 | 98,049.99 | 4,461.27 | 1,338.38 | 200.76 |
| Jul-05 | 106,146.17 | 4,829.65 | 1,412.67 | 211.90 |
| Aug-05 | 118,378.04 | 5,386.20 | 1,535.07 | 230.26 |
| Sep-05 | 126,453.65 | 5,753.64 | 1,596.64 | 239.50 |
| Oct-05 | 84,586.14 | 3,848.67 | 1,039.14 | 155.87 |
| Nov-05 | 138,265.49 | 6,291.08 | 1,651.41 | 247.71 |
| Dec-05 | 67,623.45 | 3,076.87 | 784.60 | 117.69 |
| Jan-06 | 68,587.29 | 3,120.72 | 772.38 | 115.86 |
| Feb-06 | 83,468.96 | 3,797.84 | 911.48 | 136.72 |
| Mar-06 | 88,906.62 | 4,045.25 | 940.52 | 141.08 |
| Apr-06 | 181,029.40 | 8,236.84 | 1,853.29 | 277.99 |
| May-06 | 82,321.61 | 3,745.63 | 814.67 | 122.20 |
| Jun-06 | 89,359.38 | 4,065.85 | 853.70 | 128.06 |
| Jul-06 | 61,919.82 | 2,817.35 | 570.15 | 85.52 |
| Aug-06 | 94,229.72 | 4,287.45 | 836.05 | 125.41 |
| Sep-06 | 91,056.30 | 4,143.06 | 776.82 | 116.52 |
| Oct-06 | 103,836.19 | 4,724.55 | 850.42 | 127.56 |
| Nov-06 | 62,095.79 | 2,825.36 | 487.37 | 73.11 |
| Dec-06 | 51,925.41 | 2,362.61 | 389.83 | 58.47 |
| Jan-07 | 143,611.4 | 6,534.32 | 1,029.16 | 154.37 |
| Feb-07 | 98,440.67 | 4,479.05 | 671.86 | 100.78 |
| Mar-07 | 149,880.64 | 6,819.57 | 971.79 | 145.77 |
| Apr-07 | 32,134.17 | 1,462.10 | 197.38 | 29.61 |
| May-07 | 196,530.30 | 8,942.13 | 1,140.12 | 171.02 |
| Jun-07 | 104,085.74 | 4,735.90 | 568.31 | 85.25 |
| Jul-07 | 61,754.34 | 2,809.82 | 316.10 | 47.42 |
| Aug-07 | 143,608.94 | 6,534.21 | 686.09 | 102.91 |
| Sep-07 | 113,970.38 | 5,185.65 | 505.60 | 75.84 |
| Oct-07 | 99,930.28 | 4,546.82 | 409.21 | 61.38 |
| Nov-07 | 97,249.99 | 4,424.87 | 365.05 | 54.76 |
| Dec-07 | 93,133.80 | 4,237.59 | 317.82 | 47.67 |
| Jan-08 | 106,738.52 | 4,856.60 | 327.82 | 49.17 |
| Feb-08 | 101,731.03 | 4,628.76 | 277.73 | 41.66 |
| Mar-08 | 98,089.94 | 4,463.09 | 234.31 | 35.15 |
| Apr-08 | 105,704.12 | 4,809.54 | 216.43 | 32.46 |
| May-08 | 106,039.33 | 4,824.79 | 180.93 | 27.14 |
|  |  | $378,190.43 | $129,373.59 | $19,406.03 |

| | |
|---|---:|
| **Sub-total of unauthorized "Allocated Expenses"** | $378,190.43 |
| **Sub-total of unauthorized 15% of Allocated Expenses added to Overhead** | 56,728.56 |
| **Interest on unauthorized "Allocated Expenses" at 9% per annum through 8/1/08** | 129,373.59 |
| **Interest on unauthorized 15% of Allocated Expenses added to Overhead at 9% per annum through 8/1/08** | 19,406.03 |
| **Attorneys' Fees** | 150,466.58 |
| **Auditing Expenses** | 14,659.30 |
| **TOTAL** | $748,824.49 |

## CONCLUSION

WHEREFORE, SAI Trust respectfully requests that this Honorable Court grant summary judgment its favor and award judgment in the amount of $725,589.88, inclusive of attorneys' fees and costs and deny Debtors Motion for Summary Adjudication and for such other and further relief as this court may deem just and appropriate.

Dated: New York, New York
September 16, 2008

        Yours, etc.,

        **NICOLETTI HORNIG & SWEENEY**
        Attorneys for
        Robert Membeno, Trustee for SAI Trust

        By: _____
        Lawrence C. Glynn (LG-6431)
        Wall Street Plaza
        88 Pine Street
        New York, New York 10005
        (212) 220-3830
        NH&S File No.:    00000840LCG