| UNITED STATES BANKRUPTCY COURT | FOR PUBLICATION |
| SOUTHERN DISTRICT OF NEW YORK | |

| In re: | Chapter: 11 |
|---|---|
| CALPINE CORPORATION, et al. | Case No.: 05-60200 (BRL) <br> Jointly Administered |
| Debtors. | |

**MEMORANDUM DECISION ON REORGANIZED DEBTORS' MOTION
FOR SUMMARY ADJUDICATION OF SAI CLAIMS AND SAI
TRUST'S COUNTERMOTION FOR SUMMARY JUDGMENT**

Calpine Corporation and its affiliated reorganized debtors (collectively, the "Reorganized Debtors" or "Calpine") have filed a motion (the "Claims Objection") pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 3007 (the "Bankruptcy Rules") seeking summary adjudication discharging claim numbers 6309, 6314, 6315, 6316 6327 and 6328 (the "SAI Claims") filed by Robert Membreno, as trustee of the SAI Trust ("SAI Trust"). SAI Trust opposes the Claims Objection and has filed its own motion for summary judgment on the SAI Claims.

**I. Background**

The SAI Claims stem from the alleged breach of an agreement ("Purchase Agreement") for the sale of the West Ford Power Plant ("West Ford Plant") originally entered into in 1984 between a predecessor of SAI Trust (SAI Geothermal) and Freeport McMoran Resource Partners, L.P. ("Freeport"), which subsequently assigned its interest to the Reorganized Debtors in July 1990. Under the terms of the Purchase Agreement, SAI Trust's predecessor sold its interest in the West Ford Plant to Freeport, but retained the right to receive monthly royalty payments for a percentage of the profits generated by the West Ford Plant. Under the Purchase Agreement, this royalty payment was referred to as the Net Profit Interest ("NPI").

1

In 1994, a dispute arose between SAI Trust and Calpine regarding the calculation of NPI payments. SAI Trust claimed, *inter alia*, that the Debtors had: (i) incorrectly allocated certain costs and expenses to the West Ford Plant which were not permitted under the express terms of the Purchase Agreement, and (ii) failed to provide annual certification of the NPI statements from the Debtors' chief financial officer as required under section 1.6 of the Purchase Agreement.

Prior to 1998, Calpine operated the West Ford Plant as a separate, stand-alone entity and accounted for its costs and expenses apart from all other plants. In 1998, however, after Calpine came to own a majority of the consolidated geysers field (the "Geysers") and power plants in the area surrounding the West Ford Plant, Calpine consolidated the Geysers field into a single business entity and began allocating costs and expenses to departments and individual plants. Accordingly, in 1998, as the West Ford Plant became part of an integrated business entity, Calpine began to allocate operating expenses to the West Ford Plant by determining that plant's budgeted share of maintenance costs and expenses. SAI Trust contends that Calpine began improperly deducting allocated expenses from their calculation of NPI in direct contravention to the manner in which NPI had previously been calculated over the previous eleven year course of dealing.

On May 26, 2005, SAI Trust commenced an action against Calpine in the State of California, Santa Clara Superior Court, titled *Membrano v. Freeport McMoran Resources Partners, L.P.*, Case No. 1-05-CV-041957 (the "2005 State Court Action"), asserting, among other things, claims for breach of contract and specific performance.

On December 20, 2005, Calpine and certain affiliates filed petitions under chapter 11 of title 11 of the United States Code ("Bankruptcy Code"), which automatically stayed the 2005 State Court Action.

On July 27, 2006, SAI Trust filed claim numbers 2672, 2677, 2678, 2798, 2799, and 2802 (the "Original Proofs of Claim") for NPI payments allegedly owed under the Purchase Agreement in unliquidated amounts. Subsequently thereafter, the Original Proofs of Claim were amended by the SAI Claims which seek approximately $245,000 in damages. According to SAI Trust, the damages therein asserted are necessarily estimated because the Reorganized Debtors have failed to provide them with financial statements and annual NPI certifications as required under the Purchase Agreement and necessary to calculate the precise amounts owed.

On December 19, 2007, this Court entered an order confirming Calpine's sixth amended joint plan of reorganization, which became effective on January 31, 2008.

## II. The Claims Objection and SAI Motion

On August 13, 2008, the Reorganized Debtors filed the Claims Objection maintaining that they had correctly determined and paid SAI Trust all amounts due under the Purchase Agreement and that the Reorganized Debtors were authorized to, and did properly allocate a portion of the direct operating expenses from the Geysers to the West Ford Plant for purposes of calculating NPI.

That same day, SAI Trust filed its own motion for summary judgment on the SAI Claims (the "SAI Motion") claiming, *inter alia*, that Calpine was in breach of the Purchase Agreement for (i) improperly deducting unauthorized expenses from the monthly calculation of NPI, and (ii) failing to provide certified NPI statements since April 2001. SAI Trust asserts that allocating

costs to the West Ford Plant and subtracting those amounts from Net Income (and correspondingly, NPI) is not permitted under the express terms of the Purchase Agreement. In support of the SAI Motion, SAI Trust claims, among other things, that a December 1989 supplement (the "1989 Explanation") between the original contracting parties as well as a February 1995 settlement agreement (the "Settlement Agreement") support its contention that only expenses directly incurred at the project – namely, the West Ford Plant – may be deducted from NPI and that cost allocating is impermissible under the terms of the Purchase Agreement. Furthermore, SAI Trust contends that the issue of what can and cannot be used in calculating NPI has already been fully litigated and adjudicated at trial in February 1992 (the "1992 State Court Action"), and, therefore, the Reorganized Debtors are estopped under the doctrines of issue and claim preclusion from arguing that "allocated expenses" may be included in calculating NPI.

In response, the Reorganized Debtors argue that SAI Trust is owed nothing because Calpine is permitted under the Purchase Agreement to allocate direct operating expenses as part of the NPI calculation. Specifically, the Reorganized Debtors contend, *inter alia*, that (a) the plain language of the Purchase Agreement is broadly worded and permits cost allocating, (b) only those expenses attributable to the West Ford Plant – and no other plant – were allocated and deducted from the calculation of NPI, (c) there was no factual connection between either the 1995 dispute or the 1992 State Court Action and the present proceeding that could preclude the Reorganized Debtors from allocating expenses, and (d) SAI Trust could not prevail on its claim that the Reorganized Debtors breached the Purchase Agreement by failing to provide certified NPI statements because SAI Trust could not prove any damages were proximately caused by

4

such failure. The Reorganized Debtors further contend that nothing in the Purchase Agreement may be construed to limit their ability to manage the West Ford Plant as a part of the consolidated Geysers as opposed to a stand-alone entity.

**III. Discussion**

Summary judgment, made applicable through Bankruptcy Rule 7056, is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bank. P. 7056; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *In re Dana Corp.*, No. 06-10354, 2007 WL 3376882, *4 (Bankr. S.D.N.Y. Nov. 6, 2007). Accordingly, a factual dispute will be found "material" only if it will affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). On a summary judgment motion, the moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Id.* at 249. Once the movant has made its showing, the burden of production shifts to the non-movant who must "go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, establish that there is a specific and genuine issue of material fact warranting a trial." *Celotex Corp.,* 477 U.S. at 324.

Under California law,[1] "the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636; *see also U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002); *Thor Seafood Corp. v. Supply Mgmt. Serv.*, 352 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005) ("When a

---

[1] Section 9.6 of the Purchase Agreement provides that the Purchase Agreement and the legal relations among the parties shall be governed by the laws of the State of California. Purchase Agreement, at § 9.6.

5

court is required to interpret a contract, the goal should be to discern and enforce the parties' mutual intent at the time the contract was formed.").

Summary judgment in a contract case is proper when the contract is not ambiguous. Whether the contract is ambiguous is a question of law for the court. *See American Medical Intern., Inc. v. Valliant*, No. 94-16573, 1996 WL 14227, *2 (9th Cir. Jan. 16, 1996); *Eastman Kodak Co. v. Sun Microsystems, Inc.*, No. 02-cv-6074T, 2004 WL 1737214, *3 (W.D.N.Y. Aug. 2, 2004) ("Under California law the interpretation of a contract, including whether its terms are ambiguous, is a matter of law.")

It is a well-established maxim of contractual interpretation that a contract is ambiguous if it is "capable of more than one reasonable interpretation." *Miller v. U.S.*, 363 F.3d 999, 1004 (9th Cir. 2004). However, "[a] contract term is not ambiguous merely because the parties ... proffer conflicting interpretations of a term; an ambiguity arises only where the agreement is reasonably susceptible to more than one interpretation." *Unicom Sys., Inc. v. Electronic Data Sys., Corp.*, No. 04-6716, 2005 WL 5801534, *12 (C.D. Cal. Nov. 1, 2005).

Although Calpine and SAI Trust decidedly disagree over the proper calculation of NPI, neither party contends that the Purchase Agreement is ambiguous. Quite to the contrary, both parties argue that the language of the Purchase Agreement and the manner in which NPI is to be calculated are clear and wholly unambiguous on the face of the agreement. *See* Reorganized Debtors' Reply in Support of their Motion for Summary Adjudication [docket no. 7959 ], dated September 17, 2008, at p.1; *see also* SAI Trust's Memorandum of Law in Opposition to Debtor's Motion for Summary Judgment [docket no. 7957], dated September 10, 2008, at p. 1.

Section 1.5 of the Purchase Agreement defines NPI as a set percentage of "Net Income." Section 9.1 of the Purchase Agreement defines Net Income as:

> The gross revenues received by Buyer from the Project minus the sum of the following:
>
> (ii) all Project **direct operating expenses (excluding depreciation)**,
>
> (iii) general and administrative expenses associated with the Project,
>
> (iv) the cost of any Project related capital additions made subsequent to the Date of First Commercial Operation, and
>
> (v) if the Project or a portion thereof is financed through Project Financing, principal, interest, reserves and any fees payable in respect of the Project Financing

Purchase Agreement, at § 9.1 (emphasis added).

While SAI Trust has repeatedly (and needlessly) sought to call attention to the use of the phrase "all Project" in the Purchase Agreement and 1995 Settlement Agreement in hopes of narrowly limiting the calculation of NPI, the Court agrees with the Reorganized Debtor that the relevant language is actually much broader. Section 9.1 of the Purchase Agreement is clear and unambiguous on its face, and it calls for the deduction of <u>all</u> "direct operating expenses" from the calculation of net income. Calpine has neither suggested, nor attempted to, deduct expenses from NPI that were attributable to any plant other than the West Ford Plant. Clearly the language of section 9.1 is broad enough to encompass overhead costs allocated by the Reorganized Debtor to the West Ford Plant. Meanwhile, SAI Trust has not pointed to a single legal authority in support of its interpretation. Moreover, to read section 9.1 as SAI Trust suggests would result in a windfall to SAI Trust allowing it to avoid application of any direct

operating expenses associated with centralized operations and maintenance and properly allocated to the West Ford Plant.

Additionally, while the Purchase Agreement may be silent as to a definition of "direct operating expenses," section 9.1 of the Purchase Agreement provides that "[f]or purposes of calculating the direct operating expenses and the general administrative expenses, the Accounting Procedures provided in Exhibit F shall govern." Exhibit F is a standard "Accounting Procedure Joint Operations" section of model contracts drafted by the Committee on Petroleum Accounting Standards. Exhibit F identifies twelve permissible categories of "Direct Charges" that may be charged against the "operator." Included among those twelve categories is a catch-all provision, which allows for the deduction from NPI of any expenditure, incurred "in the necessary and proper conduct of the Joint Operations." Exhibit F, at p. 3. Clearly the overhead allocations deducted by Calpine were "necessary and proper" to the operation of the West Ford Plant once Calpine began operating the West Ford Plant as a part of the centralized Geysers. Accordingly, deduction of those expense from the calculation of NPI was neither improper nor in breach of the Purchase Agreement.

In addition, as SAI Trust repeatedly points out, the subject matter of the Purchase Agreement was for the sale of the West Ford Plant. By entering into the Purchase Agreement, SAI Trust sold its management interest in the West Ford Plant and there is nothing in the Purchase Agreement that can be read or construed to limit the Reorganized Debtors' ability to manage the operations of the West Ford Plant as a part of the consolidated Geysers unit. Simply put, all decisions regarding the management and operations of the West Ford Plant rest solely in the hands of the Reorganized Debtors and SAI Trust cannot force the Reorganized Debtors to

8

operate the West Ford Plant as a stand-alone plant. *See* Cal. Corp. Code § 300 ("the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the board."); *Lisle v. Shipp*, 96 Cal. App. 264, 266 (Cal. Ct. App. 1929) ("The corporate powers, business, and property of a corporation must be exercised, conducted, and controlled by its board of directors.")

SAI Trust's additional estoppel arguments are equally without merit. As the Reorganized Debtors properly note, there are no possible estoppel or preclusive effects from the resolution of either the 1995 dispute or the 1992 State Court Action. Both disputes were resolved years before the Reorganized Debtors' management made the decision to consolidate the operations at the Geysers and neither disagreement addressed the method of calculating "operating expenses" at issue here. Finally, SAI Trust's final argument must also fail as SAI Trust cannot prove any damages proximately caused from Calpine's failure to provide certified NPI statements.[2]

---

[2] Despite SAI Trust's argument that there is a lack of transparency as to the allocation of costs to the West Ford Plant, the record before the Court demonstrates otherwise. Pleadings previously filed by Calpine reveal that the Reorganized Debtors have in fact provided SAI Trust with the underlying information necessary to confirm their calculations of NPI. Specifically, each month SAI Trust receives financial reports which provide detailed information on, among other things, monthly revenue, monthly interest calculations and costs associated with the West Ford Plant. *See* Declaration of Guy Tipton in Support of the Reorganized Debtors' Response to SAI Trust 's Motion for Summary Judgment [docket no. 7955], at ¶¶ 7-13; *see also* Declaration of Guy Tipton in Support of Debtors' (A) Objection to SAI Trust's Motion for Relief from Stay and (B) Reply to SAI Trust's Response to the Debtors' Eleventh Omnibus Claims Objection to SAI Trust's Proofs of Claim [docket no. 4877], dated June 8, 2007, at ¶¶ 5-16. Moreover, SAI Trust's attempt to massage its damages claim from approximately $245,000 as set forth in its proofs of claim to over $700,000 in its summary judgment pleading is inappropriate and without justification.

## CONCLUSION

For the reasons set forth above and at oral argument, the Claims Objection is hereby granted and the SAI Motion is denied as is the bootstrap attempt to amend the amounts sought in the SAI Claims by inferential pleading.

The parties are directed to submit an appropriate order in accordance with this ruling.

Dated: New York, New York
September 26, 2008

/s/Burton R. Lifland_____
The Honorable Burton R. Lifland
United States Bankruptcy Judge